**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| FUNDAMENTAL SPORTS MANAGEMENT, LLC; | § | |
| RAHUL PATEL; GRANT GAINES; ROE-BRG | § | |
| INVESTMENTS, LLC; AND NICOLAS LAHOOD, | § | |
|      PLAINTIFFS, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 5:20-CV-774 |
| | § | (JURY TRIAL DEMANDED) |
| MAYAR ZOKAEI, | § | |
|      DEFENDANT. | § | |

**ORIGINAL COMPLAINT**

TO THE HON. U.S. DISTRICT JUDGE OF SAID COURT:

**COME NOW** Plaintiffs Fundamental Sports Management, LLC ("**FSM**"); Rahul Patel ("**Mr. Patel**"); Grant Gaines ("**Mr. Gaines**"); ROE-BRG Investments, LLC ("**ROE**"); and Nicolas Lahood ("**Lahood**") (collectively, "**Plaintiffs**") and file their Original Complaint, respectfully showing as follows:

**I. Parties**

1.     FSM is a Texas limited liability company with its principal place of business in Texas, whose members are all Texas citizens, and thus is a citizen of Texas.

2.     Mr. Patel is a Texas citizen and domiciled in Bexar County, Texas.

3.     Mr. Gaines is a Texas citizen and domiciled in Bexar County, Texas.

4.     ROE is a Texas limited liability company with its principal place of business in Texas, whose members are all Texas citizens, and thus is a citizen of Texas.

5.     Lahood is a Texas citizen and domiciled in Bexar County, Texas.

6.     Mayar Zokaei ("**Mr. Zokaei**") is an Oregon citizen.

1

## II.  Jurisdiction & Venue

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, and 2201, and 18 U.S.C. §§ 1030(g) and 1836(c).

8.     Venue is appropriate in this district pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to these claims occurred in this judicial district.

## III.  Facts

9.     In 2019, FSM began discussions with Mr. Zokaei regarding FSM's potential engagement of Mr. Zokaei as an independent contractor.  During his courtship of FSM, Mr. Zokaei made representations to FSM and Mr. Patel regarding his qualifications, track record, business practices, compliance with applicable industry requirements and covenants, client and imminently pending client roster, industry and marketing relationships, and anticipated revenues streams based upon existing and imminently pending client base.  Most if not all of Mr. Zokaei's representations on these topics were false, as further described below, and Mr. Zokaei failed to disclose material information after having a duty to do so.

10.     On December 2, 2019, Mr. Zokaei and Mr. Patel spoke by telephone while Mr. Patel was located in Bexar County, Texas.  During this conversation, Mr. Zokaei informed Mr. Patel that he: (1) was on the verge of signing Potential Client #1, Potential Client #2, and Potential Client #3, in addition to his existing Client #1; (2) had a strong relationship with the owner of a major marketing firm who would actively work with FSM if and on the condition that FSM engaged Mr. Zokaei as an independent contractor; and (3) already had a deal in place with existing Client #1 and Potential Client #3 (to take effect once Potential Client #3 was signed up),

which he would bring to FSM upon his engagement.  Mr. Zokaei intended for FSM and Mr.

Patel to rely upon these representations in deciding whether to engage Mr. Zokaei as an

independent contractor and whether to loan him $50,000, as he had requested.  FSM and Mr.

Patel did rely upon these representations in deciding to engage Mr. Zokaei as an independent

contractor of FSM and to loan Mr. Zokaei what ultimately amounted to $50,000.  Mr. Zokaei

knew that these representations were false in that: (1) he was nowhere close to signing Potential

Client #1, Potential Client #2, or Potential Client #3; (2) he did not have a strong relationship

with the owner of a major marketing firm; (3) this major marketing firm had not agreed to

actively work with FSM on the condition that FSM engage Mr. Zokaei as an independent

contractor for FSM, or otherwise, as evidenced by the fact that Mr. Zokaei never introduced this

major marketing firm never to FSM, whether by phone, email, text, or otherwise; and (5) he did

not already have a deal in place with this marketing firm for existing Client #1, and he was not

on the verge of signing Potential Client #1, Potential Client #2, or Potential Client #3.  Mr.

Zokaei failed to disclose these representations were false and also failed to ever correct these

misrepresentations even though Mr. Zokaei: (1) learned new information that made his earlier

representations misleading or untrue; (2) created a false impression by making a partial

disclosure; and (3) voluntarily disclosed some information and therefore had a duty to disclose

the whole truth.

    11.    On December 5, 2019, Mr. Zokaei sent an email to Mr. Patel in Bexar County,

Texas, identifying his current client roster as well as the revenues Mr. Zokaei represented he

would be earning from his representation of these clients.  In this email, Mr. Zokaei represented

the following to FSM and Mr. Patel: (1) over $4 million in agent fees from an employment

contract for Client #1 over the next four years; (2) between $300,000-$600,000 in agent fees

from a marketing contract for Client #1 over the next three years; (3) $55,000 in agent fees from an employment contract for Client #2 over the next two years; and (4) $25,000 in agent fees from an employment contract for Client #3 over the next two years.  Mr. Zokaei intended for FSM and Mr. Patel to rely upon these representations in deciding whether to engage Mr. Zokaei as an independent contractor and loan him $50,000, which he requested.  FSM and Mr. Patel did rely upon these representations.  Mr. Zokaei knew that these representations were false in that he would not be entitled to or actually receive the compensation that he had represented as being locked or virtually certain.  Mr. Zokaei failed to disclose these representations were false and failed to ever correct these misrepresentations even though Mr. Zokaei: (1) learned new information that made his earlier representations misleading or untrue; (2) created  a false impression by making a partial disclosure; and (3) voluntarily disclosed some information and therefore had a duty to disclose the whole truth.

12.    On December 17, 2019, in anticipation of engaging Mr. Zokaei as an independent contractor and in reliance upon Mr. Zokaei's misrepresentations and failures to disclose material facts, FSM and Mr. Patel loaned Mr. Zokaei the amount of $10,000, as Mr. Zokaei had requested.  A true and correct copy of the promissory note memorializing this loan is attached hereto as Exhibit A.

13.    On January 15, 2020, Mr. Zokaei sent another email to Mr. Patel in Bexar County, Texas, identifying his current client roster (which had increased from three clients to six) as well as eight additional persons that Mr. Zokaei represented as being on the verge of being signed as a client (several of which are premier professional sports players).  Mr. Zokaei intended for FSM and Mr. Patel to rely upon these representations in deciding whether to engage Mr. Zokaei as an independent contractor and loan him an additional $40,000, which he

4

requested.  FSM and Mr. Patel did rely upon these representations.  Mr. Zokaei knew that these representations were false in that at least one of the persons identified as a current client was not actually his client, one of his clients was in the process of terminating him, and most if not all of the persons he represented as being on the verge of signing with him were not and had never expressed any interest in so doing.  Mr. Zokaei failed to disclose these representations were false and failed to ever correct these misrepresentations even though Mr. Zokaei: (1) learned new information that made his earlier representations misleading or untrue; (2) created a false impression by making a partial disclosure; and (3) voluntarily disclosed some information and therefore had a duty to disclose the whole truth.

14.     In reliance upon his fraudulent misrepresentations and failures to disclose material information, FSM engaged Mr. Zokaei as an independent contractor.  Though an independent contractor agreement was prepared, Mr. Zokaei failed to sign the same.  Notwithstanding, Mr. Zokaei manifested his assent to the terms of this written agreement by accepting his position as an independent contractor with FSM and accepting the benefits, including payment of compensation, as set forth in this agreement.  Therefore, Mr. Zokaei is bound by the terms of this agreement.  A true and correct copy of this agreement is attached hereto as Exhibit B.  On February 4, 2020, and in reliance upon Mr. Zokaei's misrepresentations and failures to disclose material facts, FSM loaned Mr. Zokaei an additional $40,000.00.  A true and correct copy of the promissory note memorializing this loan is attached hereto as Exhibit C.

15.     Unbeknownst to FSM and Mr. Patel, existing Client #1 terminated Mr. Zokaei as his agent.  Mr. Zokaei failed to disclose this information to FSM and Mr. Patel, who learned of the termination from public news reports on February 7, 2020.  After learning of this information, Mr. Patel, while in Bexar County, Texas, contacted Mr. Zokaei by telephone.

During their conversation, Mr. Zokaei falsely claimed he had no idea why existing Client #1 terminated him, he had not spoken to existing Client #1 about the termination, and he was in shock and had no warning that existing Client #1 was going to terminate him.

16.      On or about February 10, 2020, Mr. Zokaei traveled to Bexar County, Texas, to meet with Mr. Patel and others at FSM's headquarters in San Antonio, Texas.  During this visit, Mr. Zokaei reiterated his claims that he had no idea why existing Client #1 terminated him, he had not spoken to existing Client #1 about the termination, and he was in shock and had no warning that existing Client #1 was going to terminate him.  In addition, Mr. Zokaei again confirmed the representations in his January 15, 2020, email regarding his current client roster (except for Client #1) as well as the eight prospects on the verge of signing with him and FSM. Mr. Zokaei intended for FSM and Mr. Patel to rely upon these representations by continuing with and not terminating him as an independent contractor.  FSM and Mr. Patel did rely upon these representations.  As before, Mr. Zokaei knew that these representations were false, and he failed to disclose these representations were false and failed to ever correct these misrepresentations even though Mr. Zokaei: (1) learned new information that made his earlier representations misleading or untrue; (2) created  a false impression by making a partial disclosure; and (3) voluntarily disclosed some information and therefore had a duty to disclose the whole truth.

17.      On February 15, 2020, FSM received information indicating Mr. Zokaei had created and was utilizing fake social media accounts to disparage various persons in the professional sports industry, which violated, at a minimum, paragraph 14 of Prohibited Conduct Subject to Discipline in the NBPA Regulations Governing Player Agents.  A true and correct copy of the NBPA Regulations are attached hereto as Exhibit D.  When confronted with this

information, Mr. Zokaei informed Mr. Patel, who was located in Bexar County, Texas, that the information was not true.  In response, FSM, through Mr. Patel, requested Mr. Zokaei to submit a written report identifying his position regarding this information as well as disclosing any other issues that might cause reputational damage to Mr. Zokaei or FSM and its principals and agents. Though he agreed to do so, Mr. Zokaei never submitted such a written report.

18.     Along with other independent contractors of FSM, Mr. Zokaei attended the NBA All-Star weekend from February 14-16, 2020, in Chicago, Illinois.  During this event, it became evident that Mr. Zokaei lacked experience as an agent and possessed dubious personal character, contrary to his earlier representations to FSM and Mr. Patel.  For example, FSM and Mr. Patel learned that existing Client #1 had terminated Mr. Zokaei due to inappropriate behavior and representation, including but not limited to Mr. Zokaei using a bogus social media account to disparage Client #1's current team as well as a prominent journalist who covered the team, plus to publish misleading information regarding Client #1.  When confronted regarding these allegations, Mr. Zokaei admitted to this wrongdoing and incredibly expressed only his surprise that he had been caught.  In addition, it became clear that Mr. Zokaei did not have the relationships with the potential clients that he had previously represented to FSM and Mr. Patel. To the contrary, an acquaintance of Mr. Zokaei had those relationships, and Mr. Zokaei was attempting to palm them off to FSM and Mr. Patel as his own.  In yet another example of his dubious personal character, Mr. Zokaei had promised tickets to an event to this acquaintance but failed to deliver these tickets as promised, and then laid out an expletive-laden excuse in front of the acquaintance and his child, which further tarnished the reputation of Mr. Zokaei, and through association, FSM and its principals and agents, too.

19.     On March 3, 2020, Mr. Zokaei informed FSM that he needed to travel to Miami to meet with and close a deal with Prospective Client #4.  Though FSM provided all requested materials, Mr. Zokaei failed to deliver anything he promised.  This was not simply a failure to produce.  Rather, Mr. Zokaei had no hope of fulfilling his representations because Prospective Client #4 had no interest in engaging Mr. Zokaei, contrary to his representations otherwise to FSM and Mr. Patel.

20.     On April 18, 2020, FSM learned that a text message had been sent to the attention of the manager of one of FSM's potential (but now existing) clients to warn this client that FSM was tied up with a scam agent who was being investigated for fake social media accounts.  FSM immediately recognized Mr. Zokaei was the "agent" the subject of this warning because Mr. Zokaei had previously admitted to his use of bogus social media accounts to spread mis- and derogatory information in violation of paragraph 14 of Prohibited Conduct Subject to Discipline in the NBPA Regulations Governing Player Agents.

21.     Around this same time, FSM discovered that Mr. Zokaei caused to be published on the internet that he was the agent for Potential Client #5 and Potential Client #6, which was not true.  Shortly thereafter, the actual sports agent of Potential Client #5 became extremely upset with FSM for the misrepresentation that Mr. Zokaei had caused to be published.

22.     In light of the totality of the circumstances and the culmination of his numerous misrepresentations and failures to disclose material information, FSM terminated Mr. Zokaei for cause as an independent contractor on April 20, 2020.  The actions and conduct of Mr. Zokaei jeopardized FSM's status and that of its principals and other independent contractors as NBPA-certified agents, their reputations, and their existing and prospective client relationships.  Obviously, this type of behavior is not acceptable, especially in a professional industry.  If Mr.

Zokaei had been truthful in his representations to FSM and Mr. Patel and disclosed all material information to FSM and Mr. Patel (including but not limited to that information as was necessary to cause his prior representations not to be misleading), then FSM would never have engaged Mr. Zokaei as an independent contractor, and FSM and Mr. Patel would never have loaned Mr. Zokaei $50,000.

23.     Following his termination, Mr. Zokaei, without authorization, accessed the email server of FSM, sent out emails to third-parties misrepresenting that he was still an independent contractor of FSM, solicited a former intern of FSM to provide him with information and documents that are trade secrets of FSM, and disseminated such trade secrets of FSM to rival agents and others.  The trade secrets consist of the financial, business, and economic information of FSM, including plans, compilations, designs, methods, techniques, and processes, in the form of the business model and strategies and marketing pitch documents, all of which FSM utilizes to distinguish itself from its competitors in the professional sports agency and athlete/celebrity marketing spheres.

24.     FSM has taken reasonable measures to keep such information secret and confidential such as by keeping this information on secure computer servers with limited and password-protected access and providing it only to those on a need-to-know basis.  FSM also requires those accessing such information to contractually agree to maintain the confidentiality of this information.  This information derives independent economic value by not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  That is, this information is proprietary to FSM and has been created and maintained in a manner to advantage only FSM and those persons who would use such information for the economic benefit of FSM.

9

25.     Following his termination, Mr. Zokaei, through counsel located in Harris County and Travis County, Texas, sent a series of letters to Bexar County, Texas, threatening to initiate legal action against FSM, Mr. Patel, Mr. Gaines, and others.  For example, by letter dated May 11, 2020, and directed to Bexar County, Texas, Mr. Zokaei, through counsel, alleged: (1) Mr. Zokaei had an employment contract with FSM for a term of one-year; (2) FSM wrongfully terminated Mr. Zokaei from FSM on or about April 20, 2020; (3) FSM thereby breached the alleged "employment" contract; (4) Mr. Zokaei had suffered $279,089.08 in damages due to this alleged breach; (5) Mr. Zokaei would resolve his claims for payment of either $129,089.08, or of $78,589.08 plus the forgiveness of the $50,000.00 loan; and (6) if Mr. Zokaei's demand were not met, then Mr. Zokaei would initiate a lawsuit against FSM and its "principals and investors".

## IV.  Causes of Action

26.     All conditions precedent to Plaintiffs' recovery have occurred or have been waived, excused, or otherwise satisfied.  All notices required have been provided, waived, excused, or otherwise satisfied.

27.     Plaintiffs repeat and incorporate the allegations contained in paragraphs 1-26 herein for all purposes, including in support of each cause of action asserted.

## A.  Fraud (by Misrepresentation & Omission) & Fraudulent Inducement

28.     For the purpose of inducing FSM to engage him as an independent contractor and for the purpose of inducing FSM and Mr. Patel to loan him $50,000.00, Mr. Zokaei made false material representations and failed to disclose material information to FSM and Mr. Patel.  When he made these representations, Mr. Zokaei: (1) knew they were false; or (2) made them recklessly, as a positive assertion, and without knowledge of its truth.  Mr. Zokaei had a duty to disclose this information to FSM and Mr. Patel because Mr. Zokaei: (1) discovered new

information that made his earlier representations misleading or untrue; (2) created  false impression by making a partial disclosure; and/or (3) voluntarily disclosed some information and therefore had a duty to disclose the whole truth.  Mr. Zokaei knew FSM and Mr. Patel were ignorant of the true facts and remained deliberately silent despite his duty to disclose.  Mr. Zokaei made these misrepresentations and failed to disclose material information with the intent that FSM and Mr. Patel act or refrain from acting upon the same, which they did.  FSM and Mr. Patel relied Mr. Zokaei's misrepresentations and failures to disclose information in entering these transactions, which causes them damages.

29.     FSM and Mr. Patel seek judgment against Mr. Zokaei for actual damages, consequential damages including lost profits, nominal damages, exemplary damages, costs of court, pre- and post-judgment interest, and all other legal and equitable relief available under statute.

**B.  Breach of Contract**

30.     The independent contractor agreement and the related promissory notes were valid, binding agreements between FSM and Mr. Zokaei.  Without limiting the foregoing identifications of breaches of contract, Mr. Zokaei materially breached these contracts by: (1) failing to assist FSM with recruiting potential National Basketball Association ("**NBA**")/high-level overseas players for representation; (2) failing to coordinate meetings with any and all NBA teams and recruiting specials relating to the potential representation by FSM of such players; (3) failing to aid in developing specific marketing ideas for potential FSM represented clients and assist in coordinating with family and key members of players with FSM; (4) falsely claiming that he, and FSM, represented Potential Client #5 and Potential Client #6 in a player/agent capacity; (5) using bogus social media accounts to post misleading information and

opinions regarding both NBA players, teams, agents, and journalists; (6) engaging in a pattern and practice of improper conduct that violated ethical rules of the profession as well as the covenants imposed upon Mr. Zokaei, and FSM, by the NBPA; and (7) failing to repay the loans. FSM and Mr. Patel suffered damages as a natural, probable, and foreseeable result of such breach.

31.     FSM seeks judgment against Mr. Zokaei for actual damages (including all money paid to Mr. Zokaei in the form of compensation or reimbursements), consequential damages including lost profits, court costs, pre- and post-judgment interest, and attorneys' fees.  FSM and Mr. Patel, jointly and severally, seek judgment against Mr. Zokaei for actual damages (including the $50,000.00 loaned plus interest), consequential damages including lost profits, court costs, pre- and post-judgment interest, and attorneys' fees.

**C.  Violations of the Texas Deceptive Trade Practices Act**

32.     FSM is a consumer within the meaning of Tex. Bus. & Com. Code Chapter 17 in that FSM sought and/or acquired services from Mr. Zokaei.

33.     Mr. Zokaei engaged in false, misleading, or deceptive acts or practices, including but not limited to: (1) passing off services as those of another; (2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of services; (3) causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another; (4) representing that services have approval, characteristics, uses, or benefits they do not have; (5) representing that services are of a particular standard, quality, or grade when they were of another; (6) disparaging the service or business of another by false or misleading representation of facts; (7) advertising services with the intent not to sell them as advertised; and (8) failing to disclose information concerning services that was known at the time of the

transaction when such failure to disclose was intended to induce FSM into a transaction into which FSM would not have entered had the information been disclosed.  These violations were the producing cause of damages to FSM.  Mr. Zokaei knowingly and intentionally committed the above-described violations.

34.     FSM seeks judgment against Mr. Zokaei for actual damages, double or treble damages, any other relief the Court deems proper, court costs, pre- and post-judgment interest, and attorney fees.  If the judgment is not satisfied within three months of the date of its entry, then FSM requests the appointment of a receiver for Mr. Zokaei and the revocation of any license or certificate authorizing Mr. Zokaei to engage in business in Texas.

**D.  Tortious Interference with Contract & Prospective Contractual Relations**

35.     FSM had contracts with various clients with which Mr. Zokaei willfully and intentionally interfered, which proximately caused injury and actual damage to FSM.  FSM had a reasonable probability to enter business relationships with various clients with which Mr. Zokaei intentionally interfered through independently tortious conduct, which proximately caused injury and actual damage to FSM.  Mr. Zokaei acted with actual fraud or malice in so doing.

36.     FSM seeks judgment against Mr. Zokaei for actual damages, consequential damages including lost profits, exemplary damages, costs of court, and pre- and post-judgment interest.

**E.  Breach of Fiduciary Duty**

37.     Mr. Zokaei accepted a fiduciary obligation to FSM as well as a special relationship of trust and confidence.  Therefore, Mr. Zokaei owed a full suite of fiduciary duties to FSM, including but not limited to a duty of loyalty, a duty of candor, a duty to refrain from self-dealing, a duty to act with integrity of the strictest kind, and a duty of fair, honest dealing.

Mr. Zokaei breached his fiduciary duties to FSM, which resulted in injury to FSM and benefit to Mr. Zokaei.  Therefore, Mr. Zokaei is liable to FSM for breach of fiduciary duty.

38.     FSM seeks judgment against Mr. Zokaei for actual damages, consequential damages including lost profits, disgorgement of profit, imposition of a constructive trust, an accounting, appointment of a receiver, other equitable relief, exemplary damages, costs of court, and pre- and post-judgment interest.

**F.  Violation of Texas Uniform Trade Secrets Act, Tex. Civ. Prac. Rem. Code § 134A**

39.     By virtue of his status as an independent contractor of FSM, Mr. Zokaei was in a confidential relationship with FSM and in possession of confidential information and trade secrets.  In violation of this confidential relationship, Mr. Zokaei misappropriated confidential information and trade secrets owned by FSM.  Mr. Zokaei acquired the confidential information and trade secrets by improper means and/or after notice that disclosure was improper or unauthorized.  As a result, FSM has suffered and continues to suffer injury.

40.     Plaintiff seeks judgment against Mr. Zokaei for all statutorily-available remedies including but not limited to injunctive relief, actual damages, consequential damages, exemplary damages, imposition of a constructive trust, pre- and post-judgment interest, court costs, and attorneys' fees.

**G.  Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030**

41.     Prior to and after termination, Mr. Zokaei accessed FSM's protected computers and servers to download data and documents containing confidential information and trade secrets without authorization and/or in a manner that exceeded authorized access.  After termination, Mr. Zokaei continued to access and use FSM's protected computer email server to

obtain information and data, which are things of value without authorization and/or in a manner that exceeded authorized access.

42.    Mr. Zokaei intentionally accessed a computer without authorization and/or in a manner that exceeded authorized access and thereby obtained information from FSM's protected computer in violation of 18 U.S.C. § 1030(a)(2)(C).  Mr. Zokaei knowingly, and with the intent to defraud, accessed FSM's protected computer without authorization and/or in a manner that exceeded authorized access, and by means of such conduct furthered the intended fraud and obtained a thing of value in violation of 18 U.S.C. § 1030(a)(4).  When FSM alleges Mr. Zokaei accessed a computer in a manner that exceeded authorized access, FSM alleges that Mr. Zokaei accessed the computer with authorization and then used such access to obtain or alter information in the computer that Mr. Zokaei was not entitled so to obtain or alter.

43.    As a result of the foregoing violations committed by Mr. Zokaei, FSM has suffered damage and/or loss, and thus FSM is entitled pursuant to 18 U.S.C. § 1030(g) to maintain a civil action against Mr. Zokaei to obtain compensatory damages, injunctive relief, and other equitable relief.  Therefore, FSM seek judgment against Mr. Zokaei for compensatory damages, injunctive relief, and other equitable relief.

**H.  Violation of Defense Trade Secret Act, 18 U.S.C. § 1832, *et seq.***

44.    FSM is the owner of trade secrets in that FSM owns financial, business, and economic information, including plans, compilations, designs, methods, techniques, and processes, in the form of the business model and strategies and marketing pitch documents that FSM utilizes to distinguish itself from its competitors in the professional sports agency and athlete/celebrity marketing spheres.  FSM uses these trade secrets in connection with its services that are rendered throughout many different states and thus in interstate commerce.  Mr. Zokaei

misappropriated these trade secrets. Pursuant to 18 U.S.C. § 1836(b), FSM is entitled to bring a civil action for damages resulting from Mr. Zokaei's misappropriation of these trade secrets.

45. Pursuant to 18 U.S.C. § 1836(b)(3), FSM seeks judgment against Mr. Zokaei for injunctive relief, damages for actual loss caused by his misappropriate of trade secrets, damages for any unjust enrichment caused his misappropriate of trade secrets that is not addressed in computing damages for actual loss, alternatively a reasonable royalty for the unauthorized disclosure or use of trade secrets, exemplary damages because the misappropriation was done willfully and maliciously, reasonable attorney fees, costs, and pre- and post-judgment interest.

## I. Harmful Access of Computer

46. Pursuant to Tex. Civ. Prac. & Rem. Code § 143.001, a person who is injured or whose property has been injured as a result of a violation of Tex. Pen. Code Chapter 33 has a civil cause of action if the conduct constituting the violation was committed knowingly or intentionally. A person who establishes a cause of action is entitled to actual damages and reasonable attorney fees and costs.

47. Pursuant to Tex. Pen. Code § 33.02, a person commits an offense if the person knowingly accesses a computer, computer network, or computer system without the effective consent of the owner. Pursuant to Tex. Pen. Code § 33.01(12), consent is not effective if: (1) induced by deception or coercion; (2) given by a person the actor knows is not legally authorized to act for the owner; and/or (3) used for a purpose other than that for which the consent was given.

48. FSM has been injured and FSM's property has been injured as a result of Mr. Zokaei's violations of Tex. Pen. Code Chapter 33, which Mr. Zokaei committed fraudulently and maliciously. Mr. Zokaei has accessed FSM's computer, computer network, and/or computer

system without the effective consent of FSM (including because Mr. Zokaei accessed the same for a purpose other than that for which FSM had consented, and then later after his termination when FSM did not give him any consent), which injured FSM.  Therefore, Mr. Zokaei is liable to FSM for damages under Tex. Civ. Prac. & Rem. Code § 143.001.  FSM seeks judgment against Mr. Zokaei for actual damages, consequential damages, exemplary damages, pre- and post-judgment interest, court costs, and attorneys' fees.

**J.  Defamation/Business Disparagement**

49.     Mr. Zokaei published and continues to publish statements of fact referring to FSM that are defamatory and false, as well as disparaging words about FSM's current business that are also false. With regard to the truth of the statement, Mr. Zokaei acted with actual malice, negligence, without privilege and/or is strictly liable. Mr. Zokaei's actions proximately caused injury and damages to FSM. FSM seeks recovery of actual damages, consequential damages, lost profits, exemplary damages, pre- and post-judgment interest, and court costs.

**K.  Declaratory Judgment**

50.     Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, Plaintiffs seek a judgment declaring the rights and other legal relations between them and Mr. Zokaei with respect to Mr. Zokaei's threatened claims.

51.     Specifically, Mr. Zokaei claims: (1) Mr. Zokaei had an employment contract with FSM for a term of one-year; (2) FSM wrongfully terminated Mr. Zokaei from FSM on or about April 20, 2020; (3) FSM thereby breached the alleged employment contract; (4) Mr. Zokaei had suffered $279,089.08 in damages due to this alleged breach; (5) Mr. Zokaei would resolve his claims for payment of either $129,089.08, or of $78,589.08 plus the forgiveness of the $50,000.00 loan; (6) if Mr. Zokaei's demand were not met, then Mr. Zokaei would initiate a

lawsuit against FSM and its "principals and investors"; and (7) each of Plaintiffs are somehow liable to him on account of these allegations.

52.     Plaintiffs, as indicated below, seek the following declaratory judgments:

a.     FSM did not wrongfully terminated Mr. Zokaei from FSM on or about April 20, 2020;

b.     FSM did not breach the alleged employment contract with Mr. Zokaei; and

c.     None of Plaintiffs other than FSM could have any liability to Mr. Zokaei for the alleged breach of the alleged employment contract with FSM.

## V.  Exemplary Damages

53.     FSM and Mr. Patel seek recovery of exemplary damages based on knowing and/or intentional conduct described as a felony in Tex. Pen. Code §32.46.  Pursuant to section 41.008(c), the limitations on recovery of exemplary damages set out in section 41.008 do not apply.

## VI.  Demand for Jury Trial

54.     Plaintiffs demand a trial by jury.

## VII.  Prayer

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray the Court enter judgment in their favor against Mr. Zokaei for all relief requested herein or that are available under these facts and award Plaintiffs all such other and further relief, both general and special, at law or in equity, to which they may be entitled.

Respectfully submitted,

**PATEL GAINES, PLLC**
221 West Exchange Ave., Suite 206A
Fort Worth, Texas 76164
www.patelgaines.com
(817) 394-4844 | Telephone
(817) 394-4344 | Facsimile

By: _/s/ Lance H. "Luke" Beshara_
     Lance "Luke" H. Beshara
     Texas State Bar No. 24045492
     lbeshara@patelgaines.com

**ATTORNEYS FOR PLAINTIFFS**

# EXHIBIT A

## PROMISSORY NOTE

**DATE:**                                                  December 17, 2019

**MAKER:**                                                 Mayar Zokaei

**PAYEE:**                                                 Rahul B. Patel, individually
                                                           and Fundamental Sports
                                                           Management, LLC

**PRINCIPAL AMOUNT:**                                      Ten Thousand No/100
                                                           Dollars ($10,000.00)

**ANNUAL INTEREST RATE**
**OF UNPAID PRINCIPAL FROM DATE:**                         Ten Percent (10%)

**JURISDICTION AND VENUE**                                 Bexar County, San Antonio,
                                                           Texas, United States, all
                                                           applicable laws under the
                                                           State of Texas.

**TERMS OF PAYMENT (Payment and Interest):** Maker shall pay to Payee on or before the
Maturity Date the total Principal Amount. Annual interest of unpaid principal interest in the
amount of Zero Dollars if the total Principal Amount is paid on or before the Maturity Date.
Failure to pay the Principal Amount in full on or before the Maturity Date shall be considered an
"Event of Default" by Maker.

**MATURITY DATE:**                                         December 31, 2020

**DEFAULT INTEREST:** On or after the occurrence of an Event of Default, the interest rate
applicable to the Note shall have accrued at a rate equal to per year that is the lesser of (i) 10.00%
or (ii) the maximum rate permitted by applicable law ("Default Interest"). Default Interest, and not
any rate set by statue, shall be computed in any entry of judgment pertaining to this Note, and
further, shall be paid subsequent to the entry of such judgment, and until actual satisfaction of said
judgment. The judgment shall include both the action and the obligation itself. In such event, the
Default Interest rate shall continue up through and including all foreclosure proceedings and
proceedings for payment of monies, including but not limited to surplus money proceedings and
shall be computed in the entry of any judgment, and further, subsequent to the entry of any
judgment, and until actual satisfaction of this Note and said judgment.

**SECURITY AGREEMENT:** Repayment of this Note is secured by Mayar Zokaei, all his interest,
accounts, property or otherwise including but not limited to those by Mayar Zokaei or in his or her
marital estate ("**Collateral**").

Maker promises to pay the order of Payee at the place for payment and according to the terms of payment as stated above.

Maker and each surety, endorser, and guarantor waive all demands for payment, presentation for payment, notices of intention to accelerate maturity, notices of acceleration of maturity, protests, and notices of protest, to the extent permitted by law.

If this Note or any instrument securing collateral to it is given to an attorney for collection or enforcement, or if suit is brought for collection or enforcement, or if it is collected or enforced through probate, bankruptcy, or other judicial proceeding, then Maker shall pay Payee all costs of collection and enforcement, including reasonable attorney's fees and court costs, in additional to other amounts due.

Any notices or other communications required or permitted hereunder shall be sufficiently given and deemed delivered and received when delivered personally or, if sent by registered or certified mail, postage prepaid, to the applicable party at its address above given or at such other address as shall be furnished in writing by such party to the other, the notice shall be deemed to have been delivered and received as of the date so delivered or deposited in the United States Mail.

There shall be no penalty for prepayment hereunder.

The Maker is responsible for all obligations represented by this Note.

When the context requires, singular nouns and pronouns include the plural.

EXECUTED as of the date first written above.

MAKER:

12/17/19

By: _____

Mayar Zokaei

# EXHIBIT B

## <u>INDEPENDENT CONTRACTOR AGREEMENT</u>

This Independent Contractor Agreement ("<u>Agreement</u>") is entered into effective as of the 1st day of _____, 2020 between FUNDAMENTAL SPORTS MANAGEMENT, LLC, a Texas corporation (herein referred to as the "Company," or "FSM"), and Mayar Zokaei ("<u>Contractor</u>").

1. **Hiring**.   Contractor has been hired by Company effective <u>February 1</u>, 2020 to serve as the Vice-President of <u>Basketball Operations</u> (the "Position") of FSM. In Contractor's capacity as Vice-President of <u>Basketball Operations</u>, he will have such duties and responsibilities as are outlined in <u>Section 3</u> below. Contractor will report directly to Rahul Patel, or another individual designated by Company.

2. **Term**. Contractor shall be employed as a Contractor by FSM from <u>February 1</u>, 2020 for a period of one-year, renewable annually at the sole discretion of FSM.

3. **Duties.**   As Vice-President of <u>Basketball Operations</u>, Contractor shall help FSM with recruiting potential National Basketball Association ("NBA") / high-level overseas players for representation. Contractor shall coordinate meetings with any and all NBA teams and recruiting specials relating to the potential representation by FSM of such players. With the consent of FSM, Contractor shall have the authority to sign players and potential players to FSM for representation for marketing and under the Standard Player Agent Contract ("SPAC"). Contractor will also aid in developing specific marketing ideas for potential FSM represented clients and assist in coordinating with family and key members of players with FSM. Contractor will be primarily located in Los Angeles, California and New York, New York but will travel to San Antonio, Texas with reasonable notice. Contractor and FSM will develop and implement appropriate reports to keep FSM aware of Contractor's progress.

4. **Compensation**.  In consideration for Contractor's services, Contractor will be compensated biweekly based on an annual salary of $150,000.00 to be paid in accordance with standard payroll practices of Company. Contractor will be responsible for any and all applicable withholdings and deductions as required by law.

<u>Any NBA SPAC Contractor currently has under contract or is in the current pipeline</u>
- FSM receives 100% return on: (1) the any and all Compensation paid to Contractor; and (2) any and all expenses paid on Contractor's behalf,
- FSM shall also receive a maximum of 5% of any compensation owed to Contractor under currently existing Standard Player Agent Contracts (SPAC), Contracts Between Agent and Athlete, and any other related contracts, including current marketing contracts and marketing contracts that are currently in the pipeline that have been entered into as of the date of this Agreement;
- As of January 15, 2020, the athletes this will apply to are listed in the attached confidential **Exhibit A**.

<u>Future Contracts secured by Contractor</u>
- FSM receives 75% of compensation due and owing under any contract Contractor negotiates and secures
- Contractor receives 25% of compensation due and owing under any contract Contractor negotiates and secures on behalf of FSM.

In addition, $50,000.00 (of which $10,000 was advanced on December 17, 2019 and secured by a Promissory Note executed the same date (the "2019 Promissory Note") shall be advanced after execution of all agreements required to be signed by Contractor (the "Signing Advance"). The Signing Advance shall be paid back at 0% interest for the first 12 months, after which such remaining Signing Advance that has not been repaid shall accrue interest at 8% per annum, as will be formally memorialized and secured by a second Promissory Note securing payment of the remaining $40,000.00 (the "2020 Promissory Note"). Such repayment of the Signing Advance past the first 12 months may be drawn from any income Contractor receives while under contract with FSM.

5. **Expenses**. Contractor will also be provided with an expense allowance of $5,000.00 per month, which expenses shall be recovered by Company before any potential bonus to Contractor is paid. Such expenses shall be calculated on a rolling basis and subject to an annual adjustment on December 31st of each year.

6. **Bonus**. Contractor will be entitled to earn bonuses as follows: (1) should Contractor save on budgeted expenses (as set forth in §5 above) tabulated at year's end, Contractor will be entitled to 50% of the unspent expenses; (2) if Contractor revenue exceeds 2x the expenses, a 10% bonus is paid on the incremental revenue between 2x and 3x expenses; (3) if Contractor revenue exceeds 3x the expenses, a 20% bonus is paid on the incremental revenue between 3x and 4x the expenses; (4) all Contractor revenue that exceeds 4x their expenses, a 30% bonus is paid on the incremental revenue.

7. **Relationship**:  The Parties agree that this Agreement does not create an employee-Company relationship and Contractor will remain an independent contractor.

8. **Confidentiality**. Contractor acknowledges and agrees that he will be disclosed, and Company agrees to disclose, confidential information of Company to which Contractor would not have access except for employment with Company. This confidential information includes, but is not limited to, client information and preferences, specific client product orders and needs, including the rates they pay, marketing information, pricing formulas, pricing strategies, Contractor compensation, research information, training materials, customer lists, customer contact information, and sales promotion information (collectively, the "Confidential Information"). This Confidential Information is a valuable, special and unique asset of Company used in its business to obtain a competitive advantage over its competitors.  Protection of such Confidential Information against unauthorized disclosure and use is of critical importance to Company in maintaining its competitive position.  Contractor will not, at any time during or after his employment by Company, make any unauthorized disclosures of the Confidential Information, or make any use thereof, except in the carrying out of his employment responsibilities with Company. Contractor acknowledges that Company's business operations are rapidly expanding and growing and that Company has invested considerable time, money and resources in establishing its business model and client base (the "Company's Business").

9. **Non-Disparagement**. In the event that the Contractor's employment with Company terminates and/or is terminated Contractor expressly agrees not to disparage Company in any public forum whether verbal, print or electronic, including but not limited to, websites, business bureaus, blogs, chats, newspapers, magazines, word-of-mouth, social groups, questionnaires, surveys,

emails, radio and/or television. Contractor agrees to instruct all agents, servants, Contractors and affiliates to abide by the same.

10. **Right of First Refusal**. Contractor agrees that all business opportunities, which are offered to Contractor, or conceived by Contractor, either solely or jointly with others, which may be related to the Company's Business or capable of beneficial use by Company (as determined in the sole discretion of Company) shall be immediately disclosed to Company in writing. Unless Company rejects such opportunity in writing; Contractor acknowledges and agrees that he or she shall have no right or authority to pursue such opportunity. Contractor acknowledges and agrees that Company provides the opportunities and the resources for Contractor to initiate, establish and/or develop contacts and relationships within the Company's Business. Further, Company will provide training and other guidance to provide Contractor with the ability to create and/or enhance opportunities in the Company's Business. All goodwill and other benefits (collectively, the "Goodwill") derived from such efforts described in this paragraph shall inure solely to the benefit of Company. Contractor recognizes that the Goodwill is a valuable asset of Company. Contractor acknowledges that, in exchange for the covenants and considerations described herein, Contractor agrees to refrain from using the Goodwill for the benefit of any other person or entity other than for the benefit of Company and in furtherance of his employment duties with the Company. Contractor acknowledges that he has a duty of loyalty to Company. Contractor hereby acknowledges that such duty of loyalty is a contractual duty, the breach of which will subject Contractor to liability to Company, including, without limitation, Company's attorneys' fees and costs if Company pursues any claim arising from such breach.

11. **Non-Solicitation**. During the period Contractor is employed by Company and in the event that the Contractor's employment with Company terminates, the Contractor acknowledges that he does not have the right to, and shall refrain from:

       i.     soliciting any client of Company that Contractor did not have a prior relationship with or otherwise attempt to induce any such client to discontinue or reduce its relationship with Company;

       ii.     render advice or services to, or otherwise accept any business from, any current clients of Company that Contractor did not have a prior relationship with or otherwise attempt to induce any such client to discontinue or reduce its relationship with Company;

       iii.     render advice or services to, or otherwise assist, any other person, associate or entity who is engaged, directly or indirectly, with the solicitation of any clients of Company with whom Contractor did not have a prior relationship with; and/or

       iv.     induce any employee of Company to terminate or limit his or her employment with Company, or hire or assist in the hiring of any such Contractor by any person, association or entity not affiliated with Company.

**IF CONTRACTOR BREACHES ANY PROVISIONS OF SECTION 11(i) – (iv) ABOVE, THEN BECAUSE DAMAGES ARISING FROM SUCH BREACH ARE**

**DETERMINABLE, BUT HARD TO ACERTAIN, CONTRACTOR SHALL PAY TO THE COMPANY, AS LIQUIDATED DAMAGES AND NOT AS PENALTY, A SUM EQUAL TO: (1) $50,000.00 FOR EACH BREACH OF SECTION 11(i); (2) $20,000 FOR EACH BREACH OF SECTION 11(ii); (3) $30,000.00 FOR EACH BREACH OF SECTION 11(iii); AND (4) $40,000.00 FOR EACH BREACH OF SECTION 11(iv). THE PARTIES EACH ACKNOWLEDGE AND AGREE THAT IT IS DIFFICULT OR IMPOSSIBLE TO DETERMINE WITH PRECISION THE AMOUNT OF DAMAGES THAT WOULD OR MIGHT BE INCURRED BY THE COMPANY FOR A VIOLATION OF SECTIONS 11(i) – (iv) AND THAT THE AMOUNTS OF DAMAGES SET FORTH HEREIN IS FAIR AND REASONABLE COMPENSATION FOR SUCH LOSS.**

In the alternative, and only if Company chooses, at its sole discretion, to forgo enforcement of the Liquidated Damage provision as set forth above, then Company shall be entitled to, in addition to any other remedy it may have (exclusive of liquidated damages), injunctive relief for the enforcement of any provision in Section 11, including Section (i)-(iv). Contractor agrees that his breach of this Agreement will result in immediate and irreparable damage to Company such that Company could not be adequately compensated by an award of monetary damages, and in the event of any threatened or actual breach, Company shall be entitled to an injunctive order appropriately restraining and/or prohibiting such breach without the necessity of Company posting bond or other security. Pursuit of any remedy by Company except as otherwise expressly set forth in this Section, shall not constitute a waiver of any other right or remedy by Company under this Agreement or under applicable law.

12. **Non-Compete.** During the period Contractor is employed by Company and for two (2) years thereafter, Contractor agrees that he or she will not, directly or indirectly, engage in or work for any business engaging in, any activities similar or otherwise competitive with the business, services, and/or activities of Company including but not limited to the sports agency business and the marketing, promotion, or management of any professional athlete, whether currently signed with a professional sports franchise or seeking such contract. It is further understood that Contractor shall not use any work-product created by Company or while Contractor was under contract with Company for any period of time after the termination of this Agreement. Notwithstanding the foregoing list or subsequent descriptions, it is expressly understood and agreed that Company has, and reserves the right to amend both the list and/or descriptions of the services and/or activities covered by the non-compete clause from time to time, as it deems necessary.

13. **Miscellaneous**.

(i)     It is the desire and intent of the parties that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies applied in the applicable jurisdiction, and in Texas, namely, Sections 15.50 and 15.51 of the Texas Business and Commerce Code. Accordingly, if any particular provision of this Agreement shall be adjudicated to be invalid or unenforceable, it is the specific intent and agreement of the parties hereto that such provision shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable. In addition, if the scope of any restriction or covenant contained in this Agreement is too broad to permit enforcement thereof to its fullest extent, then it is the specific intent

and agreement of the parties that such restriction or covenant shall be enforced to the maximum extent permitted by law, and Company and Contractor hereby consent and agree that such scope shall be judicially modified accordingly in any proceeding brought to enforce such restriction.

(ii)    In the event Company is required to pursue legal action to enforce all or any part of this Agreement, Contractor shall be responsible for all reasonable attorneys' fees and court costs incurred by Company, in addition to any other remedies allowed by law or in equity.

(iii)   Contractor acknowledges and agrees that the benefits and consideration contained in this Agreement (including, without limitation, the disclosures and access to Confidential Information and the training, support and guidance to be provided by Company as described herein) are unique and valuable and in support of the restrictive covenants and other agreements being created hereby between Contractor and Company.  Specifically, Contractor would not otherwise be entitled to such benefits and consideration, except for his or her employment by Company and the execution of this Agreement.  These factors were of critical importance to Contractor, without which Contractor would not have entered into this Agreement.  Likewise, the restrictive covenants and other agreements made by Contractor herein are of critical importance to Company, without which Company would not have entered into this Agreement. The parties acknowledge and agree that the benefits and considerations given Contractor hereunder and the restrictive covenants and other agreements given by Contractor hereunder are ancillary to and support each other.

(iv)    Upon termination of the Contractor's contractual relationship with Company, for any reason, or upon the demand by Company, at any time, Contractor shall return all Confidential Information in his or her possession or control to Company, including, without limitation, all copies thereof or notes or memoranda derived therefrom.  If any Confidential Information is stored electronically or magnetically, Contractor shall erase and delete all copies.

(v)     Contractor agrees to inform any future prospective Company of the terms and conditions of this Agreement.  If Company receives information that Contractor has accepted employment with another Company in violation of this Agreement, or if Company receives information that Contractor has received an offer with another Company that upon acceptance would violate the terms and conditions of this Agreement, then Company has express authority and permission to deliver a copy of this Agreement to such other Company to confirm Company's rights and Contractor's restrictive obligations

(vi)    Upon termination of this Agreement, Company shall promptly, on a prospective basis, discontinue using Contractor's name, biography and/or likeness in its advertising and promotional materials.

(vii)   The provisions of this, Section 12 shall survive termination and remain in full force and effect to the extent allowed by law.

**14. No Conflict.**  Contractor confirms that he is able to carry out the work that this job involves without breaching any legal restrictions on his activities, such as restrictions imposed by a

5

current or former Company. Contractor also confirms that he will inform Company about any such restrictions and provide Company with as much information about them as possible, including any agreements between his and his current or former Company describing such restrictions on his activities. Contractor further confirms that he has not removed or taken any documents or proprietary data or materials of any kind, electronic or otherwise, with his from his current or former Company to Company without written authorization from his current or former Company.

15. **Governing law**: This agreement shall be governed by and construed under the laws of the State of Texas.

16. **Entire agreement**:  This is the entire agreement between Company and Contractor relating to the subject matter herein and supersedes any prior agreements, written or oral.

17. **Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[Signatures on Following Page]

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed effective on the date and year first written above.

**CONTRACTOR:**

By: _____

Name:       Mayar Zokaei

Position:   Vice-President of Basketball Operations

**COMPANY:**

Fundamental Sports Management, LLC, a Texas limited liability company

By: _____

Name: Rahul B. Patel

Title:   Managing Member

7

<u>C<span>ONFIDENTIAL</span></u>

## <u>Exhibit A</u>

### <u>Current Clients</u>
1. Mitchell Robinson
2. Kenny Wooten
3. Ayinde Sprewell
4. Torren Jones
5. Desonta Bradford
6. Joshua Smith

### <u>Current Pipeline</u>
1. Trae Young
2. Nassir Little
3. Coby White
4. Obi Toppin
5. Tyrese Haliburton
6. Melvin Frazier
7. Dennis Smith Jr.
8. Udoka Azubuike

# EXHIBIT C

## PROMISSORY NOTE

| | |
|---|---|
| **DATE:** | February 4, 2020 |
| **MAKER:** | Mayar Zokaei |
| **PAYEE:** | Rahul B. Patel, individually and Fundamental Sports Management, LLC |
| **PRINCIPAL AMOUNT:** | Forty-Thousand No/100 Dollars ($40,000.00) |
| **ANNUAL INTEREST RATE OF UNPAID PRINCIPAL FROM DATE:** | Ten Percent (10%) |
| **JURISDICTION AND VENUE** | Bexar County, San Antonio, Texas, United States, all applicable laws under the State of Texas. |

**TERMS OF PAYMENT (Payment and Interest):** Maker shall pay to Payee on or before the Maturity Date the total Principal Amount. Annual interest of unpaid principal interest in the amount of Zero Dollars if the total Principal Amount is paid on or before the Maturity Date. Failure to pay the Principal Amount in full on or before the Maturity Date shall be considered an "Event of Default" by Maker.

| | |
|---|---|
| **MATURITY DATE:** | December 31, 2020 |

**DEFAULT INTEREST:** On or after the occurrence of an Event of Default, the interest rate applicable to the Note shall have accrued at a rate equal to per year that is the lesser of (i) 10.00% or (ii) the maximum rate permitted by applicable law ("Default Interest"). Default Interest, and not any rate set by statue, shall be computed in any entry of judgment pertaining to this Note, and further, shall be paid subsequent to the entry of such judgment, and until actual satisfaction of said judgment. The judgment shall include both the action and the obligation itself. In such event, the Default Interest rate shall continue up through and including all foreclosure proceedings and proceedings for payment of monies, including but not limited to surplus money proceedings and shall be computed in the entry of any judgment, and further, subsequent to the entry of any judgment, and until actual satisfaction of this Note and said judgment.

**SECURITY AGREEMENT:** Repayment of this Note is secured by Mayar Zokaei, all his interest, accounts, property or otherwise including but not limited to those by Mayar Zokaei or in his or her marital estate ("**Collateral**").

2/4/20

Maker promises to pay the order of Payee at the place for payment and according to the terms of payment as stated above.

Maker and each surety, endorser, and guarantor waive all demands for payment, presentation for payment, notices of intention to accelerate maturity, notices of acceleration of maturity, protests, and notices of protest, to the extent permitted by law.

If this Note or any instrument securing collateral to it is given to an attorney for collection or enforcement, or if suit is brought for collection or enforcement, or if it is collected or enforced through probate, bankruptcy, or other judicial proceeding, then Maker shall pay Payee all costs of collection and enforcement, including reasonable attorney's fees and court costs, in additional to other amounts due.

Any notices or other communications required or permitted hereunder shall be sufficiently given and deemed delivered and received when delivered personally or, if sent by registered or certified mail, postage prepaid, to the applicable party at its address above given or at such other address as shall be furnished in writing by such party to the other, the notice shall be deemed to have been delivered and received as of the date so delivered or deposited in the United States Mail.

There shall be no penalty for prepayment hereunder.

The Maker is responsible for all obligations represented by this Note.

When the context requires, singular nouns and pronouns include the plural.

EXECUTED as of the date first written above.


MAKER:

By:_____     2/4/20
        Mayar Zokaei

**EXHIBIT D**



# NBPA
# REGULATIONS
# GOVERNING
# PLAYER
# AGENTS

AS AMENDED JUNE 2019

# NBPA REGULATIONS GOVERNING PLAYER AGENTS

AS AMENDED JUNE 2019

© 2019 National Basketball Players Association, All Rights Reserved

## CONTENTS

# 5 | Introduction

**6 |** The NBPA's Objectives In Establishing Rules
for Certifying and Regulating Player Agents

**7 |** The NBPA's Authority to Regulate Player Agents

**10 |** The NBPA's Reasons for the 2016, 2018  And 2019 Amendments

## SECTION 1

# 12 | Scope of Regulations

## SECTION 2

# 14 | Requirements for Certification

**15 |** Applying for Certification

**16 |** Grounds for Denial of Certification

**17 |** Appeal from Denial of Certification

**17 |** Suspension or Revocation of Certification

**18 |** Form of Certification

**18 |** Expiration of Certification

## SECTION 3

# 20 | Standard of Conduct for Player Agents in Providing Services Governed by These Regulations

**21 |** General Requirements

**24 |** Prohibited Conduct Subject to Discipline

**27 |** Miscellaneous

**SECTION 4**

# 28 | Standard Player Agent Contract; Maximum Fees

**29** | Standard Form

**29** | Player Agent Compensation


**SECTION 5**

# 32 | Arbitration Procedures

**34** | Filing

**35** | Answer

**36** | Arbitrator

**36** | Hearing

**36** | Costs

**36** | Time Limits


**SECTION 6**

# 37 | Oversight and Compliance Procedure

**38** | Disciplinary Committee

**38** | Complaint; Filing

**39** | Answer

**39** | Proposed Disciplinary Action

**40** | Appeal

**40** | Conduct of Hearing

**41** | Time Limits; Cost


**SECTION 7**

# 42 | Effective Date; Amendment

———————————

# INTRODUCTION

These Regulations govern Player Agents who provide representational services to Players (including "rookies") by conducting individual contract negotiations with National Basketball Association ("NBA") Teams, assisting or advising in connection with such negotiations, and/or administering, advising, or enforcing agreements reached as a result of those negotiations. These Regulations were first promulgated by the Officers and Player Representatives of the National Basketball Players Association ("NBPA") in 1986 and have remained in effect with modifications in 1991, 2016, 2018 and 2019.

# A

# THE NBPA'S OBJECTIVES IN ESTABLISHING RULES FOR CERTIFYING AND REGULATING PLAYER AGENTS

The NBPA's primary objectives in promulgating, maintaining, amending and enforcing these Regulations include the following:

(1)  To establish and enforce minimum requirements to become a certified Player Agent;

(2)  To afford each Player the opportunity to select a certified Player Agent who, in turn, has agreed to comply with these Regulations, to represent or advise Players as a fiduciary with honesty, competency and loyalty, and act consistent with the Player's membership in a collective bargaining unit;

(3)  To make available to each Player a comprehensive disclosure of facts relevant to the ability of an individual to serve in the critical role of a fiduciary, thereby affording the Player the opportunity to make well informed decisions about his important choice of a Player Agent;

(4)  To establish and enforce uniform standards of conduct and fiduciary responsibility applicable to all certified Player Agents, which has become increasingly important because the business of many Player Agents has become international in scope and the promulgation of a host of different—often conflicting—laws and rules issued by federal, state and local authorities designed to regulate the conduct of sports Agents in general; and

(5)  To provide Players and Player Agents with an expeditious, fair, informal, cost efficient and exclusive procedure for resolving any dispute concerning their relationship, transactions or contractual obligations.

# **B** THE NBPA'S AUTHORITY TO REGULATE PLAYER AGENTS

The basis of the NBPA's authority to adopt and enforce these Regulations is its status, conferred by federal labor law, as the exclusive bargaining representative for all Players including rookies. Section 9(a) of the National Labor Relations Act provides, in relevant part:

> Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment.

Consistent with that federal labor law, labor organizations such as the NBPA are authorized to adopt and enforce reasonable rules and regulations, such as these Regulations, provided that they further the labor organization's legitimate self-interests. That governing principle has been recognized and agreed upon by the NBA (acting for and on behalf of its member teams) in its collective bargaining agreement with the NBPA and is set forth in Article XXXVI:

> **Player Agents**
>
> **Section 1 | Approval of Player Contracts**
>
> The NBA shall not approve any Player Contract between a Player and a Team unless such Player (a) is represented in the negotiations with respect to such Player Contract by an Agent or representative duly certified by the Players Association in accordance with the Players Association's Regulations Governing Player Agents and authorized to represent him, or (b) acts on his own behalf in negotiating such Player Contract.

**Player Agents** (Article XXXVI, Continued)

## Section 2 | Fines

The NBA shall impose a fine of $50,000 upon any Team that negotiates a Player Contract with an Agent or representative not certified by the Players Association in accordance with the Players Association's Regulations Governing Player Agents if, at the time of such negotiations, such Team either (a) knows that such Agent or representative has not been so certified, or (b) fails to make reasonable inquiry of the NBA as to whether such Agent or representative has been so certified. Notwithstanding the preceding sentence, in no event shall any Team be subject to a fine if the Team negotiates a Player Contract with an Agent or representative designated as the Player's authorized Agent on the then-current Agent list provided by the Players Association to the NBA in accordance with Section 5 below.

## Section 3 | Prohibition on Players as Agents

For purposes of negotiating the terms of a Uniform Player Contract or otherwise dealing with a Team over any matter, players are prohibited from (a) representing other current or prospective NBA Players as an Agent certified under the Players Association's Regulations Governing Player Agents, or (b) holding an equity interest or position in a business entity that represents other current or prospective NBA Players as an Agent certified under the Players Association's Regulations Governing Player Agents.

## Section 4 | Indemnity

The Players Association agrees to indemnify and hold harmless the NBA, its Teams and each of its and their respective past, present and future owners (direct and indirect) acting in their capacity as Team owners, officers, directors, trustees, employees, successors, agents, attorneys, heirs, administrators, executors and assigns, from any and all claims of any kind arising from or relating to (a) the Players Association's Regulations Governing Player Agents, and (b) the provisions of this Article, including, without limitation, any judgments, costs and settlements, provided that the Players Association is immediately notified of such claim in writing (and, in no event later than five (5) days from the receipt thereof), is given the opportunity to assume the defense thereof, and the NBA and/or its Teams

(whichever is sued) use their best efforts to defend such claim, and do not admit liability with respect to and do not settle such claim without the prior written consent of the Players Association.

## Section 5 | Agent Lists

The Players Association agrees to provide the NBA League Office with a list of (a) all Agents certified under the Players Association's Regulations Governing Player Agents, and (b) the Players represented by each such Agent. Such list shall be updated once every two (2) weeks from the day after the NBA Finals to the first day of the next succeeding Regular Season and shall be updated once every month at all other times.

## Section 6 | Confirmation by the Players Association

If the NBA has reason to believe that the Agent representing a Player in Contract negotiations is not a certified Agent or is not the Agent authorized to represent the Player, then the NBA may, at its election, request in writing from the Players Association confirmation as to whether the Agent who represented the Player in the Contract negotiations is in fact the Player's certified representative. If within three (3) business days of the date the Players Association receives such written request, the NBA does not receive a written response from the Players Association stating that the Agent who represented the Player is not the Player's certified representative, then the NBA shall be free to act as if the Agent is the Player's confirmed certified representative.

# C

# THE NBPA'S REASONS FOR THE 2016, 2018 AND 2019 AMENDMENTS

Given that over thirty (30) years have elapsed since the initial promulgation of these Regulations, the NBPA Executive Committee concluded that the time was ripe to review and analyze the experiences that both they and the Players they represent had in connection with the services provided by their Player Agents. Those experiences demonstrated that amendments to these Regulations were warranted to better reflect the reality of the business between Players and Player Agents, including the role played by recruiters and other employees in assisting Player Agents in soliciting and/or retaining Players as clients and the additional services provided by individuals such as financial advisors, investment managers, and tax consultants that has become an integral part of Player representation. In conducting this review the NBPA also had the distinct benefit of comparing the regulatory systems that its sister professional sports unions (MLBPA, NFLPA, and NHLPA) had adopted as well as learning from the experiences they had in administering and enforcing them.

As a result of this extensive undertaking, the Executive Committee and Board of Player Representatives decided to amend the Regulations in the manner set forth in the sections that follow. At bottom, however, the fundamental principles underlying these Regulations remains constant. As the exclusive bargaining representative of the Players, the NBPA retains the right to conduct all individual Player negotiations with NBA Teams as well as the right to delegate to Player Agents its statutory authority to represent Players in conducting and/or assisting in those negotiations and thereafter in administering and enforcing them, subject to the NBPA's added right to impose reasonable requirements applicable to Player Agent conduct. In turn, the NBPA

requests and requires under these Regulations that the Player Agent accept as a threshold that he has a singular duty to act as a fiduciary; to unconditionally serve to protect the interests of the Players he[1] represents; and to perform those services with honesty, integrity, competence, transparency, and free of any conflicts—real or apparent. This is at once a major commitment but one that the NBPA has determined to be the sine qua non for any individual first in obtaining and thereafter in maintaining certified status. Once the 2016 Amendments were enacted, the NBPA further analyzed how the new Regulations affected both Players and Player Agents, which Regulations needed further clarification, and which existing Regulations needed to be revised, resulting in the 2018 and 2019 amendments.

## SECTION 1

# SCOPE OF REGULATIONS

No person (other than a Player representing himself) shall be permitted to conduct individual contract negotiations on behalf of a Player (including a rookie) [2] and/or assist in or advise with respect to such negotiations with NBA Teams after the effective date of these Regulations unless he  (1) is a currently certified as a Player Agent pursuant to these Regulations, and (2) has a current Standard Player Agent Contract ("SPAC") signed with the Player[3] (See Section 4).

The activities or conduct of Player Agents that are governed by these Regulations include, but are not limited to: The providing of advice, counsel, information or assistance to Players (including rookies)  with respect to negotiating their individual contracts with NBA Teams and/or thereafter in enforcing those contracts; the conduct of compensation negotiations with the NBA Teams on behalf of individual Players; and any other activity or conduct which directly bears upon the Player Agent's integrity, competence or ability to properly represent individual Players and the NBPA in individual contract negotiations.

All provisions of these Regulations, including this one, may be amended by the Officers and Player Representatives of the NBPA periodically as they deem appropriate.

---

[2]  Throughout these Regulations the term "rookie" shall mean any Player who has not played in the NBA in any season prior to entering into his first contract with an NBA Team.

[3]  Throughout these Regulations all references to "Players" also shall apply to "rookies," unless expressly stated otherwise.

**SECTION 2**

# REQUIREMENTS OF CERTIFICATION

Any person who wishes to perform the functions of a Player Agent described in Section 1 must be certified by the NBPA, pursuant to the following procedure:

_____

**A**

## APPLYING FOR CERTIFICATION

To apply for certification as a Player Agent, an individual must complete the Application for Certification as an NBPA Player Agent ("Application") and pay the nonrefundable application fee. The Application must be submitted in accordance with the instructions provided on the NBPA website. The mere filing of the Application does not constitute certification of a Player Agent.

To be eligible for certification, the applicant must have received a degree from an accredited four year college or university, provided that the NBPA, in its unreviewable discretion, may accept relevant negotiating experience to substitute for any year(s) of formal education. Only individuals are eligible to be certified; the NBPA will not entertain any Application filed in the name of any corporation, company, partnership or other business entity. There is no limit on the number of individuals in any one corporation or other business entity who are eligible for certification.

The NBPA will review the Application and perform a background investigation. In addition, the NBPA may request further written materials from the applicant and/or conduct whatever further investigation it deems appropriate, including an informal conference with the applicant. The applicant must also pass a written exam administered by the NBPA. The exam will focus on key provisions of the Collective Bargaining Agreement, these Regulations, and other relevant matters to ensure that a certified Player Agent is able to provide high quality representation to his clients. The NBPA will provide a preparation course for applicants.

The signing and filing of an Application constitutes the applicant's agreement to comply with and be bound by these Regulations, including the exclusive arbitration remedy set forth in Section 5, and that the failure to comply in any material respect with any provision of these Regulations shall constitute grounds for denial, revocation, or suspension of his certification or other disciplinary action.

## B GROUNDS FOR DENIAL OF CERTIFICATION

Given the important function that Player Agents perform for the individual Player(s) they represent, it is the NBPA's intention in promulgating these Regulations to ensure that only those persons who can reasonably be expected to faithfully carry out those important fiduciary responsibilities will be entitled to certification. Consistent with this objective, the NBPA is authorized to deny certification to any applicant who:

Fails to properly complete the Application, including the necessary release and disclosure form(s);

Fails to cooperate with the NBPA in its processing of his Application;

Makes false or misleading statements of a material nature in the Application;

Misappropriates funds, or engaged in other specific acts of financial malpractice such as embezzlement, theft or fraud, which would render him unfit to serve in a fiduciary capacity on behalf of Players;

Engages in any other conduct that reflects adversely on his credibility, integrity or competence to serve in a fiduciary capacity on behalf of Players;

Refuses to swear or affirm that he will comply with these Regulations and any amendments thereto and that he will abide by the fee structure contained in the SPAC incorporated into these Regulations.

Fails to obtain a passing score on the Agent Exam.

# C

# APPEAL FROM DENIAL OF CERTIFICATION

In the event an Application is denied pursuant to this Section, the applicant shall be notified in writing appeal by prepaid certified mail (or similar means such as Federal Express) and via email of the reasons for the denial, except for failure to pass the Agent Exam which may be done by email only. The applicant may appeal such action to the Arbitrator appointed pursuant to Section 5 of the Regulations; provided that such appeal must be initiated by filing a written notice of appeal by prepaid certified mail (or similar means such as Federal Express) and via email upon the NBPA and the Arbitrator within thirty (30) days of receipt of the notice denying his Application. The appeal shall be processed and resolved in accordance with the arbitration procedures set forth in Section 5, paragraphs D through F of these Regulations. The appeal to arbitration shall constitute the exclusive method of challenging any denial of certification.

# D

# SUSPENSION OR REVOCATION OF CERTIFICATION

At any time subsequent to granting  certification to a Player Agent the NBPA can, based upon information brought to its attention or acting on its own initiative, propose suspending or revoking such certification on any ground that would have provided a basis for denying certification in the first place (see Section 2.B), for conduct prohibited in Section 3.B.1-20 of these Regulations and/or non-compliance with the obligations contained required in Section 3.A of these Regulations.[4] Any such proposed suspension or revocation must be sent by prepaid certified mail (or similar means such as Federal Express) and via email. The Player Agent may appeal any such proposed suspension of revocation by complying with the procedure for invoking arbitration as set forth in Section 6.B-G. The appeal to arbitration shall constitute the exclusive method of challenging any proposed suspension or revocation of certification.

**E**

# FORM OF CERTIFICATION

Upon approving an Application as a Player Agent, the NBPA shall provide the applicant with a written certification by prepaid certified mail (or similar means such as Federal Express) and via email.

The applicant will thereupon be authorized to serve as a Player Agent in conducting individual Player negotiations with NBA Teams and/or assisting in or advising with respect to such negotiations.

In granting certification, the NBPA shall not be deemed to have endorsed any particular Player Agent; and, in no event, shall the grant of certification be deemed to impose liability upon the NBPA for any acts or omissions of the Player Agent in providing representation to any Player.

**F**

# EXPIRATION OF CERTIFICATION

In order to prevent automatic expiration of certification, a Player Agent must negotiate and execute a contract for a Player with an NBA Team  at least once during any five (5) year period. For any Player Agent certified on or before July 1, 2016, the applicable five year period will begin on July 1, 2016. For any Player Agent certified thereafter, the applicable five (5) year period will begin on the July 1 of the full first Season the Player Agent is certified.  A Player Agent whose certification lapses under this provision must reapply as a new applicant under the procedures set forth in these Regulations to regain his certification. The Player Agent may appeal any such automatic expiration of certification by complying with the procedure for invoking arbitration as set forth in Section 6.E-F. The appeal to arbitration shall constitute the exclusive method of challenging any automatic expiration of certification.



[4]   In the extraordinary circumstances where the Disciplinary Committee's investigation discloses that the Agent's conduct is of such a serious nature as to justify immediately invalidating his certification, the Disciplinary Committee is authorized to take such action. In such event, the Agent may appeal that action in the same manner as he could appeal from a proposed suspension or termination set forth in Section 6.

[5]   For clarity, the Player Agent's name must appear on the Agent Certification page of the contract.



## SECTION 3

# STANDARD OF CONDUCT FOR PLAYER AGENTS IN PROVIDING SERVICES GOVERNED BY THESE REGULATIONS

As described throughout these Regulations, one of the objectives of the NBPA in issuing these Regulations is to enable Players to make informed selection of Player Agents and to ensure that the Player Agents shall provide to the individual Players whom they represent effective representation at fair and reasonable rates that are uniformly applicable.

## A GENERAL REQUIREMENTS

Consistent with this objective, a Player Agent shall be required to:

1 | Disclose on his Application and thereafter upon request of the NBPA all information relevant to his qualifications to serve as a Player Agent, including, but not limited to, background, special training, experience in negotiations, past representation of professional athletes, and relevant business associations or memberships in professional organizations;

2 | Pay the annual Agent fees no later than the first of July every year for the upcoming season.

3 | Attend a NBPA seminar each year, except when the NBPA determines not to require the attendance of its experienced Player Agents at any seminar;

4 | Comply with the maximum fee amounts in Section 4 of these Regulations, the SPAC and all other provisions of these Regulations, and any amendments thereto;

5 | Advise a Player and report to the NBPA any known violations by an NBA Team of a Player's individual contract or the CBA generally;

6 | Within 48 hours, provide the NBPA with a copy, via email, of any fully executed SPAC. It is the Player Agent's responsibility to maintain and/or produce the original copy of such SPAC, upon request by the NBPA;

7 | Provide on or before April 1 of each succeeding year, to each Player who he represents, with a copy to the NBPA,

As described throughout these Regulations, one of the objectives of the NBPA in issuing these Regulations is to enable Players to make informed selection of Player Agents and to ensure that the Player Agents shall provide to the individual Players whom they represent effective representation at fair and reasonable rates that are uniformly applicable.



## GENERAL REQUIREMENTS

Consistent with this objective, a Player Agent shall be required to:

1 | Disclose on his Application and thereafter upon request  of the NBPA all information relevant to his qualifications to serve as a Player Agent, including, but not limited to, background, special training, experience in negotiations, past representation of professional athletes, and relevant business associations or memberships in professional organizations;

2 | Pay the annual Agent fees no later than the first of July every year for the upcoming season.

3 | Attend a NBPA seminar each year, except when the NBPA determines not to require the  attendance of its experienced Player Agents at any seminar;

4 | Comply with the maximum fee amounts in Section 4 of these Regulations, the SPAC and all other provisions of these Regulations, and any amendments thereto;

5 | Advise a Player and report to the NBPA any known violations by an NBA Team of a Player's individual contract or the CBA generally;

6 | Within 48 hours, provide the NBPA with a copy, via email, of any fully executed SPAC.  It is the Player Agent's responsibility to maintain and/or produce the original copy of     such SPAC, upon request by the NBPA;

7 | Provide on or before April 1 of each succeeding year, to each Player who he represents, with a copy to the NBPA, an itemized

statement ("Fee Disclosure Form")  covering the period January 1 through December 31 of the immediately prior year which separately sets forth both the fee charged to the Player for, and any expenses incurred in connection with the performance of, the following services: (a) individual Player salary negotiations, (b) the management of the Player's assets, (c) the provision to the Player of financial, investment, legal, tax and/or other advice, and (d) any other miscellaneous services;

8 | Permit a person or firm authorized by a Player who is a former or current client to conduct an audit, upon request, of all relevant books and records relating to any services provided to that Player;

9 | Notify the NBPA within thirty (30) days of any significant changes in your status relevant to your continuing to be certified as a Player Agent. Specifically the Player Agent is required to notify the NBPA, via email of:

(a)  Any change involving employment status that has taken place since the filing of the Application;

(b)  Any change in the Player(s) that a Player Agent represents;

(c)  Any disciplinary proceeding that has been initiated against the Player Agent, or any formal charge or complaint filed against the Player Agent in his personal and/or professional capacity (including any criminal charges or civil claims) since the filing of the Application;

(d) Any changes regarding the Player Agent's contact information;

10 | Provide on or before April 1 of each year to the NBPA (with a copy to each Player that he currently represents) the information set forth in Sections 10-12 of the current Application;

11 | Provide the NBPA with all materials that the NBPA deems relevant with respect to any investigation conducted by the NBPA and in all other respects cooperate fully with the NBPA;

12 | Properly monitor and supervise all employees or associates who provide a Player Agent with any services in connection with the representation of a Player. Conduct by an employee or associate of a Player Agent that would violate these Regulations shall be deemed to be conduct of the Player Agent and shall subject that Player Agent to discipline under these Regulations;

13 | In connection with payments for assistance in recruiting any Player:

(a)  Prepare a Recruiter Disclosure Form disclosing any other individual, firm, or organization to whom you have paid or promised to pay money or any other thing of value (excluding any other Player Agent whose name appears on the SPAC) in return for recruiting or helping to recruit a Player to sign a SPAC;

(b)  Provide a copy of that Recruiter Disclosure Form to the Player in advance of signing that Player to a SPAC so as to allow the Player adequate time to consider the information before the Player signs the SPAC;

(c)  Have the Player sign the Recruiter Disclosure Form acknowledging that he is aware of the payments and that he approves of them;

(d)  Submit a copy of that Recruiter Disclosure Form along with the SPAC to the NBPA as required by Section 3.A.6;

(e)  Submit to the NBPA an updated Recruiter Disclosure Form if any information changes.

For clarity, a family member or any other person with a pre-existing relationship with a Player (or firm or organization

where such family member or person has a financial interest) may not be used as a Recruiter.

14 | Any conduct by an individual, firm or organization listed as a Recruiter for a Player Agent on the Recruiter Disclosure Form required by this Section 3.A.13 that would violate these Regulations shall be deemed to be conduct of the Player Agent and shall subject that Player Agent to discipline under these Regulations;

**B**

Comply with all written policies that may be issued from time to time by the NBPA.

## PROHIBITED CONDUCT SUBJECT TO DISCIPLINE

1 | To further effectuate the objectives of these Regulations, Player Agents are prohibited from:

Representing any Player in individual contract negotiations with any NBA Team unless the Player Agent (a) has a current certification, and (b) has a current SPAC signed with each such Player;

2 | Providing or offering a monetary inducement (other than a fee less than the maximum fee contained in the SPAC) to any Player (including a rookie) or college athlete to induce or encourage that person to utilize his services;

3 | Providing or offering money or any other thing of value to a member of a Player's family or any other person for the purpose of inducing or encouraging the Player to utilize his services or for the purpose of inducing or encouraging that person to recommend that a Player (including a rookie) or college athlete utilize the services of the Player Agent, except as permitted under Section A(13) above;

4 | Providing materially false or misleading information to any Player (including a rookie) or college athlete in the context of seeking to be selected as a Player Agent for that individual or

in the course of representing that Player as his Player Agent;

5 | Engaging in conduct which violates any NCAA regulations;

Holding or seeking to hold, either directly or indirectly, a financial interest in any professional basketball team or in any other business venture that would create an actual conflict of interest or the appearance of a conflict of interest between the individual Player and his Player Agent;

6 | Representing the General Manager or coach of any NBA Team (or any other management representative who participates in the team's deliberations or decisions concerning what compensation is to be offered to individual Players) in matters pertaining to his employment or any other matters in which he has any financial stake in or association with any NBA Team; provided, however, that this provision does not prohibit two individuals within the same agency from separately representing a Player and a coach/GM, provided notice is given to the Player that another Agent with the agency represents a coach/GM;

7 | Engaging in any other activity which creates an actual or potential conflict of interest with the effective representation of Players; provided that the representation of two or more Players on any one NBA Team shall not itself be deemed to be prohibited by this provision;

9 | Soliciting or accepting money or anything of value from any NBA Team under circumstances where to do so would create a conflict or an apparent conflict with the interests of any Player he represents;

10 | Negotiating and/or agreeing to any provision in a Player contract which deprives that Player of any benefit contained in any Collective Bargaining Agreement between the NBA and the NBPA;

Negotiating and/or agreeing to any provision in a Player contract or side letter agreement which directly or indirectly

violates any stated policies, rules, or requirements established by the NBPA;

12 | Concealing material facts from any Player whom the Player Agent is representing which relate to the subject of the individual's contract negotiation;

13 | Failing to advise the Player and failing to report to the NBPA any known violations by an NBA Team of a Player's individual contract or the CBA generally;

14 | Engaging in unlawful conduct and/or conduct involving dishonesty, fraud, deceit, misrepresentation, or other conduct which reflects adversely on his fitness as a Player Agent or jeopardizes the effective representation of Players;

15 | Breaching the provisions of the SPAC that the Player Agent is required to enter into pursuant to these Regulations; provided, however, that grounds for discipline shall not exist when, in the circumstances of a particular case, there was a reasonable basis for doubting whether the Player Agent's conduct was in breach of the SPAC;

16 | Indirectly circumventing the fee limits of the SPAC by knowingly and intentionally increasing the fees that he had charged or otherwise would have charged the Player for other services, including but not limited to: financial consultation, advice concerning money management, and/or negotiating endorsement agreements on behalf of Players;

17 | Violating the provisions of the SPAC whereby the Player Agent agrees to resolve all disputes involving the meaning, interpretation, application or enforcement of that agreement exclusively through arbitration and not to initiate any lawsuit for breach of contract against the Player;

18 | Agreeing to split fees with another Agent without completing Exhibit A of the SPAC;

19 | Assigning rights to receive fees pursuant to a SPAC without completing Exhibit B of the SPAC; and,

20 | Violating any of the requirements of Section 3.A.1-14 or Section 4.A.  A Player Agent who engages in any prohibited conduct defined above shall be subject to discipline in accordance with the procedures of Section 6 of these Regulations ; and

21 | Wagering or attempting to wager, directly or indirectly, anything of value on any game or event conducted by, or occurring in, or related to the NBA or the NBA G-League (or any future iterations of the NBA Developmental League), including without limitation, a Player draft selection, a Player contract signing, a Player statistical achievement, a summer league game , or any other event that could be characterized as a "prop bet."

## C | MISCELLANEOUS

In addition to refraining from the foregoing prohibited conduct, the NBPA further expects that every Player Agent will carry out the representational services covered by these Regulations with the highest degree of professional competence and integrity. The NBPA likewise expects that to achieve and maintain high quality performances every Player Agent, at a minimum, will take the necessary steps to become knowledgeable about the NBPA's structure, the economics of the industry, applicable Collective Bargaining Agreements, basic negotiating techniques, and all areas of the law relevant to his professional duties. If, after these Regulations become effective, the NBPA determines that there is a need to impose additional requirements with respect to the quality of Player Agent performance, the NBPA reserves the right to amend these Regulations accordingly.

## SECTION 4

# STANDARD PLAYER AGENT CONTRACT; MAXIMUM FEES

**A**

# STANDARD FORM

To qualify to perform the services of a Player Agent under these Regulations, in respect to an individual Player, a person must satisfy two prerequisites: (1) he must be certified; and (2) he must have a current NBPA Standard Player Agent Contract ("SPAC") signed with the Player. Retyped contracts will not be accepted.

A copy of the executed SPAC shall be sent via email by the Player Agent to the NBPA within 48 hours of execution. The NBPA may designate specific person(s) to receive SPACs.

The Player Agent is responsible for maintaining and/or producing the original copy of such SPAC, upon request by the NBPA.

Any agreement between a Player Agent and a Player entered into after the effective date of these Regulations which is not in writing or which does not meet the requirements of these Regulations shall be of no force and effect, and no Player Agent shall have the right to assert any claim against the Player for compensation on the basis of such purported contract.

Any SPAC entered into after the effective date of these Regulations shall include a provision whereby either party may terminate that agreement upon fifteen (15) days written notice to the other party. Any such notice must be signed by the terminating party in order to be effective.  A copy of the written notice must be sent to the NBPA by prepaid certified mail (or similar means such as Federal Express) or via email. The fifteen (15) day notice period may be shortened

by the parties by agreement, or absent agreement of the parties, upon a showing of exigent circumstances made to the Arbitrator.

# PLAYER AGENT COMPENSATION

**B**

The maximum fees which the Player Agent may charge or collect shall be as follows:

1 | If the Player Agent negotiates a Player contract whereby the Player receives only the minimum compensation under the NBA-NBPA Collective Bargaining Agreement applicable for the playing season or seasons covered by the individual contract, the Player Agent shall receive, no greater than, a fee of two percent (2%) for each such season, unless the Player and the Player Agent have agreed to a lesser percentage.

For clarity, when determining whether the Player has earned in excess of his applicable minimum compensation, the fee for each season is determined on an individual season basis.  It is of no consequence on fees for future seasons, that a Player received more than his applicable minimum compensation in any other season of the Player contract. For example, if a Player signs a three-year player contract whereby the compensation in Year-1 is in excess of his applicable minimum compensation and the compensation in Years 2 and 3 is only his applicable minimum compensation, then the Player Agent may charge a fee of, no greater than, 4% on Year-1 and 2% on Years 2 and 3.

2 | If the Player Agent negotiates a contract whereby the compensation the individual Player receives is in excess of the minimum compensation applicable under the NBA-NBPA Collective Bargaining Agreement for one or more playing seasons, the Player Agent shall receive, no greater than, a fee of four percent (4%) of the compensation negotiated for the Player for each playing season, unless the Player and the Player Agent have agreed to a lesser percentage.

3 | Notwithstanding Section 4.B.2 above, if the Player is a rookie drafted in the first round of the NBA Draft who receives compensation in accordance with the "Rookie Scale" set forth in Article VIII of the CBA, the Player Agent shall receive, no greater than, a fee that is the higher of (i) 4% of the compensation in excess of the 80% amount that is guaranteed under the Rookie Scale; or (ii) the amount payable under subparagraph (A) above by a rookie who receives only the minimum compensation under Article II, Section 6(B) of the Collective Bargaining Agreement, unless the Player and the Player Agent have agreed to a lesser percentage.

In computing the maximum allowable fee, the term "compensation" shall include base salary, signing bonus and any performance bonus actually received by the Player.  No other benefits negotiated on behalf of the individual Player shall be taken into consideration – including, but not limited to, the value of a personal loan, an insurance policy, an automobile, or a residence, etc.[6]  Any portion of a fee based on Player compensation that is unascertainable at the time the Player contract is negotiated (e.g., a performance bonus) shall not be collected by the Player Agent until the Player has received such compensation.

It is the intent of these Regulations that the Player Agent shall not be entitled to receive any fee for his services until the Player receives the compensation upon which the fee is based. Consistent with this objective, a Player Agent is prohibited from including any provision in a SPAC with a Player whereby the Player becomes obligated to make any fee payment to the Player Agent in advance of the Player receiving the compensation upon which the fee is based. However, in promulgating these Regulations, the NBPA recognizes that in certain circumstances a Player may decide that it is in his best interest to pay his Player Agent's fee in advance of  receiving any compensation – whether it be his salary for the current playing season or deferred compensation.[7] Accordingly, it is the intent of these Regulations that an option be accorded to the Player to make advance fee payments to his Player Agent if the Player chooses to do so. In any such situation the Player Agent is authorized to accept the advanced payment.

---

[6] The amount of the Agent's fee shall not be affected by the fact that the Player received a guaranteed contract from an NBA Team.

[7] With respect to deferred compensation, the Agent shall only be entitled to a fee based on the present value of that compensation.

## SECTION 5

# ARBITRATION PROCEDURES

In establishing this new system for regulating Player Agents it is the intention of the NBPA that the arbitration process shall be the exclusive method for resolving any and all disputes that may arise from denying certification to an applicant or from the interpretation, application or enforcement of these Regulations and the resulting SPACs between Player Agents and individual Players. This will ensure that those disputes – which involve essentially internal matters concerning the relationship between individual Players, the NBPA in its capacity as their exclusive bargaining representative, and Player Agents performing certain delegated representative functions relating particularly to individual Player compensation negotiations – will be handled and resolved expeditiously by the decision-maker established herein, without need to resort to costly and time-consuming formal adjudication.

The provisions of this Section shall apply with respect to three types of disputes that may arise under these Regulations;

1 | The NBPA denies an Application and the applicant wishes to appeal from that action;

2 | A dispute arises with respect to the meaning, interpretation, or enforcement of a SPAC (described in Section 4) entered into between a Player and the Player Agent; and

3 | A dispute arises between two or more Player Agents with respect to their individual entitlement to fees owed, whether paid or unpaid, by a Player who was jointly represented by such Player Agents. In such cases, at the Player's option, any fees paid or payable by the Player after the dispute arises shall be placed in escrow pending final resolution of such dispute, and paid out of escrow in accordance with the Arbitrator's decision.

With respect to any dispute that may arise pursuant to paragraph (1) above, the procedure for filing an appeal and invoking arbitration is set forth in these Regulations in Section 2.D. Once arbitration has been invoked, the procedure set

forth in subparagraphs D through F, below, shall apply. With respect to any dispute that may rise pursuant to paragraph (2-3) above, the following procedures shall apply:

# A

# FILING

The arbitration of a dispute under subparagraph (2-3) above shall be initiated by the filing of a written grievance either by the Player or the Player Agent.

Any such grievance must be filed within thirty (30) days from the date of the occurrence of the event upon which the grievance is based or within thirty (30) days from the date on which the facts of the matter become known or reasonably should have become known to the grievant or within thirty (30) days from the effective date of these Regulations, whichever is later. A Player need not be under contract to an NBA Team at the time a grievance relating to him hereunder arises or at the time such grievance is initiated or processed.

A Player may initiate a grievance against a Player Agent if he (i) sends the written grievance by prepaid certified mail (or similar means such as Federal Express) to the Player Agent's business address or by personal delivery at such address, and via email to the email address on file with the NBPA, and (ii) sends a copy to the NBPA by prepaid certified mail (or similar means such as Federal Express) and email.8 A Player Agent may initiate a grievance against a Player if he (i) sends a written grievance by prepaid certified mail (or similar means such as Federal Express) to the Player or by personal delivery of the grievance to the Player, and via email to the email address on file with the NBPA, and (ii) furnishes a copy thereof to the NBPA by prepaid certified mail (or similar means such as Federal Express) and email.  A Player Agent may initiate a grievance against another Player Agent if he (i) sends a written grievance by prepaid certified mail (or similar means such as Federal Express) to the Player Agent or by personal delivery of the grievance to the Player Agent, and via address on file with the NBPA, and (ii) furnishes a copy thereof to the NBPA by prepaid certified mail (or similar means such as Federal Express) and

email. The written grievance shall set forth in plain and understandable terms the facts and circumstances giving rise to the grievance, the provision(s) of the agreement between the Player and his Player Agent(s) alleged to have been violated, and the relief sought. Any relevant documents relied on in the grievance should be attached thereto.

**B**

## ANSWER

The party against whom a grievance has been filed ("the respondent") shall answer the grievance in writing by prepaid certified mail (or similar means such as Federal Express) or personal delivery, and email within thirty (30) calendar days of receipt of the grievance. The Answer shall admit or deny the facts alleged in the grievance and shall also briefly set forth the reasons why the respondent believes the grievance should be denied. The respondent must also provide a copy of his Answer to the NBPA by prepaid certified mail (or similar means such as Federal Express) and email at the same time. Once the Answer is filed, the NBPA shall promptly provide the Arbitrator with copies of the grievance and Answer and all other relevant documents. If an Answer is not filed within this time limit, the Arbitrator, in his discretion, may issue an order where appropriate, granting the grievance and the requested relief upon satisfactory proof of the claim.

---

[8] For clarity, in the event a party receives the grievance by one means only (i.e., email) and acknowledges its receipt, such acknowledgement will not relieve the other party of the obligation to file under both manners described herein.  This footnote applies in all instances whereby two means of notice are required.

[9] In an appeal from a denial of certification, the parties will be the Player Agent and the NBPA.

## C

### ARBITRATOR

The NBPA has selected skilled and experienced person(s) to serve as the outside impartial Arbitrator(s) for all cases arising hereunder.

## D

### HEARINGS

The Arbitrator shall schedule a hearing on the dispute in New York City, except that the parties may mutually, with the consent of the NBPA, agree on Chicago or Los Angeles. At such hearings, the parties – i.e., the Player and the Player Agen–t [9] – may appear in person or by counsel or other representative. The parties to the dispute and the NBPA, as well, will have the right to present, by testimony or otherwise, any evidence relevant to the grievance. Within thirty (30) days after the close of the hearing, the Arbitrator shall issue a written award. That award shall constitute full, final and complete resolution of the grievance, and will be binding upon the Player and the Player Agent(s) involved. Given the uniquely internal nature of any such dispute that may be presented to the Arbitrator, it is the NBPA's intention that an award issued by the Arbitrator not be subject to judicial review on any grounds.

## E

### COSTS

Each party will bear the costs of its own witnesses and counsel. Costs of arbitration, including the fees and expenses of the Arbitrator and court reporter, will be borne equally between the parties to the grievance; provided, however, the Arbitrator may assess some or all of the party's costs to an opposing party if he deems a party's conduct to be frivolous. If the Arbitrator grants a monetary award, it shall be paid within ten (10) days, unless otherwise stated by the Arbitrator.

## F

### TIME LIMITS

The time limits of this Section may be extended only by written agreement of the parties.

**SECTION 6**

# OVERSIGHT AND COMPLIANCE PROCEDURE

**A**

## DISCIPLINARY COMMITTEE

The NBPA Executive Committee shall serve as the Disciplinary Committee, assisted by the NBPA Executive Director (or designee), Director of Security, and Legal Department. In this capacity, it shall have the authority and responsibility of initiating and then presenting disciplinary cases against Player Agents who violate these Regulations. In carrying out this function the Committee may also have the assistance of its outside legal counsel.

**B**

## COMPLAINT; FILING

Disciplinary proceedings against any Player Agent shall be initiated by the filing of a written complaint against the Player Agent by the Disciplinary Committee when it has reasonable cause to believe that the Player Agent has violated these Regulations. The Disciplinary Committee may act on the basis of its own knowledge or on the basis of information obtained from any person having knowledge of the action or conduct of the Player Agent in question, including, but not limited to, Players, NBPA staff, or other persons associated with professional or intercollegiate basketball. The Complaint shall be sent to the Player Agent by prepaid certified mail (or similar means such as Federal Express) addressed to the Player Agent's business office, or may be hand-delivered to the Player Agent personally at his business address, and via email. The Complaint shall set forth the specific action or conduct giving rise to the Complaint and cite the Regulation(s) alleged to have been violated.

A Complaint must be filed by the Disciplinary Committee within six (6) months from the date of the occurrence which gave rise to the Complaint, or within six (6) months from the date on which the information sufficient to create reasonable cause became known or reasonably should have become known to the Disciplinary Committee, whichever is later.  The filing deadline shall be extended by any new information disclosed to or discovered by the Disciplinary Committee, which it could not have reasonably obtained beforehand.

## C   ANSWER

The Player Agent against whom the Complaint has been filed shall have twenty (20) days in which to file a written Answer to the Complaint. Such Answer shall be sent by prepaid certified mail (or similar means such as Federal Express) and email to the Disciplinary Committee at the offices of the NBPA. The Answer must admit or deny the facts alleged in the Complaint, and shall also assert any facts or arguments which the Player Agent wishes to state in his defense.

## D   PROPOSED DISCIPLINARY ACTION

Within thirty (30) days after receipt of the Answer, the Disciplinary Committee shall inform the player agent in writing (by prepaid certified mail) of the nature of the discipline, if any, which the Committee proposes[10] to impose, which discipline may include one or more of the following:

1 | Issuance by the Committee of an informal order of reprimand to be retained in the Player Agent's file at the Committee's offices;

2 | Issuance of a formal letter of reprimand which may be made public;

3 | Imposition of a fine of up to $100,000 payable

within thirty (30) days of the imposition of such fine to the NBPA Foundation;

4 | Restitution to the Player as appropriate under the circumstances;

5 | Suspension of a Player Agent's certified status for a specified period of time during which he is prohibited from representing the NBPA in conducting individual contract negotiations for

---

[10] If the Committee already has invalidated the Player Agent's certification (see note 4), the same appeal procedure as contained herein shall apply.

any Player or assisting in or advising with respect to such negotiations; and

6 | Revocation of the Player Agent's Certification hereunder.

## E   APPEAL

The Player Agent against whom a Complaint has been filed under this Section or whose certification has automatically expired under Section 2 may appeal the Disciplinary Committee's proposed disciplinary action or the automatic expiration to the Arbitrator by filing a written Notice of Appeal with the Arbitrator within twenty (20) days following his receipt of notification of the proposed disciplinary action.

Within thirty (30) days of receipt of the Notice of Appeal, the Arbitrator shall set a time and place for a hearing on the appeal, which hearing shall take place in New York City, unless the parties mutually agree upon Chicago or Los Angeles.

The failure of a Player Agent to file a timely appeal shall be deemed to constitute an acceptance of the (1) proposed discipline which shall then be promptly administered or (2) automatic expiration.

## F   CONDUCT OF HEARING

At the hearing of any appeal, the Committee shall have the burden of proving by the preponderance of the evidence the allegations of its Complaint, except in the case of an automatic expiration of certification, the Player Agent shall have the burden of proving by the preponderance of the evidence that he has in fact negotiated and executed a contract for a Player with a NBA Team during the requisite period. The Committee and the Player Agent shall be afforded a full opportunity to present, through testimony or otherwise, their evidence pertaining to the charge(s) and defense(s) of the alleged violation(s) of the Regulations. The hearing shall be conducted in accordance

with the Voluntary Labor Arbitration Rules of the American Arbitration Association. Each of the parties may appear with counsel or a representative of its choosing. The hearing will be transcribed.

At the close of the hearing or within thirty (30) days thereafter, the Arbitrator shall issue a decision on the appeal, which decision shall either affirm, vacate or modify the proposed action of the Disciplinary Committee or confirm or rescind the automatic expiration of the certification (as applicable). For proposed disciplinary action by the Committee, the Arbitrator shall decide two issues: first, whether the Player Agent has engaged in or is engaging in prohibited conduct as alleged by the Committee; and second, if so, whether the discipline proposed by the Committee is reasonable in the circumstances of the case under review. If he decides both questions affirmatively, he shall issue an order affirming the proposed discipline; if he decides that the Player Agent has not engaged in any prohibited conduct, the Arbitrator shall issue an order vacating the proposed discipline and dismissing the case; and, if he decides the first question affirmatively but concludes that the proposed penalty is unreasonable, the Arbitrator shall issue an order modifying the penalty (provided, however, that no modification can result in the imposition of more severe discipline than that proposed by the Committee).

## **G**     TIME LIMITS; COST

Each of the time limits set forth in this Section may be extended by mutual written agreement of the parties involved. The fees and expenses of the Arbitrator will be paid by the NBPA. Each party will bear the costs of its own witnesses and counsel, etc.

**SECTION 7**

# NOTICE; EFFECTIVE DATE; AMENDMENT

All notices to the NBPA must be:

1 | Sent by prepaid certified mail (or similar means such as Federal Express) to:

> National Basketball Players Association
> ATTN: Legal Department
> 1133 Avenue of the Americas, 5th Floor
> New York, NY 10036
>
> and/or;

2 | Sent by email to: Legal@nbpa.com

These Regulations shall become effective on June 30, 2019.

These Regulations may be amended periodically by the action of the Officers of the NBPA and the Player Representatives.



For more information, please contact us.

**National Basketball Players Association**
**T** 212 655 0880  |  **F** 212 655 0881  |  nbpa.com