IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| FUNDAMENTAL SPORTS MANAGEMENT, LLC; | § | |
| RAHUL PATEL; GRANT GAINES; ROE-BRG | § | |
| INVESTMENTS, LLC; AND NICOLAS LAHOOD, | § | CIVIL ACTION NO. 5:20-CV-00774-FB |
| PLAINTIFFS, | § | (LEAD CASE) (JURY TRIAL DEMANDED) |
| | § | |
| V. | § | (CONSOLIDATED WITH 5:20-CV-00775-FB) |
| | § | |
| MAYAR ZOKAEI, | § | |
| DEFENDANT. | § | |

---

## PLAINTIFFS' THIRD MOTION FOR SUMMARY JUDGMENT

---

TO THE HON. RICHARD B. FARRER, U.S. DISTRICT JUDGE:

**COME NOW** Plaintiffs Fundamental Sports Management, LLC ("**FSM**"); Rahul Patel ("**Mr. Patel**"); and ROE-BRG Investments, LLC ("**ROE**") (collectively, "**Plaintiffs**") and file this Third Motion for Summary Judgment, respectfully showing the Court as follows:

### I. <u>Summary</u>

1.      Plaintiffs move for summary judgment on their declaratory judgment cause of action that: (1) FSM did not wrongfully terminate Defendant Mayar Zokaei ("**Defendant**") from FSM; (2) FSM did not breach the alleged "employment" contract with Defendant; and (3) none of Plaintiffs other than FSM could have any liability to Defendant for the alleged breach of the alleged "employment" contract with FSM.   The summary judgment evidence conclusively establishes that: (1) Defendant only alleges that he had a contract with FSM, and none of the other Plaintiffs; (2) Defendant admits that no contract was ever reached with FSM (or any other of Plaintiffs, for that matter); and (3) Defendant has been paid more than he could possibly be

owed even if Defendant proves the remainder of his case.  Therefore, summary judgment should be granted.

## II.  Judicial Notice & Summary Judgment Evidence

2.      Pursuant to Fed. R. Evid. 201, Plaintiffs request that the Court take judicial notice of the contents of the Clerk's file for: (1) this civil action; and (2) the styled and numbered *Mayar Zokaei v. Fundamental Sports Management, LLC, et al.*; 5:20-cv-00775-FB; in this Court (the "**Related Case**").

3.      Pursuant to Fed. R. Evid. 201, Plaintiffs request that the Court take judicial notice of the records of the Texas Secretary of State referenced herein.

4.      Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs adopt by reference, the same as though such was incorporated herein, their Original Complaint.  *See* Doc. No. 1.

5.      Pursuant to Fed. R. Civ. P. 56(c), Plaintiffs hereby give notice of their intent to use the following summary judgment evidence attached hereto:

    Exhibit A      Declaration of Rahul B. Patel; and
    Exhibit B      Excerpts of Deposition Transcript of Mayar Zokaei.

## III.  Relevant Procedural History

6.      On June 29, 2020, Defendant filed his original petition (the "**State Court Petition**") against to commence suit against Plaintiffs in the 285th Judicial District Court, Bexar County, Texas (the "**State Court Case**").  *See* Exhibit B-2.[1]

7.      On July 3, 2020, Plaintiffs filed their Original Complaint [Doc. No. 1] in this Court (the "**Lead Case**") and removed the State Court Case to federal court under 28 U.S.C. §

---

[1] Plaintiffs reference this exhibit for only limited purposes because it contains judicial admissions of Defendant. Except as cited, Plaintiffs disavow the hearsay statements contained in this exhibit.

1331.  *See* Doc. No. 1 in the Related Case.[2]  Upon removal, the State Court Case was styled and numbered *Zokaei v. Fundamental Sports Management, LLC, et al.*; 5:20-cv-00775-FB; in this Court.

8.     Plaintiffs then moved to consolidate the Related Case with the Lead Case [Doc. No. 5], which the Court granted [Doc. No. 6].  The Court then entered an order administratively closing the Related Case.

9.     On September 18, 2020, Defendant filed his original answer [Doc. No. 7].

### IV.  <u>Pertinent Factual Background</u>

10.    Defendant judicially admitted that he began "working for FSM on or about February 1, 2020."  *See* Exhibit B-2 ¶ 11 (first sentence).[3]  Defendant judicially admitted that he was terminated from FSM on April 20, 2021.  *See* Exhibit B-2 ¶ 14 (first sentence); *see also* Exhibit B-7.[4]

11.    When originally formed on June 16, 2017, FSM had only three managing members: (1) Mr. Patel; (2) Mr. LaHood; and (3) Mr. Gaines.  *See* Exhibits A & A-1.  On November 29, 2018, however, FSM filed a certificate of amendment whereby the only managing members of FSM was changed to be: (1) Mr. Patel; and (2) ROE.  *See* Exhibits A & A-2.

12.    Defendant alleged (and when used against him, judicially admitted) that he had a "written employment contract" with an unidentified party. *See* Exhibit B-2 ¶ 14 (first sentence).  During his deposition, however, Defendant concedes that if he had a contract with any of Plaintiffs, then it was only with FSM, and no one else (including but not limited to any of the

---

[2] Pursuant to Fed. R. Evid. 201, Plaintiffs request that the Court take limited judicial notice of the contents of the Clerk's file for the Related Case.  Plaintiffs reference the documents filed in the Related Case for only limited purposes because they contain judicial admissions of Defendant.  Except as cited, Plaintiffs disavow the hearsay statements contained in that action.
[3] Plaintiffs cite this evidence for only the limited purpose stated as a party admission of Defendant.  However, the remainder of the statements in this exhibit are hearsay.
[4] Plaintiffs cite this evidence for only the limited purpose stated as a party admission of Defendant.  However, the remainder of the statements in this exhibit are hearsay.

other Plaintiffs).  *See* Exhibit B at 125:23-25.  Defendant alleged (and when used against him, judicially admitted) that he did not assent to the Independent Contractor Agreement that was attached to Plaintiffs' Original Complaint (Doc. No. 1 at ¶ 14 and Exhibit B).  *See* Doc. No. 12 at ¶ 14.

13.     Regardless, Defendant concedes that Defendant and FSM (or any other of Plaintiffs, for that matter) never finalized negotiating the form of a contract with one another for his alleged "employment", nor executed any such alleged contract.  *See* Exhibit B at 74:24 – 75:23, 76:5 – 77:14, 78:11 – 79:14, 85:4 – 86:8, 93:1 – 94:24, 95:21 – 96:8, 97:21 – 98:1, 98:7 – 99:16, 117:3-19, 118:3 – 118:23.  In fact, as late as March 11, 2020, Defendant emailed FSM with a counteroffer to the proposed contract that FSM had most recently offered.  *See id.*; Exhibits B-8, B-9, B-11, & B-12.

14.     During his deposition, Defendant admitted that Defendant and FSM (or any of the other Plaintiffs, for that matter) never reached a contract because the terms were still being negotiated.  *See* Exhibits B at 111:9 – 112:3, 115:4-23, 117:9-19, 118:3-23; B-8, B-9, B-11, B-12, B-17.

15.     During his deposition, Defendant: (1) alleged that FSM owed him $12,500.00 per month for his services, and he alleged he was owed $6,250.00 for his services; (2) alleged he was entitled to be reimbursed up to $5,000.00 per month for expenses, and he was owed $11,589.08; and (3) admitted that FSM paid him no less than $49,250.04, exclusive of the $50,000.00 that funded the loans memorialized by the two promissory notes.  *See* Exhibits B at 42:22 – 43:6; 96:9-22, 128:16 – 130:12, 133:5-8; B-7;[5] B-19; B-20.

---

[5] Plaintiffs cite this evidence for only the limited purpose stated as a party admission of Defendant.  However, the remainder of the statements in this exhibit are hearsay.

## V.  Legal Standard

16.    A party is entitled to summary judgment if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

17.    "The substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248.  The movant accomplishes this by informing the court of the basis for its motion, and by identifying portions of the record which reveal that there are no genuine material fact issues. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant produces such evidence, the nonmovant must then direct the court to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial.  *See id.* at 323-24.

## VI.  Arguments & Authorities

18.    Plaintiffs are entitled to partial summary judgment because: (1) FSM (or any other of Plaintiffs, for that matter) did not wrongfully terminate Defendant from FSM; (2) FSM (or any other of Plaintiffs, for that matter)  did not breach the alleged employment contract with Defendant; and (3) none of Plaintiffs other than FSM could have any liability to Defendant for the alleged breach of the alleged employment contract with FSM.

19.    The elements necessary to form a valid and binding contract are: (1) an offer; (2) acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms, or "mutual assent"; and (5) execution and delivery of the contract with the intent that it be mutual and binding.  *See, e.g., Specialty Select Care Ctr. of San Antonio v. Owen*, 499 S.W.3d 37, 43 (Tex. App. – San Antonio 2016, no pet.).

20.     A purported "acceptance" of an offer cannot change or qualify the material terms of the offer, and any purported "acceptance" that does not mirror the offer actually constitutes both a rejection of the offer and a counteroffer.  *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 513-14 (Tex. 2014); *Davis v. Tex. Farm Bureau Ins*., 470 S.W.3d 97, 104-05 (Tex. App. – Houston [1st Dist.] 2015, no pet.) ("A counteroffer constitutes a rejection, not an acceptance, of the original offer.").

21.     Under Texas law, employment is presumed to be at-will unless and until it is proven otherwise.  *Midland Judicial Dist. Cmty. Supervision & Corr. Dep't v. Jones*, 92 S.W.3d 486, 487 (Tex. 2002) (per curiam) (internal citation omitted).  That is, an employer can terminate an employee for good cause, bad cause, or no cause unless an employment agreement provides otherwise.  *Montgomery County Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998).

22.     An employee bears the burden of proving that the employer agreed to modify their at-will employment status.  *See Brown*, 965 S.W.2d at 502-03.  To do so, the employee must prove that the employer expressly agreed not to terminate the employee except under clear and specific circumstances.  *Id.* at 502; *Jones*, 92 S.W.3d at 487.

23.     First, Defendant admitted during his deposition that if he had a contract with any of Plaintiffs, then such contract was only with FSM.  *See* Exhibit B at 125:23-25.  Therefore, each of Plaintiffs other than FSM are entitled to summary judgment none of Plaintiffs other than FSM have any liability to Defendant for the causes of action for breach of contract, and thus Plaintiffs (other than FSM) are entitled to summary judgment.

24.     Second, Defendant alleges that FSM agreed to employ him for at least one year based upon an unexecuted proposed independent contractor agreement that Defendant rejected by making a counteroffer.  *See* Exhibits B at 74:24 – 75:23, 76:5 – 77:14, 78:11 – 79:14, 85:4 –

86:8, 93:1 – 94:24, 95:21 – 96:8, 97:21 – 98:1, 98:7 – 99:16, 117:3-19, 118:3 – 118:23; B-8; B-9; B-11; & B-12.   Defendant's counteroffer constituted a rejection of FSM's offer, not an acceptance.  *See, e.g., Davis*, 470 S.W.3d at 104-05.  In addition, Defendant alleged (and when used against him, judicially admitted) that he had a "written employment contract" with an unidentified party. *See* Exhibit B-2 ¶ 14 (first sentence). Defendant alleged (and when used against him, judicially admitted) that he did not assent to the Independent Contractor Agreement that was attached to Plaintiffs' Original Complaint (Doc. No. 1 at ¶ 14 and Exhibit B).  *See* Doc. No. 12 at ¶ 14.  Therefore, Defendant and FSM (or any other of Plaintiffs, for that matter) never reached any contract, which means that FSM could not have breached any contract, and thus Plaintiffs are entitled to summary judgment.

25.     Fourth, FSM has actually paid Defendant more than he could possibly be owed according to Defendant's own judicial and sworn admission.  As Defendant testified during his deposition and alleged in his sworn Texas Workforce Commission wage claim (which are admissions when used against him): (1) FSM contracted to pay Defendant $150,000.00 annually, which is a daily rate of $410.96; (2) Defendant was to be paid $6,250.00 twice per month; and (3) Defendant began providing services to FSM on February 1, 2020, and was terminated on April 20, 2020.  *See* Exhibit A to Doc. No. 1 (pp. 8-15) in the Related Case at p. 10, ¶¶ 11 (first sentence) & 14 (first sentence); *see also* Exhibits B at 42:22 – 43:6; 96:9-22, 128:16 – 130:12, 133:5-8; B-7; B-19; B-20.

26.     Based upon his admissions, Defendant could be owed no more than $44,054.92, consisting of: (1) $32,465.84 for his services between February 1, 2020, through April 20, 2020 (79 days x $410.96/day = $32,465.84); and (2) $11,589.08 for unreimbursed expenses.

Defendant admitted that FSM paid him no less than $49,250.04 towards what he alleges he was owed.  *See* Exhibits B at 42:22 – 43:6; 96:9-22, 128:16 – 130:12, 133:5-8; B-7; B-19; B-20.

27.    As such, Defendant has admitted that he was paid no less than $5,195.12 more than what he alleges he was owed.  Therefore, FSM (or any other of Plaintiffs, for that matter) owe Defendant nothing, and thus Plaintiffs are entitled to summary judgment.

## VII.  Attorney's Fees

28.    A person, including Plaintiffs, may recover attorney's fees from an individual such as Defendant on a claim for breach of contract. Tex. Civ. Prac. & Rem. Code § 38.001(8).

29.    Plaintiffs will seek recovery of costs and attorney fees in accordance with Local Rule CV-7(j)(1) and Fed. R. Civ. P. 54(d)(2).

## VIII.  Prayer

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray that the Court grant this Motion in its entirety, enter partial summary judgment as requested herein, and award Plaintiffs all such other and further relief, both general and special, at law or in equity, to which Plaintiffs may be entitled.

Respectfully submitted,

**PATEL GAINES, PLLC**
221 West Exchange Avenue, Suite 306
Fort Worth, Texas 76164
www.patelgaines.com
(817) 394-4844 | Telephone
(817) 394-4344 | Facsimile

By: */s/ Lance H. "Luke" Beshara*
      Lance "Luke" H. Beshara
      Texas State Bar No. 24045492
      lbeshara@patelgaines.com

**ATTORNEY FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I certify that the date this document was filed with the Clerk of the Court, a true and correct copy was transmitted in accordance with the requirements of the Federal Rules of Civil Procedure, addressed as follows:

*Via ECF Service*:
John D. Murphy
Husein Hadi

                                    */s/ Lance H. "Luke" Beshara*
                                    Lance H. "Luke" Beshara

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| FUNDAMENTAL SPORTS MANAGEMENT, LLC; | § | |
| RAHUL PATEL; GRANT GAINES; ROE-BRG | § | |
| INVESTMENTS, LLC; AND NICOLAS LAHOOD, | § | CIVIL ACTION NO. 5:20-CV-00774-FB |
| PLAINTIFFS, | § | (LEAD CASE) (JURY TRIAL DEMANDED) |
| | § | |
| V. | § | (CONSOLIDATED WITH 5:20-CV-00775-FB) |
| | § | |
| MAYAR ZOKAEI, | § | |
| DEFENDANT. | § | |

---

**Plaintiffs' Appendix in Support of Third Motion for Summary Judgment**

---

COME NOW Plaintiffs Fundamental Sports Management, LLC; Rahul Patel; and ROE-BRG Investments, LLC (collectively, "**Plaintiffs**"), and pursuant to Local Rule CV-7(d)(1) file their Appendix in Support of Third Motion for Partial Summary Judgment, respectfully showing the Court as follows:

| | | |
|---|---|---|
| Tab A | Declaration of Rahul Patel | App. 1-3 |
| Tab A-1 | Certificate of Formation | App. 4-6 |
| Tab A-2 | Certificate of Amendment | App. 7-10 |
| Tab B | Deposition Transcript of Mayar Zokaei | App. 11-86 |
| Tab B-2 | Plaintiff's Original Petition | App. 87-95 |
| Tab B-7 | Wage Claim | App. 96-99 |
| Tab B-8 | Email String | App. 100-103 |
| Tab B-9 | Independent Contractor Agreement | App. 104-112 |
| Tab B-11 | Email String | App. 113-114 |
| Tab B-12 | Independent Contractor Agreement | App. 115-123 |

Tab B-17       Certificate of Formation…………..........................App. 124-126

Tab B-19       Wire Notice…………..................................................App. 127-128

Tab B-20       Payment Ledger...........................................................App. 129-130

Respectfully submitted,

**PATEL GAINES, PLLC**
221 West Exchange Ave., Suite 206A
Fort Worth, Texas 76164
www.patelgaines.com
(817) 394-4844 | Telephone
(817) 394-4344 | Facsimile

By: */s/ Lance H. "Luke" Beshara*
    Lance "Luke" H. Beshara
    Texas State Bar No. 24045492
    lbeshara@patelgaines.com

**ATTORNEY FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I certify that the date this document was filed with the Clerk of the Court, a true and correct copy was transmitted in accordance with the requirements of the Federal Rules of Civil Procedure, addressed as follows:

***Via ECF Service***:
John D. Murphy
Husein Hadi

    */s/ Lance H. "Luke" Beshara*
    Lance H. "Luke" Beshara

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| FUNDAMENTAL SPORTS MANAGEMENT, LLC; | § | |
| RAHUL PATEL; GRANT GAINES; ROE-BRG | § | |
| INVESTMENTS, LLC; AND NICOLAS LAHOOD, | § | CIVIL ACTION NO. 5:20-CV-00774-FB |
| PLAINTIFFS, | § | (LEAD CASE) (JURY TRIAL DEMANDED) |
| | § | |
| V. | § | (CONSOLIDATED WITH 5:20-CV-00775-FB) |
| | § | |
| MAYAR ZOKAEI, | § | |
| DEFENDANT. | § | |

---

## DECLARATION

---

Pursuant to 28 U.S.C. § 1746, the undersigned makes the following declaration:

1.     I am the Chief Executive Officer of Fundamental Sports Management, LLC ("**FSM**").

2.     On June 16, 2017, FSM was formed when the Texas Secretary of State accepted and filed a Certificate of Formation.  A true and correct copy of this Certificate of Formation is attached hereto as Exhibit A-1.  When originally formed, as evidenced in Exhibit A-1, FSM had only three managing members: (1) me; (2) Nicolas Lahood; and (3) Grant Gaines.

3.     On November 29, 2018, the Texas Secretary of State accepted and filed a Certificate of Amendment with the Texas Secretary of State.  A true and correct copy of this Certificate of Amendment is attached hereto as Exhibit A-2.  By virtue of this Certificate of Amendment, the only managing members of FSM were changed to be: (1) me; and (2) ROE-BRG Investments, LLC ("**ROE**").  Since that time, the only managing members of FSM have been: (1) me; and (2) ROE.  Since that time, Nicolas Lahood and Grant Gaines have not been members, managers, or held any other role or position with FSM.

4.     I am a custodian of records for FSM, and I am familiar with the manner and method by which FSM makes, maintains, and keeps its business records.  The records attached hereto as Exhibits A-1 and A-2: (1) were made at or near the time by – or from information transmitted by – someone with knowledge; and (2) were kept in the course of a regularly conducted activity of a business.  The making of records such as Exhibits A-1 and A-2 was a regular practice of the business activities of FSM.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on this 16th day of August, 2021.

Rahul Patel

# EXHIBIT A-1

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300



**Certificate of Formation
Limited Liability Company**

**Filed in the Office of the
Secretary of State of Texas
Filing #: 802747419 06/16/2017
Document #: 744927150002
Image Generated Electronically
for Web Filing**

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

## Fundamental Sports Management, LLC

### Article 2 – Registered Agent and Registered Office

☑A. The initial registered agent is an organization (cannot be company named above) by the name of:

## Patel Gaines, PLLC

### OR

☐ B. The initial registered agent is an individual resident of the state whose name is set forth below:

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**14414 Blanco Road**
**Ste 320  San Antonio  TX  78216**

### Consent of Registered Agent

☐A. A copy of the consent of registered agent is attached.

### OR

☑B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☐A. The limited liability company is to be managed by managers.

### OR

☑B. The limited liability company will not have managers. Management of the company is reserved to the members. The names and addresses of the governing persons are set forth below:

| Managing Member 1: | **Rahul  B  Patel** | Title: | **Managing Member** |

Address: **14414 Blanco Road   Ste. 320  San Antonio  TX, USA  78216**

| Managing Member 2: | **Nicolas    LaHood** | Title: | **Managing Member** |

Address: **14414 Blanco Road   Ste. 320  San Antonio  TX, USA  78216**

| Managing Member 3: | **Grant  M  Gaines** | Title: | **Managing Member** |

Address: **14414 Blanco Road   Ste. 320  San Antonio  TX, USA  78216**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

[The attached addendum, if any, is incorporated herein by reference.]

### Organizer

The name and address of the organizer are set forth below.

**Rahul B. Patel**          **14414 Blanco Road, Ste 320, San Antonio, Texas 78216**

### Effectiveness of Filing

☑A. This document becomes effective when the document is filed by the secretary of state.

### OR

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Rahul B. Patel**

Signature of Organizer

**FILING OFFICE COPY**

# EXHIBIT A-2

| | | |
|---|---|---|
| **Form 424**<br>**(Revised 05/11)**<br><br>Submit in duplicate to:<br>Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>512 463-5555<br>FAX: 512/463-5709<br>**Filing Fee: See instructions** | <br>**Certificate of Amendment** | This space reserved for office use.<br><br>**F I L E D**<br>**In the Office of the**<br>**Secretary of State of Texas**<br><br>**NOV 2 9 2018**<br><br>**Corporations Section** |

## Entity Information

The name of the filing entity is:

Fundamental Sports Management, LLC

State the name of the entity as currently shown in the records of the secretary of state. If the amendment changes the name of the entity, state the old name and not the new name.

The filing entity is a: (Select the appropriate entity type below.)

☐ For-profit Corporation                    ☐ Professional Corporation

☐ Nonprofit Corporation                    ☐ Professional Limited Liability Company

☐ Cooperative Association                  ☐ Professional Association

☒ Limited Liability Company                ☐ Limited Partnership

The file number issued to the filing entity by the secretary of state is:   802747419

The date of formation of the entity is:   June 16, 2017

## Amendments

### 1. Amended Name

(If the purpose of the certificate of amendment is to change the name of the entity, use the following statement)

The amendment changes the certificate of formation to change the article or provision that names the filing entity. The article or provision is amended to read as follows:

The name of the filing entity is: (state the new name of the entity below)

_____

The name of the entity must contain an organizational designation or accepted abbreviation of such term, as applicable.

### 2. Amended Registered Agent/Registered Office

The amendment changes the certificate of formation to change the article or provision stating the name of the registered agent and the registered office address of the filing entity. The article or provision is amended to read as follows:

### Registered Agent
(Complete either A or B, but not both. Also complete C.)

☐  A. The registered agent is an organization (cannot be entity named above) by the name of:

_____

**OR**

☐  B. The registered agent is an individual resident of the state whose name is:

_____

*First Name*                    *M.I.*          *Last Name*                        *Suffix*

The person executing this instrument affirms that the person designated as the new registered agent has consented to serve as registered agent.

C. The business address of the registered agent and the registered office address is:

2030 N Loop 1604 W, Suite 200            San Antonio          TX    78248
*Street Address (No P.O. Box)*                    *City*              :          *State   Zip Code*

### 3. Other Added, Altered, or Deleted Provisions

Other changes or additions to the certificate of formation may be made in the space provided below. If the space provided is insufficient, incorporate the additional text by providing an attachment to this form. Please read the instructions to this form for further information on format.

Text Area (The attached addendum, if any, is incorporated herein by reference.)

☐ **Add** each of the following provisions to the certificate of formation. The identification or reference of the added provision and the full text are as follows:

☒ **Alter** each of the following provisions of the certificate of formation. The identification or reference of the altered provision and the full text of the provision as amended are as follows:

Change Grant M. Gaines to ROR-BRG Investments, LLC

☒ **Delete** each of the provisions identified below from the certificate of formation.

Nicholas LaHood as Managing Member 2 of the company

## Statement of Approval

The amendments to the certificate of formation have been approved in the manner required by the Texas Business Organizations Code and by the governing documents of the entity.

Form 424                                        7

## Effectiveness of Filing (Select either A, B, or C.)

A. ☒ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: _____

C. ☐ This document takes effect upon the occurrence of a future event or fact, other than the passage of time. The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

## Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date:   November 2, 2018

By: _____

Rahul B. Patel
Signature of authorized person

Rahul B. Patel Managing Member
Printed or typed name of authorized person (see instructions)

Form 424                                    8

# EXHIBIT B

## Mayar Zokaei - August 3, 2021

**1**

```
1           IN THE UNITED STATES DISTRICT COURT
2           FOR THE WESTERN DISTRICT OF TEXAS
3                 SAN ANTONIO DIVISION
4 FUNDAMENTAL SPORTS          )
   MANAGEMENT, LLC; RAHUL     )
5 PATEL; GRANT GAINES,        )
   ROE-BRG INVESTMENTS, LLC;  )
6 AND NICOLAS LaHood,         )
                              )
7    Plaintiffs,              ) NO. 5:20-CV-00774-FB
                              ) (CONSOLIDATED WITH
8 VS.                         )   5:20-CV-00775-FB)
                              )
9 MAYAR ZOKAEI,               )
                              )
10   Defendant.               )
11
12       ORAL AND VIDEOTAPED DEPOSITION OF
13               MAYAR ZOKAEI
14               AUGUST 3, 2021
15             (Reported Remotely)
16       ORAL AND VIDEOTAPED DEPOSITION of MAYAR
17 ZOKAEI, produced as a witness at the instance of the
18 Plaintiffs, and duly sworn, was taken in the
19 above-styled and numbered cause on the 3rd of August,
20 2021, from 11:32 a.m. to 4:01 p.m., Pacific Daylight
21 Time, before Audra B. Paty, CSR in and for the State
22 of Texas, reported by machine shorthand, in the City
23 of Wilsonville, County of Clackamas, State of Oregon,
24 pursuant to Notice and the Federal Rules of Civil
25 Procedure.
```

**2**

```
1          A P P E A R A N C E S
2    FOR THE PLAINTIFFS:
         Mr. Lance H. "Luke" Beshara
3        PATEL GAINES, PLLC
         221 West Exchange Avenue
4        Suite 308
         Fort Worth, Texas 76164
5        817.394.4844
         lbeshara@patelgaines.com
6
7    FOR THE DEFENDANT:
8        Mr. John Murphy
         HIGDON LAWYERS
9        4900 Fournace Place
         Bellaire, Texas 77401
10       713.2237300
         john@higdonlawyers.com
11
         Mr. Sedrick Stagg
12       THE HADI LAW FIRM, PLLC
         7100 Regency Square Boulevard
13       Suite 140
         Houston, Texas 77036
14       832.433.7977
         litigation@thehadilawfirm.com
15
16
     ALSO PRESENT:
17       Mr. Rahul B. Patel
         Mr. Guy Tubbs, Videographer
18
19
20
21
22
23
24
25
```

**3**

```
1                I N D E X
2 WITNESS                                     PAGE
3 MAYAR ZOKAEI
4 EXAMINATION BY MR. BESHARA                    6
5
6 CORRECTIONS MADE BY WITNESS                 184
7 SIGNATURE OF WITNESS                        185
8 REPORTER'S CERTIFICATION                    186
9
10 EXHIBITS                              IDENTIFIED
11 Exhibit  1 - NBPA Regulations Governing
               Player Agents                  10
12
   Exhibit  2 - Plaintiff's Original Petition
13             and Request for Disclosures     22
14 Exhibit  3 - Independent Contractor Agreement 31
15 Exhibit  4 - Promissory Note 10K            50
16 Exhibit  5 - Promissory Note 40K            52
17 Exhibit  6 - Confidentiality and Nondisclosure
               Agreement                       54
18
   Exhibit  7 - Wage Claim                     58
19
   Exhibit  8 - E-mail string to e-mail being
20             3-11-20 Zokaei e-mail to Fahim   74
21 Exhibit  9 - Independent Contractor Agreement 82
22 Exhibit 10 - Independent Contractor
               Confidentiality and Nondisclosure
23             Agreement                        84
24 Exhibit 11 - 1-31-20 Patel e-mail to Zokaei  93
25 Exhibit 12 - Independent Contractor Agreement 93
```

**4**

```
1 EXHIBITS                              IDENTIFIED
2 Exhibit 13 - Independent Contractor
               Confidentiality and Nondisclosure
3             Agreement                         93
4 Exhibit 14 - Purchase Agreement               93
5 Exhibit 15 - E-mail string top e-mail being
               4-29-20 Schoeffler e-mail to
6             Zokaei                           101
7 Exhibit 16 - E-mail string top e-mail being
               4-30-20 Schoeffler e-mail to
8             Zokaei                           106
9 Exhibit 17 - Certificate of Formation Limited
               Liability Company              111
10
   Exhibit 18 - Entity Information            111
11
   Exhibit 19 - Outgoing Wire Notice          128
12
   Exhibit 20 - Fundamental Sports Management
13             Transaction Report             129
14 Exhibit 21 - 5-11-20 Hadi Law Firm letter
               to Gaines                      156
15
   Exhibit 22 - E-mail string top e-mail being
16             3-3-20 Patel letter to Zokaei  160
17 Exhibit 23 - Request for Taxpayer
               Identification Number and
18             Certification                  165
19 Exhibit 24 - RealGM document               179
20
21
22
23
24
25
```

Mayar Zokaei - August 3, 2021

**5**

1               P R O C E E D I N G S

2          THE VIDEOGRAPHER:  Going on the record at

3 11:32 Pacific Daylight Time.  Today is Tuesday, August

4 3rd, 2021.  This is the beginning of tape number 1,

5 volume 1.  We are here for the deposition of Mayar

6 Zokaei in the case styled Fundamental Sports

7 Management, LLC et al. versus Mayar Zokaei.

8          This deposition is taking place in

9 Wilsonville, Oregon.  The court reporter is Audra

10 Paty.  We are with Dickman Davenport, 4228 North

11 Central Expressway, Suite 101, Dallas, Texas 75206.

12 Will counsel please state their appearances for the

13 record after which the court reporter will read a

14 brief statement and then swear in the witness.

15          MR. MURPHY:  For the plaintiff, my name

16 is John Murphy.  I'm with the Higdon Law Firm in

17 Bellaire, Texas.

18          MR. STAGG:  Sedrick Stagg with The Hadi

19 Law Firm.

20          MR. BESHARA:  I am Luke Beshara.  I

21 represent -- let me get the list of names here for us.

22 Fundamental Sports Management, LLC, Rahul Patel, Grant

23 Gaines, ROE-BRG Investments, LLC, and Nicolas LaHood.

24          THE REPORTER:  Okay.  I will make a brief

25 statement and then I will swear the witness in.

**6**

1          My name is Audra Paty, Texas Certified

2 Shorthand Reporter Number 5987.  This deposition is

3 being conducted remotely in accordance with the

4 current Emergency Order regarding the COVID-19 State

5 of Disaster issued and signed by the Supreme Court of

6 Texas.

7          The deposition is being held via

8 videoconferencing equipment.  The witness and reporter

9 are not in the same room.  The witness will be sworn

10 in remotely pursuant to agreement of all parties.

11          The parties will stipulate that the

12 testimony is being given as if the witness was sworn

13 in person.

14          All parties please state your agreement

15 on the record at this time.

16          MR. MURPHY:  That's so agreed.

17          MR. BESHARA:  Luke Beshara agrees.

18          THE WITNESS:  I agree.

19          MAYAR ZOKAEI,

20 having been first duly sworn, testified as follows:

21               EXAMINATION

22 BY MR. BESHARA:

23     Q.  Mr. Zokaei, my name is Luke Beshara.  As you

24 know, I represent Fundamental Sports Management, LLC

25 and several other individuals and an entity.

**7**

1          Let's start off by you giving your name

2 and spelling it for the record.

3     A.  My name is Mayar Zokaei.  That's M-A-Y-A-R,

4 last name, Z-O-K-A-E-I.

5     Q.  Where are you presently located as you give

6 your deposition today?

7     A.  I am in Wilsonville, Oregon.

8     Q.  Do you understand that you have been sworn in

9 as a witness the same as though you were seated in a

10 courtroom and you're under oath?

11     A.  I do.

12     Q.  So all your testimony is subject to the same

13 penalties of perjury the same as though you were

14 seated in a witness stand in a courtroom?

15     A.  Got it.

16     Q.  Let's start off with a little background.

17 What is it -- what is it that you do for a living,

18 Mr. Zokaei?

19     A.  I am a basketball agent.

20     Q.  And how long have you been a basketball

21 agent?

22     A.  About 11 years.

23     Q.  Some of this stuff I know and you know, but

24 it's for the benefit of the jury.  When you say

25 basketball agent, what type of basketball players are

**8**

1 you representing?

2     A.  I represent players that play professionally

3 in the NBA as well as overseas.

4     Q.  And are you conducting business under your

5 own name or are you associated with an entity that you

6 perhaps own or someone else owns?

7     A.  At the current time I am operating as an

8 individual under my own name.

9     Q.  And what is the name of your sports agency?

10     A.  I don't have a sports agency.  I am again

11 operating as an individual under my own name.

12     Q.  I understand you don't have an entity, but

13 you are a sports agent so if -- when you hold yourself

14 out and you introduce to someone, what do you have on

15 your business card or what's the name of your

16 business?

17     A.  I just refer to myself as an individual

18 representing athletes.

19     Q.  So it's just Mayar Zokaei?

20     A.  Yeah.

21     Q.  With nothing else?

22     A.  I don't have a business card.

23     Q.  Do you -- have you registered any assumed

24 names, for example, under which you conduct business?

25     A.  Not with respect to my work as a sports

Mayar Zokaei - August 3, 2021

**9**

1 agent.
2    Q.  All right.  How long have you been a -- are
3 you certified by the NBPA?
4    A.  Yes, I am currently certified by the NBPA.
5    Q.  And what is the NBPA?
6    A.  That is the union that certifies and
7 regulates agents.
8    Q.  For professional basketball players in the
9 NBA?
10    A.  Yes.
11    Q.  What is the process to become registered or
12 certified with the NBPA?
13    A.  There is an application you fill out.
14 There's a background check and there's an administered
15 test that you take.
16    Q.  Are you subject to any rules or regulations
17 issued from the NBPA?
18    A.  Yes.
19    Q.  And where -- I'm going to go ahead and share
20 screen.
21        MR. BESHARA:  We have that available; is
22 that correct?
23        THE WITNESS:  Are you asking me?
24        MR. BESHARA:  No, I was asking the court
25 reporter, but we'll go ahead and try.

**10**

1        THE REPORTER:  Yes.  You should be able
2 to.
3        MR. BESHARA:  And for opposing counsel,
4 how do you want me to get you over deposition
5 exhibits?  Do you want me to send them to you all at
6 the end or do you want me to send them as we go along?
7        MR. MURPHY:  Yeah, if you can send them
8 at the end, Luke, that's fine.
9        THE REPORTER:  You can also put them in
10 the chat and they can be downloaded, but that's up to
11 you guys.
12        MR. BESHARA:  That's fine with me.  I
13 don't think I've ever done that.  File.  Can you go
14 over to the chat function and see if you can access
15 that?
16        MR. MURPHY:  Okay.  It's downloading.
17        (Exhibit No. 1 marked.)
18    Q.  (BY MR. BESHARA)  Okay.  I'm going to go
19 ahead and share the screen.  This is what I marked as
20 Deposition Exhibit 1.  Mr. Zokaei, are you able to see
21 that?
22    A.  Yes.
23    Q.  And I'm going to decrease it a little bit so
24 you have a slightly better view.  Have you ever seen
25 this document before?  Have you ever seen this

**11**

1 document before?
2    A.  Are you speaking to me?
3    Q.  Yes, Mr. Zokaei.
4    A.  Yes, I have.
5    Q.  Okay.  And what is Exhibit 1?
6    A.  This is a document that they give to all
7 agents I believe when you get certification and that
8 are the rules of conduct for agents.
9    Q.  And are you obligated to comply with the
10 rules of conduct set forth in Deposition Exhibit 1 as
11 part of your registration as an NBPA agent?
12    A.  Yes.
13    Q.  What happens if you fail to comply with these
14 rules of conduct set forth in Deposition Exhibit 1?
15    A.  I'm am not quite sure.  I have never failed
16 to comply with these rules and regulations so I do not
17 know what the recourse is on behalf of this NBPA for
18 something like that.
19    Q.  You went through a process of applying to
20 become an NBPA agent.  You didn't learn that violating
21 these rules of conduct would subject you to
22 disciplinary procedure from the NBPA up to and
23 including revocation of your certification?
24    A.  Yeah, specifically I don't know what the
25 process is.  I do know that there are ramifications,

**12**

1 but I do not know what it entails if you do -- if you
2 are in conflict of these rules and regulations.
3    Q.  Would you agree with me that discipline could
4 include revocation as a certified NBPA agent?
5    A.  Yes.
6    Q.  Is it important for you in your line of work
7 to make sure that you comply with the rules of conduct
8 set forth in Deposition Exhibit 1?
9    A.  Yes.
10    Q.  Coming back, how long ago -- when were you
11 first licensed as an NBPA agent?
12    A.  I don't remember the exact time or year, but
13 it has been several years.
14    Q.  Certainly before any of the events at issue
15 in this lawsuit, right?
16    A.  Yes.
17    Q.  I mean, we're talking late 2019 when you
18 first began discussions with FSM -- if I say FSM, will
19 you understand I mean Fundamental Sports Management,
20 LLC --
21    A.  Yes.
22    Q.  -- a party to this action?
23        So were you licensed at the time you
24 began negotiations with FSM?
25    A.  Yes, I was.

Mayar Zokaei - August 3, 2021

**13**

1    Q.  Let's jump to that point.  How did you first
2become familiar with FSM?
3    A.  I had read I believe an article online and
4there was a new agency that had started in San Antonio
5and it piqued my interest just because of, you know,
6being a smaller agency in a city that is not really
7well known for startup basketball agencies.  And I
8reached out to the principal over there or somebody
9over there to see if there was potential for us to
10work together.
11    Q.  Who was it that you reached out to that you
12spoke with on behalf of FSM?
13    A.  Rahul Patel.
14    Q.  Okay.  Do you remember when you first began
15communications with Rahul Patel on behalf of FSM?
16    A.  Around October, November 2019.
17    Q.  What were you doing for a living in October,
18November of 2019?
19    A.  I was working as a basketball agent.
20    Q.  And who were you employed by at that time?
21    A.  I was still an independent agent working for
22myself.
23    Q.  So much like you are today?
24    A.  Yes.
25    Q.  Have you -- aside from -- putting aside

**14**

1FSM --
2    A.  Uh-huh.
3    Q.  -- have you ever worked as an agent for a
4sports agency?
5    A.  I have not had a formal arrangement with a
6sports agency, no.
7    Q.  So ever since you became an NBPA certified
8agent, besides your stint with FSM, you have worked
9for yourself as an independent agent; is that correct?
10    A.  Yes.  I have been mentored by some agents and
11worked on an informal level, but I have never worked
12formally with another agency.
13    Q.  How did you first get into this industry?
14    A.  It's just something that I wanted to do since
15I was a kid.  I always wanted to get into the world of
16basketball.  Unfortunately I wasn't tall enough nor
17skilled enough to play basketball and I thought this
18was an opportunity for me to be involved with the
19basketball world, perhaps on the other side of it.
20    Q.  So that leads me to another point.  Have you
21always wanted to specifically be an agent for
22professional basketball players or for professional
23athletes in general?
24    A.  Professional basketball players.
25    Q.  So that's always been your focus?

**15**

1    A.  Yes.
2    Q.  And I can only imagine, you know, you sign
3up, you take your test, you get registered, certified
4by the NBPA, that's your first step, right?
5    A.  Correct.
6    Q.  What do you next to develop a client base?
7    A.  You, again, either find somebody that can
8mentor that can maybe teach you a little bit about
9the business and also research players and see, you
10know, who are legitimate prospects for you to
11represent and then reach out to players and try to
12establish rapport and relationships with potential
13prospects.
14    Q.  Who was the first client you ever signed up?
15    A.  The first client that I personally ever
16signed up was Joshua Smith.
17    Q.  And when was that?
18    A.  2013, '14.
19    Q.  Okay.
20    A.  In regards to NBA.  With regards to NBA.  But
21I did sign up other clients and I placed them overseas
22before that.
23    Q.  Okay.  So your first NBA client was Joshua
24Smith?
25    A.  Yes, yes.

**16**

1    Q.  And that was around 2013, 2014?
2    A.  Yeah, around that time.  2014, maybe 2015.
3    Q.  So I want to focus just on NBA players now,
4not professional players overseas.
5    A.  Okay.
6    Q.  How many NBA players have you represented
7over the course of your career?
8    A.  Too many to count to be honest and remember,
9but several.  Several.  See, the definition of an NBA
10player, perhaps can you elaborate on what you mean by
11that?
12    Q.  I mean someone who actually signed a contract
13with an NBA team to play.
14    A.  Right.  I would say probably more than ten.
15    Q.  Okay.
16    A.  Yeah.
17    Q.  Jumping forward to the October, November of
182019 time frame when you first reached out to Rahul
19Patel on behalf of FSM --
20    A.  Yes.
21    Q.  -- how many NBA players were you representing
22at that time?
23    A.  At that time, players with NBA contracts I
24believe it was about three or four.
25    Q.  Okay.  And then I'm assuming that you also

Mayar Zokaei - August 3, 2021

---

**17**

1 had some non-NBA professional players that you
2 represented as well?
3   A.  Yes.
4   Q.  And how many of those were you representing
5 in the time frame when you reached out to Rahul Patel?
6   A.  If I remember correctly, it's been a while,
7 but around that time four or five as well.
8   Q.  Okay.  When you reached out to Rahul Patel,
9 you were the one that initiated the contact, correct?
10   A.  Correct.
11   Q.  And I believe you mentioned you reached out
12 to him about the possibility of working together; is
13 that right?
14   A.  Yes, yes.
15   Q.  What do you mean by working together with
16 FSM?
17   A.  I did notice that he had assembled a team and
18 I was operating as a one-man shop and I was being
19 spread a little bit thin and -- being that I had
20 signed some clients in the past that required a little
21 more time and attention.  It would have been great to
22 have a marketing component as well behind me as well
23 as another certified agent to work with, which
24 Mr. Patel was at the time, and just kind of somewhere
25 to hang your hat and work with others that are

---

**18**

1 like-minded with similar goals.
2   Q.  Okay.  Did you ask Rahul Patel if FSM would
3 be interested in hiring you as its employee?
4   A.  Yes.
5   Q.  Okay.  And what -- tell me about the
6 discussions you had with Mr. Patel regarding
7 employment opportunities.
8   A.  He said he would have to talk with some
9 people that he worked with, specifically Matt Fossey,
10 and that there was potential interest there, that they
11 were looking to add another agent and that he would
12 set up a call with Mr. Fossey to initiate some
13 discussions regarding that.
14   Q.  So in this discussion that you had with
15 Mr. Patel, what is it that you were offering to
16 provide to FSM?
17   A.  My experience as well as my ability to
18 recruit more players.  At the time, FSM did not have
19 any players in the NBA and nor had they placed any
20 players since it was formed in the NBA.  And I was
21 also offering my services and experience and contacts
22 with marketing, the marketing component of players as
23 well as contacts across the league.
24   Q.  Tell me a little bit more about your
25 experience with the marketing component.  What do you

---

**19**

1 mean by that?
2   A.  I have negotiated deals.  I have negotiated
3 for basketball players.  I have negotiated
4 arrangements, hotel partnerships, other brand
5 partnerships with automobile makers and those are kind
6 on the table if you are working for a basketball
7 player with regards to the marketing endorsement
8 component.
9   Q.  So you're talking about on the endorsement
10 side of things more?
11   A.  Correct.
12   Q.  All right.  So if you distill down what it is
13 that you were going to be doing for FSM?
14   A.  FSM.
15   Q.  FSM, right.  It was going to be, what?  You
16 were going to represent players as an agent, correct?
17   A.  And recruit.
18   Q.  And recruit.  You were going to try to obtain
19 and negotiate marketing deals on behalf of players?
20   A.  Correct.
21   Q.  Anything else?
22   A.  Just serve as a sounding board if they ever
23 had -- you know, being that Mr. Patel was a newly
24 certified agent and experience in the realm provide a
25 sounding board for him in case he had any questions or

---

**20**

1 whatnot and contribute in any way I could that was
2 required of me in the agency as my role as a vice
3 president within the scope of me being an agent.
4   Q.  And were you going to be reporting directly
5 to Rahul Patel as the president of FSM?
6   A.  Yes.
7   Q.  What was it that you were expecting in return
8 from FSM?
9   A.  Pretty much just support from the marketing
10 side, if there is any graphics or whatnot that I
11 needed, Mr. Patel insisted that he had a team of four
12 or five people on his marketing team that could do
13 that.  He would provide an expense report -- an
14 expense opportunity for me to get reimbursement and
15 expense allotment per month and also a life coach he
16 said that would be there for me as it was available to
17 all FSM employees, an officer for me to work at and
18 another agent under the umbrella of FSM besides
19 himself to offer another dynamic and a partner for me
20 when we're recruiting players.
21   Q.  Who was that other agent going to be besides
22 Mr. Patel?
23   A.  Colin Bryant.
24   Q.  And where was your office supposed to be
25 located?

---

Dickman Davenport, Inc
214.855.5100     www.dickmandavenport.com     800.445.9548

Mayar Zokaei - August 3, 2021

21

1    A.   At the law office of Patel Gaines in San
2Antonio, Texas.
3    Q.   And how often did you come to San Antonio,
4Texas to the law offices of Patel Gaines?
5    A.   Shortly after I was hired.  I made a visit
6within, you know, a few weeks and then the pandemic
7hit.  So there was no opportunity for me to travel
8there again, but I had planned another trip there
9close to the date of the shutdown.
10    Q.   How does it work when you're trying to
11develop and expand your client base?  Do you just sit
12in your office wherever that may be, whether it's in
13Oregon or Texas, or are you going out on the road to
14go get face time with these players, make your
15introduction and give them a pitch?
16    A.   Combination of both.
17    Q.   All right.  And how do you do it?  I mean, do
18you reach out to unrepresented players, do you reach
19out to family members.  What are you doing to get -- I
20mean, I can't just call an NBA player and schedule a
21meeting, right?  They're not going to just meet with
22me.  They're busy guys.  How do you do it?
23    A.   You can try to do that and that actually is a
24dynamic that is involved with how we work.  Sometimes
25you will reach out to their college coach if they're a

22

1player in college and say there is a player I'm
2interested in that's on your roster, would you be able
3to set up a meeting after the season.  Sometimes you
4reach out to their high school coach or mentor if
5they're in college that they have relationships with
6or you reach out and you get contact information from
7their college coach for their parents and establish
8rapport that way.
9    Q.   Okay.  I'm going to show you what I'm marking
10as Deposition Exhibit 2.
11         MR. BESHARA:  And I have made it
12available in the chat file for those that want to get
13that.
14    A.   And what is that?
15    Q.   (BY MR. BESHARA)  I'm about to pull it up for
16you.  Bear with me one second.
17    A.   Sure.
18    Q.   Did you ultimately file a lawsuit against
19FSM, ROE-BRG Investments, LLC, Rahul Patel, Grant
20Gaines, and Nicolas LaHood in Bexar County, Texas?
21    A.   Yes, I did.
22         (Exhibit No. 2 marked.)
23    Q.   (BY MR. BESHARA)  I'm going to show you
24Deposition Exhibit 2.  Can you see that?
25    A.   I can.

23

1    Q.   All right.  So this is a file marked copy.
2And by file marked, do you see where my cursor is
3here?  Do you see what I've highlighted?
4    A.   Yes.
5    Q.   That means this lawsuit was filed on June
629th, 2020 at 1:56 p.m.  Okay.  I'll represent that to
7you.  It was assigned this cause number in the 285th
8Judicial District Court.  It's titled plaintiff's
9original petition and request for disclosures and
10identified you as the plaintiff.  Is this a copy of
11the lawsuit that you filed against my clients?
12    A.   I haven't looked at the whole thing, but,
13yes, it does seem like that is a copy of the lawsuit.
14    Q.   Okay.  If you go into the chat function, you
15can download any of these documents yourself.  I want
16you to be able to provide truthful answers.  I'm not
17trying to rush you here.
18    A.   Gotcha.
19    Q.   Feel free to do that if you want to look at
20it.  I'm going to direct your attention -- well, first
21off, do you know who The Hadi Law Firm, PLLC is?
22    A.   Yes, that is one of the firms representing
23me.
24    Q.   Okay.  And did you authorize The Hadi Law
25Firm to file Deposition Exhibit 2 on your behalf to

24

1commence a lawsuit?
2    A.   Yes.
3    Q.   Did you review this lawsuit --
4    A.   Yes, I did.
5    Q.   -- before it was filed?
6    A.   Yes.
7    Q.   Are the statements and allegations contained
8in Deposition Exhibit 2 true and correct?
9    A.   Yes.
10    Q.   But it was nothing that you needed to change
11because you reviewed it before it was filed, right?
12    A.   I don't remember if there was anything I
13needed to change.
14    Q.   Well, certainly you would have told your
15attorneys, hey, that's incorrect, we need to fix this,
16this factual statement is wrong?
17    A.   With regards to statements, yes, there is no
18changes that I required.
19    Q.   All right.  So in this lawsuit, you sued
20Fundamental Sports Management, which we call FSM,
21ROE-BRG Investments, LLC, Rahul Patel, Grant Gaines,
22and Nicolas LaHood, right?
23    A.   Yes.
24    Q.   And according to the factual allegations you
25make, which begin on paragraph 11 of deposition

Mayar Zokaei - August 3, 2021

25

1Exhibit 2 --
2    A.  Yes.
3    Q.  -- plaintiff -- and you're the plaintiff,
4right?
5    A.  Yes.
6    Q.  So you began working for FSM on or about
7February 1st, 2020; is that correct?
8    A.  That is, yes, what it says in the lawsuit.
9    Q.  No, I'm asking you.  I mean, is that a true
10or a false statement?
11    A.  That is a true statement.  It was a true
12statement at the time.  Later on there was a Texas
13Workforce Commission report.
14    Q.  Yeah.
15    A.  And the rendered verdict was that I had, in
16fact, been an employee of FSM since December 1st,
172019.
18    Q.  Well, I mean, how did you not know when you
19were employed?  When did you start working for FSM?
20    A.  I was given tasks and performed duties in
21December, as of December 1st, 2019.  I didn't get paid
22or compensated until late January 2020.
23    Q.  What tasks were you performing for FSM before
24February 1st, 2020?
25    A.  I was asked to fly out to Las Vegas to meet

26

1with Mr. Patel and his team regarding some meetings
2that we would be having around an NBA event.  I was
3not able to make it because it was around
4Christmastime and it was last minute.  Mr. Patel also
5asked me to get Instagram verification for current --
6at the time current client of his.
7        Mr. Patel asked me to try to solicit some
8endorsement deals for some of his clients.  Many, many
9tasks that he had asked me to do at that time during
10which he said continuously that there would be an
11agreement coming for our employment, but that I should
12trust him and, you know, just come on board and take
13the initiative and do whatever I could because at that
14point I was part of the team.  So I didn't think at
15that time that that was the actual time of my
16employment because, again, I didn't get paid until
17about a month and a half later, but providing this
18information to the Texas Workforce Commission and the
19person assigned to that, they did, in fact, render a
20decision that I was not paid for the time in December
212019 that I worked for Mr. Patel and FSM.
22    Q.  How long does it take to get an Instagram
23verification for an account?
24    A.  It is not such an easy process.  You have to
25build a -- basically a resume for the client, contend

27

1why it should be verified, reach out to someone.  And
2if you do get rejected, come back almost with a
3rebuttal, well, this is why I think this person should
4be able to do it.  Mr. Patel told me that he had tried
5to do it for several months for Mr. Holman, but that
6he had no conduct nor means of being able to secure
7that and I think it was within two weeks of me working
8on it I was able to secure that verification for his
9client.
10    Q.  So my question to you wasn't what process
11does it take to get the verification.
12    A.  Right.
13    Q.  How much time did you spend doing that?
14    A.  It was about two years ago so I don't
15remember exactly, but it was several days, if not
16couple weeks.
17    Q.  So how many hours would that be?
18    A.  I didn't add up the hours, so I'm sorry.  I
19can't tell you and I don't want to guess.  It was one
20of the many tasks.  I wasn't just focusing on that.
21    Q.  So you have no idea?  As you sit here right,
22you can't tell me one way or the other?
23    A.  I would say roughly -- if you want me to
24guess.
25    Q.  No, I don't want you to guess.

28

1    A.  Right.
2    Q.  You don't have time records.  You can't tell
3me for certain.  You would just be guessing, right?
4    A.  No.  At the minimum, something like that with
5the front and back -- you know, back and forth and
6preparing some sort of file probably at the minimum
7about 10, 15 hours.
8    Q.  Okay.  And then you mentioned that you were
9supposed to go on vacation over to Vegas and meet up
10with Rahul and some other guys, but it was last minute
11so you couldn't do that, right?
12    A.  Not a vacation.  He had requested for me to
13come as a business trip and meet with them and --
14    Q.  But you didn't actually do it, right?
15    A.  No, because of the last minute notice I
16wasn't able to.
17    Q.  That's fine.  But you didn't spend any time
18going to Vegas because you never went to Vegas, right?
19    A.  No.  I looked for flights, I looked for
20hotels, but I did not go.
21    Q.  Okay.  Who were you trying -- who were you
22working on endorsement deals for at the request of
23FSM?
24    A.  Rahul asked me to work on some endorsement
25deals were Keldon Johnson.  He specifically said that

Mayar Zokaei - August 3, 2021

---

**29**

1he had Keldon Johnson.
2    Q.  Okay.  So what did you do -- what actual
3tasks did you perform in connection with that?
4    A.  I'm sorry.  Can you repeat that?
5    Q.  What tasks did you actually perform in trying
6to fulfill FSM's request about Keldon Johnson?
7    A.  I contacted several hotel properties in the
8San Antonio area because I was instructed by Mr. Patel
9to secure a partnership with a local four star or
10higher hotel property to accommodate Keldon's family
11when they visited the San Antonio area.  And my
12direction by Mr. -- by Rahul was to find a hotel to
13which we could make an arrangement where Keldon would
14not pay for any rooms for his family nor would they
15pay for any rooms, but there would be a partnership to
16where we could make an appearance at the hotel and
17promote it on Keldon's social media.  So I contacted I
18would say probably about 10 to 15 hotels in the San --
19greater San Antonio area.
20    Q.  Okay.  And did you -- were you successful in
21procuring a deal with one of these hotels?
22    A.  Yes, I was able to secure a deal with a four
23star property in the San Antonio area, and we were
24negotiating the deals -- the components of the deal
25and they had agreed to, you know, oblige by our

---

**30**

1request for getting rooms in exchange for a
2partnership.
3    Q.  And which property was it that you secured?
4    A.  I don't remember the name at the time.  I
5believe -- I don't remember the name.  Sorry.  I had
6contact with so many hotels and it was a little while
7ago, but I believe I had sent the information to Rahul
8and he knew of the hotel and the arrangement that I
9had made and he had been on a call with the hotel if I
10remember correctly.
11    Q.  So was a contract actually signed with the
12hotel?
13    A.  No, because Rahul told me to hold off on it.
14He just wanted to see if I was able to secure it
15because -- he wasn't very clear about a relationship
16with Keldon Johnson.  So I think he just wanted to see
17if I could secure that arrangement, but he did say to
18hold off on it and keep it at bay.
19    Q.  Okay.  So no contract was ever signed?
20    A.  They sent me the parameters of an agreement
21and then I just said, you know, thank you for this,
22we'll get back to you when we're ready to proceed.
23    Q.  Okay.  But my question is, to your knowledge,
24no contract was ever signed, correct?
25    A.  No, no contract -- no, signed.  I'm sorry.  I

---

**31**

1couldn't hear you.  No contract was signed.
2    Q.  All right.  What about this sentence?  Do you
3see this second sentence in paragraph 11?
4    A.  Yeah.
5    Q.  Is that a true and correct statement?
6    A.  That's correct.
7    Q.  So you had an employment contract with --
8well, let's see if I can find that employment contract
9for you.  Let me bring this down so I can share it on
10the chat first.
11        (Exhibit No. 3 marked.)
12    Q.  (BY MR. BESHARA) I'm show -- what I've got
13on the screen is Deposition Exhibit 3.  It's titled
14Independent Contractor Agreement.  Is this the
15agreement to which you referenced in paragraph 11 of
16Deposition Exhibit 2 where you had an employment
17contract that provided that you were hired for a
18one-year duration?
19    A.  Yes.
20    Q.  All right.  And this contract is -- it's
21undated, but it says it's between Fundamental Sports
22Management, LLC and you; is that correct?
23    A.  That is correct.
24    Q.  So will you agree with me that you allege
25that your employer was Fundamental Sports Management,

---

**32**

1LLC as indicated in Deposition Exhibit 3?
2    A.  Yes, based on this document.
3    Q.  Well, is there another -- you told me this
4was the contract to which you were referring in
5Deposition Exhibit 2.
6    A.  Right.
7    Q.  Is that true or not?
8    A.  Yes.
9    Q.  Okay.  So there's not another employment
10contract that I need to go find, right?
11    A.  No.
12    Q.  This is the only one, Deposition Exhibit 3 is
13your only alleged employment contract, correct?
14    A.  Yes, yes.
15    Q.  It shows that you were hired effective
16February 1st, 2020.  Do you agree with that?
17    A.  I do not agree I was hired on that.  I agree
18that --
19    Q.  Yeah, but hold on.  I'm just asking do you
20agree that's what it reads.  I know we're going to
21come back to it.
22    A.  Yes.
23    Q.  Because you're going to tell me --
24    A.  Yes.
25    Q.  And that's consistent with the first sentence

---

Mayar Zokaei - August 3, 2021

33

1of paragraph 11 on Deposition Exhibit 2 when you
2alleged in the petition that you began working for FSM
3on or about February 1st, 2020, correct?
4    A.  On the contract it says that I was hired on
5February 1st.  In the allegation in the lawsuit it
6says on or about February 1st.
7    Q.  Yeah, I get it.  I get it, but, I mean, I'm
8just tracking these two together.  They're consistent
9with each other, your allegation about beginning work
10on February 1st, 2020 in Deposition Exhibit 2 is
11consistent with the effective date set forth in
12Deposition Exhibit 3, correct?
13    A.  The allegation is not that I started work on
14February 1st.  It's on or about February 1st so that
15includes dates prior to that.
16    Q.  Sure.  And I'm not going to quibble with you
17about that.
18    A.  No problem.
19    Q.  I'm just making sure I'm tying your
20allegations --
21    A.  The same date appears both on the petition as
22well as the contract, yes.
23    Q.  So Deposition Exhibit 2, which contains your
24petition and the allegations, is consistent with the
25dates set forth in the independent contractor

34

1agreement that's been labeled as Deposition Exhibit 3,
2right?
3    A.  The same date appears on both, correct.
4    Q.  And this is the employment contract about
5which you made complaint in your petition --
6    A.  Yes.
7    Q.  -- that's Deposition Exhibit 2?
8    A.  Yes.
9    Q.  Under this agreement it says that you're
10referred to as contractor.  Do you see that in the
11title that I've highlighted?
12    A.  Yes, that's what I'm referred to as in this
13contract.
14    Q.  So when I read it, I'm not going to say
15contract, I'm going to say Mr. Zokaei so...
16    A.  Well, I appreciate it if you do refer to me,
17you refer to me as an employee.
18    Q.  Well, I'm just going to read to you -- okay.
19I'm just going to read to you the document.
20    A.  No problem.
21    Q.  It says, contractor will report directly to
22Rahul Patel; is that correct?
23    A.  That's correct.
24    Q.  Is that who you, in fact, reported to on
25behalf of FSM?

35

1    A.  Mr. -- Rahul and Matt.
2    Q.  Matt Fossey?
3    A.  Yes.
4    Q.  And which -- for what matters would you
5report to Rahul Patel and for which matters would you
6report to Matt Fossey?
7    A.  When I was hired, it was Matt Fossey and
8Rahul on the call.  When it was time for the
9termination call, they were both on the call and then
10weekly meetings, whether via Zoom or phone or text
11message updates they were both on all correspondence.
12The only difference was mostly phone calls.  If it was
13phone calls, it was just Rahul.
14    Q.  All right.  But you didn't report to Nicolas
15LaHood, did you?
16    A.  No.
17    Q.  Have you ever even met Nicolas LaHood?
18    A.  I never met Matt Fossey.  So I have not met
19many of these people.
20    Q.  Well, have you spoken with Nicolas LaHood?
21    A.  I don't remember if I have or not.
22    Q.  You didn't report to Grant Gaines did you?
23    A.  I don't remember if I reported to him within
24this capacity.
25    Q.  Well, sure, but I asked you who you reported

36

1to and you told me it was Matt Fossey and Rahul Patel.
2    A.  Okay.
3    Q.  So you didn't report to Grant Gaines, did
4you?
5    A.  I don't believe I ever reported to him, no.
6    Q.  Okay.  Did you ever report to ROE-BRG
7Investments, LLC?  No, you didn't, right?
8    A.  No.
9    Q.  Do you even know who that is?
10    A.  No.
11    Q.  What is ROE-BRG Investment, LLC's
12relationship with you?
13    A.  I do not -- I'm not familiar with the name of
14the entity.  I just know that it was a name in a
15lawsuit and was one of the investors of the agency.
16    Q.  But you don't claim to have had an employment
17contract -- which you told me your employment contract
18is Deposition Exhibit 3, right?
19    A.  Yes.
20    Q.  That's not with ROE-BRG Investments, LLC, is
21it?
22    A.  No.
23    Q.  It's with Fundamental Sports Management, LLC,
24correct?
25    A.  That's correct.

Mayar Zokaei - August 3, 2021

**37**

1    Q.  Here we see in paragraph 2 on Deposition
2 Exhibit 3, it says that contractor shall be employed
3 as a contractor by FSM from February 1st, 2020 for a
4 period of one year.  Do you see that?
5    A.  Yes.
6    Q.  Is that where -- is that the basis for your
7 allegation of paragraph number 11 of Deposition
8 Exhibit 2 when you state that you were hired for a
9 one-year duration?
10    A.  That and also the words that were conveyed to
11 me by Rahul Patel.
12    Q.  Okay.  This is your employment contract, is
13 it not?
14    A.  Yes.
15    Q.  Doesn't this set forth the terms of your
16 alleged employment?
17    A.  Yes.
18    Q.  And this says that you're hired for a period
19 of one year, right?
20    A.  Correct.
21    Q.  So you're not telling me that you were
22 relying upon conversations that you had with Rahul
23 prior to this document being presented, are you?  This
24 is -- this contains the terms of your agreement,
25 doesn't it?

**38**

1    A.  Rahul never signed this document so most of
2 the -- I guess most of the stuff that we had --
3 understanding we had with respect to our employment
4 without a signed document was me just trusting him in
5 his word.
6    Q.  Did you sign Deposition Exhibit 3?
7    A.  I do believe I signed and sent back a copy --
8 excuse me.  Strike that.  I asked for a minor change
9 to that and said I was ready to sign and I never
10 received that document back with a change.  And also
11 the document that I received had some sort of
12 watermark on it so I could not sign and submit that
13 because Rahul told me to wait for the final document
14 to be drawn up.
15    Q.  So Rahul or someone with FSM presented you
16 with Deposition Exhibit Number 3, correct?
17    A.  Yes.
18    Q.  You reviewed it and you requested changes be
19 made?
20    A.  I requested a minor change.  It was just
21 technicality.  And then he said, no problem, we'll
22 make that change and I'll send it back to you.
23    Q.  Okay.  But you requested a change be made,
24 correct?
25    A.  Yes.

**39**

1    Q.  And was that change ever made in the document
2 represented to you?
3    A.  Never was represented to me, no.
4    Q.  And you never signed this agreement, did you?
5    A.  No.
6    Q.  And FSM never signed this agreement either,
7 did it?
8    A.  No, they did not.
9    Q.  All right.  Do you agree with me that your
10 duties with respect to your alleged employment with
11 FSM are contained in paragraph 3 of Deposition Exhibit
12 Number 3?
13    A.  Yes.
14    Q.  So tell me what you did to comply with your
15 obligations under paragraph 3 of Deposition Exhibit 3?
16    A.  Would it be okay -- okay.  So I was -- per
17 this contract I was to recruit potential players and I
18 did so.  I recruited four players.
19    Q.  Did you sign up any of these players while --
20    A.  I signed all of them.
21    Q.  Let me finish.  Okay.  Did you sign up any of
22 these players while you were still associated with
23 FSM?
24    A.  Yes.
25    Q.  What are the names of those players?

**40**

1    A.  Kylor Kelly was one.
2    Q.  Okay.
3    A.  Leslie Varner was two.  Torren Jones was the
4 third.  And there is a couple of other ones I don't
5 remember at that this time.
6    Q.  Are any of those people still your client?
7    A.  Yes.
8    Q.  Who?
9    A.  Kylor Kelly is my client; Torren Jones is my
10 client.
11    Q.  All right.  The process of being an NBA agent
12 is probably foreign to most jurors, right.  I mean,
13 they don't understand really the underbelly of how
14 this works.  Is there a standard form agency agreement
15 that the NBPA promulgates for an agent such as
16 yourself to sign along with a client such as Kylor
17 Kelly?
18    A.  Yes.
19    Q.  And that's called an SPAC?
20    A.  Correct.
21    Q.  And that's just the standard form document,
22 correct?
23    A.  Correct.
24    Q.  Does it set parameters of what the agent's
25 compensation will be?

Mayar Zokaei - August 3, 2021

**41**

1   A.  Yes, it does.
2   Q.  Are there -- so are there limits or you can
3charge whatever you want?
4   A.  No, there are limits.
5   Q.  And what are those limits?
6   A.  It's 4 percent commission on all fees, up to
74 percent that's negotiated between you and the
8client, and 2 percent on a minimum contract, up to 2
9percent negotiated between you and the client.  Those
10are the standard thresholds or limits.
11   Q.  Gotcha.  So when you signed up these clients
12while you were still associated with FSM, did you sign
13them up under the flag of Fundamental Sports
14Management, LLC?
15   A.  Yes.
16   Q.  Were they listed in the contract?
17   A.  Yes.  As I was instructed to, yes.
18   Q.  All right.  And you say these people are
19still your clients.  So I'm assuming that when you
20were no longer associated with FSM, you took those
21clients with you when you left; is that right?
22   A.  I was told to take them with me, yes.
23   Q.  Even better.  So FSM didn't try to keep any
24of the people you signed up, they just let you leave
25and take whoever it was that you came to them with and

**42**

1who you signed up during your period of association
2with FSM, correct?
3   A.  Correct.
4   Q.  What was your compensation supposed to be
5from FSM?
6   A.  For my employment?
7   Q.  Well, you say it's employment.  I say it's
8for contracting.  We know there is a dispute there so
9I don't know how you describe it, but what were you
10supposed to get paid?
11   A.  Mr. Beshara, there is no dispute.  I take
12exception to the fact that you referred to me as a
13contractor when the Texas Workforce Commission, which
14is a government agency, has already ruled that I am
15considered and was considered an employee of FSM.  If
16you don't have record of that documentation or that
17verdict, I will be happy to have my counsel forward
18that to you, but I do believe that you have received
19that document and reviewed it.
20   Q.  Answer the question.
21   A.  Right.  You said something?
22   Q.  I'm not here to argue legal points.  I'm
23asking how much you were to be paid.  I don't care
24what you --
25   A.  I was paid $12,500 a month and I was to be

**43**

1compensated up to $5,000 in expenses per month.
2   Q.  So expense reimbursements?
3   A.  Correct.
4   Q.  So it's not compensation, it's reimbursement
5for expenses actually incurred, right?
6   A.  Correct.
7   Q.  And how were you supposed to document those
8expenses in order to be entitled to reimbursement?
9   A.  I was to give a -- fill out a form, an
10expense report, submit, and receive payment,
11reimbursement.
12   Q.  Did you have to provide receipts or
13documentation to support the charges?
14   A.  Yes, yes.
15   Q.  All right.  And we're back to Deposition
16Exhibit 3 and paragraph 4 states that you would be
17paid $150,000 annually, which is $12,500 per month,
18correct?
19   A.  You got cut off at the end.
20   Q.  I said 12,500 a month --
21   A.  Yes.
22   Q.  -- is 150,000 annually, right?
23   A.  Yes.
24   Q.  So, again, we see paragraph 4 of Deposition
25Exhibit 3 is consistent with what you've stated in

**44**

1your petition, which is attached as Deposition Exhibit
22 and you're testifying to me today, right?
3   A.  Correct.
4   Q.  What does it mean when there is a reference
5to a current pipeline?
6       MR. MURPHY:  I'm sorry.  A current what,
7Luke?
8       MR. BESHARA:  Pipeline.
9       MR. MURPHY:  Oh.
10   Q.  (BY MR. BESHARA)  It's up here.  I'll just
11highlight it.  Do you see it?
12       MR. MURPHY:  Okay.
13   Q.  (BY MR. BESHARA)  What does that mean, Mr.
14Zokaei?
15   A.  Prospects that you either have relationships
16with that are not signed by you at the time or
17prospects that you're interested in recruiting that
18you have not currently signed as representation for at
19this time or at the time.
20   Q.  Were you interested in signing LeBron James?
21   A.  Yes.
22   Q.  Was he in your pipeline?
23   A.  He's not.
24   Q.  Okay.  So I need some better description
25other than you're interested in signing a person

Mayar Zokaei - August 3, 2021

---

45

1 because I imagine you're interested in signing every
2 NBA player?
3    A.  I repeat myself again.  Players that you have
4 a relationship with or players that you have a
5 relationship with some parties that are associated
6 with them or you have some sort of rapport with them
7 or parties that they're affiliated with.
8    Q.  Okay.  So when you signed up these clients
9 and you used an SPAC standard agent form promulgated
10 by the NBPA --
11    A.  Uh-huh.
12    Q.  -- Fundamental Sports Management, LLC was
13 listed as the agent, right?  You were the agent in
14 charge, but the company is Fundamental Sports
15 Management, LLC, correct?
16    A.  Yes.
17    Q.  How was FSM supposed to make money from you
18 signing up clients and doing what you do?
19    A.  Any new clients that I would bring to the
20 table, they were entitled to a percentage of any
21 basketball or endorsement deals that the client was
22 able to secure.
23    Q.  For new clients?
24    A.  Yes.
25    Q.  If you look on Deposition Exhibit 3 under

---

46

1 paragraph 4, I see that any NBA SPAC contractor
2 currently has under contract or is in the current
3 pipeline, it says FSM is to receive 100 percent return
4 on all compensation paid to contractor and any and all
5 expenses paid on contractor's behalf.  Do you agree
6 with that?
7    A.  I don't know if that was in the original
8 agreement that was sent to me.
9    Q.  Well, what was the minor change that you
10 requested?
11    A.  I don't remember.  I don't remember.  It was
12 very minor.  It might even been a spelling of
13 something or whatnot.  I don't remember, but this
14 looks like a pretty material change.
15    Q.  You think this is material.  You don't think
16 this was included in what was sent to you?
17    A.  I don't -- it's been a while so I don't
18 remember, but I don't believe this was a part of it.
19    Q.  Okay.  Well, the way I read this is basically
20 FSM is going to be paying you $12,500 a month and
21 giving you an expense allowance?
22    A.  Uh-huh.
23    Q.  But whenever you get paid from your current
24 clients you have to pay FSM back for what they
25 basically advanced you on those contracts.  Do you

---

47

1 agree it?
2    A.  Got it.  Got it.  Seems like, yeah, that's
3 what it says.
4    Q.  I think maybe you're looking at it and you
5 thought you weren't going to going to get any money of this
6 deal on your current clients or the ones in your
7 pipeline.  I read it that you get everything after you
8 pay FSM back.  Is that consistent with what --
9    A.  I believe the way it was written it was a
10 little bit open to interpretation.
11    Q.  Well, let's ask you, though.  Is that
12 consistent with what you thought how I just described
13 it, that for your current client and those in the
14 pipeline, all you have to do is reimburse FSM for the
15 money it advanced you for the expenses and your
16 distribution on a monthly basis and then after that
17 you kept the rest?
18    A.  That's what it says here, but I don't
19 remember if that was in the original agreement that
20 was sent to me.
21    Q.  Well, I mean, you didn't think that FSM was
22 going to give you money -- advance you money every
23 month and give you an expense allowance and not be
24 able to recover any of it, did you?
25    A.  I knew that they were going to be able to

---

48

1 recover it from potential commissions on deals that I
2 was able to work out.
3    Q.  Okay.  What about this next bullet point?
4 Did you agree to that term?
5    A.  I did not agree to it at that time and I
6 don't remember this being in there because I had some
7 clients that I had maintained for a little bit.  And
8 we came to some sort of understanding that not all
9 those clients would FSM be entitled to compensation
10 for because they preceded my employment with them.  So
11 I don't know if this was changed since it was first
12 presented to me.
13    Q.  Okay.  We'll come down and see what Exhibit A
14 is in a minute.  What about with respect to future
15 contracts?  Do you agree that FSM would receive 75
16 percent of the compensation due and owing under any
17 contract you negotiated and secured while you were
18 associated with FSM?
19    A.  I don't remember those being the numbers that
20 we were agreeing to.
21    Q.  Okay.  What do you remember the numbers
22 being?
23    A.  I believe that it was closer to about a split
24 on that.
25    Q.  Like a 50/50?

---

Mayar Zokaei - August 3, 2021

**49**

1   A. Yes.
2   Q. Okay. What about this part, contractor
3receives 25 percent of the compensation? I guess
4that's just the flip side?
5   A. Yes.
6   Q. What about this, what about this in addition
750,000 of which 10,000 was advanced on December 17th,
82019 and secured by a promissory note shall be
9advanced after the execution of all agreements. It
10says, signing advance will be paid back at 0 percent
11interest for 12 months after which such remaining
12signing advance that has not been repaid shall accrue
13interest at 8 percent per annum. And it mentions
14there will be a second promissory note for the
15remaining 40,000. Do you remember discussions about
16that?
17   A. Yes, I do.
18   Q. Okay.
19       THE WITNESS: We are approaching about an
20hour. Would it be okay if I requested a break?
21   MR. BESHARA: Yeah, that's fine. We're
22at kind of a stopping point anyway. We'll come back
23and talk about those.
24       THE WITNESS: Okay. How long of a break?
25   MR. BESHARA: How long do you need?

**50**

1       THE WITNESS: If you give me about five
2minutes.
3   MR. BESHARA: That's fine. It's 2:30.
4Let's plan on being back at 2:35.
5       THE WITNESS: Okay.
6       THE VIDEOGRAPHER: We're off the record.
7The time is 12:30.
8       (Recess 12:30 to 12:36.)
9       THE VIDEOGRAPHER: We're back on the
10record. The time is 12:36.
11       (Exhibit No. 4 marked.)
12   Q. (BY MR. BESHARA) Mr. Zokaei, where we left
13off we were discussing in Deposition Exhibit 3 some
14references to promissory notes. And I'm going to show
15you what I'm marking as Deposition Exhibit 4. Can you
16see that?
17   A. Yes.
18   Q. Do you recognize this promissory note?
19   A. Yes.
20   Q. For the amount of $10,000, correct?
21   A. Correct.
22   Q. It's dated December 17th, 2019, correct?
23   A. That's correct.
24   Q. And that's consistent with the reference in
25Deposition Exhibit 3 where there is mention of 10,000

**51**

1having been advanced on December 17th, 2019, right?
2   A. Yes.
3   Q. You admit that you received that $10,000,
4correct?
5   A. Correct.
6   Q. And by this promissory note, you promised to
7repay Rahul B. Patel individually and Fundamental
8Sports Management, LLC $10,000. And it says the
9maturity date is December 31st, 2020. Do you see
10that?
11   A. Yes.
12   Q. Are these your initials here on the bottom of
13the first page?
14   A. Yes.
15   Q. And did you, in fact, cause those initials to
16be made on that page?
17   A. Yes.
18   Q. Is this your signature on the bottom of the
19second page?
20   A. Yes.
21   Q. And did you, in fact, cause your signature to
22be affixed to the bottom of the second page of
23Deposition Exhibit 4?
24   A. Yes.
25   Q. As we sit here today, I guess it's August

**52**

113rd, 2021, you did not pay $10,000 back to Rahul Patel
2or Fundamental Sports Management, did you?
3   A. No.
4   Q. Show you what I'm marking as Deposition
5Exhibit 5.
6       (Exhibit No. 5 marked.)
7   Q. (BY MR. BESHARA) Deposition Exhibit 5 is
8another promissory note, correct?
9   A. Correct.
10   Q. You were the maker of the note, correct?
11   A. What does that mean?
12   Q. That means you were the one promising to
13repay $40,000, correct?
14   A. Yes, yes.
15   Q. You promised to repay Rahul B. Patel
16individually and Fundamental Sports Management,
17correct?
18   A. Correct.
19   Q. The amount of the note was $40,000, correct?
20   A. Yes.
21   Q. The maturity date was December 31st, 2020,
22correct?
23   A. Yes.
24   Q. Your initials appear on the bottom of the
25first page of Deposition Exhibit 5?

Mayar Zokaei - August 3, 2021

---

**53**

1    A.  Yes.
2    Q.  Did you cause those initials to be affixed on
3the bottom of the first page?
4    A.  Yes.
5    Q.  Is this your signature that appears on the
6bottom of the second page of Deposition Exhibit 5?
7    A.  Yes.
8    Q.  Did you cause your signature to be affixed to
9this document?
10    A.  Yes.
11    Q.  And the promissory notes that we marked as
12Deposition Exhibit 4 and Deposition Exhibit 5, you
13signed both of those and delivered them back to FSM
14and Rahul Patel, didn't you?
15    A.  Yes.
16    Q.  And FSM and Rahul Patel did, in fact, send
17you a total of $10,000 initially and then an
18additional $40,000, correct?
19    A.  Yes.
20    Q.  And you received that, right?
21    A.  Yes.
22    Q.  And like the $10,000 note, you have not
23repaid the $40,000 note either, have you?
24    A.  No, I have not.
25    Q.  You have made zero payments on either of

---

**54**

1these notes, have you?
2    A.  That's what I said, yes.
3    Q.  Bear with me one second.  I'm going to do
4some quick housekeeping, okay.
5         (Exhibit No. 6 marked.)
6    Q.  (BY MR. BESHARA)  All right.  I have shared
7Deposition Exhibit 6 on the chat and I'm going to
8share it on the screen.  Now, are you able to see
9Deposition Exhibit 6, Mr. Zokaei?  Can you see that?
10Mr. Zokaei, can you see the document that I've shared?
11    A.  Yes.
12    Q.  All right.  This document that I've labeled
13as Deposition Number 6 is titled Confidentiality and
14Nondisclosure Agreement.  Do you recognize this
15document?
16    A.  I'm looking over it right now.
17    Q.  If you want to see the whole thing, go to the
18chat function.
19    A.  I see it, yeah.
20    Q.  And just click on it and then you can pull it
21up.  That way I don't have to scroll for you.
22    A.  Yes, I see it.
23    Q.  Do you recognize this document?
24    A.  I don't recognize this document.  I just see
25my signature on the bottom, but I don't remember this.

---

**55**

1    Q.  Well, we're going to go through each of
2these.
3    A.  No problem.
4    Q.  Deposition Exhibit 6, the bottom of the first
5page, are those your initials?
6    A.  Yes.
7    Q.  Did you cause your initials to be affixed
8there?
9    A.  Yes.
10    Q.  Bottom of page 2, are those your initials?
11    A.  Yes.
12    Q.  Did you cause your initials to be affixed
13there?
14    A.  Yes.
15    Q.  Page 3, there is a signature that purports to
16be that of you.  Did you cause that signature to be
17affixed there?
18    A.  Yes.
19    Q.  That's, in fact, your signature, isn't it?
20    A.  That is my signature, yes.
21    Q.  This agreement indicates that it is between
22Fundamental Sports Management -- do you see that?
23    A.  Yes.
24    Q.  -- and any and all entities associated with
25or affiliated with you, right?  Well, you individually

---

**56**

1and any entities associated with you.  Do you see
2that?
3    A.  Yes.
4    Q.  You don't dispute that you executed and
5delivered this Confidentiality and Nondisclosure
6Agreement to Fundamental Sports Management, do you?
7    A.  I do see my signatures on there.  I just
8don't remember this document.  It's been two years.
9    Q.  I know, but I'm saying you don't have any
10reason to dispute -- the signatures appear to be your
11signature, right?
12    A.  Yes, correct.
13    Q.  It's just a function where you may not recall
14this, but it's just due to the passage of time,
15correct?
16    A.  Yes.
17    Q.  You are not disputing that you, in fact,
18signed and delivered this document to Fundamental
19Sports Management, are you?
20    A.  No.
21    Q.  And do you -- I'm not going to ask you a lot
22of questions because you don't remember it, but do you
23generally know what a Confidentiality and
24Nondisclosure Agreement, sometimes referred to as an
25NDA, do you know what those are?

---

Mayar Zokaei - August 3, 2021

57

1   A. Yes.
2   Q. You have seen those before in your business,
3right?
4   A. Yes.
5   Q. What are they generally designed to do?
6   A. Just protect both parties from any
7information getting out with regard to the nuances of
8an agreement.
9   Q. Okay. And it contemplates that there is
10going to be some confidential information that may be
11exchanged between you and FSM, correct?
12   A. Yes.
13   Q. You're described as Zokaei and a recipient.
14Basically it says any information that you get from
15FSM or FSM gets from you, you guys aren't going to
16share it with other people, right?
17   A. Correct.
18   Q. Do you remember negotiating with FSM for this
19paragraph 7? That looks like something you would have
20requested.
21   A. I don't remember that.
22   Q. Did you ever ask FSM not to solicit players
23on your client list?
24   A. I don't remember.
25   Q. Do you remember in paragraph 8 where the

58

1nondisclosure extends for a period of three years
2after the termination of the agreement?
3   A. I honestly don't remember this document nor
4any of the components of it just, again, because of
5the passage of time.
6   Q. I gotcha. Have you complied and if you don't
7know, tell me that because I know you're just now
8looking at this. Do you know if you complied with
9your obligations under this agreement?
10   A. I have not read the whole thing nor have I
11scrutinized it to see what the elements are so I do
12not know.
13   Q. All right. Well, now you have it. You have
14got a copy. You can look at it later.
15       (Exhibit No. 7 marked.)
16   Q. Okay. I have shared what I marked as
17Deposition Exhibit 6 for those interested and I will
18share the screen.
19       THE REPORTER: Luke, this will be 7.
20       MR. BESHARA: Yes. Sorry if I misspoke.
217 is what I marked it.
22   Q. (BY MR. BESHARA) Mr. Zokaei, you mentioned
23earlier in your testimony that you made a wage claim
24with the Texas Workforce Commission. Is that -- did I
25recall that correctly?

59

1   A. That's correct. The one you have on the
2screen.
3   Q. Okay. Now, this is -- what I marked as
4Deposition Exhibit 7, it's titled Wage Claim. It has
5information that has been completed in response to
6certain questions. It's a total of three pages. It
7bears an electronic signature. Did you cause that
8electronic signature to be made on Deposition Exhibit
97 on page 2?
10   A. Yes.
11   Q. Is your address 11868 Southwest Barcelona
12Street, Wilsonville, Oregon 97070?
13   A. Yes.
14   Q. Is that in Clackamas County, Oregon?
15   A. Yes.
16   Q. Do you agree that you signed this document on
17September 14th, 2020?
18   A. Yes.
19   Q. Did you make this wage claim under penalty of
20perjury?
21   A. Yes, I did.
22   Q. Did you swear that all of the statements you
23made in this document were true and correct?
24   A. Yes.
25   Q. Were they all, in fact, true and correct?

60

1   A. I'm sorry?
2   Q. Were all of the statements contained in the
3wage claim that's been marked as Deposition Exhibit 7
4in fact true and correct as you swore under penalty of
5perjury?
6   A. Yes.
7   Q. Is it true that when you worked -- when you
8were associated with FSM that you were an agent and
9client recruiter as you indicated on page 1 of
10Deposition Exhibit 7?
11   A. Yes.
12   Q. Is it true that you began your alleged
13employment on January 1st -- or January 22nd, 2020?
14   A. That's what it says, yes.
15   Q. Is that true and correct?
16   A. Based on the finding of the TWC that is not
17true as we discussed prior, but at the time that I
18made my claim, yes, I was under the impression that I
19actually had started work.
20   Q. Okay. Well, what did you do on January 22nd,
212020 that caused you to believe that was the date you
22first began working at FSM?
23   A. I believe I received my first paycheck.
24   Q. Okay. How often were you paid?
25   A. Every two weeks.

Mayar Zokaei - August 3, 2021

**61**

1   Q.  Did you receive an actual check or was it a
2direct deposit?
3   A.  A direct deposit.
4   Q.  And was the amount of the direct deposit --
5how much was each direct deposit?
6   A.  Roughly $6,250.
7   Q.  And no payroll taxes or Medicaid or FICA were
8withheld from that $6,250, was it?
9   A.  No.
10   Q.  Is it in fact true that you were terminated
11on April 20th, 2020?
12   A.  Yes.
13   Q.  Is it true that you were terminated by
14Mr. Rahul Patel without cause?
15   A.  Correct.
16   Q.  Did Rahul Patel provide any explanation at
17the time that he terminated your association with FSM?
18   A.  Rahul Patel and Matt Fossey provided an
19explanation on the phone.
20   Q.  Okay.  What was the explanation that was
21provided?
22   A.  They said that at the time there was a lack
23of chemistry between myself and some of the members of
24the FSM team.
25   Q.  Did they mention what members of the FSM team

**62**

1that you lacked chemistry with?
2   A.  No.
3   Q.  Did you ask?
4   A.  Yes.
5   Q.  Okay.  And they refused to tell you?
6   A.  They just said they didn't want to get into
7that.  They had a phone call.
8   Q.  Okay.  What other explanation was provided to
9you?
10   A.  That was the only explanation provided to me.
11   Q.  How long did this phone call last?
12   A.  Roughly about maybe 20, 25 minutes.
13   Q.  It took 20 to 25 minutes to tell you you were
14terminated because there was a lack of chemistry?  I
15just finished that in 20 seconds.
16   A.  That was one of the components of the
17conversation.
18   Q.  So tell me the rest of it.  Much more was
19discussed than what you told me if it's a 25-minute
20phone call.
21   A.  Sure.  They told me that I was good at my
22job.  They told me that they could tell I had a good
23track record.  They told me that I knew what I was
24doing.  They told me that there was potential for them
25to rehire me in the future or for us to work together.

**63**

1They told me that I was responsible for bringing in
2all the new clients to FSM, that I was the only one
3that I had brought in new clients to FSM during the
4month -- during the time of my employment and that
5they were very happy with my performance.
6   Q.  That's the most peculiar termination call
7I've ever heard.  Are you sure there wasn't anything
8else discussed about why you were being terminated?  I
9mean, I hear these glowing accolades and that just
10doesn't make any sense.  So was there any criticism
11that was provided during this phone call that would --
12   A.  No.
13   Q.  -- corroborate the circumstances and the
14purpose of the call, which was to terminate you?
15   A.  No.  They said that it was just a lack of
16integration with the group at FSM at the time and at
17the time, it was not a good fit, but that they would
18not dismiss the potential for us to work together in
19the future.
20   Q.  Okay.  Anything else during this 20-,
2125-minute phone call?
22   A.  Yeah, from what I recall, that was pretty
23much it.
24   Q.  So no criticism other than the lack of
25chemistry?

**64**

1   A.  No, and that's why I kept on asking, I said
2can you tell me why -- you know, is there a reason why
3you're terminating me?  And they said, no, no real
4reason.  Just the fact that, you know, the main reason
5is there was a lack of chemistry, you know, with you
6and our team.  And, you know, at the time, they didn't
7see a good fit, but they were confident that based on
8my skills and my track record and my experience and
9obviously that I was good at my job, quote, you know,
10and I had a good track record -- those were two --
11there was a potential for us to work together again.
12   Q.  But no other criticism besides lack of
13chemistry?
14   A.  No, no.
15   Q.  So were you blindsided and confused why you
16were being terminated?
17   A.  Yes, I was.
18   Q.  Because they were giving glowing reviews and
19accolades on your performance while they were
20terminating you?
21   A.  As well as telling me that there was
22potential for us to work together in the future, but
23just not at the time.
24   Q.  All right.  Let's come on back to Exhibit 7.
25You agree that you were paid on the 1st and 15th of

Mayar Zokaei - August 3, 2021

**65**

1every month?
2    A.  No, because -- yes, I was paid on the 1st and
315th of every month with the exception of my first two
4pay sequences.  As I mentioned, the first one was
5January 22nd.  Subsequent to that there was another
6payment made within a few days.
7    Q.  For how much?
8    A.  Another $6,250 was before the end of the
9month, so within about a week.
10    Q.  So you received $12,500 basically for work
11done in January?
12    A.  At that time, my assumption was that prior
13work.  I wasn't sure what month it was for.  There was
14no pay stubs or transaction reports or anything.
15    Q.  You weren't on -- you weren't on a company
16payroll as an employee, you were being treated as an
17independent contractor by FSM, correct?
18    A.  I was being treated as an employee.
19    Q.  Okay.  And you say that despite the fact the
20relevant document -- the relevant document that you
21tell me forms the basis of your association with FSM,
22which is Deposition Exhibit 3, is titled Independent
23Contractor Agreement?
24    A.  Correct.  That is the document.
25    Q.  You still thought you were an employee even

**66**

1though you signed an agreement saying you are an
2independent contractor?
3    A.  Luke, we never signed an agreement as you are
4well aware.
5    Q.  Oh, excuse me.  But you -- well, actually we
6don't even know because you told me this document has
7changes -- has items in here that are different than
8what you agreed to, right?
9    A.  Seems to me it does, but it does not change
10the fact that I didn't sign this document nor any
11other document.
12    Q.  I'm with you, but you've already told me you
13didn't agree to these terms in paragraph 4, right?
14    A.  I said I don't recall that those are the
15terms.
16    Q.  Okay.  Do you recall paragraph 7?  Do you
17recall reading that?
18    A.  Correct.
19    Q.  And why don't you read that for me so the
20jury can hear what you read at the time you saw this
21document?
22    A.  Parties agree that this agreement does not
23create an employee/company relationship and contractor
24will remain an independent contractor.
25    Q.  You signed that and you understood you agreed

**67**

1to that, didn't you?
2    A.  Luke, we did not sign a contract.
3         MR. MURPHY:  Objection, mischaracterizes
4his testimony.
5    Q.  (BY MR. BESHARA)  I'm sorry, guys.  I don't
6mean to.  But you didn't ask that that be changed, did
7you?  You didn't ask paragraph 7 to be modified, did
8you?
9    A.  I did, again, request the modification.  I
10don't remember if that was it.
11    Q.  You told me it was something minor like a
12typo?
13    A.  Yeah, so...
14    Q.  So are you telling me that you requested this
15document be changed to omit paragraph 7 and to change
16the title of the document from independent contractor
17agreement to employment agreement?
18    A.  I did not ask for that agreement to be
19changed.
20    Q.  You understood from the outset that the
21intention of FSM and your intention was to be hired as
22an independent contractor, didn't you?
23    A.  I believe --
24         MR. MURPHY:  Objection, calls for a legal
25conclusion or legal analysis on the part of

**68**

1Mr. Zokaei, but you may answer the question,
2Mr. Zokaei.
3    A.  I believe that was maybe the intent.
4    Q.  (BY MR. BESHARA)  Yeah.  I mean, otherwise we
5would have titled the document something different,
6wouldn't we?
7    A.  Perhaps the intent was there, but the
8relationship changed.
9    Q.  You're not telling me that you negotiated
10this agreement with FSM while lying to them and
11pretending, saying it was an independent contractor
12agreement and agreeing that you were an independent
13contractor while at the same time secretly believing
14you were an employee, are you?
15         MR. MURPHY:  Objection, mischaracterizes
16his testimony, but you can go ahead and answer,
17Mr. Zokaei.
18    A.  No, Mr. Beshara, I was not secretly in belief
19that this was an employee contract, but based on the
20circumstances, the obligations as well as the verdict
21handed down by the Texas Workforce Commission, later
22on subsequent to this agreement being presented to me,
23I, not myself and nor Mr. Patel, but an actual
24independent agency, ruled that I was an employee of
25FSM and not an independent contractor.

Mayar Zokaei - August 3, 2021

---

**69**

1    Q. (BY MR. BESHARA)  Okay.  But it was not
2your -- you did not have a secret intent to be
3characterized and classified as an employee as opposed
4to an independent contractor at the time when you were
5associated with FSM, correct?  Did you hear me?
6    A. With all due respect, I answered you.  Again,
7I did not secretly believe that I was an employee at
8that time.
9    Q. So it was your intent -- and I know these
10questions sound similar, but they're a little bit
11different so bear with me.
12    A. Sure.
13    Q. So was your intent at the outset prior to the
14relationship with FSM and during the course of the
15relationship with FSM that you would be an independent
16contractor?  That was your intent, wasn't it?
17        MR. MURPHY:  Objection, form.
18    A. At the outset --
19        THE WITNESS:  Go ahead.
20        MR. MURPHY:  I was going to object to the
21form of the question in that it's compound, but go
22ahead and answer.
23    A. At the outset of my relationship with FSM,
24this is how it was presented to me.  As the
25relationship went on, I do believe it evolved into an

---

**70**

1employee/employer relationship.
2    Q. (BY MR. BESHARA)  Well, how so?
3    A. I was given tasks to perform from Patel.  I
4was asked to fly out to his offices and meet with the
5staff.  I was given an e-mail address that I had to
6use.  I was given the title of vice president.  I was
7given forms by them to use.  I was given a business
8card and I was to -- I was supposed to work under
9their guidance and their direction.  There was not a
10lot of room there for what I wanted to do, specifically
11running it by or getting direction by FSM and I
12answered to them.  And weekly meetings, there was
13weekly meetings that I had to attend virtually.  There
14was updates that I had to provide, written updates
15that I had to provide, reports that I was supposed to
16provide.  These were just several stipulations, a few
17of the several stipulations which I had to abide by.
18    Q. Did you ever approach FSM and say, hey, I
19know that you presented me with the independent
20contractor agreement -- this one that's been marked as
21Deposition Exhibit 3 -- but I feel like the
22relationship has evolved into an employee
23relationship, can we get a new contract?
24    A. I don't remember.  I don't remember if we had
25that discussion or not.

---

**71**

1    Q. You didn't have that discussion, did you?
2    A. I don't remember if we had that discussion or
3not.
4    Q. Did you agree to the terms of paragraph 8,
5confidentiality?
6    A. I don't know if this was changed from the
7initial draft of the agreement that we have so I
8cannot say.
9    Q. Did you agree to a form of confidentiality in
10the independent contractor agreement?
11    A. I don't remember if this was the same clause
12that was in the original.
13    Q. Did you agree to any form of confidentiality
14when FSM hired you?
15    A. I don't recall.
16    Q. Okay.  And you, of course, don't recall
17Deposition Exhibit 6, that you admit you signed and
18delivered, that contains the exact same
19confidentiality, right?  Are you telling the jury you
20don't know you had an obligation of confidentiality
21with respect to FSM?
22        MR. BESHARA:  He's frozen or something.
23    A. Oh, sorry.  I lost you.
24    Q. (BY MR. BESHARA)  Yeah, that's fine.  Are you
25telling me that -- are you telling the jury you had no

---

**72**

1idea you had an obligation of confidentiality that you
2ran in favor of FSM?
3    A. I don't remember the components of the
4agreement that was presented to me so I can't
5postulate or guess whether that was part of the
6agreement.
7    Q. Did you agree to the terms set forth in
8paragraph 9, nondisparagement, paragraph 9 of
9Deposition Exhibit 3?
10    A. I don't remember if that was a part of the
11original agreement that I received.
12    Q. How could you -- how could you determine if
13it was or was not?  Do you have your e-mails?
14    A. I do believe I have it somewhere, yes.
15    Q. I mean, we have a lawsuit going on.  One
16would presume that you have secured and saved all the
17e-mails relevant to your claims, right?
18    A. Yes.
19    Q. Okay.  So you can very easily -- maybe you
20don't know it as you sit here today, but you can go
21back and figure this out, can't you?
22    A. I'm sure I can bring that up, yes.
23    Q. All right.  Do you recall agreeing to any
24form of a nondisparagement obligation in favor of FSM?
25    A. I don't recall.

---

Dickman Davenport, Inc

214.855.5100      www.dickmandavenport.com      800.445.9548

Mayar Zokaei - August 3, 2021

73

1    Q.  What about paragraph 11, nonsolicitation?  Do
2 you remember agreeing to the terms of this provision?
3    A.  I believe so, yes.
4    Q.  I mean, these are standard things that one
5 would expect to find in your industry, right?
6         MR. MURPHY:  Objection to the phraseology
7 "standard things", calls for a conclusion, but you may
8 go ahead and answer the question, Mr. Zokaei.
9    Q.  (BY MR. BESHARA)  Let me restate it.  Are
10 these type of provisions such as nonsolicitation,
11 nondisparagement, and nondisclosures customary in
12 contracts in your industry?
13    A.  I have only worked for one agency so I cannot
14 guess on how other contracts with other agencies are
15 formed.
16    Q.  Have you ever been a party to any other
17 contract that contain provisions such as
18 nondisclosure, nondisparagement, nonsolicitation?
19    A.  Nondisclosure, yes.
20    Q.  So these aren't alien concepts to you?
21 You're familiar what they mean, right?
22    A.  Correct.
23    Q.  Did you agree to pay liquidated damages equal
24 to $50,000 or each breach of 11 romanette 1, 20,000
25 for each breach of 11, romanette 2, 30,000 for each

74

1 breach of 11 romanette 3, and 40,000 for each breach
2 of 11, romanette 4?
3    A.  I don't recall if those were elements that
4 were in the original agreement that were sent to me.
5    Q.  Okay.  But you agree you had a contract with
6 FSM, right?
7    A.  I had an agreement with FSM, correct.
8    Q.  And you agree even though it wasn't signed
9 there was something in writing that you guys had
10 agreed to, right?
11    A.  Correct.
12    Q.  You're just telling the jury you're not sure
13 if it was this one?
14    A.  Correct.  Or if all these elements were in
15 the agreement.
16    Q.  Yeah.
17    A.  Yes.
18    Q.  But you're going to go find that out because
19 you're going to look at your e-mail and pull what you
20 agreed to, right?
21    A.  Correct, correct.
22    Q.  Bear with me one second.  Sorry, folks.
23         (Exhibit No. 8 marked.)
24    Q.  (BY MR. BESHARA)  Okay.  I have shared
25 Deposition Exhibit 8.  I'm going to share the screen.

75

1 I'll represent to you what I have marked as Deposition
2 Exhibit 8 is an e-mail string between you Mr. Zokaei,
3 Jabbar Fahim of Patel Gaines, Rahul Patel of FSM.  And
4 first off, is your e-mail address mzokaei@gmail.com?
5 Did you hear me?
6    A.  Yes, that's correct.
7    Q.  Do you remember Jabbar Fahim sending you an
8 e-mail introducing himself?
9    A.  Yes, I do.
10    Q.  You do?
11    A.  Yes.
12    Q.  Do you recall responding back to Mr. Fahim on
13 or about January 30th telling him, thanks for the
14 e-mail, you're looking forward to working with him as
15 well?
16    A.  Yes.
17    Q.  This is whenever you were negotiating the
18 form of the written contract, independent contractor
19 agreement with FSM, isn't it?
20    A.  Finalizing the agreement, yes.
21    Q.  Yeah, you're negotiating the form so that it
22 can be signed, right?
23    A.  Correct.
24    Q.  So on January 30th, Mr. Fahim says that he
25 had sent documents Rahul for review, but Rahul was

76

1 out.  He expected he was going to be able to get them
2 to you in the morning.  Do you recall him telling you
3 that?
4    A.  Yes.
5    Q.  And do you recall in response writing the
6 e-mail at the very top of Deposition Exhibit 8?
7    A.  Could you scroll up a little bit so I can see
8 the date?
9    Q.  Huh?
10    A.  Could you scroll up a little bit so I can see
11 the date?  Oh, yes.
12    Q.  So you didn't agree to what had been
13 proposed, instead is this the minor change that you
14 mentioned earlier in your testimony?
15    A.  No, this is not, no.  This was --
16    Q.  Tell me what it is.
17    A.  This was about a month and a half after he
18 submitted the agreement to me.  He did not submit it
19 to me the next day.  It was still about a week later,
20 so into February.  I had requested a change on the --
21 with respect to a minor modification and then they
22 sent me this agreement.  It was a little bit different
23 and I had asked Rahul several times, and he said that
24 they were busy, but they would get back to me.  And
25 then they never got back to me and finally I submitted

Dickman Davenport, Inc
214.855.5100      www.dickmandavenport.com      800.445.9548

Mayar Zokaei - August 3, 2021

**77**

1 this e-mail to Jabbar.  He had said Jabbar was in the
2 middle of something, extremely busy and whatnot.  He
3 said he was going to, you know, take care of any
4 questions and whatnot, but this process dragged on
5 until about March with both of them.  Said, hey, you
6 know, I was speaking to Rahul and can you just -- you
7 know, these two questions I have based on the modified
8 agreement you sent me, can you just let me know --
9 clarify these and that was it.
10     Q.  Okay.  So the way I see this, is you did not
11 accept what Jabbar had sent you and instead you asked
12 him to add the quoted section that I've highlighted
13 about any liabilities arising under seller's gross
14 negligence, wilful misconduct, or bad faith, right?
15         MR. BESHARA:  I can't hear you if you're
16 talking.  Can anybody else hear him?  Is he frozen?
17         MR. MURPHY:  Mr. Zokaei, I think you're
18 frozen.  Did you hear us?  He's frozen, Luke.
19         MR. BESHARA:  Yeah, I figured.  Do you
20 want to give him a call?
21         THE VIDEOGRAPHER:  Should we go off the
22 record?
23         MR. BESHARA:  Yeah.
24         MR. MURPHY:  Sure.
25         THE VIDEOGRAPHER:  We're off the record.

**78**

1 The time is 1:18.
2         (Recess 1:18 to 1:22.)
3         THE VIDEOGRAPHER:  We're back on the
4 record.  The time is 1:22.
5         MR. BESHARA:  All right.  Let's see if I
6 can remember where I was at.
7         THE REPORTER:  I can repeat the last
8 question if you want me to.
9         MR. BESHARA:  Yeah, will you?
10         (Record read.)
11     Q.  (BY MR. BESHARA)  Can you answer that
12 question for me, Mr. Zokaei?
13     A.  Yeah.  All the chat documents you had
14 uploaded have disappeared.  Could you please upload
15 the document you had that was screenshots of the
16 e-mail exchange if possible?
17     Q.  Yeah, I'll do it again.  Hang on.
18     A.  I believe that was Number 8.
19     Q.  It is.  Okay.  You should have it.
20     A.  Thank you.  The reason this was brought up in
21 March 11th is because based on my discussions with
22 Rahul in February, this change would be made already
23 and the document would be sent to me and that it was
24 fine.  And he actually helped me with the formulation
25 of that, and it was about, like I said, more than a

**79**

1 month until I had to basically not push, but, you
2 know, implored Rahul and Jabbar to get me the
3 documentation because I felt a little bit
4 uncomfortable for us to be proceeding with our
5 relationship and them not, you know, signing anything
6 or giving it back to me.
7     Q.  Uh-huh.  All right.  So, to make sure I
8 understand this, on Wednesday, March 11th, you do not
9 dispute that you sent an e-mail to Jabbar Fahim, the
10 attorney for FSM, copied to Rahul Patel of FSM, asking
11 him to modify the document?
12     A.  Correct.
13     Q.  Was that modification in fact made?
14     A.  No.
15     Q.  I have uploaded Exhibit 9.  And now I'm
16 uploading the attachments to that e-mail that are
17 Exhibit 9.  Mr. Zokaei?
18     A.  Yes.
19     Q.  So this is an e-mail -- well, first, it's an
20 e-mail that purports to be from Jabbar Fahim to Rahul.
21 Now, I don't have the e-mail that went to you.
22     A.  Uh-huh.
23     Q.  And, in fact, you know what, I need to pull
24 this down.  Delete those documents off.  That's going
25 to be attorney-client.  I thought it was the e-mail to

**80**

1 you.
2         MR. BESHARA:  Can you delete those out,
3 Audra?
4         THE REPORTER:  Guy, can you do that since
5 you're the host?
6         THE VIDEOGRAPHER:  Let me try.  I'm not
7 sure if I have ever done that before, but...  It might
8 have to be whoever uploaded it can delete it perhaps.
9 It's not letting me do it.
10         MR. BESHARA:  All right.  I'm snapping
11 back on those documents.  We're still going to talk
12 about some of them, but the e-mail in particular,
13 that's attorney-client.  I thought that was an e-mail
14 to Mayar.
15         THE WITNESS:  Mayar.
16         MR. BESHARA:  What's that?
17         THE WITNESS:  My name is Mayar.
18         MR. BESHARA:  My apologies.
19         THE WITNESS:  Oh, no problem.
20     Q.  (BY MR. BESHARA)  You can go ahead and open
21 the independent contractor agreement.  Do you
22 recognize that document?  The reason I ask is you
23 mentioned the one you had seen had a watermark on it,
24 and I'm wondering if this is the version of the
25 document you saw.

Mayar Zokaei - August 3, 2021

**81**

1    A.  This does seem to be a draft of an agreement
2 with the watermark on it.  I'm not sure if this is the
3 same one I received, and I do believe I received a
4 couple of different versions of the document after the
5 changes that -- the minor change I requested was made.
6 So I don't know if this was it, but the one that I
7 received had a similar watermark to this one.
8    Q.  And this one has the same language you said
9 you didn't recognize before.  You see it in paragraph
10 4?
11    A.  Yes.
12    Q.  What was supposed to happen?  You didn't
13 recall that.  I'm assuming you still can't recall it?
14    A.  I just don't remember, yeah.  Just to be
15 honest with you, I don't remember.
16    THE REPORTER:  So Exhibit 9 is those
17 three attachments minus the e-mail, right?
18    MR. BESHARA:  No, this will be Exhibit 9,
19 what you see on the screen right now, the independent
20 contractor agreement.
21    THE REPORTER:  Okay.  Gotcha.
22    MR. BESHARA:  The other document
23 should -- I don't care about the other documents, but
24 the e-mail -- John, can I get your agreement you
25 recognize to snap back?

**82**

1    MR. MURPHY:  Yes, absolutely, Luke.
2    MR. BESHARA:  There is nothing
3 controversial there, but I don't want to inadvertently
4 waive privilege by sending out something like that.
5    MR. MURPHY:  No, that's fine.
6    (Exhibit No. 9 marked.)
7    Q.  (BY MR. BESHARA)  All right.  So I'm going to
8 mark this as Exhibit 9, what we have on the screen
9 right now.  I'm recognizing a lot of what we saw with
10 Exhibit 3.  For example, on the top of page 2, it
11 references those promissory notes that we talked
12 about.  It has -- doesn't have your salary set yet so
13 that was still being negotiated at the time in
14 paragraph 4.
15    A.  What date is this?
16    Q.  What's that?
17    A.  You said my salary was being negotiated on
18 what date?
19    Q.  Well, there's no sal -- I don't know if it's
20 negotiated.  I'm presuming.  See here in paragraph 4
21 there is not a dollar value set?
22    A.  Uh-huh.
23    Q.  And this document is drafted 1-31-2020, okay,
24 so I'm assuming that it hadn't been agreed upon at
25 that point otherwise we would have a dollar figure in

**83**

1 there.  Is that consistent with what you remember?
2    A.  I had received two payments prior to this
3 date so your presumption is incorrect.
4    Q.  Okay.  So it was 12,500 per month, right?
5    A.  Correct.
6    Q.  This -- in paragraph 8 it has the
7 confidentiality that we talked about.  I'm comparing
8 this Exhibit 9 back to Exhibit 3.  It has a
9 nondisparagement.  It has a nonsolicitation like we
10 saw in Exhibit 3.  It has the liquidated damages like
11 we saw in Exhibit 3.  It has a noncompete like we see
12 in Exhibit 3.  Let's talk about disparagement.  Do you
13 know what that word means, Mr. Zokaei?
14    A.  Yes.
15    Q.  What does it mean to you?
16    A.  It is to talk badly about someone or upon
17 someone's name.
18    Q.  Have you ever spoken badly of FSM?
19    A.  No.
20    Q.  Rahul Patel?
21    A.  Not that I remember.
22    Q.  Do you remember whether or not you have
23 spoken negatively about FSM or you just don't
24 remember?
25    A.  I don't recall doing so.

**84**

1    (Exhibit No. 10 marked.)
2    Q.  (BY MR. BESHARA)  All right.  I have shared
3 Exhibit Number 10.  Do you remember being presented
4 with Exhibit Number 10?
5    A.  What do you call that?
6    Q.  What's that?
7    A.  What is the title of that?  I want to make
8 sure I have the right one.
9    Q.  It's on my screen.
10    A.  Okay.  Yeah, I don't remember this.  I
11 believe you asked me about this prior.
12    Q.  No, no, no.  I asked you about Exhibit 6,
13 what you signed and admitted it was your signature.
14 It has a slightly different title and it predates this
15 draft.
16    A.  Okay.
17    Q.  Do you remember a series of documents being
18 sent over to you by FSM?
19    A.  I do remember the agreement being sent to me.
20 I do remember this purchase agreement that you also
21 had in there.
22    A.  Yeah.
23    A.  Which I had asked for a change to, but I
24 don't remember this one.
25    Q.  Okay.

Mayar Zokaei - August 3, 2021

85

1    A.  I don't remember all -- there were several
2documents and several about pages of each document
3so...
4    Q.  All right.  Do you remember in Deposition
5Exhibit 8 -- which I'm pulling up for you right now --
6you asked for changes to be made to the independent
7contractor agreement, correct, and that's what's
8reflected in Exhibit 8?
9    A.  I don't remember which document I was
10referring to in that e-mail, but I can see the
11parlance used, you know, assume liabilities and such.
12I'm assuming that was from the independent contractor
13agreement.
14    Q.  Okay.  Did you tell me that these changes
15were made and a new draft was sent over to you?
16    A.  I never received a new draft so I do not know
17if -- I do not recall reflecting these changes that I
18requested so I do not know if it was prepared and I
19just never received it.
20    Q.  I thought you said that the changes were made
21and you received a new version, but I misunderstood
22you then, right?
23    A.  Yeah, I never received -- when I put in the
24request for these per the e-mail on March 11th, I
25don't recall receiving a new contract reflecting those

86

1changes although I was assured that it was coming.
2    Q.  Okay.  And since you don't remember ever
3receiving a contract with the changes you requested,
4you certainly didn't sign such a contract, right?
5    A.  No, no.
6    Q.  And FSM didn't sign such a contract to your
7knowledge, right?
8    A.  Correct.
9    Q.  I know we're bouncing around a little bit.
10I'm going to go back to your wage claim form.
11    A.  Sure.
12    Q.  This is Deposition Exhibit Number 7.  And
13remember you signed this document under penalty of
14perjury certifying everything is true and correct.  Is
15it true that you were hired as a sports agent and a
16recruiter?
17    A.  Yes.
18    Q.  Is it true that you had no set hours?
19    A.  That's correct.
20    Q.  Is it true that your compensation agreement
21was a written agreement?
22    A.  As in -- could you please specify?
23    Q.  Well, I mean, you're the one that filed this
24out under penalty of perjury.
25    A.  Right.

87

1    Q.  And you said it was a written agreement that
2provided for your compensation.
3    A.  Yes, I do believe I did receive some sort of
4agreement that outlined the compensation I would
5receive with FSM.
6    Q.  Okay.  Was it this agreement that we marked
7as Deposition Exhibit Number 3?
8    A.  This agreement, yes.
9    Q.  Okay.  So that's what you meant when you
10swore under penalty of perjury that you had a written
11agreement that provided for your compensation,
12correct?
13    A.  I believe this was what I was referring to.
14If not, perhaps there was another purchase agreement
15or whatnot that I received because I received several
16documents from Rahul, but I believe this was the
17written agreement that I referred to.
18    Q.  Okay.  So is it true that the claimed wages
19were not earned in Texas?
20    A.  Correct.
21    Q.  Because you only went to Texas one time to
22San Antonio, right?
23    A.  That's not why.  I asked them.  I provided
24information to the Texas Workforce Commission of where
25I lived and where the account was that they were

88

1sending the money to and they determined that it would
2be better for me to write based on their direction
3that the wages were not earned in Texas.
4    Q.  Well, yeah, but my question is much
5different.  My question is, you only went to San
6Antonio one time, right?
7    A.  Yes.
8    Q.  How long were you there?
9    A.  About three or four days.
10    Q.  Okay.  And you never returned after that,
11correct?
12    A.  No.
13    Q.  Did you travel anywhere during the period of
14your association with FSM away from Oregon and besides
15to San Antonio in that one trip?
16    A.  Yes.
17    Q.  Where did you travel to?
18    A.  New York in January as well as Chicago in
19February.
20    Q.  What was going on in Chicago in February?
21    A.  It was the NBA All-Star break weekend.
22    Q.  Okay.  Did you travel anywhere else during
23your period of association with FSM?
24    A.  I don't remember traveling anywhere else
25during that time.

Dickman Davenport, Inc
214.855.5100     www.dickmandavenport.com     800.445.9548

Mayar Zokaei - August 3, 2021

**89**

1          MR. MURPHY:  Luke, beg your pardon, but I
2believe Mr. Zokaei also traveled to Miami in --
3          THE WITNESS:  Oh, yeah.
4          MR. BESHARA:  Let the witness tell me
5that.
6          MR. MURPHY:  Oh, I'm sorry.
7    A. Yeah, I did travel to Florida for a
8recruitment meeting.
9    Q. (BY MR. BESHARA)  Who were you recruiting?
10   A. I'm sorry?
11   Q. Who were you recruiting?
12   A. It was a prospective client.
13   Q. Who?
14   A. Chris Silva.
15   Q. Who is that?
16   A. He was a player with the Miami Heat.  I
17believe now he is with the Sacramento Kings.
18   Q. Okay.  So you traveled to Florida.  I presume
19you traveled to Miami?
20   A. Correct.
21   Q. When did you do that?
22   A. I believe that was early March.
23   Q. Okay.  How long were you in Miami?
24   A. A few days.
25   Q. Two days?

**90**

1    A. Yes.
2    Q. Okay.
3    A. A little over 24 hours, but less than I would
4say two days.
5    Q. Okay.  Less than two days?
6    A. Yes.
7    Q. Did you arrive during the day or at night?
8    A. I arrived in the morning on a red eye and --
9yeah, I arrived in the morning.
10   Q. And when did you leave?  The following day
11what time?
12   A. Sometime in the early afternoon or late
13afternoon.  I think about 3:00 or 4:00 p.m.
14   Q. Okay.  Did you go to Mr. Silva's house?
15   A. No, I went to his residence, but he didn't
16have a house.
17   Q. Okay.  So you went to his residence.  What's
18his residence?
19   A. He was living in an apartment.
20   Q. Okay.  So you went to his apartment?
21   A. Yes.
22   Q. Okay.  Who was present at this meeting with
23you and Mr. Silva?
24   A. It was myself and his trainer.
25   Q. What's his trainer's name?

**91**

1    A. Shawn Farmer.
2    Q. Okay.  And how did you get the introduction
3to Chris Silva?
4    A. I had met him a few months before when I had
5visited him.  I visited the trainer and he was working
6out Mr. Silva so I was introduced to him at that time.
7We talked for a little bit and my introduction was
8through the trainer.
9    Q. Okay.  So your contact with Mr. Silva was
10through his trainer?
11   A. Correct.
12   Q. Was his trainer the one that arranged for you
13to meet with Mr. Silva at his apartment?
14   A. Yes.
15   Q. Did you meet with Mr. Silva at his apartment
16on the day you arrived or on the next day when you
17departed?
18   A. The next day before I departed.
19   Q. Okay.  How long did you meet with Mr. Silva?
20   A. It was a meeting of about a couple of hours.
21   Q. Okay.  What was discussed?
22   A. Potential change in representative for him
23and signing with FSM and myself.
24   Q. Who was his agent of record at that time?
25   A. I don't recall who his agent at the record

**92**

1was -- of the record was.
2    Q. Okay.  Did he mention to you why he was
3looking to change agents?
4    A. He said that he had not received too many
5marketing deals and also his -- his agent -- he felt
6that his agent wasn't really paying attention to him
7and not visiting him.  And he had asked for a pair of
8shoes for his agent -- from his agent and the agent
9never followed up, never was really responsive to his
10phone calls.  So he was just dissatisfied with the
11representation.
12   Q. Okay.  And how did the meeting conclude?  Did
13you get an SPAC signed with Mr. Silva?
14   A. This was just a first formal sitting down
15with him.  I told him that I would keep in touch with
16him.  It was still in the middle of the season so he
17was a little bit busy and I said that I would follow
18up subsequent to the season.  Sorry, subsequent to me
19returning and, you know, perhaps we could discuss the
20potential to work together further.  And he seemed to
21show an interest in potentially working together.
22   Q. So the answer is, no, you did not get a
23signed SPAC?
24   A. No, I did not.
25          (Exhibit No. 11 marked.)

Mayar Zokaei - August 3, 2021

93

1    Q. (BY MR. BESHARA) I'm going to show you -- I
2have just uploaded Exhibit 11. I'm going to share the
3screen with you. Okay. So I found the e-mail. You
4know, originally I inadvertently sent you one between
5the attorney and FSM. Now I have the e-mail from
6Rahul on behalf of FSM to you. Do you remember
7receiving this e-mail?
8    A. Yes.
9    Q. Okay. And I will go ahead and mark as 12,
1013, and 14 the three attachments. We'll use the ones
11that were actually attached to this e-mail.
12        (Exhibit Nos. 12 through 14 marked.)
13    Q. (BY MR. BESHARA) The reason I have sent 11,
1412 -- or 12, 13, and 14 is to make Exhibit 11 be
15complete so you have all the attachments, but I only
16want to ask you about 12 I believe it is. So this is
17like the one I saw before. In fact, I wouldn't be
18surprised if it's identical to the one we looked at a
19few moments, the draft, but it contains that language
20in paragraph 4 that you said that didn't remember it
21being there. It's got the references to the
22promissory notes. It's got the reference to the
23relationship being that of an independent contractor,
24confidentiality, nondisparagement, nonsolicitation,
25liquidated damages, noncompetition, right?

94

1    A. Yes.
2    Q. You'll agree with me that as early as January
331st, 2020, you had been provided with this draft of
4the independent contractor agreement, correct?
5    A. Based on this e-mail, yes.
6    Q. It is.
7    A. Okay.
8    Q. I mean, and you're free -- I'm sure you still
9have your e-mail.
10    A. Uh-huh.
11    Q. I can verify it, too, but I just attached
12what was attached. I have to do it in PDF because of
13the way these documents work.
14    A. Got it.
15    Q. I just pulled them down. And we saw in
16Exhibit 8 that the only comment that you had was
17asking about making the revision to add any
18liabilities under seller's gross negligence, willful
19misconduct, or bad faith, right?
20    A. This was the only comment that's reflected in
21this e-mail, yes.
22    Q. Yeah. And we already talked about it, that
23change was never made, was it, to your knowledge?
24    A. To my knowledge...
25    Q. Let me ask you this. Do you ever remember a

95

1written agreement that had that change made?
2    A. I don't remember to be honest with you. I
3think they did send me another agreement subsequent to
4this or modified agreement, but I -- it's such a long
5time ago I just can't -- I don't remember. I know
6there was some other documents sent to me. I don't
7know if it was this or a purchase agreement reflected
8with a change in players or whatnot.
9    Q. We'll come back to that.
10    A. Yeah.
11    Q. Number 3, it doesn't have the draft watermark
12anymore, and this is the one we pulled down. This is
13the one that you told me you think is the agreement
14that you referenced both in your state court petition,
15which I marked as a deposition exhibit, as well as in
16your wage claim, which is Deposition Exhibit 7, right?
17    A. I don't remember which one I was referring to
18in the wage claim because this wage claim was sometime
19in October, maybe almost a year after all these
20e-mails. So I don't remember which one it was.
21    Q. Did you ever sign and return the independent
22contractor agreement to FSM?
23    A. Mr. Beshara, with all due respect, I've
24answered that question already.
25    Q. I'm just asking you to answer it.

96

1    A. No.
2    Q. Did you ever receive an independent
3contractor agreement signed by someone on behalf of
4FSM?
5    A. No.
6    Q. So there's no fully executed independent
7contractor agreement out there, is there?
8    A. There is no signed agreement, correct.
9    Q. Coming back to Exhibit 7, you'll agree with
10me that taxes were not deducted from your direct
11deposits, were they?
12    A. Correct.
13    Q. Is it true that you were not provided with an
14explanation as to why you were not paid for the
15amounts you claim to be owed?
16    A. Correct.
17    Q. Is it true that you swore under oath you were
18owed $6,250 for wages?
19    A. Uh-huh.
20    Q. And this $11,589.08 for unreimbursed
21expenses?
22    A. Correct.
23    Q. You mentioned that -- all this stuff about
24what the Workforce Commission did. Did they order FSM
25to pay you any money?

Mayar Zokaei - August 3, 2021

**97**

1    A.  They could not enforce it because -- no, no.
2    Q.  They didn't, right?
3    A.  No.
4    Q.  You claimed you were owed money for the
5period between April 15th and April 20th, correct?
6    A.  Yes.
7    Q.  Why would you be owed $6,250 when you only
8worked five or six days during that pay period
9according to your sworn allegations?
10    A.  When I contacted the TWC, they asked me how
11long of a period -- did I receive my final paycheck
12and they said what was each paycheck for and they said
13to put this amount in there and it will be determined
14how much they owe you of that amount.
15    Q.  Okay.  Was it true when you swore under
16penalty of perjury that FSM hired you as a contractor?
17    A.  Yes.
18    Q.  You knew that you, didn't you?
19    A.  Based on the contract that I had, that was
20how it was characterized.
21    Q.  And we're talking about Exhibit 3, which is
22titled the Independent Contractor Agreement, right?
23    A.  Correct.
24    Q.  The same document that you never signed and
25FSM never signed, right?

**98**

1    A.  Correct.
2    Q.  Was it true that you had no set hours?
3    A.  Correct.
4    Q.  Was it true that you were responsible for
5paying your own taxes?
6    A.  Yes.
7    Q.  I didn't see when I received this from the
8TWC that you had attached the alleged written
9agreement for your compensation, what you were
10supposed to have done according to what I have
11highlighted on Deposition Exhibit 7.  Did you include
12a copy of your written contract when you submitted
13this to the TWC?
14    A.  I don't recall doing that and I think it's
15because -- yeah, I don't recall doing that.
16    Q.  What contract would you have attached?
17    A.  I don't recall.
18    Q.  Well, I mean, if I asked you to produce your
19written contract with FSM, what would you provide me?
20    A.  I would provide probably the last modified
21agreement that I received from FSM.
22    Q.  And right now I know you can't remember, but
23all I've seen is Exhibit 3, and you can't deny that
24Exhibit 3 is the last version that FSM sent you, can
25you?

**99**

1    A.  Yes.
2    Q.  And you will agree with me when you were
3provided this last version that's been marked as
4Exhibit 3, you asked for additional changes to be made
5to the documents, right?
6    A.  I don't remember the timeline.
7    Q.  Well, I do.  It's right here, Deposition
8Exhibit 8.  When did you make that request?
9    A.  Which request is that?
10    Q.  Are you looking at the screen, Deposition
11Exhibit 8?
12    A.  Oh, per the e-mail on March 11th, I made that
13request in February.
14    Q.  Well, what's the date of this e-mail?
15    A.  The date of the e-mail is March 11th.  That's
16when it was formalized via e-mail.
17    Q.  Okay.  There is no doubt in your mind, you
18swore to it under penalty of perjury in the wage
19claim, that you were terminated on April 20th, 2020;
20is that right?
21         MR. MURPHY:  Objection, form.
22    A.  That's right.
23    Q.  (BY MR. BESHARA)  After your termination, did
24you continue to use your e-mail address that FSM had
25provided you with its server?

**100**

1    A.  Yes.
2    Q.  What is that e-mail address?
3    A.  It was some sort of identification of me at
4the FSM sports e-mail box.
5    Q.  Okay.  You had been terminated on April 20th,
6yet you continued to use your FSM e-mail address,
7right?
8    A.  Correct.
9    Q.  Who were you communicating with using that
10e-mail address?
11    A.  With a representative from a college's media
12department.
13    Q.  Regarding whom?
14    A.  Regarding client Kylor Kelly.
15    Q.  Okay.  Why were you continuing to hold
16yourself out as being associated with FSM after you
17had been terminated on April 20th, 2020?
18    A.  I didn't hold myself out to that.  It was one
19of the e-mails on my phone that was a default e-mail,
20and I just replied simply to an e-mail that the person
21had sent me requesting a link for pictures.  And
22because only my name appears and the e-mail address
23doesn't appear, I didn't realize that it was sending
24it from an FSM e-mail account.
25    Q.  Okay.  Who else did you communicate with

Mayar Zokaei - August 3, 2021

**101**

1using your FSM e-mail address after you had been
2terminated?
3   A.   Former FSM intern named R.J. McGuire.
4   Q.   Okay.  And what did you ask R.J. McGuire to
5do from your FSM e-mail address?
6   A.   I had talked to him a couple of times -- to
7make me a graphic.
8   Q.   Okay.  Did you notify R.J. McGuire that you
9had been terminated from FSM --
10   A.   Yes.
11   Q.   -- at the time you e-mailed requesting that?
12   A.   Yes.
13   Q.   So if I go and find that e-mail it's going to
14say, R.J., I am no longer associated with FSM, but
15will you still please do this for me?
16   A.   I don't believe I put that in an e-mail, so
17no.
18   Q.   Did you tell the representative that you had
19contacted regarding Kylor Kelly that you had been
20terminated from FSM or you were no longer associated
21with FSM when you were communicating with that person?
22   A.   No.
23         (Exhibit No. 15 marked.)
24   Q.   (BY MR. BESHARA)  Okay.  I have shared
25Exhibit 15.  Is what I have marked as Deposition

**102**

1Exhibit 15 what you were referencing when you
2mentioned that you were communicating with someone
3regarding Kylor Kelly using your FSM e-mail address?
4   A.   Yes.
5   Q.   If you go to the bottom, you made your
6initial introduction.  This is your signature block
7for FSM, isn't it?
8   A.   Yes.
9   Q.   And your e-mail address with FSM was -- and I
10know I mispronounced your first name earlier.  How do
11y'all pronounce it?
12   A.   Mayar.
13   Q.   Mayar?
14   A.   Mayar.
15   Q.   So was your e-mail address while you were at
16FSM mayar@fsm-sports.com?
17   A.   Yes.
18   Q.   Did you send this e-mail to Shawn Schoeffler
19with Oregon State?
20   A.   Yes.
21   Q.   On April 29th, 2020, right?
22   A.   Yes.
23   Q.   You introduced yourself and you announced
24that you worked for FSM, right?
25   A.   Correct.

**103**

1   Q.   Mr. Schoeffler responded back, said you had
2permission to use photos, I guess that Oregon State
3had taken of Kylor Kelly, right?
4   A.   Yes.
5   Q.   And on April 29th, did you send an e-mail
6from your FSM e-mail address to Mr. Schoeffler?
7   A.   Yes.
8   Q.   Is it the e-mail that appears here on
9Deposition Exhibit 15 that states, was trying to
10access the Dropbox.  Could you please send me a new
11link?  Might have expired.
12   A.   Yes.
13   Q.   Mr. Schoeffler responded to you that same day
14and said, good timing, he had just uploaded pics from
15his senior year, right?
16   A.   Right.
17   Q.   And you respond back later that day from your
18fsmsports.com e-mail address thanking Mr. Schoeffler,
19correct?  Yes?
20   A.   Yes.
21   Q.   Right?
22   A.   Yes, that's correct.
23   Q.   And in these e-mails that -- these two
24e-mails I have seen from April 29th, not only are you
25using your FSM e-mail address, it also has your

**104**

1signature block indicating that you're VP of
2basketball operations of FSM; is that correct?
3   A.   Correct.
4   Q.   I don't see where you told Mr. Schoeffler
5that you were no longer associated with FSM in any of
6these e-mails.  Am I missing it?
7   A.   I never said that I told him that I wasn't.
8   Q.   Here is yet another e-mail later on April
929th and you have been terminated at this point for
10nine days, correct?
11   A.   Correct.
12   Q.   You are sending him another e-mail and he
13responds back with a link, doesn't he?
14   A.   Yes.
15   Q.   You understood as of April 20th when you were
16terminated that you were no longer supposed to be
17using any materials of FSM, correct?
18   A.   No.
19   Q.   What, you thought that even though you had
20been terminated, you could still masquerade as an FSM
21agent?
22         MR. MURPHY:  Objection, form.
23   Q.   (BY MR. BESHARA)  You can answer that.
24You're telling me that even though you had been
25terminated, you thought you could still hold yourself

Mayar Zokaei - August 3, 2021

---

**105**

1 as an FSM agent?
2    A.  Rahul said he would give me some time to do
3 some housekeeping and get things in order with respect
4 to prior business such as this, to getting pictures
5 from contacts that I had established relationships
6 with via the e-mail address.  And inadvertently
7 because it was a default address in my phone at that
8 time, I was sending out these e-mails to -- this
9 e-mails to -- these e-mails to this one particular
10 party requesting photos, but I was not masquerading.
11    Q.  Okay.
12    A.  I told my clients that I was no longer with
13 FSM and anybody that I had some business with.
14    Q.  Okay.  That makes better sense because you
15 told me it was an accident.
16    A.  Inadvertently.  Inadvertently, yeah.
17    Q.  You did not intentionally use your FSM e-mail
18 address, right?
19    A.  No, no.
20    Q.  And Rahul didn't tell you that you could
21 continue to use your FSM e-mail address and hold
22 yourself out as an FSM agent, did he?
23    A.  Those are two different things.  Using the
24 e-mail address because that was a line of
25 communication I had with somebody, doesn't necessarily

---

**106**

1 mean I was representing myself as that.  He told me to
2 do what I had to do, to do some housekeeping along the
3 lines such as this, getting photos of clients.
4    Q.  Did Rahul tell you that you could continue to
5 use your FSM address with the signature block that
6 holds yourself out as VP of basketball operations
7 after April 20?
8    A.  No.
9    Q.  So what made you think that that was
10 acceptable?
11    A.  It was inadvertent.
12    Q.  Okay.  So it was just an accident.  I gotcha?
13    A.  Okay.
14       (Exhibit No. 16 marked.)
15    Q.  (BY MR. BESHARA)  I uploaded Exhibit 16.
16 Have you seen this e-mail string before?  This is what
17 I have marked as Deposition Exhibit 16.
18    A.  Which one is that?  Oh, 16.
19    Q.  Yeah.
20    A.  Yeah, that was in the previous exhibit also.
21    Q.  It is.  Go to the bottom for me or just look
22 on my screen.  There are similarities.  But it ends up
23 branching off.  It's a little different so we start
24 off with the initial e-mail that we saw on Exhibit 15,
25 right, where it's from you over to Shawn Schoeffler.

---

**107**

1 He sends you over a link.  We're good there.  We have
2 seen this e-mail was trying to access Dropbox.  That's
3 on April 29th.  We see that you're using your FSM
4 e-mail address and it's got your FSM signature block
5 indicating you're VP of basketball operations, right?
6    A.  Uh-huh.
7    Q.  We saw this e-mail from Shawn Schoeffler on
8 April 29th with the good timing, right?  Do you
9 remember that?
10    A.  Yes.
11    Q.  Now we have an e-mail from you.  I think we
12 saw this one, too.  Thanks so much.  You thank him,
13 right?
14    A.  Yes.
15    Q.  Now, I don't believe that I've seen this
16 part.  I don't think 15 contains this next e-mail from
17 Shawn Schoeffler on April 29th to you.  We have an
18 e-mail from you on April 29th again using your FSM
19 Sports e-mail address with a signature block holding
20 yourself out as a VP of basketball operations back
21 over to Shawn Schoeffler, right?
22    A.  Yes.
23    Q.  He sends you a new link, correct?
24    A.  This is already in the previous exhibit, yes.
25    Q.  No, because I don't remember seeing this

---

**108**

1 part.  Now I have an e-mail from you on April 29th
2 from mzokaei@gmail.com.
3    A.  Yes.
4    Q.  Why did you switch from using your FSM e-mail
5 address to using your gmail account that does not have
6 the signature block that holds yourself out as being
7 VP of basketball operations for FSM?
8    A.  I believe I got a notice from Rahul that
9 said -- I believe that's what it was.  He had told me,
10 you know, please stop using the FSM e-mail, if I'm not
11 mistaken, or it could have just been a switch on a
12 default because the two e-mail addresses I had on
13 there.  It was my personal one and the FSM one, and
14 either it was that or that R.J.'s e-mail was not
15 populating from FSM and then I realized, oh, I'm on
16 the FSM e-mail and his e-mail is in my personal
17 e-mail.  That's probably why I have to switch over
18 there so it populates because I couldn't find his
19 e-mail address.
20    Q.  You have given me a lot of possibilities, but
21 I guess the real is you don't know?
22    A.  Yeah, I don't remember to be honest with you,
23 but I believe it was one of the two, if not a
24 combination of the two.
25    Q.  Okay.  So we switch over.  Is that the last

---

Mayar Zokaei - August 3, 2021

---

109

1time you used the FSM e-mail address?
2    A.  I don't remember.  I don't remember.
3    Q.  Well, who else were you communicating with
4holding yourself out to be VP of basketball operations
5of FSM after you were terminated on April 20th of
62020?
7    A.  I was not holding myself out as still an
8employee of FSM.  I was inadvertently using the e-mail
9address.  And, again, because it's more than almost
10two years, I don't remember -- or more than a year I
11don't remember which e-mails that I sent out.
12    Q.  But you agree with me that all of these
13e-mails when they come from the FSM address contain
14the signature block that identifies you as VP of
15basketball operations for FSM?
16    A.  Yes.
17    Q.  And you don't dispute that that happened, but
18you're telling me it was just a mistake, an accident?
19    A.  Yes.
20        MR. MURPHY:  Luke, we've been going a
21while.  When you get to a point where we can take like
22a five-, or ten-minute break let me know.
23        MR. BESHARA:  Let's do it now because I'm
24pivoting to these documents.  I just uploaded 17 and
2518.

---

110

1        MR. MURPHY:  Okay.
2        THE WITNESS:  Can we go a little bit
3longer, just like about ten more minutes?  Oh, you
4want to go on break.  John, if you want to go we can
5go; if not, I'm okay.
6        MR. MURPHY:  Okay.  If you guys want to
7press on through, that's fine.
8        THE WITNESS:  You need to use the
9restroom, John?
10       MR. MURPHY:  Well, yeah.
11       THE WITNESS:  Yeah, let's do that.  Let's
12take a break and then reconvene when you're back.
13       MR. MURPHY:  All right.
14       MR. BESHARA:  Let's try to be back at
154:20.  That's about seven minutes.
16       THE WITNESS:  Okay.
17       MR. BESHARA:  Will that work?
18       MR. MURPHY:  All right.  That sounds
19good.
20       THE VIDEOGRAPHER:  We're off the record.
21The time is 2:13.
22       (Recess 2:13 to 2:22.)
23       THE VIDEOGRAPHER:  We're back on the
24record.  The time is 2:22.
25    Q.  (BY MR. BESHARA)  All right.  Mr. Zokaei.

---

111

1    A.  Yes.
2    Q.  Well, let me ask you, on 15 and 16,
3deposition exhibits, you'll agree with me that those
4were true and correct copies of e-mail exchanges that
5you had with the persons identified in those e-mails,
6right?
7    A.  Yes.
8        (Exhibit Nos. 17 and 18 marked.)
9    Q.  Let's look at 17.  I'm going to bring it up
10on the screen for you.  Have you ever seen this
11document before?  I doubt you have.  Do you recognize
12it?
13    A.  I'm sorry, it was frozen for a little bit, so
14after you asked me if I had seen it, you got cut off.
15I apologize.
16    Q.  I said, have you seen it?
17    A.  I have not seen this, no.
18    Q.  Okay.  I'll represent to you that this is a
19certificate of formation on file with the Texas
20Secretary of State, which is what's filed to form an
21entity in the state of Texas.
22    A.  Okay.
23    Q.  And it's for Fundamental Sports Management,
24LLC.  Do you see that?
25    A.  Yes.

---

112

1    Q.  And that is the name of the entity with whom
2you contracted for the provision of services, right?
3    A.  Yes.
4    Q.  And Fundamental Sports Management, LLC had
5three -- it was managed by members.  Do you see this
6down here?
7    A.  Uh-huh.
8    Q.  And here are the three members.  Do you see
9that?
10   A.  Yes.
11   Q.  And these three people happen to be
12defendants in your lawsuit, right?
13   A.  Yes.
14   Q.  And they're plaintiffs as well, but you
15recognize each of those names, correct?
16   A.  Yes.
17   Q.  FSM was formed on June 16th, 2017, do you see
18that?
19   A.  Yes.
20   Q.  You didn't have any association with FSM
21until at least December of 2019, correct?
22   A.  Correct.
23   Q.  And, in fact, you mentioned that the first
24time you ever spoke to anyone regarding FSM it was
25Rahul Patel and that would have been in October or

---

Mayar Zokaei - August 3, 2021

113

1November of 2019, right?
2    A.  Yes.
3    Q.  So there's no allegation that you contracted
4with Fundamental Sports Management, LLC before
5December of 2019, right?
6    A.  Yes.
7    Q.  18 is another document.  It's called a
8Certificate of Amendment.  I'll represent to you that
9this is also filed with the Texas Secretary of State.
10It's when changes are made.  And it was filed on
11November 29th, 2018.  Do you see that?
12    A.  Yes.
13    Q.  And that's well before you ever had any
14contact with anyone regarding FSM, correct?
15    A.  Correct.
16    Q.  And it's well before you claim you had a
17contract with FSM, correct?
18    A.  Yes.
19    Q.  And this document makes changes.  One of the
20changes was Grant Gaines was removed as a member and
21he was replaced with ROR-BRG Investments, right?  Do
22you see that?
23    A.  Yes.
24    Q.  And Nicolas LaHood, one of the parties to
25this suit, was deleted as having any association with

114

1the company.  Do you see that?
2    A.  Yes.
3    Q.  Were you aware of this document at the time
4that you filed your lawsuit over in state court?
5    A.  No.
6    Q.  Were you aware of this document at the time
7that you filed your wage claim with the Texas
8Workforce Commission?
9    A.  No.
10    Q.  Would you agree with me because Nicolas
11LaHood was removed as being associated with the
12company at least a year before you ever performed
13services for FSM, you shouldn't have named him as a
14defendant in the lawsuit?
15        MR. MURPHY:  Objection, form, calls for
16or legal conclusion, but you can go ahead and answer.
17    A.  Luke, I'm not a lawyer.  I defer to my
18representation with regards to all procedural elements
19of my lawsuit.  So I can't speak to that.  I left it
20in their hands and I do trust them to still leave it
21in their hands.  So I'm not familiar with any of this
22stuff nor how it works.
23    Q.  (BY MR. BESHARA)  That's fair enough.  You
24know, I know you're not trained as a lawyer.  Can you
25tell me why you thought it was appropriate to bring

115

1Nicolas LaHood into the lawsuit?
2    A.  Again, I defer to my representation and they
3made those decisions.
4    Q.  Well, you have never spoken with Nicolas
5LaHood, have you?
6    A.  No.
7    Q.  And you didn't contract with Nicolas LaHood,
8did you?
9    A.  No.
10    Q.  You contracted with FSM, right?
11    A.  Correct.
12    Q.  And same thing, you never contracted with
13Grant Gaines or ROR-BRG Investments, LLC, did you?
14    A.  No.
15    Q.  You contracted with FSM?
16    A.  Correct.
17    Q.  You never contract with Rahul Patel
18individually, you contracted with FSM, didn't you?
19    A.  Correct.
20    Q.  So insofar as you're claiming there was a
21breach of your contract, the party with whom you had
22the contract was FSM, right?
23    A.  Correct.
24    Q.  Tell me what it is that you believe FSM did
25that renders it liable to you in connection with the

116

1lawsuit?  What happened?  What's your -- what are the
2facts underlying your claims?
3    A.  I didn't get paid for my reimbursement.  I
4didn't get compensated for that, and the facts are I
5have no records of ever being compensated.  I didn't
6get compensated for my work with them until several
7months later after I filed the lawsuit for some of the
8wages for work performed as well as for the rest of my
9contract.
10        I was offered a position with the company
11on a three-month trial initially, which I rejected
12because I said I would like to work with this company
13and for everybody for, you know, essentially all in,
14but based on the timeline that Rahul and Matt
15maintained, it seems like they fired me pretty close
16to the exact date of three months, which is not
17something that I agreed to.  And that timeline aligns
18with what they have done to other people within their
19company, and it seems like they just wanted to promise
20me a lot and commit to me for a year, but in the back
21of their mind, to use your verbiage, secretly believe
22that they could just try me out for three months and
23if the -- if it wasn't to their satisfaction, if it
24wasn't going to be a big, you know, haul for them
25clientwise, then they could just terminate me and

Mayar Zokaei - August 3, 2021

**117**

1figure out a way to get out from under the contract
2and --
3   Q. And by the contract you mean that Exhibit 3
4that we have looked at time and again?
5   A. Something similar to that, yeah. Yeah, I'm
6not sure if that's the one again, but something
7similar to the agreement we had, which was that I
8would be employed for a year.
9   Q. Yeah, I see that, but we've already
10established that neither you nor FSM ever signed this
11version of the independent contractor agreement or any
12other version for that matter, correct?
13   A. Correct.
14   Q. Why didn't you sign it?
15   A. I didn't have a copy that had no draft
16watermark until much later. And when I did, I
17discussed a couple of changes with Rahul and he said
18he would get those to me and then we could execute.
19And it was just dragged along. And this was
20actually -- this was an expectation in a way that they
21would you drag it along because I was told the same by
22another one of their employees that they had done the
23same thing to him, that he had to hire -- at the end,
24he had to hire an attorney to handle it because he
25thought they were playing games with him as well.

**118**

1   Q. Who told you that?
2   A. Colin Bryant.
3   Q. So Colin told you that. Which doesn't make
4any sense to me if you had been warned that FSM might
5do this, why didn't you insist on this contract being
6signed by both parties and delivered?
7   A. I did. I sent several text messages, made
8several phone calls. It's all in the regard, you
9know, asking, hey, can we please take care of this,
10can we please take care of it. And every time that I
11requested it, it was an excuse. This person is
12traveling. This person is busy. This person has
13this, this person has a family obligation. And this
14went on for, like I said, throughout the course of
15more than three months.
16   Q. But at the end of the day, ultimately no
17contract was ever signed despite your request, right?
18   A. Correct.
19   Q. And notwithstanding you want to enforce this
20written contract that wasn't signed either by FSM or
21you? Isn't that what you are trying to do in this
22lawsuit?
23   A. Yes.
24   Q. We're going to come back over to Exhibit --
25oh, shoot -- Exhibit 2. You can just follow along

**119**

1with me because I'm going to ask you about each of
2these things.
3   A. Sure.
4   Q. So the employment contract provided you were
5hired for a one-year duration?
6   A. Yes.
7   Q. We saw that in paragraph 2 of Exhibit 3,
8correct?
9   A. That's correct.
10   Q. And that's where you got the information one
11year even though this not signed and might be a
12different version ultimately the versions did have the
13one-year term in them, right?
14   A. I got the information from this as well as
15multiple conversations and communications between
16myself, Matt, and Rahul.
17   Q. The agreement also provided you would be
18reimbursed for expenses; is that true?
19   A. That's true.
20   Q. And that's consistent with what we saw in
21paragraph 5 of Deposition Exhibit 3, correct?
22   A. Yes.
23   Q. And that's where you pulled that information
24from, isn't it?
25   A. That was just a discussion we had. I don't

**120**

1remember this component being the agreement but --
2because I don't remember much about the agreement, but
3that was also part of the reasons why -- one of the
4reasons why I agreed to work with FSM was the $5,000
5expense allotment.
6   Q. Okay. You were hired to perform services for
7FSM under the managing members' direction and control;
8is that true?
9   A. Yes, under the managing members' directors
10and control.
11   Q. Okay. Who are the managing members?
12   A. To my knowledge, it was Matt, Matt Fossey,
13Rahul Patel, Grant Gaines, Amit Mehta who I also kept
14in touch with and had some correspondence with, and a
15couple of other parties that I was not -- whose
16identifies I was not keen to notified of, but
17there was a board of advisors and investors and
18decisionmakers.
19   Q. Well, Mr. Zokaei, we talked about this
20earlier and you told me that you consistent with what
21we saw in Deposition Exhibit 3 reported to Mr. Patel
22and I asked anybody else and you told me Colin Bryant.
23That's who you reported to, correct?
24   A. No, I never said I reported to Colin Bryant.
25I said I reported to Matt and Rahul.

Mayar Zokaei - August 3, 2021

121

1   Q. Okay.
2   A. That's true, but I was also informed that
3there was other parties making decisions.
4   Q. Okay.  Did you have any conversations with
5those persons personally?
6   A. Yes.
7   Q. Who?
8   A. I had conversations with Matt Fossey.  I had
9conversations with Grant Gaines.  I had conversations
10with Amit Mehta.
11   Q. Okay.  What did Grant Gaines tell you to do?
12   A. He didn't tell me specifically anything to
13do, but he was just somebody I had a conversation with
14that I was told was one of the decision-makers and
15investors in the company.
16   Q. So he never instructed you to do any work,
17did he?
18   A. No.  Not specifically, no.
19   Q. Not at all?
20   A. Not at all, no.
21   Q. He didn't tell you what to do, right?
22   A. No.  Correct.
23   Q. Matt Fossey and Rahul Patel would coordinate
24with you and that's who you had your discussions with
25regarding the work you were performing for Fundamental

122

1Sports Management, right?
2   A. That's correct.
3   Q. Now, tell me about your conversations with
4Amit.  What did Amit tell you to you do in connection
5with your work for FSM?
6   A. Oh, I just, you know, expressed my, you know,
7gratitude for him being part of the company.  He
8expressed the same.  He said -- from what I recall I
9said, you know, look forward to meeting you in person
10just as I said that to Matt and, you know, just...
11   Q. My question is, what did he tell you to do in
12terms of performing services for --
13   A. I don't remember specifically, but there was
14some things that he told me.
15   Q. Okay.  You can't -- what did he tell you?
16That's what I've got to know.
17   A. Right.  We had one conversation and we had
18one exchange.  That was it.  So I don't remember.
19   Q. Okay.  Was it via telephone or via text,
20e-mail, what?
21   A. I believe it was via text.
22   Q. Okay.  And did he give you instructions on
23what to do in terms of performing services for FSM?
24   A. I don't remember what the context of our
25conversation was beyond just, you know, it's great to

123

1be working together.
2   Q. Okay.  So you cannot tell the jury that Amit
3told you to do anything with respect to services to be
4performed for FSM, right?
5   A. I don't remember him -- I don't remember that
6conversation, specifically what it entailed or all of
7it that it entailed.
8   Q. Okay.  So you can't tell the jury that he
9told you to do anything?  Since you can't remember
10what it was, you can't tell the jury?
11   A. That's correct.  Yes, that would be a good
12assumption.
13   Q. All right.  And we have already established
14Grant never told you to perform services for FSM?
15   A. That's correct.
16   Q. What about -- what about this -- oops, hold
17on.  What about this entity ROE-BRG Investments, LLC?
18What did they tell you to do in terms of performance
19services for FSM?
20   A. I'm not sure what that entity is or who
21was...
22   Q. Wouldn't it be safe to say then if you don't
23even know who they are, nobody ever told you to
24perform services on their behalf, right?
25   A. That's correct.

124

1   Q. Nicolas LaHood, you never even spoke to him,
2did you?
3   A. No, I did not.
4   Q. Because he hadn't been associated with the
5company for at least a year before you even contacted
6Rahul, right?  We saw that in Exhibit 18?
7   A. Mr. Patel -- Rahul mentioned him during the
8time of my employment as somebody that was involved
9with FSM.
10   Q. Yeah, but you never had a conversation with
11Mr. LaHood ever, did you?
12   A. No.  Never, no.
13   Q. And because of that you can confirm to the
14jury that Mr. LaHood never told you to perform
15services on behalf of FSM?
16   A. That is correct.
17   Q. You know, I'm an attorney.  I know how this
18stuff works, but I'm looking at this statement in
19paragraph 11 of Deposition Exhibit 2 where you say
20that FSM, ROE, Rahul Patel, Grand Gaines and Nicolas
21LaHood specialize in NBA agent representation, sports
22marketing, brand development, legal representation,
23contract negotiations, and endorsements.  Do you see
24that?
25   A. Yes.

Mayar Zokaei - August 3, 2021

125

1    Q. You don't have any basis to claim that
2 Nicolas LaHood specializes in any of those things, do
3 you?
4    A. No.
5    Q. And same thing with ROE-BRG Investments. No
6 basis to make that statement because you don't even
7 know who they are, right?
8    A. Correct.
9    Q. Grant Gaines is an attorney for FSM, but he
10 never gave you any instructions with respect to your
11 work as a sports agent, right?
12    A. No.
13    Q. That's not correct?
14    A. No, that's true. He did not.
15    Q. Okay. Rahul Patel would give you
16 instructions, right?
17    A. Yes.
18    Q. And Matt Fossey would give you instructions?
19    A. That is correct.
20    Q. And they did so as officers of FSM, right?
21    A. I don't know what capacity they served, but
22 they were telling me what to do.
23    Q. And your contract was this FSM according to
24 you, right?
25    A. Yes.

126

1    Q. So when they were telling you to do stuff for
2 FSM, they were acting on behalf of FSM, right?
3    A. They were representing themselves as agents
4 for FSM at that point, yes.
5    Q. Well, I mean --
6    A. Yeah.
7    Q. You had no reason to dispute that Rahul --
8    A. No.
9    Q. -- is a representative of FSM, do you?
10    A. No.
11    Q. And Matt Fossey, what's his title?
12    A. I don't know. He was -- I was told he was an
13 investor.
14    Q. Did you exchange e-mails with the guy?
15    A. Yes.
16    Q. Okay. Did he have an FSM e-mail address?
17    A. I don't remember specifically what his
18 signature line was or where he was sending it from.
19    Q. That's what I'm getting at. What about
20 Rahul? You got e-mails from Rahul?
21    A. Yes, yes.
22    Q. And Rahul is identified as what?
23    A. I believe the CEO of FSM or the president,
24 the founder, an agent, yeah.
25    Q. I'm going to pop us back over to Deposition

127

1 Exhibit 11. You don't need to pull it up. It's going
2 to be fast. Does this refresh your recollection as to
3 what Rahul's role was with FSM?
4    A. Yes.
5    Q. So what did you understand Rahul to be with
6 respect to FSM?
7    A. One of the principals there.
8    Q. I mean, what's his title?
9    A. CEO and NBPA license agent.
10    Q. Okay. We have already established that ROE,
11 Grant Gaines, and Nicolas LaHood didn't exercise any
12 control or supervision over you, you just didn't have
13 any dealings with them, did you?
14    A. Grant Gaines and Nicolas LaHood, that's
15 correct.
16    Q. And the entity, this ROE entity?
17    A. Right.
18    Q. So that part probably needs to be corrected,
19 but it is your testimony that Rahul and Matt Fossey on
20 behalf of FSM did have control and supervision over
21 your job duties, correct?
22    A. Yes.
23    Q. You've already told me -- well, you told me
24 they didn't provide you an explanation for why you
25 were terminated?

128

1    A. They just said, like I mentioned, it was
2 chemistry issues.
3    Q. Yeah, chemistry. And you told me that they
4 didn't pay you for some of the time that you worked
5 ending in April and we had that fight in front of the
6 Workforce Commission, didn't we?
7    A. Before that Workforce Commission complaint,
8 they -- or around that time when they got notice of
9 it, they wired me money for partial payment.
10    Q. In fact, they wired you -- it was an unusual
11 amount. It was over $5,000. Do you remember that?
12    A. I don't remember exactly the amount.
13    Q. Yeah, I'm going to get you that amount.
14    A. Okay.
15       (Exhibit No. 19 marked.)
16    Q. (BY MR. BESHARA) I posted Exhibit 19 to the
17 chat. I'm going to share my screen. There's not a
18 whole lot to this. This is a wire transfer receipt,
19 isn't it?
20    A. Yes.
21    Q. Do you agree that on or about June 24th, 2020
22 FSM wired you $5,000.04?
23    A. That's correct.
24    Q. And you don't dispute that you received that,
25 do you?

Mayar Zokaei - August 3, 2021

---

**129**

1   A. I do not dispute that, no.
2   Q. I'm going to upload Exhibit 20. I'm also
3 going to share the screen.
4        (Exhibit No. 20 marked.)
5   Q. (BY MR. BESHARA) I'll represent to you, Mr.
6 Zokaei, that this is a business record of Fundamental
7 Sports Management and it relates to payments that have
8 been made to you. Okay. We have the $40,000. That's
9 for the promissory note. Really we should have
10 another $10,000 on for the other promissory note,
11 right? It was funded, correct?
12   A. Yes, that's correct.
13   Q. Okay. But we're showing payments of -- it's
14 dated over in the first column and the second to last
15 column shows amounts. Do you see that?
16   A. Yes.
17   Q. Do you agree that FSM made each of these
18 payments to you on the date so indicated as well as
19 the $10,000 payment they made on the first promissory
20 note?
21   A. Sorry. I lost you there. It was frozen.
22   Q. Okay. That's fine. I just wanted you to
23 confirm with me that you agree that FSM did, in fact,
24 make each of these payments to you on the date
25 indicated and the amount indicated on Deposition

---

**130**

1 Exhibit 20?
2   A. Yes.
3   Q. In addition to those payments, there's an
4 additional $10,000 payment that FSM made back in
5 December of 2019, and that's memorialized in that
6 promissory note, correct?
7   A. That's correct.
8   Q. And I think the reason why it doesn't show up
9 here is because this was a transaction report from
10 January through December and that first payment was
11 made in December of '19, right?
12   A. Yes.
13   Q. So -- and I remember you talking about
14 getting paid around the 22nd of January and then again
15 at the end of the month.
16   A. Uh-huh.
17   Q. And we see that reflected here?
18   A. Yes.
19   Q. In the first of those. And I think you said
20 you might have started doing some work for FSM in
21 December of 2019, right?
22   A. Yes, I did start doing work for FSM in
23 December.
24   Q. You -- but you didn't do work for it in
25 November, did you?

---

**131**

1   A. I don't remember about November.
2   Q. You told me that you were talking to Rahul in
3 October and November and you started doing some work.
4 I think he asked you to help him with Instagram
5 verification in December. That was your testimony
6 earlier?
7   A. Yes.
8   Q. Is that right?
9   A. Yes. That's what I remember, yes.
10   Q. So are you claiming in this lawsuit that
11 you're owed money for December of 2019?
12   A. No, I did not make that claim. The Texas
13 Workforce Commission rendered that decision.
14   Q. Well, put that aside.
15   A. Right.
16   Q. I'm asking are you seeking --
17   A. No.
18   Q. -- those as damages in this lawsuit? You're
19 not?
20   A. Not -- no. Not -- no.
21   Q. Okay. What you're seeking in this lawsuit is
22 reimbursement of the expense, which is that $11,500
23 figure we saw on your wage claim, right?
24   A. Yes.
25   Q. And then you believe you should also be paid

---

**132**

1 through a one-year period under your contract, right?
2   A. Yes.
3   Q. And you were only paid -- so if you started
4 doing work in December, then we would be paying you
5 through November 30th of 2020, right?
6   A. Yes.
7   Q. And we only paid you through the end of April
8 of 2020, right?
9   A. Yes.
10   Q. So then we're looking at May, June, July,
11 August, September, October, November. So seven months
12 is what you're claiming is your damages, right?
13   A. My damages are for -- based on the lawsuit
14 through the end of December.
15   Q. I don't get it. Why?
16   A. Because subsequent to the filing of the
17 lawsuit is when there was a determination made that I
18 was also due monies for December, but my agreement and
19 understanding with FSM was to be employed through the
20 end of December.
21   Q. You agree with me that you are claiming you
22 had a one-year contract, right?
23   A. Yes.
24   Q. Okay. And you have also told me that you
25 started working in December of 2019, right?

---

Mayar Zokaei - August 3, 2021

133

1   A. Yes, yes.
2   Q. So we'll let the Court sort that out when the
3year begins and ends.
4   A. No problem.
5   Q. You're seeking payment of $12,500 per month
6for however long the Court determines that contract,
7if any, was to run through, right?
8   A. Yes, yes.
9   Q. I'm coming back over to Exhibit 3,
10Mr. Zokaei.
11   A. Okay.
12   Q. Can you see that?
13   A. Yes.
14   Q. What does Exhibit A demonstrate?
15   A. List of clients that I represented and also a
16list of clients that I was recruiting or I had
17contacts with.
18   Q. Okay.  And this Exhibit A references a
19Mitchell Robinson.  Were you representing Mitchell
20Robinson?
21   A. I'm sorry?
22   Q. Did you represent Mitchell Robinson?
23   A. Yes.
24   Q. Who is Mr. Mitchell Robinson?
25   A. He is a player, a basketball player in the

134

1NBA.
2   Q. Who does he play for?
3   A. The New York Knicks currently.
4   Q. Who was he playing for back in this time
5frame of end of 2019 and the beginning of 2020?
6   A. The New York Knicks.
7   Q. So he has been playing with them since that
8time?
9   A. Yes.
10   Q. Was he signed by the New York Knicks when he
11became eligible?
12   A. Yes, drafted by them, yes.
13   Q. How did you develop your relationship with
14Mitchell Robinson?
15   A. I reached out to a family member and
16expressed my interest in representing him because I
17heard that he had no representation at the time.
18   Q. When did you sign an SPAC with Mitchell
19Robinson?
20   A. Sometime in January or February of 2019,
21around that time.
22   Q. So by the time you came over to FSM, he had
23been a client of yours for less than a year?
24   A. Approximately a year, yeah.
25   Q. Is he still your client?

135

1   A. No, he's not.
2   Q. Okay.  And did you fire him or did he fire
3you?
4   A. He fired me.
5   Q. When did he fire you?
6   A. It was shortly after Rahul and I returned
7from a trip.  We returned I think around the 26th or
827th and sometime I think in the end of January or
9early February was when I was notified by somebody in
10his party that he was firing me and then it was
11confirmed.
12   Q. So towards the end of January, the beginning
13of February is when you heard?
14   A. Yeah, yes.
15   Q. Okay.  Was it before or after February 1st?
16   A. I don't remember.
17   Q. I'm looking at an article that says that
18Robinson has fired his latest rep, Mayar Zokaei -- or
19Mayar Zokaei.  It's from an article dated February
206th, 2020.  Does that refresh your recollection?
21   A. It was before that.  That was, like, a
22deadline, like a significant deadline in the NBA.  So
23you'll see a lot of changes with regards to teams or
24players or whatnot.  So that article was pretty much
25around the same time and came out obviously subsequent

136

1to the news I was fired.
2   Q. Well, I mean, did you find out via the news
3or via Mitchell or via one of Mitchell's --
4   A. No, I found out before the news.
5   Q. Okay.  And so you found out probably in late
6January that he was you firing you?
7   A. I don't remember exactly.  It was either late
8January -- but I'm pretty sure it was close to the --
9to maybe within a couple of days of that before coming
10out.
11   Q. Okay.  And what reason did Mitchell give you
12for terminating him?
13   A. I was never able to confirm with him at the
14time because I was never able to reach him.
15   Q. Okay.  Well, I'm not talking about confirm at
16the time.  What about now?  Have you since learned why
17he fired you?
18   A. Yes, we had a discussion and it was because
19of some false representations made to him by a family
20member or confidant.
21   Q. Okay.  What false representations were those?
22   A. That I took a jersey or some of his shoes and
23I sold them.
24   Q. Okay.  Well, where would you have stolen them
25from?

Mayar Zokaei - August 3, 2021

---

**137**

1   A. Sold them. Sold them. That I had an
2autograph or jersey and whatnot. It was -- whatever
3it was at the time, I proved to him that it was not
4true and we were going to reconcile.
5   Q. And did you?
6   A. We -- reconciled with me until the lawsuit
7that Rahul filed against me came out in the news
8making the frivolous allegations, which -- and he was
9prime to fire his representation. I drew up the
10termination letter that he requested of me to fire his
11representation at the time in order to hire me, but
12once those allegations came out, it caused, you know,
13an adverse effect on our relationship and it just
14stymied and destroyed my chances of representing him.
15   Q. Okay.
16   A. But -- yeah.
17   Q. Do you use Twitter?
18   A. Yes.
19   Q. What Twitter handles do I have?
20   A. I have zokaeiworld, which is referenced
21there.
22   Q. What else?
23   A. That's the only one that's my account.
24   Q. Okay. What other Twitter accounts have you
25published content on or used to publish content on?

---

**138**

1   A. This is the only one that I publish content
2on.
3   Q. What other accounts have you directed others
4to publish content on?
5   A. I don't direct anybody to publish content on
6any other accounts. In the course of my work, working
7with journalists, sometimes we will provide, like, a
8tip of, hey, this guy is going to be appearing at this
9event or whatnot or this guy is signing a shoe deal.
10So I provide information, but I don't direct anybody
11to provide -- to post anything.
12   Q. Okay. Do you ever publish tweets on your
13official account of @zokaeiworld that contain
14expletives?
15   A. I don't recall doing so.
16   Q. Do you think that's professional to do so?
17   A. Twitter is a platform where you can be raw so
18it's -- you know, it's not uncommon for sometimes raw
19language to come out on Twitter.
20   Q. Do you see other NBA agents using expletives
21in their Tweets?
22   A. Yes.
23   Q. Okay. Tell me who does that besides you.
24   A. I don't recall right now, but not uncommon to
25see that. I can give you...

---

**139**

1   Q. Do you dispute on January 10 you posted --
2you retweeted a post about Mitchell Robinson shooting
3and training corner threes before the Knicks game
4tonight against the Pelicans on January 10th and
5stated, all fucking day @23savage?
6   A. I don't recall that specific Tweet. There's
7a lot of Tweets and it's been, you know, more than a
8year so I don't specifically recall that.
9   Q. You're not -- I can look at you right now.
10You're not surprised that I'm asking about using
11expletives in Tweets. You just explained to me that
12you think it's common and acceptable, right?
13   A. I said not uncommon.
14   Q. Okay. Do you think it's acceptable to
15publish Tweets with expletives?
16   A. Within the context of promoting your client,
17something where, hey, he is doing this, great F'ing
18job, I don't think -- you're asking my opinion?
19   Q. Yeah.
20   A. In that context, no, there is nothing wrong
21with it.
22   Q. So you don't think that shows a lack of a
23professionalism in a professional industry such as
24yours?
25   A. No.

---

**140**

1   Q. Who is the biggest NBA agent out there?
2   A. I'm not -- you know, I don't gauge or rank
3them so I wouldn't know.
4   Q. Tell me some big names out there.
5   A. Bernard Lee. He represents Jimmy Butler,
6some other clients. You know, agencies, you know,
7Rich Paul. There is, you know, a list that you can
8pull up of agents such as Bernard Lee and Rich Paul.
9   Q. Have you ever seen Bernard Lee and Chris Paul
10post expletive-laden Tweets about their clients?
11   A. This was not about my client. It was in
12reference to, but, yes, I have seen them post, yes.
13   Q. Give me an example.
14   A. What is it?
15   Q. Give me an example of them using expletives
16in publicly posted Tweets.
17   A. I give you the name of the agent, Bernard
18Lee. So you can go on his profile in Twitter, yeah.
19   Q. Give me an example. Are you guessing?
20   A. I don't -- no, I have seen them. Sometimes
21it comes across. So I don't specifically memorize
22Tweets by other agents, but it is -- you know, if you
23search Bernard Lee on Twitter or somebody, you can see
24it's not uncommon for agents that represent superstar
25athletes or big time agents, to use your verbiage, do

---

Mayar Zokaei - August 3, 2021

### 141

1 so.
2    Q.  Okay.  Have you ever made threats on your
3 Twitter to stop spreading fallacies about Mitchell
4 Robinson or else you would start spreading the truth
5 about them?
6    A.  It's not a threat.  Just that I don't
7 appreciate anybody talking and making false statements
8 about my clients or else I would expose the truth
9 about them and what their agenda is.
10    Q.  Okay.  You told me you went to the NBA
11 All-Star weekend in Chicago, right?
12    A.  Yes, that's correct.
13    Q.  While you were still with FSM?
14    A.  Yes.
15    Q.  Who else was there on behalf of FSM?
16    A.  It was Colin Bryant was the other agent and
17 Frank -- Frank Robinson who was a runner for FSM.
18    Q.  Did you have another client named Kenny that
19 you lost besides Mitchell?
20    A.  Who?
21    Q.  Someone by the name of Kenny?
22    A.  Yes.
23    Q.  Who was that?
24    A.  Kenny Wooten.
25    Q.  When you lost -- why did Kenny fire you?

### 142

1    A.  He fired me because his Godfather was not in
2 alignment with him switching representation to me to
3 have me represent him, and when he found out, he told
4 him to be represented by anybody but the person who
5 had initially signed him.
6    Q.  Okay.  So you disagree that it was your
7 inexperience and lack of professionalism that cost you
8 Mitchell and Kenny?
9    A.  It's not what they say.  It's what they would
10 say.  I secured Kenny a new contract and he fired me
11 the day that I secured him the new contract.
12    Q.  I know, but I'm asking.
13    A.  Oh, yeah, I disagree, yes.
14    Q.  Disagree with that?
15    A.  Patently false.
16    Q.  Do you know someone named Scott Perry?
17    A.  Yes.
18    Q.  Who is he?
19    A.  He is the general manager for the Knicks.
20    Q.  The same team that Mitchell Robinson played
21 for?
22    A.  Yes.
23    Q.  How would you describe your relationship with
24 Scott Perry?
25    A.  It was a working relationship.

### 143

1    Q.  Was it warm?  Was it friendly?
2    A.  I hadn't known him for that long, but, yeah,
3 it was friendly, personal.
4    Q.  You would disagree that he disliked you?
5    A.  Yes, I would disagree that he disliked me.
6    Q.  Would you disagree that if someone said that
7 you didn't understand the dynamics between an agent
8 and a team is a working relationship?
9    A.  I'm sorry.
10    Q.  Would you disagree if I told you that you
11 don't understand the agent/team dynamics is a working
12 relationship?
13    A.  I disagree with that, yes.
14    Q.  So you understand that it's important for the
15 agent to get along with the team, including the office
16 staff?
17    A.  Correct.
18    Q.  Let me make sure I understood that.  You
19 agree that it's important for you to get along with
20 those people in the front office?
21    A.  Yes.
22    Q.  And your position is that Scott Perry liked
23 you, right?
24    A.  I have no reason to believe that he disliked
25 me.

### 144

1    Q.  Do you have any reason to believe whether or
2 not it was his opinion that you viewed the front
3 office of the Knicks organization as the enemy?
4    A.  No.
5    Q.  Would you be surprised to learn that the
6 Knicks front office are the ones who visited with
7 Mitchell about the problems they had with you and
8 suggested that he terminate you?
9    A.  Yes.
10    Q.  You never heard that?
11    A.  No.
12    Q.  Have you ever publicly called out the Knicks
13 organization via Twitter?
14    A.  No.
15    Q.  You haven't?
16    A.  No.
17    Q.  So if I go look in January on your Twitter
18 feed, I'm not going to see anything where you slammed
19 the Knicks organization?
20    A.  In January of when?
21    Q.  2020.
22    A.  I don't recall.  I don't recall ever doing
23 that, not my memory.
24    Q.  Not to your memory?
25    A.  No.

Mayar Zokaei - August 3, 2021

145

1    Q.  You have no idea -- you're telling the jury
2you have no idea that it's those events that led up to
3the culmination of Mitchell Robinson terminating you?
4    A.  I already explained to you why he terminated
5me.
6    Q.  I know what you said.  I'm asking you now
7that I'm giving you this information.
8    A.  Oh, no, no.  Do I want to change my words?
9Is that what you said?
10    Q.  Yeah, do you want to change them?
11    A.  No, no.
12    Q.  Do you know any sportswriters that cover the
13Knicks?
14    A.  Yes.
15    Q.  Who?
16    A.  There's a -- probably a dozen of them.
17    Q.  Let's start with a guy named Mitch Berman --
18or Mark Berman.
19    A.  Oh, yes, yes.
20    Q.  Do you know him?
21    A.  Yes.
22    Q.  And he covers the Knicks?
23    A.  That's correct.
24    Q.  What paper does he write for?
25    A.  One of the New York dailies in New York.  I

146

1believe it's The Daily News.
2    Q.  Okay.  How would you describe your
3relationship with Mark Berman?
4    A.  It's great.
5    Q.  Really?
6    A.  Yes.  He just messaged me the other day.
7    Q.  What other social media accounts do you use
8besides Twitter?  Do you have Instagram?
9    A.  Facebook occasionally.
10    Q.  Okay.  And what is your -- what handles do
11you have on Facebook?  Do you have more than one?
12    A.  Facebook and Instagram is just myself.
13    Q.  Well, what is it?
14    A.  Mayar Zokaei.
15    Q.  Okay.  Anything else?
16    A.  No.
17    Q.  Have you ever used what are sometimes called
18burner social media accounts or bogus social media
19accounts to slam or -- disparage is probably the
20better word -- disparage other sports agents?
21    A.  No.
22    Q.  Have you ever used any burner or bogus social
23media accounts besides the ones you have told me?
24    A.  Besides my own personal accounts under my
25name, no.

147

1    Q.  The ones you described to me, are there any
2others that you have ever used or caused to be used to
3publish content at your direction?
4    A.  No.
5    Q.  Do you recall having discussions with Colin
6Bryant during All-Star weekend regarding your use of
7these burner or bogus social media accounts?
8    A.  No.
9    Q.  Do you recall admitting that you used them,
10but then trying to explain why it was okay for you to
11have done so?
12    A.  I did not admit to using any such accounts.
13    Q.  You didn't?
14    A.  No.
15    Q.  Okay.  Would you want to admit to it right
16now?
17    A.  I did not use nor do I use any such accounts.
18    Q.  You have never done that?
19    A.  No.
20    Q.  What if Mark Berman says that he has the
21evidence tying you to these accounts?  Would you be
22surprised by that?
23    A.  Yes.
24    Q.  Would you be nervous if we were to present
25that evidence from Mark Berman?

148

1    A.  No.
2    Q.  No?
3    A.  No.
4    Q.  Would you deny that it was you behind those
5accounts?
6    A.  I have never used bogus social media
7accounts.
8    Q.  And you never admitted that to Colin Bryant
9during NBA All-Star weekend?
10    A.  Absolutely not.
11    Q.  Do you know someone named Dennis Smith, Jr.?
12    A.  Yes.
13    Q.  Who is Dennis Smith, Jr.?
14    A.  He is a player that plays in the NBA.
15    Q.  Yeah?
16    A.  Yes.
17    Q.  Okay.  Do you know a guy named Shawn Farmer?
18    A.  Yes.  We discussed him already.
19    Q.  I don't remember.  Who is Shawn Farmer?
20    A.  He's a trainer.
21    Q.  Oh, you never gave me his name I don't think.
22So Shawn Farmer is the trainer for Chris Silva?
23    A.  Yes.
24    Q.  Okay.  Did you have occasion to visit with
25Shawn Farmer during the NBA All-Star weekend in 2020?

Mayar Zokaei - August 3, 2021

149

1   A.  Yes.
2   Q.  Did Shawn Farmer have his son with him when
3you met with him?
4   A.  He does not have a son.  His son was not with
5him at that time.
6   Q.  Does he not have a son or his son wasn't with
7him?
8   A.  He has an older son, but that -- I have never
9met before, but was not with him at the time.
10   Q.  Did you promise Shawn Farmer to get him and
11his son tickets to the NBA All-Star weekend?
12   A.  I did not make any promises to Mr. Farmer and
13his son.
14   Q.  Who did you make promises to?
15   A.  Mr. Farmer asked me for a ticket to a special
16event at the All-Star game.
17   Q.  Okay.  Did you tell him you were going to get
18those tickets?
19   A.  Yes.
20   Q.  Did you get those tickets?
21   A.  Yes, I did.
22   Q.  Okay.  Was Colin Bryant present when Shawn
23Farmer told you that he went to pick up the tickets
24but they weren't there?
25   A.  I provided a ticket for Colin Bryant to

150

1attend the same event.
2   Q.  That's not my question, sir.  Was Colin
3Bryant present when Shawn Farmer told you that he went
4to pick up the tickets and they weren't there?
5   A.  Shawn Farmer never told me that he went to
6pick up any tickets and they weren't there.
7   Q.  Okay.
8   A.  Not to my memory.
9   Q.  Was there a roughly 12-year-old boy present
10with Shawn Farmer?
11   A.  Yes.
12   Q.  -- at the time?
13     Who was the boy?
14   A.  He was the child of a friend.
15   Q.  Of whose?
16   A.  Of Shawn Farmer.
17   Q.  Okay.  So Shawn Farmer didn't have his own
1812-year-old son there, he had his friend's 12-year-old
19son with him, correct?
20   A.  Yes.
21   Q.  And consistent with what I saw in your
22Tweets, were you using expletive-laced language in
23front of this 12-year-old child?
24   A.  No.
25   Q.  And so I guess you're going to deny that

151

1Shawn asked you to respect that kid the same way you
2would respect your own kids?
3   A.  Yeah, he never said that.
4   Q.  No?  Did you ever project that Mitchell
5Robinson would end up in Dallas?
6   A.  Did I ever...
7   Q.  Did you ever publicly state your belief that
8Mitchell Robinson would end up in Dallas with the
9Mavericks?
10   A.  I don't recall doing so.
11   Q.  Did you ever think that was going to happen
12privately?
13   A.  Yes.  Potential for him to be, you know, with
14a lot of teams that would have a need for a player
15like him.
16   Q.  Okay.  Did you ever disparage management with
17the New York Knicks publicly?
18   A.  I'm sorry.  What was that?
19   Q.  Did you ever publicly disparage management
20with the New York organization?
21   A.  No.
22   Q.  Did you ever publicly disparage management
23with the Dallas Mavericks?
24   A.  No.
25   Q.  So all these things people are making up

152

1about you?  Is that what your testimony is, Mr.
2Zokaei?
3   A.  I didn't know people were making this stuff
4up about me.  I don't understand what your questioning
5is for, but you asked me a question and I answered it.
6   Q.  So I'm telling you if other people are saying
7this about you, then you're telling me they're making
8it all up?
9   A.  I don't know who is saying what so I don't
10know what their intent is.  I work in a cut-throat
11industry, you know, so people are going to --
12   Q.  Your friend Mark Berman --
13   A.  Oh, yeah.
14   Q.  -- is reporting that he's got the evidence of
15you and the burner accounts.  Your friend.  Why is
16your friend publicly telling people that?
17   A.  I don't know.
18   Q.  All a big misunderstanding?
19   A.  I don't know if he has said such a thing
20so...
21   Q.  I'm saying assume that he has.
22   A.  Okay.  Assumptions.
23   Q.  Huh?
24   A.  You're asking me to assume something and
25answer a question based on that assumption?

Mayar Zokaei - August 3, 2021

153

1   Q.  Yeah.
2       MR. MURPHY:  Objection to the form of the
3question.  It assumes facts not in evidence and facts
4that may not be established at time of trial.
5   Q.  (BY MR. BESHARA)  Okay.  Will you still
6answer it.  I don't have the witness here to present
7it, but I'm asking you, why would your friend, Mark
8Berman, say that you were using burner accounts to
9trash the New York Knicks organization?
10      MR. MURPHY:  Objection, calls for
11speculation.
12   Q.  (BY MR. BESHARA)  That's fine.  You don't
13know?
14   A.  I can't speculate on that.  Sorry.
15   Q.  And you didn't know that Mitchell Robinson
16terminated you as his agent because the front office
17of the Knicks organization encouraged him to do so?
18      MR. MURPHY:  Objection, calls for
19speculation and assumes facts not in evidence and
20facts that may not be established at time of trial.
21   Q.  (BY MR. BESHARA)  You can still answer.
22   A.  I told you why he terminated me.
23   Q.  No, you told me why you said that he
24terminated you.
25   A.  Right.

154

1   Q.  You didn't have any inkling that you were
2about to be terminated before the first days of
3February of 2020?
4   A.  No, no.
5   Q.  And then you found out later on that
6supposedly because you stole some -- or sold some
7shoes and a jersey?
8   A.  Yeah.
9   Q.  Is that pretty typical for agents to be fired
10for selling merchandise of their clients?
11   A.  I don't know.  I have never heard of such a
12thing and nor did I do that so I can't speculate on
13that.
14   Q.  Well, have you ever heard of another agent
15being fired for that?
16   A.  No.
17   Q.  The NBPA --
18   A.  Uh-huh.
19   Q.  -- rules of conduct, we talked about those
20way earlier.  Remember Exhibit 1?
21   A.  Yes.
22   Q.  Don't they prohibit certain type of behavior
23such as using bogus burner social media accounts?
24   A.  Yes, I would assume so.
25   Q.  They do, right?  I mean, you have read the

155

1rules?
2   A.  I haven't memorized the rules, but I would
3assume that's probably not something that they favor
4or they're okay with.
5   Q.  Are you familiar with this rule, rule number
6 14?
7   A.  Yes.  This one?  Yes.
8   Q.  And read it for the jury.  What do the NBPA
9rules of conduct prohibit?
10   A.  One of the rules is they prohibit in engaging
11in unlawful conduct and/or conduct involving
12dishonestly, fraud, deceit, misrepresentation, other
13conduct which adversely -- which reflects adversely on
14his fitness as a player agent or jeopardizes the
15effective representation of players.
16   Q.  Would you agree with me that publicly
17slamming the front office of your client's NBA
18team jeopardizes your effective representation of a
19client?
20   A.  If an agent was to do that, I would not make
21any assumptions, but that's up to the NBPA to
22investigate and determine.
23   Q.  Do you think that it would be -- constitute
24deceit to use bogus or burner social media accounts to
25post derogatory information about other agents or

156

1teams?
2   A.  I don't know what the NBPA would perceive as
3something that constitutes that.  I can't speculate on
4how and if they would proceed on an investigation on
5that.  I just...
6   Q.  Have you ever asked?
7   A.  Asked what?
8   Q.  Have you ever contracted the NBPA and asked
9if it's okay to use burner or bogus social media
10accounts to trash other people?
11   A.  I have contacted them, but I have not asked
12that because I've never done that.
13   Q.  Yeah.
14      (Exhibit No. 21 marked.)
15   Q.  (BY MR. BESHARA)  I have just shared Exhibit
1621.  Does the law firm of The Hadi Law Firm represent
17you?
18   A.  They are one of the firms that represent me,
19yes.
20   Q.  Have you ever seen this letter before?
21   A.  Yes.  Demand letter?
22   Q.  Yeah.  Did you review this letter before it
23was sent out?
24   A.  Yes, I did.
25   Q.  Are all of the statements contained in this

Mayar Zokaei - August 3, 2021

157

1letter true and accurate?
2    A. I'm not an attorney so I can't speculate on
3attorneys' fees or actual damages, but with regards to
4the claim and some of the requests or demands for
5payment or due salary, yes.
6    Q. So you're asking for 10 months worth of
7salary, if my math is right? 12,500 a month --
8actually, no, I guess it's nine and a half months,
9right?
10    A. That's what it said in the original demand
11letter, yes.
12    Q. The expenses of 16,589.08, in your sworn wage
13claim, you stated it was $11,589.08. What changed?
14    A. When I was wired $5,000 per the itemized bank
15statement that you provided, when I told the TWC that
16it was $5,000 and they said, what did you correspond
17with, and I said, I don't know. There was no
18explanation. In fact, the money wasn't supposed to
19ever be sent to me. Your firm and your party was
20supposed to only correspond with my attorney and if
21any monies were to be paid, to be paid to him. So
22when you guys sent me $5,000 and I explained to the
23TWC that that amount was sent to me and they said,
24well, this corresponds to your expense allotment which
25they owe you. We would like for you to subtract that

158

1from the expenses. That's why the amount was reduced
2from 16,000 to 11,000.
3    Q. Okay. And it's $5,000.02, wasn't it?
4    A. I don't remember the exact change, yeah.
5    Q. And just to clarify, my firm didn't send you
6anything. FSM sent you a wire, right?
7    A. Okay. Right. Your client.
8    Q. Okay. Allowable expenses, what is this, for
9expenses that you didn't actually incur and you didn't
10have reimbursed to you?
11    A. I don't know. You might have to ask my
12attorney regarding that.
13    Q. Well, I mean, look, you're the one that is
14going to testify to your damages. These aren't
15questions for your attorneys. So what are your
16damages?
17    A. You know, I don't -- I defer to my attorneys
18on how they calculated these amounts.
19    Q. Forget about it. Tell me what your damages
20are. Forget about -- here. Let me drop this down so
21you aren't preoccupied with it. What are your
22damages? Itemize them.
23    A. So I was not paid my wages --
24    Q. Okay.
25    A. -- for December and then May through December

159

1or whatever the Court determines. And I was not
2reimbursed for my expenses.
3    Q. Okay.
4    A. And some other stuff that we -- oh, and also
5training for clients that I brought in under FSM and
6only signed under FSM with the understanding that
7expenses for training for the NBA draft would be
8incurred by the agency.
9    Q. I didn't see any of that in Deposition
10Exhibit 3, did you?
11    A. No.
12    Q. So that's just something else. All right.
13    A. Like I said, you're not familiar with the
14industry, but that's kind of commonplace and the
15precedence was set by Rahul.
16    Q. Okay. Did you get any -- what ended up
17happening with Silva in this trip over to Miami. You
18didn't sign him up, did you?
19    A. No, no, I didn't sign him. Kept in touch and
20when -- yeah, I did not sign him.
21    Q. What happened?
22    A. Just when I was terminated by FSM, you know,
23part of it when you have an agency giving you money
24for travel and such, you can survive and recruit new
25clients, but when that was pulled out from underneath

160

1me and I had no -- no more expenses or reimbursements
2or even a team, you know, there was really no way that
3I could go forth and represent myself to somebody that
4I had initially told I work with this agency and now
5say, hey, I no longer work with this agency. So I
6didn't follow up on that.
7          (Exhibit No. 22 marked.)
8    Q. (BY MR. BESHARA) I just shared Exhibit 22.
9So you recognize this as a series of e-mails between
10you and Rahul?
11    A. Yes.
12    Q. And so on March 3rd, you tell FSM that you're
13getting really close here with Chris Silva.
14    A. Right.
15    Q. Just want to have everything in order. Can
16you please send me the paperwork, right?
17    A. Yes.
18    Q. And Rahul says, Boom! What day do you think
19you're meeting him. I will send you the following.
20FSM agreement and the new SPAC agreement with you
21listed as agent. Did he do that?
22    A. Did he what?
23    Q. Did he send you over the FSM Marketing and
24Managing Agreement and the NBA SPAC Agreement with you
25listed as agent?

Mayar Zokaei - August 3, 2021

161

1     A. I don't remember, but I believe he may have.
2     Q. Yeah, he did.
3     A. Yeah.
4     Q. And so did you end up going and meeting with
5him sometime before or after the 12th?
6     A. Chris Silva?
7     Q. Yes.
8     A. Yes. No, because then the pandemic hit so
9everything was shut down, but I had -- you know, I had
10flights for everything aligned for the Big 12
11tournament as well as visiting him.
12     Q. Well, look, man, you went over and you met
13with Silva in Miami, right?
14     A. That's right.
15     Q. When did you go to Miami?
16     A. I think it was a couple of days before this
17e-mail.
18     Q. Yeah?
19     A. Yeah. If I'm not mistaken, yeah.
20     Q. But I can go back and look at your expense
21reports and see it, right?
22     A. Yeah, that's all there. Yeah.
23     Q. Did you ever forward over these agreements
24over to Silva for his review so he could sign them?
25     A. It was not to be reviewed over the phone or

162

1e-mails. It was to be in person.
2     Q. So that answer is, no, you did not?
3     A. No, no.
4     Q. And because of the pandemic, you never went
5forward and did anything with Silva, right?
6     A. Right, I could not meet with him in person,
7but I kept in touch, but no.
8     Q. And, you know, you talk about this pandemic
9shutting down the ability to do anything. Well, you
10weren't going anywhere anyway in 2020. You weren't
11going on recruiting trips because the country was shut
12down, right?
13     A. No, I was.
14     Q. What? Why didn't you go back and meet with
15Chris Silva and get this contract signed?
16     A. Because he was under quarantine by the team.
17He could not come out and meet with anybody and he was
18in Miami for, like, two or three months subsequent to
19the pandemic. And he was just -- he was told to
20remain in his apartment, to not go anywhere because
21things were fluid, told to not meet with anybody until
22further direction by the team.
23     Q. Okay. Makes sense, but if you are not going
24to be able to meet with the guy in person because the
25pandemic, why didn't you send over the documents via

163

1e-mail so you could get them signed up as you
2represented you were on the verge of doing back on
3March 3?
4     A. Because his preference was to meet in person
5and discuss.
6     Q. Well, my preference, too, but he couldn't
7meet in person, right? He told you that?
8     A. Right, I couldn't force him to do what he
9didn't want to do.
10     Q. Well, the team wouldn't allow it. So I know
11that might have been his preference, but you didn't
12think to go a different route if you weren't going to
13be able to meet with this guy due to COVID?
14     A. I did. I said, you know, would you like for
15me to send this stuff to you. And he said, no, let's
16wait until we meet in person. I said, no problem.
17     Q. After the pandemic hit and before you were
18terminated from FSM on April 20th, what other
19recruiting trips did you take?
20     A. I met with Kylor Kelly and signed him. I
21don't remember, but I took one other, maybe two other
22trips during that time, but I met with Kylor Kelly. I
23went on a recruiting trip and I met him, presented
24everything to his family in person and then they
25signed.

164

1     Q. Okay. Isn't it true that COVID limited your
2ability to go out and travel to recruit these players?
3     A. Yes.
4     Q. I mean, some players you couldn't even meet
5with at all because they were under either government
6or team restrictions due to COVID, right?
7     A. That's correct.
8     Q. So it's not really fair to say if you would
9have had this money in your expense account, you could
10have done all these things. I mean, COVID really put
11all that stuff on the backboard, right?
12     A. Yes, it put a lot of it on the backboard for
13a little bit.
14     Q. Until when? I mean, I'm thinking Texas was
15open way before Oregon.
16     A. Uh-huh.
17     Q. And we were still shut down until October.
18So when did Oregon lift its COVID restrictions or are
19they still in place to this day?
20     A. No, there's still certain restrictions that
21are in place to some point, but I took a recruiting
22trip in May to New Orleans.
23     Q. Okay.
24     A. In 2020.
25     Q. Who did you sign up?

Mayar Zokaei - August 3, 2021

**165**

1    A.  Mitchell Robinson asked me to fly out there
2to meet with him.
3    Q.  Yeah.  But you never did sign up Silva?  We
4can clarify that, right?
5    A.  No, we did not.
6    Q.  And you never even forwarded him the
7contracts --
8    A.  No.
9    Q.  -- because you were planning on doing that in
10person?
11    A.  No, his preference.
12    Q.  I gotcha.
13        (Exhibit No. 23 marked.)
14    Q.  (BY MR. BESHARA)  I just uploaded 23.  Do you
15recognize this document?
16    A.  Yes.
17    Q.  What is it?
18    A.  It's a request for taxpayer identification.
19    Q.  And did -- were you requested to do this by
20FSM?
21    A.  Yes.
22    Q.  Do you know what a W-9 is?
23    A.  Yes.
24    Q.  That's what this document is, right?
25    A.  That's correct.

**166**

1    Q.  And this is your signature that appears on
2Deposition Exhibit 23, right?
3    A.  Yes.
4    Q.  And it's January 30th, 2020, right?
5    A.  That's correct.
6    Q.  Do you understand the difference between a
7W-9 and a W-4?
8    A.  I don't know what a W-4 is, but I know what a
9W-9 is.
10    Q.  W-4 is what you fill out if you're going to
11be an employee.  W-9 is what you submit when you're
12going to be an independent contractor.  You didn't
13realize that?
14    A.  I thought a W-9 was only what you submitted
15and fill out if you are responsible for paying your
16own taxes and it's not deducted from your wages.
17    Q.  Okay.  So that's an independent contractor,
18right?
19    A.  An independent contractor can be somebody
20that uses this.
21    Q.  I mean, because employees have taxes withheld
22from their wages, correct?
23    A.  There are -- you can be an employee and pay
24your own taxes.
25    Q.  No, you can't.  Who told you that?

**167**

1    A.  I was under that assumption so...
2    Q.  So you were just guessing at that, right?
3    A.  No, I was explained -- that was explained to
4me by someone, but maybe they were wrong.
5    Q.  All right.  But this is all consistent going
6back to Exhibit 3, which is titled Independent
7Contractor Agreement wherein the document itself that you were going to be an
8document itself that you were going to be an
9independent contractor, right?
10    A.  Yes, that's what was the initial from the
11onset, the intent.
12    Q.  All right.  We're about to get finished here.
13I've got to run through a series of things.
14    A.  No problem.
15        THE WITNESS:  You guys want to take a
16break, John?
17        MR. MURPHY:  No, I'm doing well.
18        THE WITNESS:  I haven't really ate yet,
19but no problem.
20        MR. BESHARA:  Yeah.
21        THE WITNESS:  How much longer do you
22think?
23        MR. BESHARA:  I'm going to go through a
24series of pictures with you which are --
25        THE WITNESS:  What were you saying when I

**168**

1said I haven't ate yet?
2        MR. BESHARA:  Oh, I was saying I'm going
3to go through a series of pictures with you.
4        THE WITNESS:  Okay.
5    Q.  (BY MR. BESHARA)  Do you know who uses the
6Twitter handle @nbainsider?
7    A.  No.
8    Q.  No?
9    A.  No.
10    Q.  What about the handle
11hoopsagentwhistleblower?
12    A.  I do not know that one.
13    Q.  So your testimony is you're not associated
14with either of those accounts?
15    A.  You asked me if I know those accounts?  No,
16I'm not familiar with those accounts.
17    Q.  Are you associated with those accounts?
18    A.  No, I'm not.
19    Q.  Do you know who is on those accounts?
20    A.  No.
21    Q.  Have you ever published content from those
22accounts?
23    A.  I don't recall so.  Wait.  Published content
24on those accounts?
25    Q.  From those accounts.

Mayar Zokaei - August 3, 2021

169

1      MR. MURPHY: Published content.
2    A. Oh, I thought you said republishes. No, no.
3    Q. (BY MR. BESHARA) Okay. And I'm assuming
4you're going to tell me that you never asked a third
5party to publish content at your request from either
6of those accounts?
7    A. No, no.
8    Q. And you have no idea who nbainsider is or
9hoopsagentwhistleblower?
10    A. No.
11    Q. Who is the Octagon Family?
12    A. I'm sorry. I don't know what that is.
13    Q. They're associated with Trae Young. Do you
14know who Trae Young is?
15    A. Oh, his former agency, yes.
16    Q. Have you ever published derogatory comments
17regarding the Octagon Agency?
18    A. No.
19    Q. What about the handle payingtoplayrbp?
20    A. Is that the Twitter account?
21    Q. Yeah. You don't know who that is?
22    A. No.
23    Q. What about any social media account that says
24payingtoplayrbp?
25    A. No.

170

1    Q. Have you ever posted derogatory information
2about Rahul Patel on any social media platform from
3any account?
4    A. No.
5    Q. Have you ever caused a third party to do so
6at your request?
7    A. No.
8    Q. So when someone creates a fake Twitter
9account that says payingtoplayrbp and it says, Rahul
10Patel is fake as the Instagram followers he about
11@keldonjohnson wait until the news comes out about all
12the things he has done, you're not behind that?
13    A. No, I don't have anything to do with Keldon
14Johnson. So I don't know why you would assume it's
15me.
16    Q. You realize you're under oath, right?
17    A. Yes.
18    Q. Were you aware that FSM was receiving reports
19that you were a, quote, scam agent?
20    A. That was brought up to me by Rahul.
21    Q. Okay. And what was your response to that?
22    A. I said -- I asked him what he was talking
23about, if he would elaborate.
24    Q. Okay. And after he elaborated, what did you
25tell him?

171

1    A. Well, he said somebody is saying anonymously
2that you have burner accounts.
3    Q. Yeah.
4    A. And I denied it.
5    Q. Okay. So you didn't have burner accounts for
6NBA -- @nbadraftgodb?
7    A. No.
8    Q. @nbadraftgod2?
9    A. No.
10    Q. agentexposure?
11    A. No.
12    Q. nbainsider411?
13    A. No.
14    Q. @lookalive901?
15    A. No.
16    Q. Do you know someone named Frank?
17    A. Frank?
18    Q. Do you know someone named Joshua Bone?
19    A. Yes.
20    Q. Who is he?
21    A. He is -- he's either a player or relative of
22a player.
23    Q. Okay. And is that relative named Frank?
24    A. Is what?
25    Q. Isn't that relative named Frank?

172

1    A. Frank, I don't know.
2    Q. Well, you said you know who Joshua Bone is.
3    A. Yes.
4    Q. Who is the player that he's associated with?
5    A. Jordan Bone.
6    Q. Okay.
7    A. Yes.
8    Q. You told me that you had spoken with Amit
9Mehta by text message before, right?
10    A. Yeah.
11    Q. Is Amit an agent?
12    A. No.
13    Q. Who is he?
14    A. Mr. Luke, do you want us to take a break so
15you can eat.
16    Q. No. Tell me who is Amit Mehta is?
17    A. He is, from what I was informed, an investor
18and advisor and a decision-maker at FSM.
19    Q. Okay. Do you know anything about Amit Mehta
20having fake followers on his account?
21    A. On what account?
22    Q. On Amit Meta's social media accounts. Have
23you ever accused him of having fake followers?
24    A. I don't have any real contact with Amit.
25    Q. Okay. Do you know who Lamar Peters he?

Mayar Zokaei - August 3, 2021

173

1    A.  Are you asking me?
2    Q.  Yeah.
3    A.  He's a player.  He's an NBA player, I
4believe.
5    Q.  Do you follow him?  Have you tried to sign
6him as a client?  Have you attempted to contact him?
7    A.  No.  Lamar Peters.  There's a Lamar that we
8were recruiting while I worked at FSM.  I just don't
9remember his last name.
10    Q.  Okay.  What about Pierre Jackson?
11    A.  I do know of him.
12    Q.  Okay.  Did you try to recruit him?
13    A.  No.
14    Q.  What about Jaylen Hands?
15    A.  Yes, I know of him.
16    Q.  Have you tried to recruit him?
17    A.  No.
18    Q.  Why not?
19    A.  Just really nobody that came on my radar.
20Rahul had asked me to arrange some sort of endorsement
21deal for him --
22    Q.  Yeah.
23    A.  -- because he was recruiting him.
24    Q.  Okay.  What about Scott Machado?
25    A.  I don't know who that is.

174

1    Q.  M-A-C-H-A-D-O.
2    A.  Yeah, I'm not familiar with him.
3    Q.  Shannon Bogues?
4    A.  I'm not familiar with him.
5    Q.  Barry Brown?
6    A.  Not familiar with him.  I know the name.
7    Q.  Kaiser Gates?
8    A.  Kaiser who.
9    Q.  Kaiser Gates?
10    A.  I'm not familiar with him.
11    Q.  Simi Chittu?
12    A.  I've seen the name.  Just not familiar with
13him.
14    Q.  Okay.  And you haven't tried to recruit any
15of these people?
16    A.  No, I have not -- none of these names to my
17recollection are players that I have tried to recruit.
18    Q.  Okay.  I already asked you about
19hoopsagentwhistleblower, right?
20    A.  I don't remember.
21    Q.  Well, do you know who is behind
22hoopsagentwhistleblower?
23    A.  No idea.
24    Q.  Have you ever used that account?
25    A.  No.

175

1    Q.  Have you ever asked someone else to publish
2content using that account?
3    A.  No.
4    Q.  Have you ever asked anyone to publish
5content -- forget about what account, but asked them
6to go out and publish content at your request that
7might -- that you thought might have been a good idea?
8    A.  I work with reporters and media bloggers all
9the time.  So sometimes when there's, like I said,
10something that I want put out there about my client,
11you will give the information, furnish it, so they can
12get it out to, you know, either their media platform
13or followers.
14    Q.  So do you agree that if your projected top 20
15pick, for example, in the NBA draft and your Twitter
16and Instagram profiles aren't verified, your agent is
17just lazy?
18    A.  I don't --
19    Q.  Do you agree?
20    A.  No, I don't know.
21    Q.  Do you think it's important for your clients
22to have verified Twitter and Instagram profiles?
23    A.  Not really.
24    Q.  Huh?
25    A.  Not really.

176

1    Q.  Do all of your clients have verified Twitter
2and Instagram profiles?
3    A.  No.
4    Q.  Well, it sounds like you -- I mean, you told
5me at the beginning of this that Rahul asked you to
6get one of his client's Instagrams verified and you
7spent 15 hours on it.
8    A.  Yes.  What is it?
9    Q.  You didn't think it was important for that to
10be verified?
11    A.  It was not my client so it wouldn't have
12mattered to me, but for Rahul it was important so
13that's why I got it done.
14    Q.  Did you suggest that it be done?
15    A.  I don't remember.
16    Q.  And you never told anybody with FSM if social
17media accounts weren't verified, the agent is just
18lazy?  That's not something you would say?
19    A.  I don't recall saying anything like that, no.
20    Q.  Do you recall ever saying that?
21    A.  No.
22    Q.  Does it sound like something that you might
23say?
24    A.  No.
25        THE WITNESS:  Is John still with us?

Dickman Davenport, Inc
214.855.5100    www.dickmandavenport.com    800.445.9548

Mayar Zokaei - August 3, 2021

177

1        MR. BESHARA: I don't know. He's on
2mute. He might be eating. Do you want to call him
3real fast and see or text him?
4        THE WITNESS: Yeah. John, can you hear
5us? Give me a moment. I'm going to just see where
6he's at.
7        MR. BESHARA: Yep.
8        THE VIDEOGRAPHER: Do you want me to stay
9on the record?
10        MR. BESHARA: No.
11        THE VIDEOGRAPHER: We're off the record.
12The time is 3:50.
13        (Recess 3:50 to 3:52.)
14        THE VIDEOGRAPHER: We're back on the
15record. The time is 3:52.
16    Q. (BY MR. BESHARA) What about dollar sign,
17dollar sign drizzy get that and there's something
18else. Do you know who is associated with that social
19media account?
20    A. No.
21    Q. Do you know who Marcell Scott is?
22    A. Yes.
23    Q. Who is that?
24    A. He is Mitchell Robinson's trainer.
25    Q. And do you know who DeAndre Jordan is?

178

1    A. He's a player in the NBA.
2    Q. Do you think that Marcell Scott has been
3trying to take credit for Mitchell Robinson's skills
4on the basketball court?
5    A. I can't speculate on that.
6    Q. Do you know who De'Anthony Melton is?
7    A. Yes.
8    Q. Who is he?
9    A. He's a player with the Grizzlies.
10    Q. Who is Malik Newman?
11    A. I'm not sure who that is.
12    Q. Who is Bruno Fernando?
13    A. I believe he's an NBA player.
14    Q. Rico Hines?
15    A. I don't know who that is.
16    Q. Todd Ramasar?
17    A. He's an agent.
18    Q. Who is Cameron Reddish?
19    A. He is a player for the Atlanta Hawks.
20    Q. Who is Rich Paul?
21    A. He's a basketball agent.
22    Q. Who is Marc Cornstein?
23    A. He's an agent, I believe.
24    Q. Who is Peter Cornell?
25    A. Agent.

179

1    Q. Who is @davidjr.realtor?
2    A. I don't know who that is.
3    Q. Who is Chris Gaston?
4    A. I'm sorry?
5    Q. Chris Gaston?
6    A. He's an agent.
7    Q. De'Aaron Fox?
8    A. He's a basketball player.
9    Q. Carson Edwards?
10    A. I don't know who that is.
11    Q. Did you ever list yourself on realgm.com as
12being the agent for Keldon Johnson?
13    A. That is not a website that you can list
14yourself as anybody's agent.
15    Q. That's not my question.
16    A. No.
17    Q. Did you ever do that?
18    A. No.
19    Q. But you can't control with your own account
20who you identify are your players?
21    A. I don't understand your question.
22        (Exhibit No. 24 marked.)
23    Q. (BY MR. BESHARA) Here. Let me show you an
24exhibit. All right. I just uploaded it for you.
25    A. I see it.

180

1    Q. Okay.
2    A. Yes.
3    Q. Were you the agent for Desonta Bradford?
4    A. Yes.
5    Q. Were you the agent for Torren Jones?
6    A. Yes.
7    Q. Cameron Oliver?
8    A. Yes.
9    Q. Joshua Smith?
10    A. Yes.
11    Q. Keldon Johnson?
12    A. No.
13    Q. Okay. And you didn't cause this information
14to be published on realgm.com?
15    A. Absolutely not.
16    Q. How does that information get published on
17realgm.com?
18    A. They collect it from online or their contacts
19or the NBPA.
20    Q. So it's your testimony you had nothing to do
21with this erroneous information contained on your
22realgm.com profile?
23    A. Based on information from actual RealGM, yes.
24    Q. What? What do you mean based on information
25from RealGM? I'm asking you.

Mayar Zokaei - August 3, 2021

**181**

1   A. Oh, yeah.  I contacted them to ask them why I
2 was listed as his agent when it was brought to my
3 attention.
4   Q. Who did you speak with?
5   A. The CEO and the president of RealGM, the
6 publisher.
7   Q. What is his name?
8   A. I can look it up.
9   Q. Okay.
10   A. Todd Essman.
11   Q. Okay.
12   A. E double S.
13   Q. And what did Mr. Essman tell you had happened
14 here where Keldon Johnson was erroneously reported as
15 being your client and you his agent?
16   A. He said that he had saw a media report that
17 had said that, but he could not find the source any
18 longer and he apologized for listing me -- listing him
19 as my client and said that it through no fault or
20 provocation of my own.  I did not cause that to be,
21 and he put -- I asked him to put that in an e-mail and
22 he did.
23   Q. Okay.  Well, I'll look forward to seeing that
24 e-mail.
25   A. Mr. Patel was copied on the e-mail so ask

**182**

1 your client.  He should have it.
2   Q. Okay.  When was this conversation you had
3 with Mr. Essman?
4   A. This was July.
5   Q. Of 2020?
6   A. July of 2020, yes.
7   Q. Okay.
8   A. That's what the date of the correspondence
9 was to myself and Rahul.
10   Q. What is the date of it?
11   A. July 17th.
12   Q. And how do I spell Essman's name?
13   A. E, double S, M-A-N.
14   Q. What's his first name?
15   A. Todd.
16   Q. All right.  So we're about to wrap up.  I've
17 got a question.  It's 2021.
18   A. Uh-huh.
19   Q. We're sitting in August.  Have you filed tax
20 returns for 2020?
21   A. No, I have not.
22   Q. Okay.  Did you receive a 1099 from FSM?
23   A. No.  Although I requested, I did not receive
24 one.
25   Q. You haven't received one?

**183**

1   A. No.
2   Q. Okay.  When do you -- did you file for an
3 extension on your taxes?
4   A. Yes.
5       MR. BESHARA:  All right.  I'll mention to
6 Rahul that you still haven't received a 1099.  We'll
7 get that over to you.
8       THE WITNESS:  I appreciate it.
9       MR. BESHARA:  I don't have any further
10 questions at this time.
11       MR. MURPHY:  We will reserve any
12 questions we have until time of trial.
13       MR. BESHARA:  All right.  I appreciate
14 everyone's patience.
15       THE VIDEOGRAPHER:  This concludes the
16 deposition.  We're off the record.  The time is 4:01.
17       (Deposition concluded at 4:01 p.m.)
18
19
20
21
22
23
24
25

**184**

1          CHANGES AND SIGNATURE
2 WITNESS NAME:  MAYAR ZOKAEI   AUGUST 3, 2021
3 PAGE LINE CHANGE          REASON
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Mayar Zokaei - August 3, 2021

**185**

1        I, MAYAR ZOKAEI, have read the foregoing
2 deposition and hereby affix my signature that same is
3 true and correct, except as noted above.
4
5        _____
         MAYAR ZOKAEI
6
7
8
9
10 THE STATE OF _____)
11 COUNTY OF _____)
12        Before me, _____, on this
13 day personally appeared MAYAR ZOKAEI, known to me (or
14 proved to me under oath or through _____)
15 (description of identity card or other document) to be
16 the person whose name is subscribed to the foregoing
17 instrument and acknowledged to me that they executed
18 the same for the purposes and consideration therein
19 expressed.
20        Given under my hand and seal of office this
21 _____ day of _____, 2021.
22
23        _____
         NOTARY PUBLIC IN AND FOR
24        THE STATE OF _____
   My commission expires: _____
25

**186**

1 STATE OF TEXAS )
2 COUNTY OF DALLAS )
3        I, Audra B. Paty, Certified Shorthand
4 Reporter, in and for the State of Texas, certify that
5 the foregoing deposition of MAYAR ZOKAEI was reported
6 stenographically by me at the time and place
7 indicated, said witness having been placed under oath
8 by me; that review was requested pursuant to Federal
9 Rule of Civil Procedure 30(e)(1); and that the
10 deposition is a true record of the testimony given by
11 the witness.
12        I further certify that I am neither counsel
13 for nor related to any party in this cause and am not
14 financially interested in its outcome.
15        Given under my hand on this the 12th day of
16 August, 2021.
17        _____
         Audra B. Paty, Certified
18        Shorthand Reporter No. 5987
         Dickman Davenport, Inc.
19        Firm Registration #312
         4228 North Central Expressway
20        Suite 101
         Dallas, Texas 75206
21        214.855.5100   800.445.9548
         e-mail: abp@dickmandavenport.com
22        My commission expires 10-31-22
23
   Time used by each party:
24 Mr. Beshara - 4:08
   Mr. Murphy - 0:00
25 Mr. Stagg - 0:00

Mayar Zokaei - August 3, 2021

**A**

**a.m** 1:20
**abide** 70:17
**ability** 18:17
  162:9 164:2
**able** 10:1,20 22:2
  23:16 26:3 27:4
  27:6,8 28:16
  29:22 30:14
  45:22 47:24,25
  48:2 54:8 76:1
  136:13,14
  162:24 163:13
**above-styled**
  1:19
**abp@dickman...**
  186:21
**absolutely** 82:1
  148:10 180:15
**accept** 77:11
**acceptable**
  106:10 139:12
  139:14
**access** 10:14
  103:10 107:2
**accident** 105:15
  106:12 109:18
**accolades** 63:9
  64:19
**accommodate**
  29:10
**account** 26:23
  87:25 100:24
  108:5 137:23
  138:13 164:9
  169:20,23
  170:3,9 172:20
  172:21 174:24
  175:2,5 177:19
  179:19
**accounts** 137:24
  138:3,6 146:7
  146:18,19,23
  146:24 147:7
  147:12,17,21

148:5,7 152:15
153:8 154:23
155:24 156:10
168:14,15,16
168:17,19,22
168:24,25
169:6 171:2,5
172:22 176:17
**accrue** 49:12
**accurate** 157:1
**accused** 172:23
**acknowledged**
  185:17
**acting** 126:2
**action** 12:22
**actual** 26:15 29:2
  61:1 68:23
  157:3 180:23
**add** 18:11 27:18
  77:12 94:17
**addition** 49:6
  130:3
**additional** 53:18
  99:4 130:4
**address** 59:11
  70:5 75:4 99:24
  100:2,6,10,22
  101:1,5 102:3,9
  102:15 103:6
  103:18,25
  105:6,7,18,21
  105:24 106:5
  107:4,19 108:5
  108:19 109:1,9
  109:13 126:16
**addresses** 108:12
**administered**
  9:14
**admit** 51:3 71:17
  147:12,15
**admitted** 84:13
  148:8
**admitting** 147:9
**advance** 47:22
  49:10,12

**advanced** 46:25
  47:15 49:7,9
  51:1
**adverse** 137:13
**adversely** 155:13
  155:13
**advisor** 172:18
**advisors** 120:17
**affiliated** 45:7
  55:25
**affix** 185:2
**affixed** 51:22
  53:2,8 55:7,12
  55:17
**afternoon** 90:12
  90:13
**agencies** 13:7
  73:14 140:6
**agency** 8:9,10
  13:4,6 14:4,6
  14:12 20:2
  36:15 40:14
  42:14 68:24
  73:13 159:8,23
  160:4,5 169:15
  169:17
**agenda** 141:9
**agent** 7:19,21,25
  8:13 9:1 11:11
  11:20 12:4,11
  13:19,21 14:3,8
  14:9,21 17:23
  18:11 19:16,24
  20:3,18,21
  40:11,15 45:9
  45:13,13 60:8
  86:15 91:24,25
  92:5,6,8,8,8
  104:21 105:1
  105:22 124:21
  125:11 126:24
  127:9 140:1,17
  141:16 143:7
  143:15 153:16
  154:14 155:14

155:20 160:21
160:25 170:19
172:11 175:16
176:17 178:17
178:21,23,25
179:6,12,14
180:3,5 181:2
181:15
**agent's** 40:24
**agent/team**
  143:11
**agentexposure**
  171:10
**agents** 3:11 9:7
  11:7,8 14:10
  92:3 126:3
  138:20 140:8
  140:22,24,25
  146:20 154:9
  155:25
**ago** 12:10 27:14
  30:7 95:5
**agree** 6:18 12:3
  31:24 32:16,17
  32:17,20 39:9
  46:5 47:1 48:4
  48:5,15 59:16
  64:25 66:13,22
  71:4,9,13 72:7
  73:23 74:5,8
  76:12 94:2 96:9
  99:2 109:12
  111:3 114:10
  128:21 129:17
  129:23 132:21
  143:19 155:16
  175:14,19
**agreed** 6:16
  29:25 66:8,25
  74:10,20 82:24
  116:17 120:4
**agreeing** 48:20
  68:12 72:23
  73:2
**agreement** 3:14

3:17,21,23,25
4:3,4 6:10,14
26:11 30:20
31:14,15 34:1,9
37:24 39:4,6
40:14 46:8
47:19 54:14
55:21 56:6,24
57:8 58:2,9
65:23 66:1,3,22
67:17,17,18
68:10,12,22
70:20 71:7,10
72:4,6,11 74:4
74:7,15 75:19
75:20 76:18,22
77:8 80:21 81:1
81:20,24 84:19
84:20 85:7,13
86:20,21 87:1,4
87:6,8,11,14,17
94:4 95:1,3,4,7
95:13,22 96:3,7
96:8 97:22 98:9
98:21 117:7,11
119:17 120:1,2
132:18 160:20
160:20,24,24
167:7
**agreements** 49:9
  161:23
**agrees** 6:17
**ahead** 9:19,25
  10:19 68:16
  69:19,22 73:8
  80:20 93:9
  114:16
**al** 5:7
**alien** 73:20
**aligned** 161:10
**alignment** 142:2
**aligns** 116:17
**All-Star** 88:21
  141:11 147:6
  148:9,25

Mayar Zokaei - August 3, 2021

149:11,16
**allegation** 33:5,9
  33:13 37:7
  113:3
**allegations** 24:7
  24:24 33:20,24
  97:9 137:8,12
**allege** 31:24
**alleged** 32:13
  33:2 37:16
  39:10 60:12
  98:8
**allotment** 20:15
  120:5 157:24
**allow** 163:10
**Allowable** 158:8
**allowance** 46:21
  47:23
**Amendment**
  113:8
**Amit** 120:13
  121:10 122:4,4
  123:2 172:8,11
  172:16,19,22
  172:24
**amount** 50:20
  52:19 61:4
  97:13,14
  128:11,12,13
  129:25 157:23
  158:1
**amounts** 96:15
  129:15 158:18
**analysis** 67:25
**and/or** 155:11
**announced**
  102:23
**annually** 43:17
  43:22
**annum** 49:13
**anonymously**
  171:1
**answer** 42:20
  68:1,16 69:22
  73:8 78:11

92:22 95:25
  104:23 114:16
  152:25 153:6
  153:21 162:2
**answered** 69:6
  70:12 95:24
  152:5
**answers** 23:16
**Antonio** 1:3 13:4
  21:2,3 29:8,11
  29:19,23 87:22
  88:6,15
**anybody** 77:16
  105:13 120:22
  138:5,10 141:7
  142:4 162:17
  162:21 176:16
**anybody's**
  179:14
**anymore** 95:12
**anyway** 49:22
  162:10
**apartment** 90:19
  90:20 91:13,15
  162:20
**apologies** 80:18
**apologize** 111:15
**apologized**
  181:18
**appear** 52:24
  56:10 100:23
**appearance**
  29:16
**appearances**
  5:12
**appeared** 185:13
**appearing** 138:8
**appears** 33:21
  34:3 53:5
  100:22 103:8
  166:1
**application** 9:13
**applying** 11:19
**appreciate** 34:16
  141:7 183:8,13

**approach** 70:18
**approaching**
  49:19
**appropriate**
  114:25
**Approximately**
  134:24
**April** 61:11 97:5
  97:5 99:19
  100:5,17
  102:21 103:5
  103:24 104:8
  104:15 106:7
  107:3,8,17,18
  108:1 109:5
  128:5 132:7
  163:18
**area** 29:8,11,19
  29:23
**argue** 42:22
**arising** 77:13
**arrange** 173:20
**arranged** 91:12
**arrangement**
  14:5 29:13 30:8
  30:17
**arrangements**
  19:4
**arrive** 90:7
**arrived** 90:8,9
  91:16
**article** 13:3
  135:17,19,24
**aside** 13:25,25
  131:14
**asked** 25:25 26:5
  26:7,9 28:24
  35:25 38:8 70:4
  76:23 77:11
  84:11,12,23
  85:6 87:23 92:7
  97:10 98:18
  99:4 111:14
  120:22 131:4
  149:15 151:1

152:5 156:6,7,8
  156:11 165:1
  168:15 169:4
  170:22 173:20
  174:18 175:1,4
  175:5 176:5
  181:21
**asking** 9:23,24
  25:9 32:19
  42:23 64:1
  79:10 94:17
  95:25 118:9
  131:16 139:10
  139:18 142:12
  145:6 152:24
  153:7 157:6
  173:1 180:25
**assembled** 17:17
**assigned** 23:7
  26:19
**associated** 8:5
  39:22 41:12,20
  45:5 48:18
  55:24 56:1 60:8
  69:5 100:16
  101:14,20
  104:5 114:11
  124:4 168:13
  168:17 169:13
  172:4 177:18
**association** 42:1
  61:17 65:21
  88:14,23
  112:20 113:25
**assume** 85:11
  152:21,24
  154:24 155:3
  170:14
**assumed** 8:23
**assumes** 153:3,19
**assuming** 16:25
  41:19 81:13
  82:24 85:12
  169:3
**assumption**

65:12 123:12
  152:25 167:1
**assumptions**
  152:22 155:21
**assured** 86:1
**ate** 167:18 168:1
**athletes** 8:18
  14:23 140:25
**Atlanta** 178:19
**attached** 44:1
  93:11 94:11,12
  98:8,16
**attachments**
  79:16 81:17
  93:10,15
**attempted** 173:6
**attend** 70:13
  150:1
**attention** 17:21
  23:20 92:6
  181:3
**attorney** 79:10
  93:5 117:24
  124:17 125:9
  157:2,20
  158:12
**attorney-client**
  79:25 80:13
**attorneys** 24:15
  158:15,17
**attorneys'** 157:3
**Audra** 1:21 5:9
  6:1 80:3 186:3
  186:17
**August** 1:14,19
  5:3 51:25
  132:11 182:19
  184:2 186:16
**authorize** 23:24
**autograph** 137:2
**automobile** 19:5
**available** 9:21
  20:16 22:12
**Avenue** 2:3
**aware** 66:4 114:3

Mayar Zokaei - August 3, 2021

114:6 170:18

**B**

**B** 1:21 2:17 51:7
52:15 186:3,17
**back** 12:10 27:2
28:5,5 30:22
32:21 38:7,10
38:22 43:15
46:24 47:8
49:10,22 50:4,9
52:1 53:13
64:24 72:21
75:12 76:24,25
78:3 79:6 80:11
81:25 83:8
86:10 95:9 96:9
103:1,17
104:13 107:20
110:12,14,23
116:20 118:24
126:25 130:4
133:9 134:4
161:20 162:14
163:2 167:6
177:14
**backboard**
164:11,12
**background** 7:16
9:14
**bad** 77:14 94:19
**badly** 83:16,18
**bank** 157:14
**Barcelona** 59:11
**Barry** 174:5
**base** 15:6 21:11
**based** 32:2 60:16
64:7 68:19 77:7
78:21 88:2 94:5
97:19 116:14
132:13 152:25
180:23,24
**basically** 26:25
46:19,25 57:14
65:10 79:1

**basis** 37:6 47:16
65:21 125:1,6
**basketball** 7:19
7:20,25,25 9:8
13:7,19 14:16
14:17,19,22,24
19:3,6 45:21
104:2 106:6
107:5,20 108:7
109:4,15
133:25 178:4
178:21 179:8
**bay** 30:18
**bear** 22:16 54:3
69:11 74:22
**bears** 59:7
**beg** 89:1
**began** 12:18,24
13:14 25:6 33:2
60:12,22
**beginning** 5:4
33:9 134:5
135:12 176:5
**begins** 133:3
**behalf** 11:17
13:12,15 16:19
19:19 23:25
34:25 46:5 93:6
96:3 123:24
124:15 126:2
127:20 141:15
**behavior** 154:22
**belief** 68:18
151:7
**believe** 11:7 13:3
16:24 17:11
30:5,7 36:5
38:7 42:18
46:18 47:9
48:23 60:21,23
67:23 68:3 69:7
69:25 72:14
73:3 78:18 81:3
84:11 87:3,13
87:16 89:2,17

89:22 93:16
101:16 107:15
108:8,9,23
115:24 116:21
122:21 126:23
131:25 143:24
144:1 146:1
161:1 173:4
178:13,23
**believing** 68:13
**Bellaire** 2:9 5:17
**benefit** 7:24
**Berman** 145:17
145:18 146:3
147:20,25
152:12 153:8
**Bernard** 140:5,8
140:9,17,23
**Beshara** 2:2 3:4
5:20,20 6:17,17
6:22,23 9:21,24
10:3,12,18
22:11,15,23
31:12 42:11
44:8,10,13
49:21,25 50:3
50:12 52:7 54:6
58:20,22 67:5
68:4,18 69:1
70:2 71:22,24
73:9 74:24
77:15,19,23
78:5,9,11 80:2
80:10,16,18,20
81:18,22 82:2,7
84:2 89:4,9
93:1,13 95:23
99:23 101:24
104:23 106:15
109:23 110:14
110:17,25
114:23 128:16
129:5 153:5,12
153:21 156:15
160:8 165:14

167:20,23
168:2,5 169:3
177:1,7,10,16
179:23 183:5,9
183:13 186:24
**better** 10:24
41:23 44:24
88:2 105:14
146:20
**Bexar** 22:20
**beyond** 122:25
**big** 116:24 140:4
140:25 152:18
161:10
**biggest** 140:1
**bit** 10:23 15:8
17:19 18:24
47:10 48:7
69:10 76:7,10
76:22 79:3 86:9
91:7 92:17
110:2 111:13
164:13
**blindsided** 64:15
**block** 102:6
104:1 106:5
107:4,19 108:6
109:14
**bloggers** 175:8
**board** 19:22,25
26:12 120:17
**Bogues** 174:3
**bogus** 146:18,22
147:7 148:6
154:23 155:24
156:9
**Bone** 171:18
172:2,5
**Boom** 160:18
**bottom** 51:12,18
51:22 52:24
53:3,6 54:25
55:4,10 102:5
106:21
**Boulevard** 2:12

**bouncing** 86:9
**box** 100:4
**boy** 150:9,13
**Bradford** 180:3
**branching**
106:23
**brand** 19:4
124:22
**breach** 73:24,25
74:1,1 115:21
**break** 49:20,24
88:21 109:22
110:4,12
167:16 172:14
**brief** 5:14,24
**bring** 31:9 45:19
72:22 111:9
114:25
**bringing** 63:1
**brought** 63:3
78:20 159:5
170:20 181:2
**Brown** 174:5
**Bruno** 178:12
**Bryant** 20:23
118:2 120:22
120:24 141:16
147:6 148:8
149:22,25
150:3
**build** 26:25
**bullet** 48:3
**burner** 146:18,22
147:7 152:15
153:8 154:23
155:24 156:9
171:2,5
**business** 8:4,15
8:16,22,24 15:9
28:13 57:2 70:7
105:4,13 129:6
**busy** 21:22 76:24
77:2 92:17
118:12
**Butler** 140:5

Mayar Zokaei - August 3, 2021

**C**

C 2:1 5:1
calculated
  158:18
call 18:12 21:20
  24:20 30:9 35:8
  35:9,9 62:7,11
  62:20 63:6,11
  63:14,21 77:20
  84:5 177:2
called 40:19
  113:7 144:12
  146:17
calls 35:12,13
  67:24 73:7
  92:10 114:15
  118:8 153:10
  153:18
Cameron 178:18
  180:7
capacity 35:24
  125:21
card 8:15,22 70:8
  185:15
care 42:23 77:3
  81:23 118:9,10
career 16:7
Carson 179:9
case 5:6 19:25
cause 1:19 23:7
  51:15,21 53:2,8
  55:7,12,16 59:7
  61:14 180:13
  181:20 186:13
caused 60:21
  137:12 147:2
  170:5
Central 5:11
  186:19
CEO 126:23
  127:9 181:5
certain 28:3 59:6
  154:22 164:20
certainly 12:14
  24:14 86:4

certificate 4:9
  111:19 113:8
certification 3:8
  4:18 11:7,23
certified 6:1 9:3
  9:4,12 12:4
  14:7 15:3 17:23
  19:24 186:3,17
certifies 9:6
certify 186:4,12
certifying 86:14
chances 137:14
change 24:10,13
  38:8,10,20,22
  38:23 39:1 46:9
  46:14 66:9
  67:15 76:13,20
  78:22 81:5
  84:23 91:22
  92:3 94:23 95:1
  95:8 145:8,10
  158:4 184:3
changed 48:11
  67:6,15,19 68:8
  71:6 157:13
changes 24:18
  38:18 66:7 81:5
  85:6,14,17,20
  86:1,3 99:4
  113:10,19,20
  117:17 135:23
  184:1
characterized
  69:3 97:20
charge 41:3
  45:14
charges 43:13
chat 10:10,14
  22:12 23:14
  31:10 54:7,18
  78:13 128:17
check 9:14 61:1
chemistry 61:23
  62:1,14 63:25
  64:5,13 128:2,3

Chicago 88:18,20
  141:11
child 150:14,23
Chittu 174:11
Chris 89:14 91:3
  140:9 148:22
  160:13 161:6
  162:15 179:3,5
Christmastime
  26:4
circumstances
  63:13 68:20
city 1:22 13:6
Civil 1:24 186:9
Clackamas 1:23
  59:14
claim 3:18 36:16
  58:23 59:4,19
  60:3,18 86:10
  95:16,18,18
  96:15 99:19
  113:16 114:7
  125:1 131:12
  131:23 157:4
  157:13
claimed 87:18
  97:4
claiming 115:20
  131:10 132:12
  132:21
claims 72:17
  116:2
clarify 77:9
  158:5 165:4
classified 69:3
clause 71:11
clear 30:15
click 54:20
client 15:6,14,15
  15:23 21:11
  26:6,25 27:9
  40:6,9,10,16
  41:8,9 45:21
  47:13 57:23
  60:9 89:12

100:14 134:23
  134:25 139:16
  140:11 141:18
  155:19 158:7
  173:6 175:10
  176:11 181:15
  181:19 182:1
client's 155:17
  176:6
clients 15:21
  17:20 23:11
  26:8 41:11,19
  41:21 45:8,18
  45:19,23 46:24
  47:6 48:7,9
  63:2,3 105:12
  106:3 133:15
  133:16 140:6
  140:10 141:8
  154:10 159:5
  159:25 175:21
  176:1
clientwise 116:25
close 21:9 116:15
  136:8 160:13
closer 48:23
coach 20:15
  21:25 22:4,7
Colin 20:23
  118:2,3 120:22
  120:24 141:16
  147:5 148:8
  149:22,25
  150:2
collect 180:18
college 21:25
  22:1,5,7
college's 100:11
column 129:14
  129:15
combination
  21:16 108:24
come 21:3 26:12
  27:2 28:13
  32:21 48:13

49:22 64:24
  95:9 109:13
  118:24 138:19
  162:17
comes 140:21
  170:11
coming 12:10
  26:11 86:1 96:9
  133:9 136:9
commence 24:1
comment 94:16
  94:20
comments 169:16
commission
  25:13 26:18
  41:6 42:13
  58:24 68:21
  87:24 96:24
  114:8 128:6,7
  131:13 185:24
  186:22
commissions
  48:1
commit 116:20
common 139:12
commonplace
  159:14
communicate
  100:25
communicating
  100:9 101:21
  102:2 109:3
communication
  105:25
communications
  13:15 119:15
company 4:9
  45:14 65:15
  114:1,12
  116:10,12,19
  121:15 122:7
  124:5
comparing 83:7
compensated
  25:22 43:1

Mayar Zokaei - August 3, 2021

116:4,5,6
compensation
40:25 42:4 43:4
46:4 48:9,16
49:3 86:20 87:2
87:4,11 98:9
complaint 34:5
128:7
complete 93:15
completed 59:5
complied 58:6,8
comply 11:9,13
11:16 12:7
39:14
component 17:22
18:22,25 19:8
120:1
components
29:24 58:4
62:16 72:3
compound 69:21
concepts 73:20
conclude 92:12
concluded
183:17
concludes 183:15
conclusion 67:25
73:7 114:16
conduct 8:24
11:8,10,14,21
12:7 27:6
154:19 155:9
155:11,11,13
conducted 6:3
conducting 8:4
confidant 136:20
confident 64:7
confidential
57:10
confidentiality
3:17,22 4:2
54:13 56:5,23
71:5,9,13,19,20
72:1 83:7 93:24
confirm 124:13

129:23 136:13
136:15
confirmed
135:11
conflict 12:2
confused 64:15
connection 29:3
115:25 122:4
consideration
185:18
considered 42:15
42:15
consistent 32:25
33:8,11,24
43:25 47:8,12
50:24 83:1
119:20 120:20
150:21 167:5
CONSOLIDA...
1:7
constitute 155:23
constitutes 156:3
contact 17:9 22:6
30:6 91:9
113:14 172:24
173:6
contacted 29:7
29:17 97:10
101:19 124:5
156:11 181:1
contacts 18:21,23
105:5 133:17
180:18
contain 73:17
109:13 138:13
contained 24:7
39:11 60:2
156:25 180:21
contains 33:23
37:24 71:18
93:19 107:16
contemplates
57:9
contend 26:25
content 137:25

137:25 138:1,4
138:5 147:3
168:21,23
169:1,5 175:2,5
175:6
context 122:24
139:16,20
continue 99:24
105:21 106:4
continued 100:6
continuing
100:15
continuously
26:10
contract 16:12
30:11,19,24,25
31:1,7,8,17,20
32:4,10,13 33:4
33:22 34:4,13
34:15 36:17,17
37:12 39:17
41:8,16 46:2
48:17 67:2
68:19 70:23
73:17 74:5
75:18 85:25
86:3,4,6 97:19
98:12,16,19
113:17 115:7
115:17,21,22
116:9 117:1,3
118:5,17,20
119:4 124:23
125:23 132:1
132:22 133:6
142:10,11
162:15
contracted 112:2
113:3 115:10
115:12,15,18
156:8
contracting 42:8
contractor 3:14
3:21,22,25 4:2
31:14 33:25

34:10,21 37:2,3
42:13 46:1,4
49:2 65:17,23
66:2,23,24
67:16,22 68:11
68:13,25 69:4
69:16 70:20
71:10 75:18
80:21 81:20
85:7,12 93:23
94:4 95:22 96:3
96:7 97:16,22
117:11 166:12
166:17,19
167:7,9
contractor's 46:5
contracts 16:23
46:25 48:15
73:12,14 165:7
contribute 20:1
control 120:7,10
127:12,20
179:19
controversial
82:3
conversation
62:17 121:13
122:17,25
123:6 124:10
182:2
conversations
37:22 119:15
121:4,8,9,9
122:3
conveyed 37:10
coordinate
121:23
copied 79:10
181:25
copies 111:4
copy 23:1,10,13
38:7 58:14
98:12 117:15
Cornell 178:24
corner 139:3

Cornstein 178:22
correct 9:22 14:9
15:5 17:9,10
19:11,16,20
24:8 25:7 30:24
31:5,6,22,23
32:13 33:3,12
34:3,22,23
36:24,25 37:20
38:16,24 40:20
40:22,23 42:2,3
43:3,6,18 44:3
45:15 50:20,21
50:22,23 51:4,5
52:8,9,10,13,17
52:18,19,22
53:18 56:12,15
57:11,17 59:1
59:23,25 60:4
60:15 61:15
65:17,24 66:18
69:5 73:22 74:7
74:11,14,21,21
75:6,23 79:12
83:5 85:7 86:8
86:14,19 87:12
87:20 88:11
89:20 91:11
94:4 96:8,12,16
96:22 97:5,23
98:1,3 100:8
102:25 103:19
103:22 104:2,3
104:10,11,17
107:23 111:4
112:15,21,22
113:14,15,17
115:11,16,19
115:23 117:12
117:13 118:18
119:8,9,21
120:23 121:22
122:2 123:11
123:15,25
124:16 125:8

Mayar Zokaei - August 3, 2021

125:13,19
127:15,21
128:23 129:11
129:12 130:6,7
141:12 143:17
145:23 150:19
164:7 165:25
166:5,22 185:3
**corrected** 127:18
**CORRECTIO...**
3:6
**correctly** 17:6
30:10 58:25
**correspond**
157:16,20
**correspondence**
35:11 120:14
182:8
**corresponds**
157:24
**corroborate**
63:13
**cost** 142:7
**counsel** 5:12 10:3
42:17 186:12
**count** 16:8
**country** 162:11
**County** 1:23
22:20 59:14
185:11 186:2
**couple** 27:16
40:4 81:4 91:20
101:6 117:17
120:15 136:9
161:16
**course** 16:7 69:14
71:16 118:14
138:6
**court** 1:1 5:9,13
6:5 9:24 23:8
95:14 114:4
133:2,6 159:1
178:4
**courtroom** 7:10
7:14

**cover** 145:12
**covers** 145:22
**COVID** 163:13
164:1,6,10,18
**COVID-19** 6:4
**create** 66:23
**creates** 170:8
**credit** 178:3
**criticism** 63:10
63:24 64:12
**CSR** 1:21
**culmination**
145:3
**current** 6:4 8:7
26:5,6 44:5,6
46:2,23 47:6,13
**currently** 9:4
44:18 46:2
134:3
**cursor** 23:2
**customary** 73:11
**cut** 43:19 111:14
**cut-throat**
152:10

___
**D**

**D** 3:1 5:1
**dailies** 145:25
**Daily** 146:1
**Dallas** 5:11 151:5
151:8,23 186:2
186:20
**damages** 73:23
83:10 93:25
131:18 132:12
132:13 157:3
158:14,16,19
158:22
**date** 21:9 33:11
33:21 34:3 51:9
52:21 60:21
76:8,11 82:15
82:18 83:3
99:14,15
116:16 129:18

129:24 182:8
182:10
**dated** 50:22
129:14 135:19
**dates** 33:15,25
**Davenport** 5:10
186:18
**davidjr.realtor**
179:1
**day** 76:19 90:7
90:10 91:16,16
91:18 103:13
103:17 118:16
139:5 142:11
146:6 160:18
164:19 185:13
185:21 186:15
**Daylight** 1:20 5:3
**days** 27:15 65:6
88:9 89:24,25
90:4,5 97:8
104:10 136:9
154:2 161:16
**De'Aaron** 179:7
**De'Anthony**
178:6
**deadline** 135:22
135:22
**deal** 29:21,22,24
47:6 138:9
173:21
**dealings** 127:13
**deals** 19:2,19
26:8 28:22,25
29:24 45:21
48:1 92:5
**DeAndre** 177:25
**deceit** 155:12,24
**December** 25:16
25:21,21 26:20
49:7 50:22 51:1
51:9 52:21
112:21 113:5
130:5,10,11,21
130:23 131:5

131:11 132:4
132:14,18,20
132:25 158:25
158:25
**decision** 26:20
131:13
**decision-maker**
172:18
**decision-makers**
121:14
**decisionmakers**
120:18
**decisions** 115:3
121:3
**decrease** 10:23
**deducted** 96:10
166:16
**default** 100:19
105:7 108:12
**defendant** 1:10
2:7 114:14
**defendants**
112:12
**defer** 114:17
115:2 158:17
**definition** 16:9
**delete** 79:24 80:2
80:8
**deleted** 113:25
**delivered** 53:13
56:5,18 71:18
118:6
**demand** 156:21
157:10
**demands** 157:4
**demonstrate**
133:14
**denied** 171:4
**Dennis** 148:11,13
**deny** 98:23 148:4
150:25
**departed** 91:17
91:18
**department**
100:12

**deposit** 61:2,3,4
61:5
**deposition** 1:12
1:16 5:5,8 6:2,7
7:6 10:4,20
11:10,14 12:8
22:10,24 23:25
24:8,25 31:13
31:16 32:1,5,12
33:1,10,12,23
34:1,7 36:18
37:1,7 38:6,16
39:11,15 43:15
43:24 44:1
45:25 50:13,15
50:25 51:23
52:4,7,25 53:6
53:12,12 54:7,9
54:13 55:4
58:17 59:4,8
60:3,10 65:22
70:21 71:17
72:9 74:25 75:1
76:6 85:4 86:12
87:7 95:15,16
98:11 99:7,10
101:25 103:9
106:17 111:3
119:21 120:21
124:19 126:25
129:25 159:9
166:2 183:16
183:17 185:2
186:5,10
**deposits** 96:11
**derogatory**
155:25 169:16
170:1
**describe** 42:9
142:23 146:2
**described** 47:12
57:13 147:1
**description** 44:24
185:15
**designed** 57:5

Mayar Zokaei - August 3, 2021

**Desonta** 180:3
**despite** 65:19
    118:17
**destroyed** 137:14
**determination**
    132:17
**determine** 72:12
    155:22
**determined** 88:1
    97:13
**determines** 133:6
    159:1
**develop** 15:6
    21:11 134:13
**development**
    124:22
**Dickman** 5:10
    186:18
**difference** 35:12
    166:6
**different** 66:7
    68:5 69:11
    76:22 81:4
    84:14 88:5
    105:23 106:23
    119:12 163:12
**direct** 23:20 61:2
    61:3,4,5 96:10
    138:5,10
**directed** 138:3
**direction** 29:12
    70:9,11 88:2
    120:7 147:3
    162:22
**directly** 20:4
    34:21
**directors** 120:9
**disagree** 142:6,13
    142:14 143:4,5
    143:6,10,13
**disappeared**
    78:14
**Disaster** 6:5
**disciplinary**
    11:22

**discipline** 12:3
**disclosures** 3:13
    23:9
**discuss** 92:19
    163:5
**discussed** 60:17
    62:19 63:8
    91:21 117:17
    148:18
**discussing** 50:13
**discussion** 18:14
    70:25 71:1,2
    119:25 136:18
**discussions** 12:18
    18:6,13 49:15
    78:21 121:24
    147:5
**dishonestly**
    155:12
**disliked** 143:4,5
    143:24
**dismiss** 63:18
**disparage** 146:19
    146:20 151:16
    151:19,22
**disparagement**
    83:12
**dispute** 42:8,11
    56:4,10 79:9
    109:17 126:7
    128:24 129:1
    139:1
**disputing** 56:17
**dissatisfied** 92:10
**distill** 19:12
**distribution**
    47:16
**District** 1:1,2
    23:8
**DIVISION** 1:3
**document** 4:19
    10:25 11:1,6
    32:2 34:19
    37:23 38:1,4,10
    38:11,13 39:1

40:21 42:19
    43:7 53:9 54:10
    54:12,15,23,24
    56:8,18 58:3
    59:16,23 65:20
    65:20,24 66:6
    66:10,11,21
    67:15,16 68:5
    78:15,23 79:11
    80:22,25 81:4
    81:22 82:23
    85:2,9 86:13
    97:24 111:11
    113:7,19 114:3
    114:6 165:15
    165:24 167:8
    185:15
**documentation**
    42:16 43:13
    79:3
**documents** 23:15
    75:25 78:13
    79:24 80:11
    81:23 84:17
    85:2 87:16
    94:13 95:6 99:5
    109:24 162:25
**doing** 13:17
    19:13 21:19
    27:13 45:18
    62:24 83:25
    98:14,15
    130:20,22
    131:3 132:4
    138:15 139:17
    144:22 151:10
    163:2 165:9
    167:17
**dollar** 82:21,25
    177:16,17
**double** 181:12
    182:13
**doubt** 99:17
    111:11
**download** 23:15

**downloaded**
    10:10
**downloading**
    10:16
**dozen** 145:16
**draft** 71:7 81:1
    84:15 85:15,16
    93:19 94:3
    95:11 117:15
    159:7 175:15
**drafted** 82:23
    134:12
**drag** 117:21
**dragged** 77:4
    117:19
**drawn** 38:14
**drew** 137:9
**drizzy** 177:17
**drop** 158:20
**Dropbox** 103:10
    107:2
**due** 48:16 56:14
    69:6 95:23
    132:18 157:5
    163:13 164:6
**duly** 1:18 6:20
**duration** 31:18
    37:9 119:5
**duties** 25:20
    39:10 127:21
**dynamic** 20:19
    21:24
**dynamics** 143:7
    143:11

──────────
**E**
──────────
**E** 2:1,1 3:1 5:1,1
    181:12 182:13
**e-mail** 3:19,19,20
    3:24 4:5,5,5,7,7
    4:7,15,15 70:5
    74:19 75:2,4,8
    75:14 76:6 77:1
    78:16 79:9,16
    79:19,20,21,25

80:12,13 81:17
    81:24 85:10,24
    93:3,5,7,11
    94:5,9,21 99:12
    99:14,15,16,24
    100:2,4,6,10,19
    100:20,22,24
    101:1,5,13,16
    102:3,9,15,18
    103:5,6,8,18,25
    104:8,12 105:6
    105:17,21,24
    106:16,24
    107:2,4,7,11,16
    107:18,19
    108:1,4,10,12
    108:14,16,16
    108:17,19
    109:1,8 111:4
    122:20 126:16
    161:17 163:1
    181:21,24,25
    186:21
**e-mailed** 101:11
**e-mails** 72:13,17
    95:20 100:19
    103:23,24
    104:6 105:8,9,9
    109:11,13
    111:5 126:14
    126:20 160:9
    162:1
**earlier** 58:23
    76:14 102:10
    120:20 131:6
    154:20
**early** 89:22 90:12
    94:2 135:9
**earned** 87:19
    88:3
**easily** 72:19
**easy** 26:24
**eat** 172:15
**eating** 177:2
**Edwards** 179:9

Mayar Zokaei - August 3, 2021

effect 137:13
effective 32:15
  33:11 155:15
  155:18
either 15:7 39:6
  44:15 53:23,25
  108:14 118:20
  136:7 164:5
  168:14 169:5
  171:21 175:12
elaborate 16:10
  170:23
elaborated
  170:24
electronic 59:7,8
elements 58:11
  74:3,14 114:18
eligible 134:11
Emergency 6:4
employed 13:20
  25:19 37:2
  117:8 132:19
employee 18:3
  25:16 34:17
  42:15 65:16,18
  65:25 68:14,19
  68:24 69:3,7
  70:22 109:8
  166:11,23
employee/com...
  66:23
employee/empl...
  70:1
employees 20:17
  117:22 166:21
employer 31:25
employment 18:7
  26:11,16 31:7,8
  31:16 32:9,13
  34:4 36:16,17
  37:12,16 38:3
  39:10 42:6,7
  48:10 60:13
  63:4 67:17
  119:4 124:8

encouraged
  153:17
ended 159:16
endorsement
  19:7,9 26:8
  28:22,24 45:21
  173:20
endorsements
  124:23
ends 106:22
  133:3
enemy 144:3
enforce 97:1
  118:19
engaging 155:10
entailed 123:6,7
entails 12:1
entities 55:24
  56:1
entitled 43:8
  45:20 48:9
entity 4:10 6:25
  8:5,12 36:14
  111:21 112:1
  123:17,20
  127:16,16
equal 73:23
equipment 6:8
erroneous 180:21
erroneously
  181:14
essentially
  116:13
Essman 181:10
  181:13 182:3
Essman's 182:12
establish 15:12
  22:7
established 105:5
  117:10 123:13
  127:10 153:4
  153:20
et 5:7
event 26:2 138:9
  149:16 150:1

events 12:14
  145:2
everybody
  116:13
everyone's
  183:14
evidence 147:21
  147:25 152:14
  153:3,19
evolved 69:25
  70:22
exact 12:12 71:18
  116:16 158:4
exactly 27:15
  128:12 136:7
EXAMINATI...
  3:4 6:21
example 8:24
  82:10 140:13
  140:15,19
  175:15
exception 42:12
  65:3
exchange 2:3
  30:1 78:16
  122:18 126:14
exchanged 57:11
exchanges 111:4
excuse 38:8 66:5
  118:11
execute 117:18
executed 56:4
  96:6 185:17
execution 49:9
exercise 127:11
exhibit 3:11,12
  3:14,15,16,17
  3:18,19,21,22
  3:24,25 4:2,4,5
  4:7,9,10,11,12
  4:14,15,17,19
  10:17,20 11:5
  11:10,14 12:8
  22:10,22,24
  23:25 24:8 25:1

31:11,13,16
  32:1,5,12 33:1
  33:10,12,23
  34:1,7 36:18
  37:2,8 38:6,16
  39:11,15 43:16
  43:25 44:1
  45:25 48:13
  50:11,13,15,25
  51:23 52:5,6,7
  52:25 53:6,12
  53:12 54:5,7,9
  55:4 58:15,17
  59:4,8 60:3,10
  64:24 65:22
  70:21 71:17
  72:9 74:23,25
  75:2 76:6 79:15
  79:17 81:16,18
  82:6,8,10 83:8
  83:8,10,11,12
  84:1,3,4,12
  85:5,8 86:12
  87:7 92:25 93:2
  93:12,14 94:16
  95:15,16 96:9
  97:21 98:11,23
  98:24 99:4,8,11
  101:23,25
  102:1 103:9
  106:14,15,17
  106:20,24
  107:24 111:8
  117:3 118:24
  118:25 119:7
  119:21 120:21
  124:6,19 127:1
  128:15,16
  129:2,4 130:1
  133:9,14,18
  154:20 156:14
  156:15 159:10
  160:7,8 165:13
  166:2 167:6
  179:22,24

exhibits 3:10 4:1
  10:5 111:3
expand 21:11
expect 73:5
expectation
  117:20
expected 76:1
expecting 20:7
expense 20:13,14
  20:15 43:2,10
  46:21 47:23
  120:5 131:22
  157:24 161:20
  164:9
expenses 43:1,5,8
  46:5 47:15
  96:21 119:18
  157:12 158:1,8
  158:9 159:2,7
  160:1
experience 18:17
  18:21,25 19:24
  64:8
expired 103:11
expires 185:24
  186:22
explain 147:10
explained 139:11
  145:4 157:22
  167:3,3
explanation
  61:16,19,20
  62:8,10 96:14
  127:24 157:18
expletive-laced
  150:22
expletive-laden
  140:10
expletives 138:14
  138:20 139:11
  139:15 140:15
expose 141:8
expressed 122:6
  122:8 134:16
  185:19

Mayar Zokaei - August 3, 2021

Expressway 5:11
186:19
extends 58:1
extension 183:3
extremely 77:2
eye 90:8

**F**
F'ing 139:17
face 21:14
Facebook 146:9
146:11,12
fact 25:16 26:19
34:24 42:12
51:15,21 53:16
55:19 56:17
59:25 60:4
61:10 64:4
65:19 66:10
79:13,23 93:17
112:23 128:10
129:23 157:18
facts 116:2,4
153:3,3,19,20
factual 24:16,24
Fahim 3:20 75:3
75:7,12,24 79:9
79:20
fail 11:13
failed 11:15
fair 114:23 164:8
faith 77:14 94:19
fake 170:8,10
172:20,23
fallacies 141:3
false 25:10
136:19,21
141:7 142:15
familiar 13:2
36:13 73:21
114:21 155:5
159:13 168:16
174:2,4,6,10,12
family 21:19
29:10,14

118:13 134:15
136:19 163:24
169:11
Farmer 91:1
148:17,19,22
148:25 149:2
149:10,12,15
149:23 150:3,5
150:10,16,17
fast 127:2 177:3
fault 181:19
favor 72:2,24
155:3
February 25:7,24
32:16 33:3,5,6
33:10,14,14
37:3 76:20
78:22 88:19,20
99:13 134:20
135:9,13,15,19
154:3
Federal 1:24
186:8
feed 144:18
feel 23:19 70:21
fees 41:6 157:3
felt 79:3 92:5
Fernando 178:12
FICA 61:7
fight 128:5
figure 72:21
82:25 117:1
131:23
figured 77:19
file 10:13 22:12
22:18 23:1,2,25
28:6 111:19
filed 23:5,11 24:5
24:11 86:23
111:20 113:9
113:10 114:4,7
116:7 137:7
182:19
filing 132:16

fill 9:13 43:9
166:10,15
final 38:13 97:11
Finalizing 75:20
finally 76:25
financially
186:14
find 15:7 29:12
31:8 32:10 73:5
74:18 101:13
108:18 136:2
181:17
finding 60:16
fine 10:8,12
28:17 49:21
50:3 71:24
78:24 82:5
110:7 129:22
153:12
finish 39:21
finished 62:15
167:12
fire 135:2,2,5
137:9,10
141:25
fired 116:15
135:4,18 136:1
136:17 142:1
142:10 154:9
154:15
firing 135:10
136:6
firm 2:12 4:14
5:16,19 23:21
23:25 156:16
156:16 157:19
158:5 186:19
firms 23:22
156:18
first 6:20 12:11
12:18 13:1,14
14:13 15:4,14
15:15,23 16:18
23:20 31:10
32:25 48:11

51:13 52:25
53:3 55:4 60:22
60:23 65:3,4
75:4 79:19
92:14 102:10
112:23 129:14
129:19 130:10
130:19 154:2
182:14
fit 63:17 64:7
fitness 155:14
five 17:7 20:12
50:1 97:8
five- 109:22
fix 24:15
flag 41:13
flights 28:19
161:10
flip 49:4
Florida 89:7,18
fluid 162:21
fly 25:25 70:4
165:1
focus 14:25 16:3
focusing 27:20
folks 74:22
follow 92:17
118:25 160:6
173:5
followed 92:9
followers 170:10
172:20,23
175:13
following 90:10
160:19
follows 6:20
force 163:8
foregoing 185:1
185:16 186:5
foreign 40:12
forget 158:19,20
175:5
form 40:14,21
43:9 45:9 69:17
69:21 71:9,13

72:24 75:18,21
86:10 99:21
104:22 111:20
114:15 153:2
formal 14:5
92:14
formalized 99:16
formally 14:12
formation 4:9
111:19
formed 18:20
73:15 112:17
former 101:3
169:15
forms 65:21 70:7
formulation
78:24
Fort 2:4
forth 11:10,14
12:8 28:5 33:11
33:25 37:15
72:7 160:3
forward 16:17
42:17 75:14
122:9 161:23
162:5 181:23
forwarded 165:6
Fossey 18:9,12
35:2,6,7,18
36:1 61:18
120:12 121:8
121:23 125:18
126:11 127:19
found 93:3 136:4
136:5 142:3
154:5
founder 126:24
four 16:24 17:7
20:11 29:9,22
39:18 88:9
Fournace 2:9
Fox 179:7
frame 16:18 17:5
134:5
Frank 141:17,17

Mayar Zokaei - August 3, 2021

171:16,17,23
171:25 172:1
**fraud** 155:12
**free** 23:19 94:8
**friend** 150:14
152:12,15,16
153:7
**friend's** 150:18
**friendly** 143:1,3
**frivolous** 137:8
**front** 28:5 128:5
143:20 144:2,6
150:23 153:16
155:17
**frozen** 71:22
77:16,18,18
111:13 129:21
**FSM** 12:18,18,24
13:2,12,15 14:1
14:8 16:19
17:16 18:2,16
18:18 19:13,14
19:15 20:5,8,17
20:18 22:19
24:20 25:6,16
25:19,23 26:21
28:23 33:2
34:25 37:3
38:15 39:6,11
39:23 41:12,20
41:23 42:2,5,15
45:17 46:3,20
46:24 47:8,14
47:21 48:9,15
48:18 53:13,16
57:11,15,15,18
57:22 60:8,22
61:17,24,25
63:2,3,16 65:17
65:21 67:21
68:10,25 69:5
69:14,15,23
70:11,18 71:14
71:21 72:2,24
74:6,7 75:3,19

79:10,10 83:18
83:23 84:18
86:6 87:5 88:14
88:23 91:23
93:5,6 95:22
96:4,24 97:16
97:25 98:19,21
98:24 99:24
100:4,6,16,24
101:1,3,5,9,14
101:20,21
102:3,7,9,16,24
103:6,25 104:2
104:5,17,20
105:1,13,17,21
105:22 106:5
107:3,4,18
108:4,7,10,13
108:15,16
109:1,5,8,13,15
112:17,20,24
113:14,17
114:13 115:10
115:15,18,22
115:24 117:10
118:4,20 120:4
120:7 122:5,23
123:4,14,19
124:9,15,20
125:9,20,23
126:2,2,4,9,16
126:23 127:3,6
127:20 128:22
129:17,23
130:4,20,22
132:19 134:22
141:13,15,17
158:6 159:5,6
159:22 160:12
160:20,23
163:18 165:20
170:18 172:18
173:8 176:16
182:22
**FSM's** 29:6

**fsmsports.com**
103:18
**fucking** 139:5
**fulfill** 29:6
**fully** 96:6
**function** 10:14
23:14 54:18
56:13
**Fundamental** 1:4
4:12 5:6,22
6:24 12:19
24:20 31:21,25
36:23 41:13
45:12,14 51:7
52:2,16 55:22
56:6,18 111:23
112:4 113:4
121:25 129:6
**funded** 129:11
**furnish** 175:11
**further** 92:20
162:22 183:9
186:12
**future** 48:14
62:25 63:19
64:22

———— G ————
**G** 5:1
**Gaines** 1:5 2:3
4:14 5:23 21:1
21:4 22:20
24:21 35:22
36:3 75:3
113:20 115:13
120:13 121:9
121:11 124:20
125:9 127:11
127:14
**game** 139:3
149:16
**games** 117:25
**Gaston** 179:3,5
**Gates** 174:7,9
**gauge** 140:2

**general** 14:23
142:19
**generally** 56:23
57:5
**getting** 30:1 57:7
70:11 105:4
106:3 126:19
130:14 160:13
**give** 7:5 11:6
21:15 43:9
47:22,23 50:1
77:20 105:2
122:22 125:15
125:18 136:11
138:25 140:13
140:15,17,19
175:11 177:5
**given** 6:12 25:20
70:3,5,6,7,7
108:20 185:20
186:10,15
**giving** 7:1 46:21
64:18 79:6
145:7 159:23
**glowing** 63:9
64:18
**gmail** 108:5
**go** 9:19,25 10:6
10:13,18 21:14
23:14 28:9,20
32:10 54:17
55:1 68:16
69:19,21 72:20
73:8 74:18
77:21 80:20
86:10 90:14
93:9 101:13
102:5 106:21
110:2,4,4,5
114:16 140:18
144:17 160:3
161:15,20
162:14,20
163:12 164:2
167:23 168:3

175:6
**goals** 18:1
**Godfather** 142:1
**going** 5:2 9:19
10:18,23 19:13
19:15,16,18
20:4,21 21:13
21:21 22:9,23
23:20 28:18
32:20,23 33:16
34:14,15,18,19
46:20 47:5,22
47:25 50:14
54:3,7 55:1
56:21 57:10,15
69:20 72:15
74:18,19,25
76:1 77:3 79:24
80:11 82:7
86:10 88:20
93:1,2 101:13
109:20 111:9
116:24 118:24
119:1 126:25
127:1 128:13
128:17 129:2,3
137:4 138:8
144:18 149:17
150:25 151:11
152:11 158:14
161:4 162:10
162:11,23
163:12 166:10
166:12 167:5,8
167:23 168:2
169:4 177:5
**good** 62:21,22
63:17 64:7,9,10
103:14 107:1,8
110:19 123:11
175:7
**gotcha** 23:18
41:11 58:6
81:21 106:12
165:12

Mayar Zokaei - August 3, 2021

**Governing** 3:11
**government**
42:14 164:5
**Grand** 124:20
**Grant** 1:5 5:22
22:19 24:21
35:22 36:3
113:20 115:13
120:13 121:9
121:11 123:14
125:9 127:11
127:14
**graphic** 101:7
**graphics** 20:10
**gratitude** 122:7
**great** 17:21
122:25 139:17
146:4
**greater** 29:19
**Grizzlies** 178:9
**gross** 77:13 94:18
**group** 63:16
**guess** 27:19,24,25
38:2 49:3 51:25
72:5 73:14
103:2 108:21
150:25 157:8
**guessing** 28:3
140:19 167:2
**guidance** 70:9
**guy** 2:17 80:4
126:14 138:8,9
145:17 148:17
162:24 163:13
**guys** 10:11 21:22
28:10 57:15
67:5 74:9 110:6
157:22 167:15

**H**

**H** 2:2
**Hadi** 2:12 4:14
5:18 23:21,24
156:16
**half** 26:17 76:17

157:8
**hand** 185:20
186:15
**handed** 68:21
**handle** 117:24
168:6,10
169:19
**handles** 137:19
146:10
**hands** 114:20,21
173:14
**hang** 17:25 78:17
**happen** 81:12
112:11 151:11
**happened** 109:17
116:1 159:21
181:13
**happening**
159:17
**happens** 11:13
**happy** 42:17 63:5
**hat** 17:25
**haul** 116:24
**Hawks** 178:19
**hear** 31:1 63:9
66:20 69:5 75:5
77:15,16,18
177:4
**heard** 63:7
134:17 135:13
144:10 154:11
154:14
**Heat** 89:16
**held** 6:7
**help** 131:4
**helped** 78:24
**hey** 24:15 70:18
77:5 118:9
138:8 139:17
160:5
**Higdon** 2:8 5:16
**high** 22:4
**higher** 29:10
**highlight** 44:11
**highlighted** 23:3

34:11 77:12
98:11
**Hines** 178:14
**hire** 117:23,24
137:11
**hired** 21:5 31:17
32:15,17 33:4
35:7 37:8,18
67:21 71:14
86:15 97:16
119:5 120:6
**hiring** 18:3
**hit** 21:7 161:8
163:17
**hold** 8:13 30:13
30:18 32:19
100:15,18
104:25 105:21
123:16
**holding** 107:19
109:4,7
**holds** 106:6
108:6
**Holman** 27:5
**honest** 16:8
81:15 95:2
108:22
**honestly** 58:3
**hoopsagentwhi...**
168:11 169:9
174:19,22
**host** 80:5
**hotel** 19:4 29:7
29:10,12,16
30:8,9,12
**hotels** 28:20
29:18,21 30:6
**hour** 49:20
**hours** 27:17,18
28:7 86:18 90:3
91:20 98:2
176:7
**house** 90:14,16
**housekeeping**
54:4 105:3

106:2
**Houston** 2:13
**Huh** 76:9 152:23
175:24

**I**

**idea** 27:21 72:1
145:1,2 169:8
174:23 175:7
**identical** 93:18
**identification**
4:17 100:3
165:18
**identified** 3:10
4:1 23:10 111:5
126:22
**identifies** 109:14
120:16
**identify** 179:20
**identity** 185:15
**imagine** 15:2
45:1
**implored** 79:2
**important** 12:6
143:14,19
175:21 176:9
176:12
**impression** 60:18
**inadvertent**
106:11
**inadvertently**
82:3 93:4 105:6
105:16,16
109:8
**include** 12:4
98:11
**included** 46:16
**includes** 33:15
**including** 11:23
143:15
**incorrect** 24:15
83:3
**incur** 158:9
**incurred** 43:5
159:8

**independent** 3:14
3:21,22,25 4:2
13:21 14:9
31:14 33:25
65:17,22 66:2
66:24 67:16,22
68:11,12,24,25
69:4,15 70:19
71:10 75:18
80:21 81:19
85:6,12 93:23
94:4 95:21 96:2
96:6 97:22
117:11 166:12
166:17,19
167:6,9
**indicated** 32:1
60:9 129:18,25
129:25 186:7
**indicates** 55:21
**indicating** 104:1
107:5
**individual** 8:8,11
8:17
**individually** 51:7
52:16 55:25
115:18
**individuals** 6:25
**industry** 14:13
73:5,12 139:23
152:11 159:14
**inexperience**
142:7
**informal** 14:11
**information** 4:10
22:6 26:18 30:7
57:7,10,14 59:5
87:24 119:10
119:14,23
138:10 145:7
155:25 170:1
175:11 180:13
180:16,21,23
180:24
**informed** 121:2

Mayar Zokaei - August 3, 2021

172:17
**initial** 71:7 102:6
  106:24 167:10
**initially** 53:17
  116:11 142:5
  160:4
**initials** 51:12,15
  52:24 53:2 55:5
  55:7,10,12
**initiate** 18:12
**initiated** 17:9
**initiative** 26:13
**inkling** 154:1
**insist** 118:5
**insisted** 20:11
**insofar** 115:20
**Instagram** 26:5
  26:22 131:4
  146:8,12
  170:10 175:16
  175:22 176:2
**Instagrams**
  176:6
**instance** 1:17
**instructed** 29:8
  41:17 121:16
**instructions**
  122:22 125:10
  125:16,18
**instrument**
  185:17
**integration** 63:16
**intent** 68:3,7 69:2
  69:9,13,16
  152:10 167:11
**intention** 67:21
  67:21
**intentionally**
  105:17
**interest** 13:5
  18:10 49:11,13
  92:21 134:16
**interested** 18:3
  22:2 44:17,20
  44:25 45:1

58:17 186:14
**intern** 101:3
**interpretation**
  47:10
**introduce** 8:14
**introduced** 91:6
  102:23
**introducing** 75:8
**introduction**
  21:15 91:2,7
  102:6
**investigate**
  155:22
**investigation**
  156:4
**Investment** 36:11
**Investments** 1:5
  5:23 22:19
  24:21 36:7,20
  113:21 115:13
  123:17 125:5
**investor** 126:13
  172:17
**investors** 36:15
  120:17 121:15
**involved** 14:18
  21:24 124:8
**involving** 155:11
**issue** 12:14
**issued** 6:5 9:17
**issues** 128:2
**Itemize** 158:22
**itemized** 157:14
**items** 66:7

_____ J _____

**Jabbar** 75:3,7
  77:1,1,11 79:2
  79:9,20
**Jackson** 173:10
**James** 44:20
**January** 25:22
  60:13,13,20
  65:5,11 75:13
  75:24 88:18

94:2 130:10,14
  134:20 135:8
  135:12 136:6,8
  139:1,4 144:17
  144:20 166:4
**Jaylen** 173:14
**jeopardizes**
  155:14,18
**jersey** 136:22
  137:2 154:7
**Jimmy** 140:5
**job** 62:22 64:9
  127:21 139:18
**John** 2:8 5:16
  81:24 110:4,9
  167:16 176:25
  177:4
**john@higdonl...**
  2:10
**Johnson** 28:25
  29:1,6 30:16
  170:14 179:12
  180:11 181:14
**Jones** 40:3,9
  180:5
**Jordan** 172:5
  177:25
**Joshua** 15:16,23
  171:18 172:2
  180:9
**journalists** 138:7
**Jr** 148:11,13
**Judicial** 23:8
**July** 132:10
  182:4,6,11
**jump** 13:1
**Jumping** 16:17
**June** 23:5 112:17
  128:21 132:10
**jurors** 40:12
**jury** 7:24 66:20
  71:19,25 74:12
  123:2,8,10
  124:14 145:1
  155:8

_____ K _____

**Kaiser** 174:7,8,9
**keen** 120:16
**keep** 30:18 41:23
  92:15
**Keldon** 28:25
  29:1,6,13 30:16
  170:13 179:12
  180:11 181:14
**Keldon's** 29:10
  29:17
**keldonjohnson**
  170:11
**Kelly** 40:1,9,17
  100:14 101:19
  102:3 103:3
  163:20,22
**Kenny** 141:18,21
  141:24,25
  142:8,10
**kept** 47:17 64:1
  120:13 159:19
  162:7
**kid** 14:15 151:1
**kids** 151:2
**kind** 17:24 19:5
  49:22 159:14
**Kings** 89:17
**knew** 30:8 47:25
  62:23 97:18
**Knicks** 134:3,6
  134:10 139:3
  142:19 144:3,6
  144:12,19
  145:13,22
  151:17 153:9
  153:17
**know** 6:24 7:23
  7:23 11:17,24
  11:25 12:1 13:5
  15:2,10 19:23
  21:6 23:21
  25:18 26:12
  28:5 29:25
  30:21 32:20

36:9,14 42:8,9
  46:7 48:11 56:9
  56:23,25 58:7,7
  58:8,12 64:2,4
  64:5,6,9 66:6
  69:9 70:19 71:6
  71:20 72:20
  77:3,6,7,8 79:2
  79:5,23 81:6
  82:19 83:13
  85:11,16,18
  86:9 92:19 93:4
  95:5,7 98:22
  102:10 108:10
  108:21 109:22
  114:24,24
  116:13,24
  118:9 122:6,6,9
  122:10,16,25
  123:23 124:17
  124:17 125:7
  125:21 126:12
  137:12 138:18
  139:7 140:2,3,6
  140:6,7,22
  142:12,16
  145:6,12,20
  148:11,17
  151:13 152:3,9
  152:10,11,17
  152:19 153:13
  153:15 154:11
  156:2 157:17
  158:11,17
  159:22 160:2
  161:9 162:8
  163:10,14
  165:22 166:8,8
  168:5,12,15,19
  169:12,14,21
  170:14 171:16
  171:18 172:1,2
  172:19,25
  173:11,15,25
  174:6,21

175:12,20
177:1,18,21,25
178:6,15 179:2
179:10
**knowledge** 30:23
86:7 94:23,24
120:12
**known** 13:7
143:2 185:13
**Kylor** 40:1,9,16
100:14 101:19
102:3 103:3
163:20,22

**L**

**labeled** 34:1
54:12
**lack** 61:22 62:14
63:15,24 64:5
64:12 139:22
142:7
**lacked** 62:1
**LaHood** 1:6 5:23
22:20 24:22
35:15,17,20
113:24 114:11
115:1,5,7 124:1
124:11,14,21
125:2 127:11
127:14
**Lamar** 172:25
173:7,7
**Lance** 2:2
**language** 81:8
93:19 138:19
150:22
**Las** 25:25
**late** 12:17 25:22
90:12 136:5,7
**latest** 135:18
**law** 2:12 4:14
5:16,19 21:1,4
23:21,24
156:16,16
**lawsuit** 12:15

22:18 23:5,11
23:13 24:1,3,19
25:8 33:5 36:15
72:15 112:12
114:4,14,19
115:1 116:1,7
118:22 131:10
131:18,21
132:13,17
137:6
**lawyer** 114:17,24
**LAWYERS** 2:8
**lazy** 175:17
176:18
**lbeshara@pate...**
2:5
**leads** 14:20
**league** 18:23
**learn** 11:20 144:5
**learned** 136:16
**leave** 41:24 90:10
114:20
**LeBron** 44:20
**led** 145:2
**Lee** 140:5,8,9,18
140:23
**left** 41:21 50:12
114:19
**legal** 42:22 67:24
67:25 114:16
124:22
**legitimate** 15:10
**Leslie** 40:3
**let's** 7:1,16 13:1
31:8 47:11 50:4
64:24 78:5
83:12 109:23
110:11,11,14
111:9 145:17
163:15
**letter** 4:14,16
137:10 156:20
156:21,22
157:1,11
**letting** 80:9

**level** 14:11
**liabilities** 77:13
85:11 94:18
**Liability** 4:9
**liable** 115:25
**license** 127:9
**licensed** 12:11,23
**life** 20:15
**lift** 164:18
**like-minded** 18:1
**liked** 143:22
**limited** 4:9 164:1
**limits** 41:2,4,5,10
**line** 12:6 105:24
126:18 184:3
**lines** 106:3
**link** 100:21
103:11 104:13
107:1,23
**liquidated** 73:23
83:10 93:25
**list** 5:21 57:23
133:15,16
140:7 179:11
179:13
**listed** 41:16
45:13 160:21
160:25 181:2
**listing** 181:18,18
**litigation@the...**
2:14
**little** 7:16 10:23
15:8 17:19,20
18:24 30:6
47:10 48:7
69:10 76:7,10
76:22 79:3 86:9
90:3 91:7 92:17
106:23 110:2
111:13 164:13
**lived** 87:25
**living** 7:17 13:17
90:19
**LLC** 1:4,5 5:7,22
5:23 6:24 12:20

22:19 24:21
31:22 32:1 36:7
36:20,23 41:14
45:12,15 51:8
111:24 112:4
113:4 115:13
123:17
**LLC's** 36:11
**local** 29:9
**located** 7:5 20:25
**long** 7:20 9:2
12:10 26:22
49:24,25 62:11
88:8 89:23
91:19 95:4
97:11 133:6
143:2
**longer** 41:20
101:14,20
104:5,16
105:12 110:3
160:5 167:21
181:18
**look** 23:19 45:25
58:14 74:19
106:21 111:9
122:9 139:9
144:17 158:13
161:12,20
181:8,23
**lookalive901**
171:14
**looked** 23:12
28:19,19 93:18
117:4
**looking** 18:11
47:4 54:16 58:8
75:14 92:3
99:10 124:18
132:10 135:17
**looks** 46:14 57:19
**lost** 71:23 129:21
141:19,25
**lot** 56:21 70:10
82:9 108:20

116:20 128:18
135:23 139:7
151:14 164:12
**Luke** 2:2 5:20
6:17,23 10:8
44:7 58:19 66:3
67:2 77:18 82:1
89:1 109:20
114:17 172:14
**lying** 68:10

**M**

**M-A-C-H-A-D...**
174:1
**M-A-N** 182:13
**M-A-Y-A-R** 7:3
**Machado** 173:24
**machine** 1:22
**main** 64:4
**maintained** 48:7
116:15
**maker** 52:10
**makers** 19:5
**making** 33:19
94:17 121:3
137:8 141:7
151:25 152:3,7
**Malik** 178:10
**man** 161:12
**managed** 112:5
**management** 1:4
4:12 5:7,22
6:24 12:19
24:20 31:22,25
36:23 41:14
45:12,15 51:8
52:2,16 55:22
56:6,19 111:23
112:4 113:4
122:1 129:7
151:16,19,22
**manager** 142:19
**managing** 120:7
120:9,11
160:24

Mayar Zokaei - August 3, 2021

**Marc** 178:22
**Marcell** 177:21
178:2
**March** 77:5
78:21 79:8
85:24 89:22
99:12,15
160:12 163:3
**mark** 82:8 93:9
145:18 146:3
147:20,25
152:12 153:7
**marked** 10:17,19
22:22 23:1,2
31:11 50:11
52:6 53:11 54:5
58:15,16,21
59:3 60:3 70:20
74:23 75:1 82:6
84:1 87:6 92:25
93:12 95:15
99:3 101:23,25
106:14,17
111:8 128:15
129:4 156:14
160:7 165:13
179:22
**marketing** 17:22
18:22,22,25
19:7,19 20:9,12
92:5 124:22
160:23
**marking** 22:9
50:15 52:4
**masquerade**
104:20
**masquerading**
105:10
**material** 46:14
46:15
**materials** 104:17
**math** 157:7
**Matt** 18:9 35:1,2
35:6,7,18 36:1
61:18 116:14

119:16 120:12
120:12,25
121:8,23
122:10 125:18
126:11 127:19
**matter** 117:12
**mattered** 176:12
**matters** 35:4,5
**maturity** 51:9
52:21
**Mavericks** 151:9
151:23
**Mayar** 1:9,13,16
3:3 5:5,7 6:19
7:3 8:19 80:14
80:15,17
102:12,13,14
135:18,19
146:14 184:2
185:1,5,13
186:5
**mayar@fsm-s...**
102:16
**McGuire** 101:3,4
101:8
**mean** 12:17,19
16:10,12 17:15
19:1 21:17,20
25:9,18 33:7
40:12 44:4,13
47:21 52:11
63:9 67:6 68:4
72:15 73:4,21
83:15 86:23
94:8 98:18
106:1 117:3
126:5 127:8
136:2 154:25
158:13 164:4
164:10,14
166:21 176:4
180:24
**means** 23:5 27:6
52:12 83:13
**meant** 87:9

**media** 29:17
100:11 146:7
146:18,18,23
147:7 148:6
154:23 155:24
156:9 169:23
170:2 172:22
175:8,12
176:17 177:19
181:16
**Medicaid** 61:7
**meet** 21:21 25:25
28:9,13 70:4
91:13,15,19
162:6,14,17,21
162:24 163:4,7
163:13,16
164:4 165:2
**meeting** 21:21
22:3 89:8 90:22
91:20 92:12
122:9 160:19
161:4
**meetings** 26:1
35:10 70:12,13
**Mehta** 120:13
121:10 172:9
172:16,19
**Melton** 178:6
**member** 113:20
134:15 136:20
**members** 21:19
61:23,25 112:5
112:8 120:11
**members'** 120:7
120:9
**memorialized**
130:5
**memorize** 140:21
**memorized** 155:2
**memory** 144:23
144:24 150:8
**mention** 50:25
61:25 92:2
183:5

**mentioned** 17:11
28:8 58:22 65:4
76:14 80:23
96:23 102:2
112:23 124:7
128:1
**mentions** 49:13
**mentor** 15:8 22:4
**mentored** 14:10
**merchandise**
154:10
**message** 35:11
172:9
**messaged** 146:6
**messages** 118:7
**met** 35:17,18,18
91:4 149:3,9
161:12 163:20
163:22,23
**Meta's** 172:22
**Miami** 89:2,16
89:19,23
159:17 161:13
161:15 162:18
**middle** 77:2
92:16
**mind** 99:17
116:21
**minimum** 28:4,6
41:8
**minor** 38:8,20
46:9,12 67:11
76:13,21 81:5
**minus** 81:17
**minute** 26:4
28:10,15 48:14
**minutes** 50:2
62:12,13 110:3
110:15
**mischaracterizes**
67:3 68:15
**misconduct**
77:14 94:19
**mispronounced**
102:10

**misrepresentat...**
155:12
**missing** 104:6
**misspoke** 58:20
**mistake** 109:18
**mistaken** 108:11
161:19
**misunderstand...**
152:18
**misunderstood**
85:21
**Mitch** 145:17
**Mitchell** 133:19
133:19,22,24
134:14,18
136:3,11 139:2
141:3,19 142:8
142:20 144:7
145:3 151:4,8
153:15 165:1
177:24 178:3
**Mitchell's** 136:3
**modification**
67:9 76:21
79:13
**modified** 67:7
77:7 95:4 98:20
**modify** 79:11
**moment** 177:5
**moments** 93:19
**money** 45:17
47:5,15,22,22
88:1 96:25 97:4
128:9 131:11
157:18 159:23
164:9
**monies** 132:18
157:21
**month** 20:15
26:17 42:25
43:1,17,20
46:20 47:23
63:4 65:1,3,9
65:13 76:17
79:1 83:4

130:15 133:5
157:7
**monthly** 47:16
**months** 27:5
49:11 91:4
116:7,16,22
118:15 132:11
157:6,8 162:18
**morning** 76:2
90:8,9
**multiple** 119:15
**Murphy** 2:8 5:15
5:16 6:16 10:7
10:16 44:6,9,12
67:3,24 68:15
69:17,20 73:6
77:17,24 82:1,5
89:1,6 99:21
104:22 109:20
110:1,6,10,13
110:18 114:15
153:2,10,18
167:17 169:1
183:11 186:24
**mute** 177:2
**mzokaei@gma...**
75:4 108:2

**N**

**N** 2:1 3:1 5:1
**name** 5:15 6:1,23
7:1,3,4 8:5,8,9
8:11,15 30:4,5
36:13,14 80:17
83:17 90:25
100:22 102:10
112:1 140:17
141:21 146:25
148:21 173:9
174:6,12 181:7
182:12,14
184:2 185:16
**named** 101:3
114:13 141:18
142:16 145:17

148:11,17
171:16,18,23
171:25
**names** 5:21 8:24
39:25 112:15
140:4 174:16
**NBA** 8:3 9:9
15:20,20,23
16:3,6,9,13,21
16:23 18:19,20
21:20 26:2
40:11 45:2 46:1
88:21 124:21
134:1 135:22
138:20 140:1
141:10 148:9
148:14,25
149:11 155:17
159:7 160:24
171:6 173:3
175:15 178:1
178:13
**nbadraftgod2**
171:8
**nbadraftgodb**
171:6
**nbainsider** 168:6
169:8
**nbainsider411**
171:12
**NBPA** 3:11 9:3,4
9:5,12,17 11:11
11:17,20,22
12:4,11 14:7
15:4 40:15
45:10 127:9
154:17 155:8
155:21 156:2,8
180:19
**NDA** 56:25
**necessarily**
105:25
**need** 24:15 32:10
44:24 49:25
79:23 110:8

127:1 151:14
**needed** 20:11
24:10,13
**needs** 127:18
**negatively** 83:23
**negligence** 77:14
94:18
**negotiate** 19:19
**negotiated** 19:2,2
19:3 41:7,9
48:17 68:9
82:13,17,20
**negotiating** 29:24
57:18 75:17,21
**negotiations**
12:24 124:23
**neither** 117:10
186:12
**nervous** 147:24
**never** 11:15
14:11 28:18
35:18 38:1,9
39:3,4,6 66:3
76:25 85:16,19
85:23 88:10
92:9,9 94:23
97:24,25 104:7
115:4,12,17
120:24 121:16
123:14 124:1
124:10,12,14
125:10 136:13
136:14 144:10
147:18 148:6,8
148:21 149:8
150:5 151:3
154:11 156:12
162:4 165:3,6
169:4 176:16
**new** 13:4 45:19
45:23 63:2,3
70:23 85:15,16
85:21,25 88:18
103:10 107:23
134:3,6,10

142:10,11
145:25,25
151:17,20
153:9 159:24
160:20 164:22
**newly** 19:23
**Newman** 178:10
**news** 136:1,2,4
137:7 146:1
170:11
**Nicolas** 1:6 5:23
22:20 24:22
35:14,17,20
113:24 114:10
115:1,4,7 124:1
124:20 125:2
127:11,14
**night** 90:7
**nine** 104:10
157:8
**non-NBA** 17:1
**noncompete**
83:11
**noncompetition**
93:25
**nondisclosure**
3:17,22 4:2
54:14 56:5,24
58:1 73:18,19
**nondisclosures**
73:11
**nondisparage...**
72:8,24 73:11
73:18 83:9
93:24
**nonsolicitation**
73:1,10,18 83:9
93:24
**North** 5:10
186:19
**Nos** 93:12 111:8
**NOTARY**
185:23
**note** 3:15,16 49:8
49:14 50:18

51:6 52:8,10,19
53:22,23 129:9
129:10,20
130:6
**noted** 185:3
**notes** 50:14 53:11
54:1 82:11
93:22
**notice** 1:24 4:11
17:17 28:15
108:8 128:8
**notified** 120:16
135:9
**notify** 101:8
**notwithstanding**
118:19
**November** 13:16
13:18 16:17
113:1,11
130:25 131:1,3
132:5,11
**nuances** 57:7
**number** 4:17 5:4
6:2 23:7 37:7
38:16 39:12
54:13 78:18
84:3,4 86:12
87:7 95:11
155:5
**numbered** 1:19
**numbers** 48:19
48:21

**O**

**O** 5:1
**oath** 7:10 96:17
170:16 185:14
186:7
**object** 69:20
**Objection** 67:3
67:24 68:15
69:17 73:6
99:21 104:22
114:15 153:2
153:10,18

Mayar Zokaei - August 3, 2021

obligated 11:9
obligation 71:20
72:1,24 118:13
obligations 39:15
58:9 68:20
oblige 29:25
obtain 19:18
obviously 64:9
135:25
occasion 148:24
occasionally
146:9
Octagon 169:11
169:17
October 13:16,17
16:17 95:19
112:25 131:3
132:11 164:17
offer 20:19
offered 116:10
offering 18:15,21
office 20:24 21:1
21:12 143:15
143:20 144:3,6
153:16 155:17
185:20
officer 20:17
officers 125:20
offices 21:4 70:4
official 138:13
oh 44:9 66:5
71:23 76:11
80:19 89:3,6
99:12 106:18
108:15 110:3
118:25 122:6
142:13 145:8
145:19 148:21
152:13 159:4
168:2 169:2,15
181:1
okay 5:24 10:16
10:18 11:5
13:14 15:19,23
16:5,15,25 17:8

18:2,5 22:9
23:6,14,24 28:8
28:21 29:2,20
30:19,23 32:9
34:18 36:2,6
37:12 38:23
39:16,16,21
40:2 44:12,24
45:8 46:19 48:3
48:13,21 49:2
49:18,20,24
50:5 54:4 57:9
58:16 59:3
60:20,24 61:20
62:5,8 63:20
65:19 66:16
69:1 71:16
72:19 74:5,24
77:10 78:19
81:21 82:23
83:4 84:10,16
84:25 85:14
86:2 87:6,9,18
88:10,22 89:18
89:23 90:2,5,14
90:17,20,22
91:2,9,19,21
92:2,12 93:3,9
94:7 97:15
99:17 100:5,15
100:25 101:4,8
101:24 105:11
105:14 106:12
106:13 108:25
110:1,5,6,16
111:18,22
120:6,11 121:1
121:4,11
122:15,19,22
123:2,8 125:15
126:16 127:10
128:14 129:8
129:13,22
131:21 132:24
133:11,18

135:2,15 136:5
136:11,15,21
136:24 137:15
137:24 138:12
138:23 139:14
141:2,10 142:6
146:2,10,15
147:10,15
148:17,24
149:17,22
150:7,17
151:16 152:22
153:5 155:4
156:9 158:3,7,8
158:24 159:3
159:16 162:23
164:1,23
166:17 168:4
169:3 170:21
170:24 171:5
171:23 172:6
172:19,25
173:10,12,24
174:14,18
180:1,13 181:9
181:11,23
182:2,7,22
183:2
older 149:8
Oliver 180:7
omit 67:15
once 137:12
one-man 17:18
one-year 31:18
37:9 119:5,13
132:1,22
ones 40:4 47:6
93:10 144:6
146:23 147:1
online 13:3
180:18
onset 167:11
oops 123:16
open 47:10 80:20
164:15

operating 8:7,11
17:18
operations 104:2
106:6 107:5,20
108:7 109:4,15
opinion 139:18
144:2
opportunities
18:7
opportunity
14:18 20:14
21:7
opposed 69:3
opposing 10:3
ORAL 1:12,16
order 6:4 43:8
96:24 105:3
137:11 160:15
Oregon 1:23 5:9
7:7 21:13 59:12
59:14 88:14
102:19 103:2
164:15,18
organization
144:3,13,19
151:20 153:9
153:17
original 3:12
23:9 46:7 47:19
71:12 72:11
74:4 157:10
originally 93:4
Orleans 164:22
outcome 186:14
Outgoing 4:11
outlined 87:4
outset 67:20
69:13,18,23
overseas 8:3
15:21 16:4
owe 97:14 157:25
owed 96:15,18
97:4,7 131:11
owing 48:16
owns 8:6

**P**
P 2:1,1 5:1
p.m 1:20 23:6
90:13 183:17
Pacific 1:20 5:3
page 3:2 51:13,16
51:19,22 52:25
53:3,6 55:5,10
55:15 59:9 60:9
82:10 184:3
pages 59:6 85:2
paid 25:21 26:16
26:20 42:10,23
42:25 43:17
46:4,5,23 49:10
60:24 64:25
65:2 96:14
116:3 130:14
131:25 132:3,7
157:21,21
158:23
pair 92:7
pandemic 21:6
161:8 162:4,8
162:19,25
163:17
paper 145:24
paperwork
160:16
paragraph 24:25
31:3,15 33:1
37:1,7 39:11,15
43:16,24 46:1
57:19,25 66:13
66:16 67:7,15
71:4 72:8,8
73:1 81:9 82:14
82:20 83:6
93:20 119:7,21
124:19
parameters
30:20 40:24
pardon 89:1
parents 22:7
parlance 85:11

Dickman Davenport, Inc
214.855.5100   www.dickmandavenport.com   800.445.9548

Mayar Zokaei - August 3, 2021

**part** 11:11 26:14
46:18 49:2
67:25 72:5,10
107:16 108:1
120:3 122:7
127:18 159:23
**partial** 128:9
**particular** 80:12
105:9
**parties** 6:10,11
6:14 45:5,7
57:6 66:22
113:24 118:6
120:15 121:3
**partner** 20:19
**partnership** 29:9
29:15 30:2
**partnerships**
19:4,5
**party** 12:22
73:16 105:10
115:21 135:10
157:19 169:5
170:5 186:13
186:23
**passage** 56:14
58:5
**Patel** 1:5 2:3,17
3:24 4:16 5:22
13:13,15 16:19
17:5,8,24 18:2
18:6,15 19:23
20:5,11,22 21:1
21:4 22:19
24:21 26:1,4,7
26:21 27:4 29:8
34:22 35:5 36:1
37:11 51:7 52:1
52:15 53:14,16
61:14,16,18
68:23 70:3 75:3
75:3 79:10
83:20 112:25
115:17 120:13
120:21 121:23

124:7,20
125:15 170:2
170:10 181:25
**Patently** 142:15
**patience** 183:14
**Paty** 1:21 5:10
6:1 186:3,17
**Paul** 140:7,8,9
178:20
**pay** 29:14,15
46:24 47:8 52:1
65:4,14 73:23
96:25 97:8
128:4 166:23
**paycheck** 60:23
97:11,12
**paying** 46:20
92:6 98:5 132:4
166:15
**payingtoplayrbp**
169:19,24
170:9
**payment** 43:10
65:6 128:9
129:19 130:4
130:10 133:5
157:5
**payments** 53:25
83:2 129:7,13
129:18,24
130:3
**payroll** 61:7
65:16
**PDF** 94:12
**peculiar** 63:6
**Pelicans** 139:4
**penalties** 7:13
**penalty** 59:19
60:4 86:13,24
87:10 97:16
99:18
**people** 18:9
20:12 35:19
40:6 41:18,24
57:16 112:11

116:18 143:20
151:25 152:3,6
152:11,16
156:10 174:15
**perceive** 156:2
**percent** 41:6,7,8
41:9 46:3 48:16
49:3,10,13
**percentage** 45:20
**perform** 29:3,5
70:3 120:6
123:14,24
124:14
**performance**
63:5 64:19
123:18
**performed** 25:20
114:12 116:8
123:4
**performing**
25:23 121:25
122:12,23
**period** 37:4,18
42:1 58:1 88:13
88:23 97:5,8,11
132:1
**perjury** 7:13
59:20 60:5
86:14,24 87:10
97:16 99:18
**permission** 103:2
**Perry** 142:16,24
143:22
**person** 6:13
26:19 27:3
44:25 100:20
101:21 118:11
118:12,12,13
122:9 142:4
162:1,6,24
163:4,7,16,24
165:10 185:16
**personal** 108:13
108:16 143:3
146:24

**personally** 15:15
121:5 185:13
**persons** 111:5
121:5
**Peter** 178:24
**Peters** 172:25
173:7
**petition** 3:12
23:9 33:2,21,24
34:5 44:1 95:14
**phone** 35:10,12
35:13 61:19
62:7,11,20
63:11,21 92:10
100:19 105:7
118:8 161:25
**photos** 103:2
105:10 106:3
**phraseology** 73:6
**pick** 149:23
150:4,6 175:15
**pics** 103:14
**pictures** 100:21
105:4 167:24
168:3
**Pierre** 173:10
**pipeline** 44:5,8
44:22 46:3 47:7
47:14
**piqued** 13:5
**pitch** 21:15
**pivoting** 109:24
**place** 2:9 5:8
164:19,21
186:6
**placed** 15:21
18:19 186:7
**plaintiff** 5:15
23:10 25:3,3
**plaintiff's** 3:12
23:8
**plaintiffs** 1:7,18
2:2 112:14
**plan** 50:4
**planned** 21:8

**planning** 165:9
**platform** 138:17
170:2 175:12
**play** 8:2 14:17
16:13 134:2
**played** 142:20
**player** 3:11 16:10
19:7 21:20 22:1
22:1 45:2 89:16
133:25,25
148:14 151:14
155:14 171:21
171:22 172:4
173:3,3 178:1,9
178:13,19
179:8
**players** 7:25 8:2
9:8 14:22,24
15:9,11 16:3,4
16:6,21,23 17:1
18:18,19,20,22
19:3,16,19
20:20 21:14,18
39:17,18,19,22
39:25 45:3,4
57:22 95:8
135:24 155:15
164:2,4 174:17
179:20
**playing** 117:25
134:4,7
**plays** 148:14
**please** 5:12 6:14
78:14 86:22
101:15 103:10
108:10 118:9
118:10 160:16
**PLLC** 2:3,12
23:21
**point** 13:1 14:20
26:14 48:3
49:22 82:25
104:9 109:21
126:4 164:21
**points** 42:22

Mayar Zokaei - August 3, 2021

pop 126:25
populates 108:18
populating 108:15
position 116:10 143:22
possibilities 108:20
possibility 17:12
possible 78:16
post 138:11 139:2 140:10 140:12 155:25
posted 128:16 139:1 140:16 170:1
postulate 72:5
potential 13:9 15:12 18:10 39:17 48:1 62:24 63:18 64:11,22 91:22 92:20 151:13
potentially 92:21
preceded 48:10
precedence 159:15
predates 84:14
preference 163:4 163:6,11 165:11
preoccupied 158:21
prepared 85:18
preparing 28:6
present 2:16 90:22 147:24 149:22 150:3,9 153:6
presented 37:23 38:15 48:12 68:22 69:24 70:19 72:4 84:3 163:23
presently 7:5

president 20:3,5 70:6 126:23 181:5
press 110:7
presume 72:16 89:18
presuming 82:20
presumption 83:3
pretending 68:11
pretty 20:9 46:14 63:22 116:15 135:24 136:8 154:9
previous 106:20 107:24
prime 137:9
principal 13:8
principals 127:7
prior 33:15 37:23 60:17 65:12 69:13 83:2 84:11 105:4
privately 151:12
privilege 82:4
probably 16:14 28:6 29:18 40:12 98:20 108:17 127:18 136:5 145:16 146:19 155:3
problem 33:18 34:20 38:21 55:3 80:19 133:4 163:16 167:14,19
problems 144:7
procedural 114:18
procedure 1:25 11:22 186:9
proceed 30:22 156:4
proceeding 79:4
process 9:11

11:19,25 26:24 27:10 40:11 77:4
procuring 29:21
produce 98:18
produced 1:17
professional 9:8 14:22,22,24 16:4 17:1 138:16 139:23
professionalism 139:23 142:7
professionally 8:2
profile 140:18 180:22
profiles 175:16 175:22 176:2
prohibit 154:22 155:9,10
project 151:4
projected 175:14
promise 116:19 149:10
promised 51:6 52:15
promises 149:12 149:14
promising 52:12
promissory 3:15 3:16 49:8,14 50:14,18 51:6 52:8 53:11 82:11 93:22 129:9,10,19 130:6
promote 29:17
promoting 139:16
promulgated 45:9
promulgates 40:15
pronounce 102:11

properties 29:7
property 29:10 29:23 30:3
proposed 76:13
prospective 89:12
prospects 15:10 15:13 44:15,17
protect 57:6
proved 137:3 185:14
provide 18:16 19:24 20:13 23:16 43:12 61:16 70:14,15 70:16 98:19,20 127:24 138:7 138:10,11
provided 31:17 61:18,21 62:8 62:10 63:11 87:2,11,23 94:3 96:13 99:3,25 119:4,17 149:25 157:15
providing 26:17
provision 73:2 112:2
provisions 73:10 73:17
provocation 181:20
PUBLIC 185:23
publicly 140:16 144:12 151:7 151:17,19,22 152:16 155:16
publish 137:25 138:1,4,5,12 139:15 147:3 169:5 175:1,4,6
published 137:25 168:21,23 169:1,16 180:14,16

publisher 181:6
pull 22:15 54:20 74:19 79:23 127:1 140:8
pulled 94:15 95:12 119:23 159:25
pulling 85:5
purchase 4:4 84:20 87:14 95:7
purports 55:15 79:20
purpose 63:14
purposes 185:18
pursuant 1:24 6:10 186:8
push 79:1
put 10:9 85:23 97:13 101:16 131:14 164:10 164:12 175:10 181:21,21
putting 13:25

**Q**

quarantine 162:16
question 27:10 30:23 42:20 68:1 69:21 73:8 78:8,12 88:4,5 95:24 122:11 150:2 152:5,25 153:3 179:15 179:21 182:17
questioning 152:4
questions 19:25 56:22 59:6 69:10 77:4,7 158:15 183:10 183:12
quibble 33:16
quick 54:4

Mayar Zokaei - August 3, 2021

**quite** 11:15
**quote** 64:9
    170:19
**quoted** 77:12

_____
**R**
**R** 2:1 5:1
**R.J** 101:3,4,8,14
**R.J.'s** 108:14
**radar** 173:19
**Rahul** 1:4 2:17
    5:22 13:13,15
    16:18 17:5,8
    18:2 20:5 22:19
    24:21 28:10,24
    29:12 30:7,13
    34:22 35:1,5,8
    35:13 36:1
    37:11,22 38:1
    38:13,15 51:7
    52:1,15 53:14
    53:16 61:14,16
    61:18 75:3,25
    75:25 76:23
    77:6 78:22 79:2
    79:10,20 83:20
    87:16 93:6
    105:2,20 106:4
    108:8 112:25
    115:17 116:14
    117:17 119:16
    120:13,25
    121:23 124:6,7
    124:20 125:15
    126:7,20,20,22
    127:5,19 131:2
    135:6 137:7
    159:15 160:10
    160:18 170:2,9
    170:20 173:20
    176:5,12 182:9
    183:6
**Rahul's** 127:3
**Ramasar** 178:16
**ramifications**

    11:25
**ran** 72:2
**rank** 140:2
**rapport** 15:12
    22:8 45:6
**raw** 138:17,18
**reach** 15:11
    21:18,18,25
    22:4,6 27:1
    136:14
**reached** 13:8,11
    16:18 17:5,8,11
    134:15
**read** 5:13 13:3
    34:14,18,19
    46:19 47:7
    58:10 66:19,20
    78:10 154:25
    155:8 185:1
**reading** 66:17
**reads** 32:20
**ready** 30:22 38:9
**real** 64:3 108:21
    172:24 177:3
**RealGM** 4:19
    180:23,25
    181:5
**realgm.com**
    179:11 180:14
    180:17,22
**realize** 100:23
    166:13 170:16
**realized** 108:15
**really** 13:6 40:13
    92:6,9 129:9
    146:5 160:2,13
    164:8,10
    167:18 173:19
    175:23,25
**realm** 19:24
**reason** 56:10
    64:2,4,4 78:20
    80:22 93:13
    126:7 130:8
    136:11 143:24

    144:1 184:3
**reasons** 120:3,4
**rebuttal** 27:3
**recall** 56:13
    58:25 63:22
    66:14,16,17
    71:15,16 72:23
    72:25 74:3
    75:12 76:2,5
    81:13,13 83:25
    85:17,25 91:25
    98:14,15,17
    122:8 138:15
    138:24 139:6,8
    144:22,22
    147:5,9 151:10
    168:23 176:19
    176:20
**receipt** 128:18
**receipts** 43:12
**receive** 43:10
    46:3 48:15 61:1
    87:3,5 96:2
    97:11 182:22
    182:23
**received** 38:10,11
    42:18 51:3
    53:20 60:23
    65:10 72:11
    81:3,3,7 83:2
    85:16,19,21,23
    87:15,15 92:4
    98:7,21 128:24
    182:25 183:6
**receives** 49:3
**receiving** 85:25
    86:3 93:7
    170:18
**Recess** 50:8 78:2
    110:22 177:13
**recipient** 57:13
**recognize** 50:18
    54:14,23,24
    80:22 81:9,25
    111:11 112:15

    160:9 165:15
**recognizing** 82:9
**recollection**
    127:2 135:20
    174:17
**reconcile** 137:4
**reconciled** 137:6
**reconvene**
    110:12
**record** 5:2,13
    6:15 7:2 42:16
    50:6,10 62:23
    64:8,10 77:22
    77:25 78:4,10
    91:24,25 92:1
    110:20,24
    129:6 177:9,11
    177:15 183:16
    186:10
**records** 28:2
    116:5
**recourse** 11:17
**recover** 47:24
    48:1
**recruit** 18:18
    19:17,18 39:17
    159:24 164:2
    173:12,16
    174:14,17
**recruited** 39:18
**recruiter** 60:9
    86:16
**recruiting** 20:20
    44:17 89:9,11
    133:16 162:11
    163:19,23
    164:21 173:8
    173:23
**recruitment** 89:8
**red** 90:8
**Reddish** 178:18
**reduced** 158:1
**refer** 8:17 34:16
    34:17
**reference** 44:4

    160:9 165:15
**referenced** 31:15
    95:14 137:20
**references** 50:14
    82:11 93:21
    133:18
**referencing**
    102:1
**referred** 34:10,12
    42:12 56:24
    87:17
**referring** 32:4
    85:10 87:13
    95:17
**reflected** 85:8
    94:20 95:7
    130:17
**reflecting** 85:17
    85:25
**reflects** 155:13
**refresh** 127:2
    135:20
**refused** 62:5
**regard** 57:7
    118:8
**regarding** 6:4
    18:6,13 26:1
    100:13,14
    101:19 102:3
    112:24 113:14
    121:25 147:6
    158:12 169:17
**regards** 15:20,20
    19:7 24:17
    114:18 135:23
    157:3
**Regency** 2:12
**registered** 8:23
    9:11 15:3
**registration**
    11:11 186:19
**regulates** 9:7
**regulations** 3:11
    9:16 11:16 12:2

    50:24 93:22
    140:12
**referenced** 31:15
    95:14 137:20
**references** 50:14
    82:11 93:21
    133:18
**referencing**
    102:1
**referred** 34:10,12
    42:12 56:24
    87:17
**referring** 32:4
    85:10 87:13
    95:17
**reflected** 85:8
    94:20 95:7
    130:17
**reflecting** 85:17
    85:25
**reflects** 155:13
**refresh** 127:2
    135:20
**refused** 62:5
**regard** 57:7
    118:8
**regarding** 6:4
    18:6,13 26:1
    100:13,14
    101:19 102:3
    112:24 113:14
    121:25 147:6
    158:12 169:17
**regards** 15:20,20
    19:7 24:17
    114:18 135:23
    157:3
**Regency** 2:12
**registered** 8:23
    9:11 15:3
**registration**
    11:11 186:19
**regulates** 9:7
**regulations** 3:11
    9:16 11:16 12:2

Mayar Zokaei - August 3, 2021

rehire 62:25
reimburse 47:14
reimbursed
  119:18 158:10
  159:2
reimbursement
  20:14 43:4,8,11
  116:3 131:22
reimbursements
  43:2 160:1
rejected 27:2
  116:11
related 186:13
relates 129:7
relationship
  30:15 36:12
  45:4,5 66:23
  68:8 69:14,15
  69:23,25 70:1
  70:22,23 79:5
  93:23 134:13
  137:13 142:23
  142:25 143:8
  143:12 146:3
relationships
  15:12 22:5
  44:15 105:5
relative 171:21
  171:23,25
relevant 65:20,20
  72:17
relying 37:22
remain 66:24
  162:20
remaining 49:11
  49:15
remember 12:12
  13:14 16:8 17:6
  24:12 27:15
  30:4,5,10 35:21
  35:23 40:5
  46:11,11,13,18
  47:19 48:6,19
  48:21 49:15
  54:25 56:8,22

57:18,21,24,25
58:3 67:10
70:24,24 71:2
71:11 72:3,10
73:2 75:7 78:6
81:14,15 83:1
83:21,22,24
84:3,10,17,19
84:20,24 85:1,4
85:9 86:2,13
88:24 93:6,20
94:25 95:2,5,17
95:20 98:22
99:6 107:9,25
108:22 109:2,2
109:10,11
120:1,2 122:13
122:18,24
123:5,5,9
126:17 128:11
128:12 130:13
131:1,9 135:16
136:7 148:19
154:20 158:4
161:1 163:21
173:9 174:20
176:15
remotely 1:15 6:3
6:10
removed 113:20
114:11
render 26:19
rendered 25:15
131:13
renders 115:25
rep 135:18
repaid 49:12
53:23
repay 51:7 52:13
52:15
repeat 29:4 45:3
78:7
replaced 113:21
replied 100:20
report 4:13 20:13

25:13 34:21
35:5,6,14,22
36:3,6 43:10
130:9 181:16
reported 1:15,22
34:24 35:23,25
36:5 120:21,23
120:24,25
181:14 186:5
reporter 5:9,13
5:24 6:2,8 9:25
10:1,9 58:19
78:7 80:4 81:16
81:21 186:4,18
REPORTER'S
3:8
reporters 175:8
reporting 20:4
152:14
reports 65:14
70:15 161:21
170:18
represent 5:21
6:24 8:2 15:11
19:16 23:6 75:1
111:18 113:8
129:5 133:22
140:24 142:3
156:16,18
160:3
representation
44:18 92:11
114:18 115:2
124:21,22
134:17 137:9
137:11 142:2
155:15,18
representations
136:19,21
representative
91:22 100:11
101:18 126:9
represented 16:6
17:2 39:2,3
133:15 142:4

163:2 167:7
representing 8:1
8:18 16:21 17:4
23:22 106:1
126:3 133:19
134:16 137:14
represents 140:5
republishes
169:2
request 3:13 4:17
23:9 28:22 29:6
30:1 67:9 85:24
99:8,9,13
118:17 165:18
169:5 170:6
175:6
requested 28:12
38:18,20,23
46:10 49:20
57:20 67:14
76:20 81:5
85:18 86:3
118:11 137:10
165:19 182:23
186:8
requesting
100:21 101:11
105:10
requests 157:4
required 17:20
20:2 24:18
research 15:9
reserve 183:11
residence 90:15
90:17,18
respect 8:25 38:3
39:10 48:14
69:6 71:21
76:21 95:23
105:3 123:3
125:10 127:6
151:1,2
respond 103:17
responded 103:1
103:13

responding 75:12
responds 104:13
response 59:5
76:5 170:21
responsible 63:1
98:4 166:15
responsive 92:9
rest 47:17 62:18
116:8
restate 73:9
restrictions
164:6,18,20
restroom 110:9
resume 26:25
return 20:7 46:3
95:21
returned 88:10
135:6,7
returning 92:19
returns 182:20
retweeted 139:2
review 24:3
75:25 156:22
161:24 186:8
reviewed 24:11
38:18 42:19
161:25
reviews 64:18
revision 94:17
revocation 11:23
12:4
Rich 140:7,8
178:20
Rico 178:14
right 9:2 12:15
15:4 16:14
17:13 19:12,15
21:17,21 23:1
24:11,19,22
25:4 27:12,21
28:1,3,11,14,18
31:2,20 32:6,10
34:2 35:14 36:7
36:18 37:19
39:9 40:11,12

41:18,21 42:21
43:5,15,22 44:2
45:13 51:1
53:20 54:6,12
54:16 55:25
56:11 57:3,16
58:13 64:24
66:8,13 71:19
72:17,23 73:5
73:21 74:6,10
74:20 75:22
77:14 78:5 79:7
80:10 81:17,19
82:7,9 83:4
84:2,8 85:4,5
85:22 86:4,7,25
87:22 88:6
93:25 94:19
95:16 97:2,22
97:25 98:22
99:5,7,20,22
100:7 102:21
102:24 103:3
103:15,16,21
105:18 106:25
107:5,8,13,21
110:13,18,25
111:6 112:2,12
113:1,5,21
115:10,22
118:17 119:13
121:21 122:1
122:17 123:4
123:13,24
124:6 125:7,11
125:16,20,24
126:2 127:17
129:11 130:11
130:21 131:8
131:15,23
132:1,5,8,12,22
132:25 133:7
138:24 139:9
139:12 141:11
143:23 147:15

153:25 154:25
157:7,9 158:6,7
159:12 160:14
160:16 161:13
161:14,21
162:5,6,12
163:7,8 164:6
164:11 165:4
165:24 166:2,4
166:18 167:2,5
167:9,12
170:16 172:9
174:19 179:24
182:16 183:5
183:13
**road** 21:13
**Robinson** 133:19
133:20,22,24
134:14,19
135:18 139:2
141:4,17
142:20 145:3
151:5,8 153:15
165:1
**Robinson's**
177:24 178:3
**ROE** 124:20
127:10,16
**ROE-BRG** 1:5
5:23 22:19
24:21 36:6,11
36:20 123:17
125:5
**role** 20:2 127:3
**romanette** 73:24
73:25 74:1,2
**room** 6:9 70:10
**rooms** 29:14,15
30:1
**ROR-BRG**
113:21 115:13
**roster** 22:2
**roughly** 27:23
61:6 62:12
150:9

**route** 163:12
**rule** 155:5,5
186:9
**ruled** 42:14
68:24
**rules** 1:24 9:16
11:8,10,14,16
11:21 12:2,7
154:19 155:1,2
155:9,10
**run** 133:7 167:13
**runner** 141:17
**running** 70:11
**rush** 23:17

---

## S

**S** 2:1 5:1 181:12
182:13
**Sacramento**
89:17
**safe** 123:22
**sal** 82:19
**salary** 82:12,17
157:5,7
**San** 1:3 13:4 21:1
21:3 29:8,11,18
29:19,23 87:22
88:5,15
**satisfaction**
116:23
**saved** 72:16
**saw** 66:20 80:25
82:9 83:10,11
93:17 94:15
106:24 107:7
107:12 119:7
119:20 120:21
124:6 131:23
150:21 181:16
**saying** 56:9 66:1
68:11 152:6,9
152:21 167:25
168:2 171:1
176:19,20
**says** 25:8 31:21

33:4,6 34:9,21
37:2,18 46:3
47:3,18 49:10
51:8 57:14
60:14 75:24
135:17 147:20
160:18 169:23
170:9,9
**scam** 170:19
**schedule** 21:20
**Schoeffler** 4:5,7
102:18 103:1,6
103:13,18
104:4 106:25
107:7,17,21
**school** 22:4
**scope** 20:3
**Scott** 142:16,24
143:22 173:24
177:21 178:2
**screen** 9:20 10:19
31:13 54:8
58:18 59:2
74:25 81:19
82:8 84:9 93:3
99:10 106:22
111:10 128:17
129:3
**screenshots**
78:15
**scroll** 54:21 76:7
76:10
**scrutinized** 58:11
**seal** 185:20
**search** 140:23
**season** 22:3
92:16,18
**seated** 7:9,14
**second** 22:16
31:3 49:14
51:19,22 53:6
54:3 74:22
129:14
**seconds** 62:15
**secret** 69:2

**Secretary** 111:20
113:9
**secretly** 68:13,18
69:7 116:21
**section** 77:12
**secure** 27:6,8
29:9,22 30:14
30:17 45:22
**secured** 30:3
48:17 49:8
72:16 142:10
142:11
**Sedrick** 2:11
5:18
**see** 10:14,20 13:9
15:9 16:9 22:24
23:2,3 30:14,16
31:3,8 34:10
37:1,4 43:24
44:11 46:1
48:13 50:16
51:9 54:8,9,10
54:17,19,22,24
55:22 56:1,7
58:11 64:7 76:7
76:10 77:10
78:5 81:9,19
82:20 83:11
85:10 98:7
104:4 107:3
111:24 112:5,8
112:17 113:11
113:22 114:1
117:9 124:23
129:15 130:17
133:12 135:23
138:20,25
140:23 144:18
159:9 161:21
177:3,5 179:25
**seeing** 107:25
181:23
**seeking** 131:16
131:21 133:5
**seen** 10:24,25

Mayar Zokaei - August 3, 2021

57:2 80:23
98:23 103:24
106:16 107:2
107:15 111:10
111:14,16,17
140:9,12,20
156:20 174:12
**seller's** 77:13
94:18
**selling** 154:10
**send** 10:5,6,7
38:22 53:16
95:3 102:18
103:5,10 158:5
160:16,19,23
162:25 163:15
**sending** 75:7
82:4 88:1
100:23 104:12
105:8 126:18
**sends** 107:1,23
**senior** 103:15
**sense** 63:10
105:14 118:4
162:23
**sent** 30:7,20 38:7
46:8,16 47:20
74:4 75:25
76:22 77:8,11
78:23 79:9
84:18,19 85:15
93:4,13 95:6
98:24 100:21
109:11 118:7
156:23 157:19
157:22,23
158:6
**sentence** 31:2,3
32:25
**September** 59:17
132:11
**sequences** 65:4
**series** 84:17
160:9 167:13
167:24 168:3

**serve** 19:22
**served** 125:21
**server** 99:25
**services** 18:21
112:2 114:13
120:6 122:12
122:23 123:3
123:14,19,24
124:15
**set** 11:10,14 12:8
18:12 22:3
33:11,25 37:15
40:24 72:7
82:12,21 86:18
98:2 159:15
**seven** 110:15
132:11
**Shannon** 174:3
**share** 9:19 10:19
31:9 54:8 57:16
58:18 74:25
93:2 128:17
129:3
**shared** 54:6,10
58:16 74:24
84:2 101:24
156:15 160:8
**Shawn** 91:1
102:18 106:25
107:7,17,21
148:17,19,22
148:25 149:2
149:10,22
150:3,5,10,16
150:17 151:1
**shoe** 138:9
**shoes** 92:8
136:22 154:7
**shoot** 118:25
**shooting** 139:2
**shop** 17:18
**shorthand** 1:22
6:2 186:3,18
**shortly** 21:5
135:6

**show** 22:9,23
31:12 50:14
52:4 92:21 93:1
130:8 179:23
**showing** 129:13
**shows** 32:15
129:15 139:22
**shut** 161:9
162:11 164:17
**shutdown** 21:9
**shutting** 162:9
**side** 14:19 19:10
20:10 49:4
**sign** 15:2,21 38:6
38:9,12 39:19
39:21 40:16
41:12 66:10
67:2 86:4,6
95:21 117:14
134:18 159:18
159:19,20
161:24 164:25
165:3 173:5
177:16,17
**signature** 3:7
51:18,21 53:5,8
54:25 55:15,16
55:19,20 56:11
59:7,8 84:13
102:6 104:1
106:5 107:4,19
108:6 109:14
126:18 166:1
184:1 185:2
**signatures** 56:7
56:10
**signed** 6:5 15:14
15:16 16:12
17:20 30:11,19
30:24,25 31:1
38:1,4,7 39:4,6
39:20 41:11,24
42:1 44:16,18
45:8 53:13
56:18 59:16

66:1,3,25 71:17
74:8 75:22
84:13 86:13
92:13,23 96:3,8
97:24,25
117:10 118:6
118:17,20
119:11 134:10
142:5 159:6
162:15 163:1
163:20,25
**significant**
135:22
**signing** 44:20,25
45:1,18 49:10
49:12 79:5
91:23 138:9
**Silva** 89:14 90:23
91:3,6,9,13,15
91:19 92:13
148:22 159:17
160:13 161:6
161:13,24
162:5,15 165:3
**Silva's** 90:14
**Simi** 174:11
**similar** 18:1
69:10 81:7
117:5,7
**similarities**
106:22
**simply** 100:20
**sir** 150:2
**sit** 21:11 27:21
51:25 72:20
**sitting** 92:14
182:19
**six** 97:8
**skilled** 14:17
**skills** 64:8 178:3
**slam** 146:19
**slammed** 144:18
**slamming** 155:17
**slightly** 10:24
84:14

**smaller** 13:6
**Smith** 15:16,24
148:11,13
180:9
**snap** 81:25
**snapping** 80:10
**social** 29:17
146:7,18,22
147:7 148:6
154:23 155:24
156:9 169:23
170:2 172:22
176:16 177:18
**sold** 136:23 137:1
137:1 154:6
**solicit** 26:7 57:22
**somebody** 13:8
15:7 105:25
121:13 124:8
135:9 140:23
160:3 166:19
171:1
**someone's** 83:17
**son** 149:2,4,4,6,6
149:8,11,13
150:18,19
**sorry** 27:18 29:4
30:5,25 44:6
58:20 60:1 67:5
71:23 74:22
89:6,10 92:18
111:13 129:21
133:21 143:9
151:18 153:14
169:12 179:4
**sort** 28:6 38:11
45:6 48:8 87:3
100:3 133:2
173:20
**sound** 69:10
176:22
**sounding** 19:22
19:25
**sounds** 110:18
176:4

Mayar Zokaei - August 3, 2021

source 181:17
Southwest 59:11
SPAC 40:19 45:9
  46:1 92:13,23
  134:18 160:20
  160:24
speak 114:19
  181:4
speaking 11:2
  77:6
special 149:15
specialize 124:21
specializes 125:2
specific 139:6
specifically 11:24
  14:21 18:9
  28:25 70:10
  121:12,18
  122:13 123:6
  126:17 139:8
  140:21
specify 86:22
speculate 153:14
  154:12 156:3
  157:2 178:5
speculation
  153:11,19
spell 182:12
spelling 7:2
  46:12
spend 27:13
  28:17
spent 176:7
split 48:23
spoke 13:12
  112:24 124:1
spoken 35:20
  83:18,23 115:4
  172:8
sports 1:4 4:12
  5:6,22 6:24 8:9
  8:10,13,25
  12:19 14:4,6
  24:20 31:21,25
  36:23 41:13

45:12,14 51:8
52:2,16 55:22
56:6,19 86:15
100:4 107:19
111:23 112:4
113:4 122:1
124:21 125:11
129:7 146:20
sportswriters
  145:12
spread 17:19
spreading 141:3
  141:4
Square 2:12
staff 70:5 143:16
Stagg 2:11 5:18
  5:18 186:25
stand 7:14
standard 40:14
  40:21 41:10
  45:9 73:4,7
star 29:9,23
start 7:1,16 25:19
  106:23 130:22
  141:4 145:17
started 13:4
  33:13 60:19
  130:20 131:3
  132:3,25
startup 13:7
state 1:21,23 5:12
  6:4,14 37:8
  95:14 102:19
  103:2 111:20
  111:21 113:9
  114:4 151:7
  185:10,24
  186:1,4
stated 43:25
  139:5 157:13
statement 5:14
  5:25 24:16
  25:10,11,12
  31:5 124:18
  125:6 157:15

statements 24:7
  24:17 59:22
  60:2 141:7
  156:25
states 1:1 43:16
  103:9
stay 177:8
stenographically
  186:6
step 15:4
stint 14:8
stipulate 6:11
stipulations
  70:16,17
stole 154:6
stolen 136:24
stop 108:10
  141:3
stopping 49:22
Street 59:12
Strike 38:8
string 3:19 4:5,7
  4:15 75:2
  106:16
stubs 65:14
stuff 7:23 38:2
  96:23 114:22
  124:18 126:1
  152:3 159:4
  163:15 164:11
styled 5:6
stymied 137:14
subject 7:12 9:16
  11:21
submit 38:12
  43:10 76:18
  166:11
submitted 76:18
  76:25 98:12
  166:14
subscribed
  185:16
subsequent 65:5
  68:22 92:18,18
  95:3 132:16

135:25 162:18
subtract 157:25
successful 29:20
sued 24:19
suggest 176:14
suggested 144:8
suit 113:25
Suite 2:4,13 5:11
  186:20
superstar 140:24
supervision
  127:12,20
support 20:9
  43:13
supposed 20:24
  28:9 42:4,10
  43:7 45:17 70:8
  70:15 81:12
  98:10 104:16
  157:18,20
supposedly 154:6
Supreme 6:5
sure 11:15 12:7
  22:17 33:16,19
  35:25 62:21
  63:7 65:13
  69:12 72:22
  74:12 77:24
  79:7 80:7 81:2
  84:8 86:11 94:8
  117:6 119:3
  123:20 136:8
  143:18 178:11
surprised 93:18
  139:10 144:5
  147:22
survive 159:24
swear 5:14,25
  59:22
switch 108:4,11
  108:17,25
switching 142:2
swore 60:4 87:10
  96:17 97:15
  99:18

sworn 1:18 6:9
  6:12,20 7:8
  97:9 157:12

T

table 19:6 45:20
take 9:15 15:3
  26:12,22 27:11
  41:22,25 42:11
  77:3 109:21
  110:12 118:9
  118:10 163:19
  167:15 172:14
  178:3
taken 1:18 103:3
talk 18:8 49:23
  80:11 83:12,16
  162:8
talked 82:11 83:7
  91:7 94:22
  101:6 120:19
  154:19
talking 12:17
  19:9 77:16
  97:21 130:13
  131:2 136:15
  141:7 170:22
tall 14:16
tape 5:4
tasks 25:20,23
  26:9 27:20 29:3
  29:5 70:3
tax 182:19
taxes 61:7 96:10
  98:5 166:16,21
  166:24 183:3
taxpayer 4:17
  165:18
teach 15:8
team 16:13 17:17
  20:11,12 26:1
  26:14 61:24,25
  64:6 142:20
  143:8,15
  155:18 160:2

Mayar Zokaei - August 3, 2021

162:16,22
163:10 164:6
**teams** 135:23
151:14 156:1
**technicality**
38:21
**telephone** 122:19
**tell** 18:5,24 27:19
27:22 28:2
32:23 39:14
58:7 62:5,13,18
62:22 64:2
65:21 76:16
85:14 89:4
101:18 105:20
106:4 114:25
115:24 121:11
121:12,21
122:3,4,11,15
123:2,8,10,18
138:23 140:4
149:17 158:19
160:12 169:4
170:25 172:16
181:13
**telling** 37:21
64:21 67:14
68:9 71:19,25
71:25 74:12
75:13 76:2
104:24 109:18
125:22 126:1
145:1 152:6,7
152:16
**ten** 16:14 110:3
**ten-minute**
109:22
**term** 48:4 119:13
**terminate** 63:14
116:25 144:8
**terminated** 61:10
61:13,17 62:14
63:8 64:16
99:19 100:5,17
101:2,9,20

104:9,16,20,25
109:5 127:25
145:4 153:16
153:22,24
154:2 159:22
163:18
**terminating** 64:3
64:20 136:12
145:3
**termination** 35:9
58:2 63:6 99:23
137:10
**terms** 37:15,24
66:13,15 71:4
72:7 73:2
122:12,23
123:18
**test** 9:15 15:3
**testified** 6:20
**testify** 158:14
**testifying** 44:2
**testimony** 6:12
7:12 58:23 67:4
68:16 76:14
127:19 131:5
152:1 168:13
180:20 186:10
**Texas** 1:2,22 2:4
2:9,13 5:11,17
6:1,6 21:2,4,13
22:20 25:12
26:18 42:13
58:24 68:21
87:19,21,24
88:3 111:19,21
113:9 114:7
131:12 164:14
186:1,4,20
**text** 35:10 118:7
122:19,21
172:9 177:3
**thank** 30:21
78:20 107:12
**thanking** 103:18
**thanks** 75:13

107:12
**thin** 17:19
**thing** 23:12 54:17
58:10 115:12
117:23 125:5
152:19 154:12
**things** 19:10 73:4
73:7 105:3,23
119:2 122:14
125:2 151:25
162:21 164:10
167:13 170:12
**think** 10:13
26:14 27:3,7
30:16 46:15,15
47:4,21 77:17
90:13 95:3,13
98:14 106:9
107:11,16
130:8,19 131:4
135:7,8 138:16
139:12,14,18
139:22 148:21
151:11 155:23
160:18 161:16
163:12 167:22
175:21 176:9
178:2
**thinking** 164:14
**third** 40:4 169:4
170:5
**thought** 14:17
47:5,12 65:25
79:25 80:13
85:20 104:19
104:25 114:25
117:25 166:14
169:2 175:7
**threat** 141:6
**threats** 141:2
**three** 16:24 58:1
59:6 81:17 88:9
93:10 112:5,8
112:11 116:16
116:22 118:15

162:18
**three-month**
116:11
**threes** 139:3
**thresholds** 41:10
**ticket** 149:15,25
**tickets** 149:11,18
149:20,23
150:4,6
**time** 1:21 5:3
6:15 8:7 12:12
12:23 13:20
16:2,18,22,23
17:5,7,21,24
18:18 21:14
25:12 26:6,9,15
26:15,20 27:13
28:2,17 30:4
35:8 40:5 44:16
44:19,19 48:5
50:7,10 56:14
58:5 60:17
61:17,22 63:4
63:16,17 64:6
64:23 65:12
66:20 68:13
69:4,8 78:1,4
82:13 87:21
88:6,25 90:11
91:6,24 95:5
101:11 105:2,8
109:1 110:21
110:24 112:24
114:3,6 117:4
118:10 124:8
128:4,8 134:4,8
134:17,21,22
135:25 136:14
136:16 137:3
137:11 140:25
149:5,9 150:12
153:4,20
163:22 175:9
177:12,15
183:10,12,16

186:6,23
**timeline** 99:6
116:14,17
**times** 76:23 101:6
**timing** 103:14
107:8
**tip** 138:8
**title** 34:11 67:16
70:6 84:7,14
126:11 127:8
**titled** 23:8 31:13
54:13 59:4
65:22 68:5
97:22 167:6
**today** 5:3 7:6
13:23 44:2
51:25 72:20
**Todd** 178:16
181:10 182:15
**told** 24:14 27:4
30:13 32:3 36:1
36:17 38:13
41:22 62:19,21
62:22,23,24
63:1 66:6,12
67:11 92:15
95:13 104:4,7
105:12,15
106:1 108:9
117:21 118:1,3
120:20,22
121:14 122:14
123:3,9,14,23
124:14 126:12
127:23,23
128:3 131:2
132:24 141:10
142:3 143:10
146:23 149:23
150:3,5 153:22
153:23 157:15
160:4 162:19
162:21 163:7
166:25 172:8
176:4,16

tonight 139:4
top 4:5,7,15 76:6
   82:10 175:14
Torren 40:3,9
   180:5
total 53:17 59:6
touch 92:15
   120:14 159:19
   162:7
tournament
   161:11
track 62:23 64:8
   64:10
tracking 33:8
Trae 169:13,14
trained 114:24
trainer 90:24
   91:5,8,10,12
   148:20,22
   177:24
trainer's 90:25
training 139:3
   159:5,7
transaction 4:13
   65:14 130:9
transfer 128:18
trash 153:9
   156:10
travel 21:7 88:13
   88:17,22 89:7
   159:24 164:2
traveled 89:2,18
   89:19
traveling 88:24
   118:12
treated 65:16,18
trial 116:11
   153:4,20
   183:12
tried 27:4 173:5
   173:16 174:14
   174:17
trip 21:8 28:13
   88:15 135:7
   159:17 163:23

164:22
trips 162:11
   163:19,22
true 24:8 25:9,11
   25:11 31:5 32:7
   59:23,25 60:4,7
   60:12,15,17
   61:10,13 86:14
   86:15,18,20
   87:18 96:13,17
   97:15 98:2,4
   111:4 119:18
   119:19 120:8
   121:2 125:14
   137:4 157:1
   164:1 185:3
   186:10
trust 26:12
   114:20
trusting 38:4
truth 141:4,8
truthful 23:16
try 9:25 15:11
   19:18 21:23
   26:7 41:23 80:6
   110:14 116:22
   173:12
trying 21:10
   23:17 28:21
   29:5 103:9
   107:2 118:21
   147:10 178:3
Tubbs 2:17
Tuesday 5:3
TWC 60:16
   97:10 98:8,13
   157:15,23
Tweet 139:6
tweets 138:12,21
   139:7,11,15
   140:10,16,22
   150:22
Twitter 137:17
   137:19,24
   138:17,19

140:18,23
141:3 144:13
144:17 146:8
168:6 169:20
170:8 175:15
175:22 176:1
two 27:7,14 33:8
   40:3 56:8 60:25
   64:10 65:3 77:7
   83:2 89:25 90:4
   90:5 103:23
   105:23 108:12
   108:23,24
   109:10 162:18
   163:21
tying 33:19
   147:21
type 7:25 73:10
   154:22
typical 154:9
typo 67:12

_____

U

Uh-huh 14:2
   45:11 46:22
   79:7,22 82:22
   94:10 96:19
   107:6 112:7
   130:16 154:18
   164:16 182:18
ultimately 22:18
   118:16 119:12
umbrella 20:18
uncomfortable
   79:4
uncommon
   138:18,24
   139:13 140:24
undated 31:21
underbelly 40:13
underlying 116:2
underneath
   159:25
understand 7:8
   8:12 12:19

40:13 79:8
127:5 143:7,11
143:14 152:4
166:6 179:21
understanding
   38:3 48:8
   132:19 159:6
understood
   66:25 67:20
   104:15 143:18
Unfortunately
   14:16
union 9:6
UNITED 1:1
unlawful 155:11
unreimbursed
   96:20
unrepresented
   21:18
unusual 128:10
updates 35:11
   70:14,14
upload 78:14
   129:2
uploaded 78:14
   79:15 80:8 93:2
   103:14 106:15
   109:24 165:14
   179:24
uploading 79:16
use 70:6,7 93:10
   99:24 100:6
   103:2 105:17
   105:21 106:5
   110:8 116:21
   137:17 140:25
   146:7 147:6,17
   147:17 155:24
   156:9
uses 166:20
   168:5

_____

V

vacation 28:9,12
value 82:21

Varner 40:3
Vegas 25:25 28:9
   28:18,18
verbiage 116:21
   140:25
verdict 25:15
   42:17 68:20
verge 163:2
verification 26:5
   26:23 27:8,11
   131:5
verified 27:1
   175:16,22
   176:1,6,10,17
verify 94:11
version 80:24
   85:21 98:24
   99:3 117:11,12
   119:12
versions 81:4
   119:12
versus 5:7
vice 20:2 70:6
videoconferenc...
   6:8
Videographer
   2:17 5:2 50:6,9
   77:21,25 78:3
   80:6 110:20,23
   177:8,11,14
   183:15
VIDEOTAPED
   1:12,16
view 10:24
viewed 144:2
violating 11:20
virtually 70:13
visit 21:5 148:24
visited 29:11
   91:5,5 144:6
visiting 92:7
   161:11
volume 5:5
VP 104:1 106:6
   107:5,20 108:7

Mayar Zokaei - August 3, 2021

109:4,14
**VS** 1:8

___

**W**

**W-4** 166:7,8,10
**W-9** 165:22
166:7,9,11,14
**wage** 3:18 58:23
59:4,19 60:3
86:10 95:16,18
95:18 99:18
114:7 131:23
157:12
**wages** 87:18 88:3
96:18 116:8
158:23 166:16
166:22
**wait** 38:13
163:16 168:23
170:11
**waive** 82:4
**want** 10:4,5,6
16:3 22:12
23:15,19 27:19
27:23,25 41:3
54:17 62:6
77:20 78:8 82:3
84:7 93:16
110:4,4,6
118:19 145:8
145:10 147:15
160:15 163:9
167:15 172:14
175:10 177:2,8
**wanted** 14:14,15
14:21 30:14,16
70:10 116:19
129:22
**warm** 143:1
**warned** 118:4
**wasn't** 14:16
27:10,20 28:16
30:15 63:7
65:13 69:16
74:8 92:6 104:7

116:23,24
118:20 149:6
157:18 158:3
**watermark** 38:12
80:23 81:2,7
95:11 117:16
**way** 20:1 22:8
27:22 46:19
47:9 54:21
77:10 94:13
117:1,20 151:1
154:20 160:2
164:15
**we'll** 9:25 30:22
38:21 48:13
49:22 93:10
95:9 133:2
183:6
**we're** 12:17
20:20 30:22
32:20 43:15
49:21 50:6,9
55:1 77:25 78:3
80:11 86:9
97:21 107:1
110:20,23
118:24 129:13
132:10 167:12
177:11,14
182:16,19
183:16
**we've** 109:20
117:9
**website** 179:13
**Wednesday** 79:8
**week** 65:9 76:19
**weekend** 88:21
141:11 147:6
148:9,25
149:11
**weekly** 35:10
70:12,13
**weeks** 21:6 27:7
27:16 60:25
**went** 11:19 28:18

69:25 79:21
87:21 88:5
90:15,17,20
118:14 141:10
149:23 150:3,5
161:12 162:4
163:23
**weren't** 47:5
65:15,15
149:24 150:4,6
162:10,10
163:12 176:17
**West** 2:3
**WESTERN** 1:2
**whatnot** 20:1,10
46:13 77:2,4
87:15 95:8
135:24 137:2
138:9
**wilful** 77:14
**willful** 94:18
**Wilsonville** 1:23
5:9 7:7 59:12
**wire** 4:11 128:18
158:6
**wired** 128:9,10
128:22 157:14
**withheld** 61:8
166:21
**witness** 1:17 3:2
3:6,7 5:14,25
6:8,9,12,18 7:9
7:14 9:23 49:19
49:24 50:1,5
69:19 80:15,17
80:19 89:3,4
110:2,8,11,16
153:6 167:15
167:18,21,25
168:4 176:25
177:4 183:8
184:2 186:7,11
**wondering** 80:24
**Wooten** 141:24
**word** 38:5 83:13

146:20
**words** 37:10
145:8
**work** 8:25 12:6
13:10 17:23,25
20:17 21:10,24
28:24 33:9,13
48:2 60:19
62:25 63:18
64:11,22 65:10
65:13 70:8
92:20 94:13
110:17 116:6,8
116:12 120:4
121:16,25
122:5 125:11
130:20,22,24
131:3 132:4
138:6 152:10
160:4,5 175:8
**worked** 14:3,8,11
14:11 18:9
26:21 60:7
73:13 97:8
102:24 128:4
173:8
**Workforce** 25:13
26:18 42:13
58:24 68:21
87:24 96:24
114:8 128:6,7
131:13
**working** 13:19
13:21 17:12,15
19:6 25:6,19
27:7 28:22 33:2
60:22 75:14
91:5 92:21
123:1 132:25
138:6 142:25
143:8,11
**works** 40:14
114:22 124:18
**world** 14:15,19
**worth** 2:4 157:6

**wouldn't** 68:6
93:17 123:22
140:3 163:10
176:11
**wrap** 182:16
**write** 88:2 145:24
**writing** 74:9 76:5
**written** 47:9
70:14 75:18
86:21 87:1,10
87:17 95:1 98:8
98:12,19
118:20
**wrong** 24:16
139:20 167:4

___

**X**

**X** 3:1

___

**Y**

**y'all** 102:11
**yeah** 8:20 10:7
11:24 16:2,16
25:14 31:4
32:19 33:7 47:2
49:21 54:19
63:22 67:13
68:4 71:24
74:16 75:21
77:19,23 78:9
78:13,17 81:14
84:10,22 85:23
88:4 89:3,7
90:9 94:22
95:10 98:15
105:16 106:19
106:20 108:22
110:10,11
117:5,5,9
124:10 126:6
126:24 128:3
128:13 134:24
135:14 137:16
139:19 140:18
142:13 143:2
145:10 148:15

Mayar Zokaei - August 3, 2021

151:3 152:13
153:1 154:8
156:13,22
158:4 159:20
161:2,3,18,19
161:19,22,22
165:3 167:20
169:21 171:3
172:10 173:2
173:22 174:2
177:4 181:1
**year** 12:12 37:4
37:19 95:19
103:15 109:10
114:12 116:20
117:8 119:11
124:5 133:3
134:23,24
139:8
**years** 7:22 12:13
27:14 56:8 58:1
109:10
**Yep** 177:7
**York** 88:18 134:3
134:6,10
145:25,25
151:17,20
153:9
**Young** 169:13,14

---

**Z**

**Z-O-K-A-E-I** 7:4
**zero** 53:25
**Zokaei** 1:9,13,17
3:3,20,24 4:6,8
4:16 5:6,7 6:19
6:23 7:3,18
8:19 10:20 11:3
34:15 44:14
50:12 54:9,10
57:13 58:22
68:1,2,17 73:8
75:2 77:17
78:12 79:17
83:13 89:2

110:25 120:19
129:6 133:10
135:18,19
146:14 152:2
184:2 185:1,5
185:13 186:5
**zokaeiworld**
137:20 138:13
**Zoom** 35:10

---

**0**

**0** 49:10
**0:00** 186:24,25

---

**1**

**1** 3:11 5:4,5
10:17,20 11:5
11:10,14 12:8
60:9 73:24
154:20
**1-31-20** 3:24
**1-31-2020** 82:23
**1:18** 78:1,2
**1:22** 78:2,4
**1:56** 23:6
**10** 3:11,22 28:7
29:18 84:1,3,4
139:1 157:6
**10-31-22** 186:22
**10,000** 49:7 50:20
50:25 51:3,8
52:1 53:17,22
129:10,19
130:4
**100** 46:3
**101** 4:6 5:11
186:20
**106** 4:8
**1099** 182:22
183:6
**10K** 3:15
**10th** 139:4
**11** 3:24 7:22
24:25 31:3,15
33:1 37:7 73:1
73:24,25 74:1,2

92:25 93:2,13
93:14 124:19
127:1
**11,000** 158:2
**11,500** 131:22
**11,589.08** 96:20
157:13
**11:32** 1:20 5:3
**111** 4:9,10
**11868** 59:11
**11th** 78:21 79:8
85:24 99:12,15
**12** 3:25 49:11
93:9,12,14,14
93:16 161:10
**12-year-old**
150:9,18,18,23
**12,500** 42:25
43:17,20 46:20
65:10 83:4
133:5 157:7
**12:30** 50:7,8
**12:36** 50:8,10
**128** 4:11
**129** 4:13
**12th** 161:5
186:15
**13** 4:2 93:10,14
**14** 4:4 15:18
93:10,12,14
155:6
**140** 2:13
**14th** 59:17
**15** 4:5 28:7 29:18
101:23,25
102:1 103:9
106:24 107:16
111:2 176:7
**150,000** 43:17,22
**156** 4:14
**15th** 64:25 65:3
97:5
**16** 4:7 106:14,15
106:17,18
111:2

**16,000** 158:2
**16,589.08** 157:12
**160** 4:16
**165** 4:18
**16th** 112:17
**17** 4:9 109:24
111:8,9
**179** 4:19
**17th** 49:7 50:22
51:1 182:11
**18** 4:10 109:25
111:8 113:7
124:6
**184** 3:6
**185** 3:7
**186** 3:8
**19** 4:11 128:15,16
130:11
**1st** 25:7,16,21,24
32:16 33:3,5,6
33:10,14,14
37:3 60:13
64:25 65:2
135:15

---

**2**

**2** 3:12 22:10,22
22:24 23:25
24:8 25:1 31:16
32:5 33:1,10,23
34:7 37:1,8
41:8,8 44:2
55:10 59:9
73:25 82:10
118:25 119:7
124:19
**2:13** 110:21,22
**2:22** 110:22,24
**2:30** 50:3
**2:35** 50:4
**20** 4:12 62:12,13
62:15 106:7
129:2,4 130:1
175:14
**20-** 63:20

**20,000** 73:24
**2013** 15:18 16:1
**2014** 16:1,2
**2015** 16:2
**2017** 112:17
**2018** 113:11
**2019** 12:17 13:16
13:18 16:18
25:17,21 26:21
49:8 50:22 51:1
112:21 113:1,5
130:5,21
131:11 132:25
134:5,20
**2020** 23:6 25:7,22
25:24 32:16
33:3,10 37:3
51:9 52:21
59:17 60:13,21
61:11 94:3
99:19 100:17
102:21 109:6
128:21 132:5,8
134:5 135:20
144:21 148:25
154:3 162:10
164:24 166:4
182:5,6,20
**2021** 1:14,20 5:4
52:1 182:17
184:2 185:21
186:16
**20th** 61:11 97:5
99:19 100:5,17
104:15 109:5
163:18
**21** 4:14 156:14,16
**214.855.5100**
186:21
**22** 3:13 4:15
160:7,8
**221** 2:3
**22nd** 60:13,20
65:5 130:14
**23** 4:17 165:13,14

Mayar Zokaei - August 3, 2021

166:2
**23savage** 139:5
**24** 4:19 90:3
179:22
**24th** 128:21
**25** 49:3 62:12,13
**25-minute** 62:19
63:21
**26th** 135:7
**27th** 135:8
**285th** 23:7
**29th** 23:6 102:21
103:5,24 104:9
107:3,8,17,18
108:1 113:11

___

**3**

**3** 1:14 3:14 31:11
31:13 32:1,12
33:12 34:1
36:18 37:2 38:6
38:16 39:11,12
39:15,15 43:16
43:25 45:25
50:13,25 55:15
65:22 70:21
72:9 74:1 82:10
83:8,10,11,12
87:7 95:11
97:21 98:23,24
99:4 117:3
119:7,21
120:21 133:9
159:10 163:3
167:6 184:2
**3-11-20** 3:20
**3-3-20** 4:16
**3:00** 90:13
**3:50** 177:12,13
**3:52** 177:13,15
**30(e)(1)** 186:9
**30,000** 73:25
**308** 2:4
**30th** 75:13,24
132:5 166:4

**31** 3:14
**312** 186:19
**31st** 51:9 52:21
94:3
**3rd** 1:19 5:4 52:1
160:12

___

**4**

**4** 3:15 41:6,7
43:16,24 46:1
50:11,15 51:23
53:12 66:13
74:2 81:10
82:14,20 93:20
**4-29-20** 4:5
**4-30-20** 4:7
**4:00** 90:13
**4:01** 1:20 183:16
183:17
**4:08** 186:24
**4:20** 110:15
**40,000** 49:15
52:13,19 53:18
53:23 74:1
129:8
**40K** 3:16
**4228** 5:10 186:19
**4900** 2:9

___

**5**

**5** 3:16 52:5,6,7,25
53:6,12 119:21
**5-11-20** 4:14
**5,000** 43:1 120:4
128:11 157:14
157:16,22
**5,000.02** 158:3
**5,000.04** 128:22
**5:20-CV-00774...**
1:7
**5:20-CV-00775...**
1:8
**50** 3:15
**50,000** 49:7 73:24
**50/50** 48:25
**52** 3:16

**54** 3:17
**58** 3:18
**5987** 6:2 186:18

___

**6**

**6** 3:4,17 54:5,7,9
54:13 55:4
58:17 71:17
84:12
**6,250** 61:6,8 65:8
96:18 97:7
**6th** 135:20

___

**7**

**7** 3:18 57:19
58:15,19,21
59:4,9 60:3,10
64:24 66:16
67:7,15 86:12
95:16 96:9
98:11
**7100** 2:12
**713.2237300** 2:10
**74** 3:20
**75** 48:15
**75206** 5:11
186:20
**76164** 2:4
**77036** 2:13
**77401** 2:9

___

**8**

**8** 3:19 49:13
57:25 71:4
74:23,25 75:2
76:6 78:18 83:6
85:5,8 94:16
99:8,11
**800.445.9548**
186:21
**817.394.4844** 2:5
**82** 3:21
**832.433.7977**
2:14
**84** 3:23

___

**9**

**9** 3:21 72:8,8
79:15,17 81:16
81:18 82:6,8
83:8
**93** 3:24,25 4:3,4
**97070** 59:12

# EXHIBIT B-2

FILED
6/29/2020 1:56 PM
Mary Angie Garcia
Bexar County District Clerk
Accepted By: Annabelle Kung

Case 5:20-cv-00774-RBF   Document 67   Filed 07/17/22   Page 99 of 141

CAUSE NO. **2020CI11759**

| | | |
|---|---|---|
| **MAYAR ZOKAEI** | § | **IN THE DISTRICT COURT** |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | **285TH** ___ **JUDICIAL DISTRICT** |
| **FUNDAMENTAL SPORTS** | § | |
| **MANAGEMENT, LLC, ROE-BRG** | § | |
| **INVESTMENTS, LLC, RAHUL** | § | |
| **PATEL, GRANT GAINES, and** | § | **OF BEXAR COUNTY, TEXAS** |
| **NICOLAS LAHOOD** | § | |
| *Defendants.* | § | |

### PLAINTIFF'S ORIGINAL PETITION AND REQUEST FOR DISCLOSURES

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Mayar Zokaei ("Plaintiff") and files this, Plaintiff's Original Petition, complaining of Defendants Fundamental Sports Management, LLC (FSM), ROE-BRG Investments, LLC, Rahul Patel, Grant Gaines, and Nicolas Lahood ("Defendants"), and for cause of action, Plaintiff would respectfully show this Honorable Court the following:

### DISCOVERY CONTROL PLAN

1.    Plaintiff affirmatively pleads that he seeks monetary relief of $200,000.00 to $1,000,000.00, including damages of any kind, penalties, costs, expenses, pre-judgment interest and attorney fees and intends that discovery be conducted under Discovery Level 3.

### PARTIES

2.    Plaintiff, M A Y A R  Z O K A E I,  is an individual residing in Wilsonville, Oregon.

3.    Defendant, FUNDAMENTAL SPORTS MANAGEMENT, LLC ("FSM"), a Texas limited liability company, may be served pursuant to article 2.11(A) of the TEXAS BUSINESS CORPORATIONS ACT, or its successor statutes, sections 5.201 and 5.255 of the TEXAS BUSINESS ORGANIZATIONS CODE, by serving its registered agent Patel Gaines, at 2030 North Loop 1604

1



Zokaei
Exhibit
**2**       Page
3 August 2021      88

West, Suite 200, San Antonio, Texas 78248. Service of said Defendant as described herein may be effected by personal delivery.

4.      Defendant, ROE-BRG Investments, LLC, a Texas limited liability company, may be served pursuant to article 2.11(A) of the TEXAS BUSINESS CORPORATIONS ACT, or its successor statutes, sections 5.201 and 5.255 of the TEXAS BUSINESS ORGANIZATIONS CODE, by serving its registered agent Grant M Gaines, at 14414 Blanco Road, Suite 320, San Antonio, Texas 78216. Service of said Defendant as described herein may be effected by personal delivery.

5.      Defendant, Rahul Patel, is an individual residing in Bexar County, Texas who may be served with process at his place of business located at 2030 North Loop 1604 West, Suite 200, San Antonio, Texas 78248. Service of said Defendant as described above can be affected by personal delivery.

6.      Defendant, Grant Gaines, is an individual residing in Bexar County, Texas who may be served with process at his place of business located at 2030 North Loop 1604 West, Suite 200, San Antonio, Texas 78248. Service of said Defendant as described above can be affected by personal delivery.

7.      Defendant, Nicolas Lahood, is an individual residing in Bexar County, Texas who may be served with process at his place of business located at 14414 Blanco Road, Suite 320, San Antonio, Texas 78216. Service of said Defendant as described above can be affected by personal delivery.

## JURISDICTION AND VENUE

8.      The subject matter in controversy is within the jurisdictional limits of this court.

9.      This court has jurisdiction over the parties because Defendants Rahul Patel, Grant Gaines, and Nicolas Lahood residents of the state of Texas.

10.     Venue in Bexar County is proper in this cause under Section 15.002(a)(1) of the Texas Civil Practice and Remedies Code because all or a substantial part of the events or omissions giving rise to this lawsuit occurred in this county.

**FACTS**

11.     Plaintiff began working for FSM on or about February 1, 2020.  Plaintiff and Defendants' employment contract provided that Plaintiff was hired for a one-year duration. The agreement also provided that Plaintiff would be reimbursed for the expenses he incurred while fulfilling his employment duties. Plaintiff was hired to perform services for FSM under the managing members' direction and control, which meant that Plaintiff did as directed. Defendants Fundamental Sports Management, LLC (FSM), ROE-BRG Investments, LLC, Rahul Patel, Grant Gaines, and Nicolas Lahood specialize in NBA agent representations, sports marketing, brand development, legal representation, contract negotiation, and endorsements. According to its public website, FSM focuses on media, marketing, and management.

12.     FSM has been extremely successfully, paying some its executive six figure salaries, making it a reasonable inference that FSM's total revenue exceed $500,000.00. Furthermore, FSM has agents and employees throughout the United States, which undoubtably shows they are engaged in interstate commerce.

13.     As the managing members of FMS, Defendants ROE-BRG Investments, LLC, Rahul Patel, Grant Gaines, and Nicolas Lahood exercised control over and supervision of Plaintiff's job duties. FSM employs more than 2 employees to manage its operations.

14.     On or about April 20, 2020, Plaintiff was wrongfully terminated by FSM. Defendants' did not pay Plaintiff for the time he worked for period ending in April. Furthermore,

Defendants did not reimburse Plaintiff for the expenses he incurred during his employment with Defendants.

15.     The FLSA was enacted to correct and eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficacy and general well-being of workers …."  29 U.S.C. § 202.  Towards this end, the FLSA set employment related requirements, including requirement to timely pay for work performed. 29 CFR § 790.21.

16.     Defendants did not pay Plaintiff for the work he had already performed as required by 29 CFR § 790.21. Defendants knew or reasonably should have known that Plaintiff was not exempt from the provisions of the FLSA. Defendants knew or showed reckless disregard for whether its pay practices violated the FLSA.

17.     Furthermore, Defendants knew that they had an employment contract with Plaintiff for the term of one year. Defendants knew that they could not terminate Plaintiff's contract without cause. Nevertheless, Defendant's wrongfully terminated Plaintiff.

### FIRST CAUSE OF ACTION: BREACH OF CONTRACT ACTION FOR WRONGFUL TERMINATION OF EMPLOYMENT.

18.     Plaintiff hereby incorporates all preceding paragraphs as if fully set forth herein.

19.     Plaintiff brings this claim pursuant to *Lee-Wright, Inc. v. Hall*, 840 S.W.2d 572 (Tex. App.—Houston [1st Dist.] 1992).

20.     Plaintiff's written employment contract provided that Plaintiff would be employed for a term of one year. Plaintiff performed the duties he was hired to perform. Nevertheless, Defendants wrongfully terminated him without cause prior to the end of the term of the contract.

21.     Defendants' actions constitute a breach of contract for wrongful termination.

### SECOND CAUSE OF ACTION: BREACH OF CONTRACT ACTION

22.     Plaintiff hereby incorporates all preceding paragraphs as if fully set forth herein.

4

23.     Plaintiff brings this claim pursuant to *Paragon Gen. Contractors, Inc. v. Larco Constr., Inc.,* 227 S.W.3d 876, 882 (Tex. App.--Dallas 2007, no pet.)

24.     Plaintiff had a contract with Defendants. As part of that contract Defendants were supposed to reimburse Plaintiff for the expenses he incurred while performing his job duties for Defendants. Plaintiff incurred expenses and timely presented those expenses to Defendants. Defendants have refused to reimburse Plaintiff for the expenses he has incurred.

25.     Defendants' actions constitute a breach of contract.

### THIRD CAUSE OF ACTION: FAILURE TO PAY WAGES IN VIOLATION OF THE FLSA

26.     Plaintiff hereby incorporates all preceding paragraphs as if fully set forth herein.

27.     Plaintiff brings this claim pursuant to 29 CFR § 790.21.

28.     During his employment for Defendants, Plaintiff was an employee who was not exempt from payment of wages provisions of the FLSA. While Plaintiff was employed by FSM and under the direction of the managing members, Plaintiff and/or Defendants were engaged in interstate commerce.

29.     Plaintiff pleads both individual and enterprise coverage under the FLSA.

30.      As a nonexempt employee, Defendants were required to pay Plaintiff at the end of the pay period.  29 CFR § 790.21.

31.     Defendants did not pay Plaintiff the wages he was due.

32.     Defendants knew or showed reckless disregard for whether their pay practices violated the FLSA.  In other words, Defendants willfully violated provisions of the FLSA.

33.     To the extent Defendants violated other employment laws in connection with its employment of Plaintiff and the matters described herein, including FLSA retaliation, Plaintiff reserves the right to file appropriate charges or claims in this case or other venues as necessary.

## DAMAGES

34.     Plaintiff hereby incorporates all preceding paragraphs as if fully set forth herein.

35.     Under the Fair Labor Standards Act, Plaintiff is entitled to relief, including, but not limited to, payment of unpaid wages and an additional equal amount as liquidated damages. *See* 29 U.S.C. § 216(b).

36.     Plaintiff is entitled to the actual damages resulting from Defendants' breach of contract.

37.     Plaintiff is also entitled to all appropriate legal and equitable relief available under the common law, including recovery for non-pecuniary losses, such as pain and suffering.

38.     Plaintiff is also entitled to an award of attorney's fees and costs under 29 U.S.C. § 216(b) and Tex. Civ. Prac. & Rem. Code § 38.001.

## NOTICE OF USE

39.     Pursuant to Rule 193.7 of the Texas Rules of Civil Procedure, Defendants are hereby notified that Plaintiffs intends to use all documents produced by Defendants in response to written discovery in pretrial proceedings and trial. Defendants are required to assert any objection to the authenticity of any document Defendants produces within ten days of its production.

## REQUEST FOR DISCLOSURES

40.     Pursuant to Rule 194 of the Texas Rules of Civil Procedure, Plaintiff requests that each and every Defendant disclose, within fifty (50) days of service of this request, the information and material described in Rule 194.2(a) through (l).

## DESIGNATED E-SERVICE EMAIL ADDRESS

41.     The following is the undersigned attorney's designated e-Service email address for all e- served documents and notices, filed and unfiled, pursuant to Tex. R. Civ. P. 21(f)(2) & 21a:

Litigation@TheHadiLawFirm.com. This is the undersigned's only e-Service email address, and service through any other email address will be considered invalid.

## REQUEST FOR DEPOSITION DATES

42.     Pursuant to Rule 199 of the Texas Rules of Civil Procedure, Plaintiff request that each and every Defendant disclose, within fifty (50) days of service of this request, dates that Defendant is available for Plaintiff to take Defendant's deposition. Plaintiff request that each corporate Defendant provide dates that Defendant's corporate representative is available for Plaintiff to take Defendant's corporate representative's deposition.

## PRAYER

43.     WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that he have and recover judgment in his favor against Defendants Fundamental Sports Management, LLC, ROE-BRG Investments, LLC, Rahul Patel, Grant Gaines, and Nicolas Lahood for the following:

> a.     All unpaid wages and expense reimbursements;
>
> b.     an additional amount equal to Plaintiff's unpaid wages and expenses as liquidated damages pursuant to statute;
>
> c.     all other forms of relief available to Plaintiff under the FLSA and the common law;
>
> d.     reasonable attorney's fees for this action and for any and all appeals in this matter;
>
> e.     pre- and post-judgment interest as allowed by law;
>
> f.     costs of court for prosecuting Plaintiff's claim; and
>
> g.     such other and further relief to which Plaintiff may be justly entitled.

Respectfully submitted,


THE HADI LAW FIRM, PLLC


By: _____
Husein Hadi
Texas Bar No. 24067641
Jamil Thomas
Texas Bar No. 24066914
Carnegie H. Mims, III
Texas Bar No. 24046448
Sedrick Stagg
Texas Bar No. 24102815
7100 Regency Square Boulevard, Suite 140
Houston, Texas 77036
Tel:  (832) 433-7977
Fax:  (855) 423-4529
litigation@thehadilawfirm.com
**Attorneys for Plaintiff**

**PLAINTIFF HEREBY DEMANDS TRIAL BY JURY**

**DATE FILED: June 26, 2020**

8

# EXHIBIT B-7

# WAGE CLAIM

Pursuant to T tle 2, Chapter 61, Texas Labor Code

## TEXAS WORKFORCE COMMISSION, LABOR LAW SECTION

101 East 15th Street, Aust n, Texas 78778-0001
Telephone 1-800-832-9243 or 1-512-475-2670 or TDD 1-800-735-2989 hear ng mpa red) Fax 1-512-475-3025
www.texasworkforce.org

*(Este formulario est disponible en espa ol.)*

I want TWC to send future correspondence n ☑ Engl sh ☐ Span sh          Qu ero que TWC env e toda futura correspondenc a en ☑ Ingl s ☐ Espa ol

| CLAIMANT PERSONAL INFORMATION | | | | | | | |
|---|---|---|---|---|---|---|---|
| F rst Name | | M.I. | Last Name | | | | |
| Mayar | | | Zokaei | | | | |
| Street Address | | Apt. | C ty | | | State | Z p |
| 11868 SW BARCELONA ST | | | Wilsonville | | | OR | 97070 |
| Date of B rth *(M/D/Y)* | Soc al Secur ty № *(optional)* | | Phone № *(normal business hours)* | | Alternate Phone № | | |
| 7/30/1978 | | | (818) 968-4437 | | (503) 680-2839 | | |

| CLAIMANT WORK LOCATION | | | | | | |
|---|---|---|---|---|---|---|
| Street Address | | Su te | C ty | | State | Z p |
| 2030 TX-1604 Loop Suite 200 | | | San Antonio | | TX | 78248 |

| EMPLOYER INFORMATION | | | | |
|---|---|---|---|---|
| Bus ness Name *(if incorporated)* | | Owner F rst Name | Owner Last Name | |
| Fundamental Sports Management (FSM) | | RAHUL B. | PATEL | |
| Street Address | Su te | C ty | State | Z p |
| 2030 TX-1604 Loop Suite 200 | | San Antonio | TX | 78248 |
| Employer s Ema l Address | | | Employer s Phone № | |
| rahul@fsm-sports.com | | | (210) 460-7787 | |
| Employer s Webs te | | | | |
| www.fsm-sports.com | | | | |

## EMPLOYMENT INFORMATION

1. What work d d you perform? *I worked as a sports agent and client recruiter*
   Beg nn ng date of employment *1/22/2020*
   Employment status w th th s employer ☐ St ll employed ☐ Qu t on _____ ☑ Term nated on *4/20/2020*
   Reason for separat on
   *I was terminated by Mr. Rahul Patel without cause*

2. When were your regularly scheduled paydays? *1st and 15th of every month*
   What was your rate of pay? Examples $3/hour $1,000/month $.50/p ece $2/sq. ft.) *$12,500 per month*
   What was the agreed work schedule? *0* hours/day *0* days/week other *sports agent/recruiter; no set hour*

3. Your compensat on agreement was ☐ Oral ☑ Wr tten please attach a copy) ☐ Don t Know

4. Were the cla med wages earned n Texas? ☐ Yes ☑ No     If not, was the job contracted n Texas? ☑ Yes ☐ No

5. Were taxes deducted from your paycheck? ☐ Yes ☑ No ☐ Don t Know

6. Is the employer st ll n bus ness? ☑ Yes ☐ No ☐ Don t Know
   What s the employer s home address and phone number?
   *19211 HABITAT CV; SAN ANTONIO, TX 78258-4411, (614) 657-6630*
   What s the name and phone number of your superv sor dur ng the cla m per od?
   *RAHUL BALKRISHNA PATEL (614) 657-6630*

7. Is the employer n bankruptcy? ☐ Yes ☑ No ☐ Don t Know          Are you n bankruptcy? ☐ Yes ☑ No
   If yes, what was the bankruptcy fil ng date? _____
   Chapter _____ Case № _____ Where filed _____
   What s the bankruptcy attorney s name, address, and phone number?

8. If you are related to the employer, please state the relat onsh p
   *n/a*

9. D d the employer g ve a reason for not pay ng you? If so, expla n
   *no, refused to reply to me emails*

10. Choose the type s) of unpa d wages below that best descr be your cla m, and wr te the amount of unpa d wages, l st ng the gross amount of wages due. Note You cannot file for recovery of any type of expenses or re mbursement, s nce expenses and re mbursements are not wages.
    Regular *$6,250.00* Comm ss ons $_____ Fr nge Benef ts* *$11,589.08* Pay Deduct ons $_____
    Overt me $_____ Unpa d Bonus $_____ Pay Below M n mum Wage $_____

### TOTAL UNPAID WAGES CLAIMED $17,839.08

\* *The only fringe benefits that can be claimed are vacation pay, holiday pay, severance, sick leave, parental leave, paid time off, or paid days off. These benefits cannot be claimed unless provided for in a written agreement or a written policy of the employer.*

11. L st the scheduled payday s) for the cla med wages *8/27/2020*

Zokaei
Exhibit
**7** Page 097

3 August 2021

12. If cla m ng **regular, overt me, and/or m n mum wage**, what were the dates you worked for wh ch you rece ved no wages? From *4/15/2020* to *4/20/2020*
Below, please expla n how you determ ned the amount cla med and prov de a breakdown of the days and hours worked.  Example  20 hours regular pay at $5 per hour and 5 hours overt me pay at $7.50 per hour  or Example  30  tems at a p ece rate of $.75 per  tem). If ava lable, attach a copy of t mecards or t mesheets. Use the attachment located on the backs de of the  nstruct ons to prov de a breakdown of the days and hours worked.
*pay period 4/15/20 - 4/30/20 was $6,250. I was hired as a contractor, no set hours, I am responsible for my own taxes.*

13. If cla m ng **comm ss ons or bonus**, what was the per od  n wh ch the wages were earned? From _____ to _____
Are you aware of any agreement to pay comm ss ons or bonus after term nat on? ☐ Yes  ☑ No
Please expla n how you determ ned the amount due. If poss ble, supply cop es of support ng documents, such as wr tten agreements, sales records, check stubs, etc.
*n/a*

14. If cla m ng a covered **fr nge benefit**, please expla n wh ch benefit s) you are cla m ng, and how the amount due was determ ned. The pol cy or agreement prov d ng for a payment after separat on  s requ red, so **please prov de a copy**, and attach ev dence of the amount owed  hours left) such as check stubs or other documents.
*Fringe benefits with respect to my employment are reimbursements for expenses (traveling, lodging, meals, purchasing tickets to attend basketball related events and games, etc) incurred while performing my job duties to Mr. Patel and his company.*

*Per my agreement with the company, I was allowed up to $5,000 per month in expenses.*

15. If cla m ng **deduct ons**, d d you s gn any author zat on for deduct ons other than regular payroll taxes? ☑ Yes  ☐ No  ☐ Don t Know   If yes, please expla n
*n/a*

16. Are you aware of any **agreement** such as arb trat on, collect ve barga n ng agreement, un on contract, ERISA, Serv ce Contract Act, etc.) that ex sted between you and the employer? ☐ Yes  ☑ No   If yes, please attach a copy.

17. Add t onal comments
*n/a*

## I UNDERSTAND THAT I MAY BE ASSESSED AN ADMINISTRATIVE PENALTY IF THIS CLAIM IS FOUND TO BE BROUGHT IN BAD FAITH.

To be cons dered val d, th s Wage Cla m must be completed below, and **s gned as true under penalty of perjury.**

My name  s *Mayar Zokaei*, my date of b rth  s *7/30/1978.*

My address  s *11868 SW Barcelona St.; Wilsonville, OR 97070.*

I declare under penalty of perjury that the forego ng  s true and correct.

Executed  n *Clackamas* County, State of *Oregon*, on the *14th* day of *September, 2020.*

*Mayar Zokaei*
Declarant s gnature)

# WAGE CLAIM WORKSHEET
## Quest on 12 – Hours Worked Per Workweek Breakdown

| Workday | Start T me | | | Stop T me | | | Start T me 2 | | | Qu t T me | | | Hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MM/DD/YYYY | Hour | M n | AM/PM | Hour | M n | AM/PM | Hour | M n | AM/PM | Hour | M n | AM/PM | Worked |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

Workweek 1 Total Hours | *0*

| Workday | Start T me | | | Stop T me | | | Start T me 2 | | | Qu t T me | | | Hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MM/DD/YYYY | Hour | M n | AM/PM | Hour | M n | AM/PM | Hour | M n | AM/PM | Hour | M n | AM/PM | Worked |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

Workweek 2 Total Hours | *0*

# EXHIBIT B-8

**Tuesday, August 3, 2021 at 3:12:59 PM Central Daylight Time**

| | |
|---|---|
| **Subject:** | Re: Agreements |
| **Date:** | Wednesday, March 11, 2020 at 11:43:11 AM Central Daylight Time |
| **From:** | Mayar Zokaei |
| **To:** | Jabbar Fahim |
| **CC:** | Rahul Patel (FSM) |
| **Attachments:** | FSMlogo_fcc1eb0e-ea2f-4b28-9b93-002086e43cb2.png, Instagram_0ab7839e-2948-42ba-95a5-97a930ea1760.png, Twitter_4e300eec-ad43-4a60-ac74-49e4af08aa2f.png, LinkedIN_2a2e8566-90d8-4255-922f-a7209c5bba88.png, Facebook_25196d55-a487-41cf-9301-961ed39dbd85.png |

Hey Jabbar,

Hope all is well. Was speaking to Rahul yesterday about the agreement and wanted to get it finalized by tomorrow if possible please

Two questions:

What is meant by "assumed liabilities",

Can we please add "any liabilities arising under Seller's gross negligence, willful misconduct or bad faith" instead of C

Thanks

**Mayar Zokaei**
VP of Basketball Operations &
NBPA Licensed Agent



mayar@fsm-sports.com
www.fsm-sports.com
(818) 968-4437 | mobile

This e-mail and any files or documents accompanying it are intended solely for the identified recipient. This e-mail may contain information that is: (1) privileged and/or (2) strictly confidential. If you are not the intended recipient or have received this transmission in error you are requested to: (1) notify the sender to arrange for its immediate return; and (2) delete from your system this e-mail and any files or documents accompanying it. Any disclosure, copying, printing or other dissemination of this e-mail (including any files or documents attached to it) is strictly prohibited.

On Jan 30, 2020, at 3:30 PM, Jabbar Fahim <jfahim@patelgaines.com> wrote:

Mayar,

I sent the documents to Rahul for review but he had to step out for an event this evening. We should be able to get them to you for your review tomorrow morning.

Thanks,
Jabbar



Zokaei
Exhibit
**8**
Page       01
3 August 2021

<NewPGLogo_e7211352-52cc-48cd-a2a7-05bbe2ab635f.png>

**San Antonio**
2030 N Loop 1604 W, Suite 200
San Antonio, Texas 78248
(210) 460 - 7787 | office
(210) 460 - 7797 | fax

**Dallas / Fort Worth**
221 West Exchange Ave., Suite 206A
Fort Worth, Texas 76164
(817) 394 - 4844 | office
(817) 394 - 4344 | fax

**Houston**
1980 Post Oak Blvd., Suite 1561
Houston, Texas 77056
(346) 358 - 9068 | office
(210) 460 - 7797 | fax

# Jabbar Fahim
**Associate Attorney**
(210) 460 - 7787 | office
(210) 296 - 9064 | mobile
**jfahim@patelgaines.com**

<AsSeenFooter_fda73c90-f3e6-4037-abc4-1858b2d7117c.png>

<Facebook_d98cfbdd-eb50-425a-8093-58555fee5ab1.png>
<LinkedIn_b872d395-a9c6-416d-8426-b6d812d0b65f.png>
www.patelgaines.com
<Instagram_c0b35c4e-c68b-402c-ae15-1f6f333e5059.png>
<Twitter_427e4c38-7eba-448b-802c-0b1e956514e7.png>

This e-mail and any files or documents accompanying it are intended solely for the identified recipient. This e-mail may contain information that is: (1) subject to the attorney-client privilege; (2) attorney work-product privilege; and/or (3) strictly confidential. If you are not the intended recipient or have received this transmission in error you are requested to: (1) notify the sender to arrange for its immediate return; and (2) delete from your system this e-mail and any files or documents accompanying it. Any disclosure, copying, printing or other dissemination of this e-mail (including any files or documents attached to it) is strictly prohibited. Unless otherwise expressly indicated, the sender's name and other information in this e-mail are for informational purposes only and are not electronic signatures.

**From:** Mayar Zokaei <mzokaei@gmail.com>
**Date:** Thursday, January 30, 2020 at 12:05 PM
**To:** Jabbar Fahim <jfahim@patelgaines.com>
**Cc:** "Rahul Patel (FSM)" <rahul@fsm-sports.com>
**Subject:** Re: Agreements

Jabbar

Thanks for your email. Looking forward to it as well as working with you.

Best,

Mayar


On Jan 30, 2020, at 9:54 AM, Jabbar Fahim <jfahim@patelgaines.com> wrote:

Mayar,

I just wanted to quickly introduce myself – I am an associate attorney at Patel Gaines and am working with Rahul on the Agreements to wrap up the deal with FSM. Also wanted to give you the heads up that the agreements should be coming your way sometime this afternoon. Looking forward to working with you very soon.

Thanks,
Jabbar Fahim

<NewPGLogo_e7211352-52cc-48cd-a2a7-05bbe2ab635f.png>

**San Antonio**
2030 N Loop 1604 W, Suite 200
San Antonio, Texas 78248
(210) 460 - 7787 | office
(210) 460 - 7797 | fax

**Dallas / Fort Worth**
221 West Exchange Ave., Suite 206A
Fort Worth, Texas 76164
(817) 394 - 4844 | office
(817) 394 - 4344 | fax

## Jabbar Fahim

**Associate Attorney**
(210) 460 - 7787 | office
(210) 296 - 9064 | mobile
**jfahim@patelgaines.com**

**Houston**
1980 Post Oak Blvd., Suite 1561
Houston, Texas 77056
(346) 358 - 9068 | office
(210) 460 - 7797 | fax

<AsSeenFooter_fda73c90-f3e6-4037-abc4-1858b2d7117c.png>

<Facebook_d98cfbdd-eb50-425a-8093-58555fee5ab1.png>
<LinkedIn_b872d395-a9c6-416d-8426-b6d812d0b65f.png>
www.patelgaines.com
<Instagram_c0b35c4e-c68b-402c-ae15-1f6f333e5059.png>
<Twitter_427e4c38-7eba-448b-802c-0b1e956514e7.png>

This e-mail and any files or documents accompanying it are intended solely for the identified recipient. This e-mail may contain information that is: (1) subject to the attorney-client privilege; (2) attorney work-product privilege; and/or (3) strictly confidential. If you are not the intended recipient or have received this transmission in error you are requested to: (1) notify the sender to arrange for its immediate return; and (2) delete from your system this e-mail and any files or documents accompanying it. Any disclosure, copying, printing or other dissemination of this e-mail (including any files or documents attached to it) is strictly prohibited. Unless otherwise expressly indicated, the sender's name and other information in this e-mail are for informational purposes only and are not electronic signatures.

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

# EXHIBIT B-9

## <u>INDEPENDENT CONTRACTOR AGREEMENT</u>

      This Independent Contractor Agreement ("<u>Agreement</u>") is entered into effective as of the 1st day of _____, 2020 between Fundamental Sports Management, LLC, a Texas corporation (herein referred to as the "Company," or "FSM"), and Mayar Zokaei ("<u>Contractor</u>").

1. **Hiring**.   Contractor has been hired by Company effective <u>February 1</u>, 2020 to serve as the Vice-President of <u>Basketball Operations</u> (the "Position") of FSM. In Contractor's capacity as Vice-President of <u>Basketball Operations</u>, he will have such duties and responsibilities as are outlined in <u>Section 3</u> below. Contractor will report directly to Rahul Patel, or another individual designated by Company.

2. **Term**. Contractor shall be employed as a Contractor by FSM from <u>February 1</u>, 2020 for a period of one-year, renewable annually at the sole discretion of FSM.

3. **Duties.**   As Vice-President of <u>Basketball Operations</u>, Contractor shall help FSM with recruiting potential National Basketball Association ("NBA") / high-level overseas players for representation. Contractor shall coordinate meetings with any and all NBA teams and recruiting specials relating to the potential representation by FSM of such players. With the consent of FSM, Contractor shall have the authority to sign players and potential players to FSM for representation for marketing and under the Standard Player Agent Contract ("SPAC"). Contractor will also aid in developing specific marketing ideas for potential FSM represented clients and assist in coordinating with family and key members of players with FSM. Contractor will be primarily located in Los Angeles, California and New York, New York but will travel to San Antonio, Texas with reasonable notice. Contractor and FSM will develop and implement appropriate reports to keep FSM aware of Contractor's progress.

4. **Compensation**.  In consideration for Contractor's services, Contractor will be compensated biweekly based on an annual salary of $__,000.00 to be paid in accordance with standard payroll practices of Company. Contractor will be responsible for any and all applicable withholdings and deductions as required by law.

    <u>Any NBA SPAC Contractor currently has under contract or is in the current pipeline</u>
- FSM receives 100% return on: (1) the any and all Compensation paid to Contractor; and (2) any and all expenses paid on Contractor's behalf,
- FSM shall also receive a maximum of 5% of any compensation owed to Contractor under currently existing Standard Player Agent Contracts (SPAC), Contracts Between Agent and Athlete, and any other related contracts, including current marketing contracts and marketing contracts that are currently in the pipeline that have been entered into as of the date of this Agreement;
- As of January 15, 2020, the athletes this will apply to are listed in the attached confidential **Exhibit A**.

<u>Future Contracts secured by Contractor</u>
- FSM receives 75% of compensation due and owing under any contract Contractor negotiates and secures
- Contractor receives 25% of compensation due and owing under any contract Contractor negotiates and secures on behalf of FSM.

Zokaei
Exhibit
**9** Page 105
3 August 2021

In addition, $50,000.00 (of which $10,000 was advanced on December 17, 2019 and secured by a Promissory Note executed the same date (the "2019 Promissory Note") shall be advanced after execution of all agreements required to be signed by Contractor (the "Signing Advance"). The Signing Advance shall be paid back at 0% interest for the first 12 months, after which such remaining Signing Advance that has not been repaid shall accrue interest at 8% per annum, as will be formally memorialized and secured by a second Promissory Note securing payment of the remaining $40,000.00 (the "2020 Promissory Note"). Such repayment of the Signing Advance past the first 12 months may be drawn from any income Contractor receives while under contract with FSM.

5. **Expenses**. Contractor will also be provided with an expense allowance of $5,000.00 per month, which expenses shall be recovered by Company before any potential bonus to Contractor is paid. Such expenses shall be calculated on a rolling basis and subject to an annual adjustment on December 31st of each year.

6. **Bonus**. [Bonus structure to be provided by Matt Fossey].

7. **Relationship**:  The Parties agree that this Agreement does not create an employee-Company relationship and Contractor will remain an independent contractor.

8. **Confidentiality**. Contractor acknowledges and agrees that he will be disclosed, and Company agrees to disclose, confidential information of Company to which Contractor would not have access except for employment with Company. This confidential information includes, but is not limited to, client information and preferences, specific client product orders and needs, including the rates they pay, marketing information, pricing formulas, pricing strategies, Contractor compensation, research information, training materials, customer lists, customer contact information, and sales promotion information (collectively, the "Confidential Information"). This Confidential Information is a valuable, special and unique asset of Company used in its business to obtain a competitive advantage over its competitors.   Protection of such Confidential Information against unauthorized disclosure and use is of critical importance to Company in maintaining its competitive position.   Contractor will not, at any time during or after his employment by Company, make any unauthorized disclosures of the Confidential Information, or make any use thereof, except in the carrying out of his employment responsibilities with Company. Contractor acknowledges that Company's business operations are rapidly expanding and growing and that Company has invested considerable time, money and resources in establishing its business model and client base (the "Company's Business").

9. **Non-Disparagement**. In the event that the Contractor's employment with Company terminates and/or is terminated Contractor expressly agrees not to disparage Company in any public forum whether verbal, print or electronic, including but not limited to, websites, business bureaus, blogs, chats, newspapers, magazines, word-of-mouth, social groups, questionnaires, surveys, emails, radio and/or television. Contractor agrees to instruct all agents, servants, Contractors and affiliates to abide by the same.

10. **Right of First Refusal**. Contractor agrees that all business opportunities, which are offered to Contractor, or conceived by Contractor, either solely or jointly with others, which may be related to the Company's Business or capable of beneficial use by Company (as determined in the sole discretion of Company) shall be immediately disclosed to Company in writing.  Unless

2

Company rejects such opportunity in writing; Contractor acknowledges and agrees that he or she shall have no right or authority to pursue such opportunity. Contractor acknowledges and agrees that Company provides the opportunities and the resources for Contractor to initiate, establish and/or develop contacts and relationships within the Company's Business.  Further, Company will provide training and other guidance to provide Contractor with the ability to create and/or enhance opportunities in the Company's Business.  All goodwill and other benefits (collectively, the "Goodwill") derived from such efforts described in this paragraph shall inure solely to the benefit of Company.  Contractor recognizes that the Goodwill is a valuable asset of Company.  Contractor acknowledges that, in exchange for the covenants and considerations described herein, Contractor agrees to refrain from using the Goodwill for the benefit of any other person or entity other than for the benefit of Company and in furtherance of his employment duties with the Company. Contractor acknowledges that he has a duty of loyalty to Company.  Contractor hereby acknowledges that such duty of loyalty is a contractual duty, the breach of which will subject Contractor to liability to Company, including, without limitation, Company's attorneys' fees and costs if Company pursues any claim arising from such breach.

11. **Non-Solicitation**. During the period Contractor is employed by Company and in the event that the Contractor's employment with Company terminates, the Contractor acknowledges that he does not have the right to, and shall refrain from:

> i. soliciting any client of Company that Contractor did not have a prior relationship with or otherwise attempt to induce any such client to discontinue or reduce its relationship with Company;

> ii. render advice or services to, or otherwise accept any business from, any current clients of Company that Contractor did not have a prior relationship with or otherwise attempt to induce any such client to discontinue or reduce its relationship with Company;

> iii. render advice or services to, or otherwise assist, any other person, associate or entity who is engaged, directly or indirectly, with the solicitation of any clients of Company with whom Contractor did not have a prior relationship with; and/or

> iv. induce any employee of Company to terminate or limit his or her employment with Company, or hire or assist in the hiring of any such Contractor by any person, association or entity not affiliated with Company.

**IF CONTRACTOR BREACHES ANY PROVISIONS OF SECTION 11(i) – (iv) ABOVE, THEN BECAUSE DAMAGES ARISING FROM SUCH BREACH ARE DETERMINABLE, BUT HARD TO ACERTAIN, CONTRACTOR SHALL PAY TO THE COMPANY, AS LIQUIDATED DAMAGES AND NOT AS PENALTY, A SUM EQUAL TO: (1) $50,000.00 FOR EACH BREACH OF SECTION 11(i); (2) $20,000 FOR EACH BREACH OF SECTION 11(ii); (3) $30,000.00 FOR EACH BREACH OF SECTION 11(iii); AND (4) $40,000.00 FOR EACH BREACH OF SECTION 11(iv). THE PARTIES EACH ACKNOWLEDGE AND AGREE THAT IT IS DIFFICULT OR IMPOSSIBLE TO DETERMINE WITH PRECISION THE AMOUNT OF DAMAGES**

3

**THAT WOULD OR MIGHT BE INCURRED BY THE COMPANY FOR A VIOLATION OF SECTIONS 11(i) – (iv) AND THAT THE AMOUNTS OF DAMAGES SET FORTH HEREIN IS FAIR AND REASONABLE COMPENSATION FOR SUCH LOSS.**

In the alternative, and only if Company chooses, at its sole discretion, to forgo enforcement of the Liquidated Damage provision as set forth above, then Company shall be entitled to, in addition to any other remedy it may have (exclusive of liquidated damages), injunctive relief for the enforcement of any provision in Section 11, including Section (i)-(iv). Contractor agrees that his breach of this Agreement will result in immediate and irreparable damage to Company such that Company could not be adequately compensated by an award of monetary damages, and in the event of any threatened or actual breach, Company shall be entitled to an injunctive order appropriately restraining and/or prohibiting such breach without the necessity of Company posting bond or other security.  Pursuit of any remedy by Company except as otherwise expressly set forth in this Section, shall not constitute a waiver of any other right or remedy by Company under this Agreement or under applicable law.

12. **Non-Compete.** During the period Contractor is employed by Company and for two (2) years thereafter, Contractor agrees that he or she will not, directly or indirectly, engage in or work for any business engaging in, any activities similar or otherwise competitive with the business, services, and/or activities of Company including but not limited to the sports agency business and the marketing, promotion, or management of any professional athlete, whether currently signed with a professional sports franchise or seeking such contract. It is further understood that Contractor shall not use any work-product created by Company or while Contractor was under contract with Company for any period of time after the termination of this Agreement. Notwithstanding the foregoing list or subsequent descriptions, it is expressly understood and agreed that Company has, and reserves the right to amend both the list and/or descriptions of the services and/or activities covered by the non-compete clause from time to time, as it deems necessary.

13. **Miscellaneous**.

    (i)    It is the desire and intent of the parties that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies applied in the applicable jurisdiction, and in Texas, namely, Sections 15.50 and 15.51 of the Texas Business and Commerce Code.  Accordingly, if any particular provision of this Agreement shall be adjudicated to be invalid or unenforceable, it is the specific intent and agreement of the parties hereto that such provision shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable.  In addition, if the scope of any restriction or covenant contained in this Agreement is too broad to permit enforcement thereof to its fullest extent, then it is the specific intent and agreement of the parties that such restriction or covenant shall be enforced to the maximum extent permitted by law, and Company and Contractor hereby consent and agree that such scope shall be judicially modified accordingly in any proceeding brought to enforce such restriction.

(ii)    In the event Company is required to pursue legal action to enforce all or any part of this Agreement, Contractor shall be responsible for all reasonable attorneys' fees and court costs incurred by Company, in addition to any other remedies allowed by law or in equity.

(iii)    Contractor acknowledges and agrees that the benefits and consideration contained in this Agreement (including, without limitation, the disclosures and access to Confidential Information and the training, support and guidance to be provided by Company as described herein) are unique and valuable and in support of the restrictive covenants and other agreements being created hereby between Contractor and Company. Specifically, Contractor would not otherwise be entitled to such benefits and consideration, except for his or her employment by Company and the execution of this Agreement. These factors were of critical importance to Contractor, without which Contractor would not have entered into this Agreement. Likewise, the restrictive covenants and other agreements made by Contractor herein are of critical importance to Company, without which Company would not have entered into this Agreement. The parties acknowledge and agree that the benefits and considerations given Contractor hereunder and the restrictive covenants and other agreements given by Contractor hereunder are ancillary to and support each other.

(iv)    Upon termination of the Contractor's contractual relationship with Company, for any reason, or upon the demand by Company, at any time, Contractor shall return all Confidential Information in his or her possession or control to Company, including, without limitation, all copies thereof or notes or memoranda derived therefrom. If any Confidential Information is stored electronically or magnetically, Contractor shall erase and delete all copies.

(v)    Contractor agrees to inform any future prospective Company of the terms and conditions of this Agreement. If Company receives information that Contractor has accepted employment with another Company in violation of this Agreement, or if Company receives information that Contractor has received an offer with another Company that upon acceptance would violate the terms and conditions of this Agreement, then Company has express authority and permission to deliver a copy of this Agreement to such other Company to confirm Company's rights and Contractor's restrictive obligations

(vi)    Upon termination of this Agreement, Company shall promptly, on a prospective basis, discontinue using Contractor's name, biography and/or likeness in its advertising and promotional materials.

(vii)    The provisions of this, Section 12 shall survive termination and remain in full force and effect to the extent allowed by law.

**14. No Conflict.** Contractor confirms that he is able to carry out the work that this job involves without breaching any legal restrictions on his activities, such as restrictions imposed by a current or former Company. Contractor also confirms that he will inform Company about any such restrictions and provide Company with as much information about them as possible, including any agreements between his and his current or former Company describing such restrictions on his activities. Contractor further confirms that he has not removed or taken any documents or proprietary data or materials of any kind, electronic or otherwise, with his from

5

his current or former Company to Company without written authorization from his current or former Company.

15. **Governing law**: This agreement shall be governed by and construed under the laws of the State of Texas.

16. **Entire agreement**:  This is the entire agreement between Company and Contractor relating to the subject matter herein and supersedes any prior agreements, written or oral.

17. **Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[Signatures on Following Page]

6

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed effective on the date and year first written above.

**CONTRACTOR:**

By: _____
Name:          Mayar Zokaei
Position:      Vice-President of Basketball Operations

**COMPANY:**

FUNDAMENTAL SPORTS MANAGEMENT, LLC, a Texas limited liability company

By: _____
Name: Rahul B. Patel
Title:   Managing Member

7

<u>**C**ONFIDENTIAL</u>

<u>**Exhibit A**</u>

**<u>Current Clients</u>**
1. Mitchell Robinson
2. Kenny Wooten
3. Ayinde Sprewell
4. Torren Jones
5. Desonta Bradford
6. Joshua Smith

**<u>Current Pipeline</u>**
1. Trae Young
2. Nassir Little
3. Coby White
4. Obi Toppin
5. Tyrese Haliburton
6. Melvin Frazier
7. Dennis Smith Jr.
8. Udoka Azubuike



1

# EXHIBIT B-11

Tuesday, August 3, 2021 at 3:42:55 PM Central Daylight Time

**Subject:** Zokaei Documents - DRAFTS - 01.31.2020

**Date:** Friday, January 31, 2020 at 3:31:58 PM Central Standard Time

**From:** Rahul Patel (FSM)

**To:** Mayar Zokaei

**Attachments:** FSMlogo_fcc1eb0e-ea2f-4b28-9b93-002086e43cb2.png, Instagram_0ab7839e-2948-42ba-95a5-97a930ea1760.png, Twitter_4e300eec-ad43-4a60-ac74-49e4af08aa2f.png, LinkedIN_2a2e8566-90d8-4255-922f-a7209c5bba88.png, Facebook_25196d55-a487-41cf-9301-961ed39dbd85.png, Independent Contractor Agreement - Mayar Zokaei - DRAFT - 01.31.2020.pdf, Contractor Confidentiality and NDA - DRAFT - 01.31.2020.pdf, MZ Purchase Agreement - DRAFT - 01.31.2020.pdf

Mayar:

See attached. They are basically all final other than the bonus structure. Matt is traveling and is in California but he is going to get me what was approved and discussed so that it can be inserted. We have agreed to the $150,000 salary and have already paid January prior to this agreement. I have requested the $40,000 additional promissory note amount to approved, submitted it to Taylor and once he gets the ink he needs to do that he will / should have made that wire.

I will have to send you a second promissory note for that matter which I will do tomorrow morning / tonight but will be the exact same as the one you executed, just for a different amount and date due of December 31, 2020.

**Rahul Patel**
CEO & NBPA Licensed Agent



rahul@fsm-sports.com
www.fsm-sports.com
(614) 657 - 6630 | mobile

This e-mail and any files or documents accompanying it are intended solely for the identified recipient. This e-mail may contain information that is: (1) privileged and/or (2) strictly confidential. If you are not the intended recipient or have received this transmission in error you are requested to: (1) notify the sender to arrange for its immediate return; and (2) delete from your system this e-mail and any files or documents accompanying it. Any disclosure, copying, printing or other dissemination of this e-mail (including any files or documents attached to it) is strictly prohibited.



Zokaei
Exhibit
**11**
3 August 2021

# EXHIBIT B-12

## INDEPENDENT CONTRACTOR AGREEMENT

This Independent Contractor Agreement ("Agreement") is entered into effective as of the 1st day of _____, 2020 between FUNDAMENTAL SPORTS MANAGEMENT, LLC, a Texas corporation (herein referred to as the "Company," or "FSM"), and Mayar Zokaei ("Contractor").

1. **Hiring**.   Contractor has been hired by Company effective February 1, 2020 to serve as the Vice-President of Basketball Operations (the "Position") of FSM. In Contractor's capacity as Vice-President of Basketball Operations, he will have such duties and responsibilities as are outlined in Section 3 below. Contractor will report directly to Rahul Patel, or another individual designated by Company.

2. **Term**. Contractor shall be employed as a Contractor by FSM from February 1, 2020 for a period of one-year, renewable annually at the sole discretion of FSM.

3. **Duties.**   As Vice-President of Basketball Operations, Contractor shall help FSM with recruiting potential National Basketball Association ("NBA") / high-level overseas players for representation. Contractor shall coordinate meetings with any and all NBA teams and recruiting specials relating to the potential representation by FSM of such players. With the consent of FSM, Contractor shall have the authority to sign players and potential players to FSM for representation for marketing and under the Standard Player Agent Contract ("SPAC"). Contractor will also aid in developing specific marketing ideas for potential FSM represented clients and assist in coordinating with family and key members of players with FSM. Contractor will be primarily located in Los Angeles, California and New York, New York but will travel to San Antonio, Texas with reasonable notice. Contractor and FSM will develop and implement appropriate reports to keep FSM aware of Contractor's progress.

4. **Compensation**.  In consideration for Contractor's services, Contractor will be compensated biweekly based on an annual salary of $__,000.00 to be paid in accordance with standard payroll practices of Company. Contractor will be responsible for any and all applicable withholdings and deductions as required by law.

Any NBA SPAC Contractor currently has under contract or is in the current pipeline
- FSM receives 100% return on: (1) the any and all Compensation paid to Contractor; and (2) any and all expenses paid on Contractor's behalf,
- FSM shall also receive a maximum of 5% of any compensation owed to Contractor under currently existing Standard Player Agent Contracts (SPAC), Contracts Between Agent and Athlete, and any other related contracts, including current marketing contracts and marketing contracts that are currently in the pipeline that have been entered into as of the date of this Agreement;
- As of January 15, 2020, the athletes this will apply to are listed in the attached confidential **Exhibit A**.

Future Contracts secured by Contractor
- FSM receives 75% of compensation due and owing under any contract Contractor negotiates and secures
- Contractor receives 25% of compensation due and owing under any contract Contractor negotiates and secures on behalf of FSM.

1

Zokaei
Exhibit
**12** Page 11
3 August 2021

In addition, $50,000.00 (of which $10,000 was advanced on December 17, 2019 and secured by a Promissory Note executed the same date (the "2019 Promissory Note") shall be advanced after execution of all agreements required to be signed by Contractor (the "Signing Advance"). The Signing Advance shall be paid back at 0% interest for the first 12 months, after which such remaining Signing Advance that has not been repaid shall accrue interest at 8% per annum, as will be formally memorialized and secured by a second Promissory Note securing payment of the remaining $40,000.00 (the "2020 Promissory Note"). Such repayment of the Signing Advance past the first 12 months may be drawn from any income Contractor receives while under contract with FSM.

5. **Expenses**. Contractor will also be provided with an expense allowance of $5,000.00 per month, which expenses shall be recovered by Company before any potential bonus to Contractor is paid. Such expenses shall be calculated on a rolling basis and subject to an annual adjustment on December 31st of each year.

6. **Bonus**. [Bonus structure to be provided by Matt Fossey].

7. **Relationship**:  The Parties agree that this Agreement does not create an employee-Company relationship and Contractor will remain an independent contractor.

8. **Confidentiality**. Contractor acknowledges and agrees that he will be disclosed, and Company agrees to disclose, confidential information of Company to which Contractor would not have access except for employment with Company. This confidential information includes, but is not limited to, client information and preferences, specific client product orders and needs, including the rates they pay, marketing information, pricing formulas, pricing strategies, Contractor compensation, research information, training materials, customer lists, customer contact information, and sales promotion information (collectively, the "Confidential Information"). This Confidential Information is a valuable, special and unique asset of Company used in its business to obtain a competitive advantage over its competitors.   Protection of such Confidential Information against unauthorized disclosure and use is of critical importance to Company in maintaining its competitive position.   Contractor will not, at any time during or after his employment by Company, make any unauthorized disclosures of the Confidential Information, or make any use thereof, except in the carrying out of his employment responsibilities with Company. Contractor acknowledges that Company's business operations are rapidly expanding and growing and that Company has invested considerable time, money and resources in establishing its business model and client base (the "Company's Business").

9. **Non-Disparagement**. In the event that the Contractor's employment with Company terminates and/or is terminated Contractor expressly agrees not to disparage Company in any public forum whether verbal, print or electronic, including but not limited to, websites, business bureaus, blogs, chats, newspapers, magazines, word-of-mouth, social groups, questionnaires, surveys, emails, radio and/or television. Contractor agrees to instruct all agents, servants, Contractors and affiliates to abide by the same.

10. **Right of First Refusal**. Contractor agrees that all business opportunities, which are offered to Contractor, or conceived by Contractor, either solely or jointly with others, which may be related to the Company's Business or capable of beneficial use by Company (as determined in the sole discretion of Company) shall be immediately disclosed to Company in writing.  Unless

2

Company rejects such opportunity in writing; Contractor acknowledges and agrees that he or she shall have no right or authority to pursue such opportunity. Contractor acknowledges and agrees that Company provides the opportunities and the resources for Contractor to initiate, establish and/or develop contacts and relationships within the Company's Business.  Further, Company will provide training and other guidance to provide Contractor with the ability to create and/or enhance opportunities in the Company's Business.  All goodwill and other benefits (collectively, the "Goodwill") derived from such efforts described in this paragraph shall inure solely to the benefit of Company.  Contractor recognizes that the Goodwill is a valuable asset of Company.  Contractor acknowledges that, in exchange for the covenants and considerations described herein, Contractor agrees to refrain from using the Goodwill for the benefit of any other person or entity other than for the benefit of Company and in furtherance of his employment duties with the Company. Contractor acknowledges that he has a duty of loyalty to Company.  Contractor hereby acknowledges that such duty of loyalty is a contractual duty, the breach of which will subject Contractor to liability to Company, including, without limitation, Company's attorneys' fees and costs if Company pursues any claim arising from such breach.

11. **Non-Solicitation**. During the period Contractor is employed by Company and in the event that the Contractor's employment with Company terminates, the Contractor acknowledges that he does not have the right to, and shall refrain from:

   i.      soliciting any client of Company that Contractor did not have a prior relationship with or otherwise attempt to induce any such client to discontinue or reduce its relationship with Company;

   ii.     render advice or services to, or otherwise accept any business from, any current clients of Company that Contractor did not have a prior relationship with or otherwise attempt to induce any such client to discontinue or reduce its relationship with Company;

   iii.    render advice or services to, or otherwise assist, any other person, associate or entity who is engaged, directly or indirectly, with the solicitation of any clients of Company with whom Contractor did not have a prior relationship with; and/or

   iv.     induce any employee of Company to terminate or limit his or her employment with Company, or hire or assist in the hiring of any such Contractor by any person, association or entity not affiliated with Company.

**IF CONTRACTOR BREACHES ANY PROVISIONS OF SECTION 11(i) – (iv) ABOVE, THEN BECAUSE DAMAGES ARISING FROM SUCH BREACH ARE DETERMINABLE, BUT HARD TO ACERTAIN, CONTRACTOR SHALL PAY TO THE COMPANY, AS LIQUIDATED DAMAGES AND NOT AS PENALTY, A SUM EQUAL TO: (1) $50,000.00 FOR EACH BREACH OF SECTION 11(i); (2) $20,000 FOR EACH BREACH OF SECTION 11(ii); (3) $30,000.00 FOR EACH BREACH OF SECTION 11(iii); AND (4) $40,000.00 FOR EACH BREACH OF SECTION 11(iv). THE PARTIES EACH ACKNOWLEDGE AND AGREE THAT IT IS DIFFICULT OR IMPOSSIBLE TO DETERMINE WITH PRECISION THE AMOUNT OF DAMAGES**

3

**THAT WOULD OR MIGHT BE INCURRED BY THE COMPANY FOR A VIOLATION OF SECTIONS 11(i) – (iv) AND THAT THE AMOUNTS OF DAMAGES SET FORTH HEREIN IS FAIR AND REASONABLE COMPENSATION FOR SUCH LOSS.**

In the alternative, and only if Company chooses, at its sole discretion, to forgo enforcement of the Liquidated Damage provision as set forth above, then Company shall be entitled to, in addition to any other remedy it may have (exclusive of liquidated damages), injunctive relief for the enforcement of any provision in Section 11, including Section (i)-(iv). Contractor agrees that his breach of this Agreement will result in immediate and irreparable damage to Company such that Company could not be adequately compensated by an award of monetary damages, and in the event of any threatened or actual breach, Company shall be entitled to an injunctive order appropriately restraining and/or prohibiting such breach without the necessity of Company posting bond or other security. Pursuit of any remedy by Company except as otherwise expressly set forth in this Section, shall not constitute a waiver of any other right or remedy by Company under this Agreement or under applicable law.

12. **Non-Compete.** During the period Contractor is employed by Company and for two (2) years thereafter, Contractor agrees that he or she will not, directly or indirectly, engage in or work for any business engaging in, any activities similar or otherwise competitive with the business, services, and/or activities of Company including but not limited to the sports agency business and the marketing, promotion, or management of any professional athlete, whether currently signed with a professional sports franchise or seeking such contract. It is further understood that Contractor shall not use any work-product created by Company or while Contractor was under contract with Company for any period of time after the termination of this Agreement. Notwithstanding the foregoing list or subsequent descriptions, it is expressly understood and agreed that Company has, and reserves the right to amend both the list and/or descriptions of the services and/or activities covered by the non-compete clause from time to time, as it deems necessary.

13. **Miscellaneous**.

    (i)     It is the desire and intent of the parties that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies applied in the applicable jurisdiction, and in Texas, namely, Sections 15.50 and 15.51 of the Texas Business and Commerce Code. Accordingly, if any particular provision of this Agreement shall be adjudicated to be invalid or unenforceable, it is the specific intent and agreement of the parties hereto that such provision shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable. In addition, if the scope of any restriction or covenant contained in this Agreement is too broad to permit enforcement thereof to its fullest extent, then it is the specific intent and agreement of the parties that such restriction or covenant shall be enforced to the maximum extent permitted by law, and Company and Contractor hereby consent and agree that such scope shall be judicially modified accordingly in any proceeding brought to enforce such restriction.

4

(ii)    In the event Company is required to pursue legal action to enforce all or any part of this Agreement, Contractor shall be responsible for all reasonable attorneys' fees and court costs incurred by Company, in addition to any other remedies allowed by law or in equity.

(iii)   Contractor acknowledges and agrees that the benefits and consideration contained in this Agreement (including, without limitation, the disclosures and access to Confidential Information and the training, support and guidance to be provided by Company as described herein) are unique and valuable and in support of the restrictive covenants and other agreements being created hereby between Contractor and Company. Specifically, Contractor would not otherwise be entitled to such benefits and consideration, except for his or her employment by Company and the execution of this Agreement. These factors were of critical importance to Contractor, without which Contractor would not have entered into this Agreement. Likewise, the restrictive covenants and other agreements made by Contractor herein are of critical importance to Company, without which Company would not have entered into this Agreement. The parties acknowledge and agree that the benefits and considerations given Contractor hereunder and the restrictive covenants and other agreements given by Contractor hereunder are ancillary to and support each other.

(iv)    Upon termination of the Contractor's contractual relationship with Company, for any reason, or upon the demand by Company, at any time, Contractor shall return all Confidential Information in his or her possession or control to Company, including, without limitation, all copies thereof or notes or memoranda derived therefrom. If any Confidential Information is stored electronically or magnetically, Contractor shall erase and delete all copies.

(v)     Contractor agrees to inform any future prospective Company of the terms and conditions of this Agreement. If Company receives information that Contractor has accepted employment with another Company in violation of this Agreement, or if Company receives information that Contractor has received an offer with another Company that upon acceptance would violate the terms and conditions of this Agreement, then Company has express authority and permission to deliver a copy of this Agreement to such other Company to confirm Company's rights and Contractor's restrictive obligations

(vi)    Upon termination of this Agreement, Company shall promptly, on a prospective basis, discontinue using Contractor's name, biography and/or likeness in its advertising and promotional materials.

(vii)   The provisions of this, Section 12 shall survive termination and remain in full force and effect to the extent allowed by law.

**14. No Conflict.** Contractor confirms that he is able to carry out the work that this job involves without breaching any legal restrictions on his activities, such as restrictions imposed by a current or former Company. Contractor also confirms that he will inform Company about any such restrictions and provide Company with as much information about them as possible, including any agreements between his and his current or former Company describing such restrictions on his activities. Contractor further confirms that he has not removed or taken any documents or proprietary data or materials of any kind, electronic or otherwise, with his from

5

his current or former Company to Company without written authorization from his current or former Company.

15. **Governing law**: This agreement shall be governed by and construed under the laws of the State of Texas.

16. **Entire agreement**:  This is the entire agreement between Company and Contractor relating to the subject matter herein and supersedes any prior agreements, written or oral.

17. **Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[Signatures on Following Page]

6

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed effective on the date and year first written above.

**CONTRACTOR:**

By: _____

Name:        Mayar Zokaei

Position:    Vice-President of Basketball
             Operations


**COMPANY:**

FUNDAMENTAL SPORTS MANAGEMENT, LLC,
a Texas limited liability company


By: _____

Name: Rahul B. Patel

Title:   Managing Member

7

<u>**C**ONFIDENTIAL</u>

<u>**Exhibit A**</u>

**<u>Current Clients</u>**
1. Mitchell Robinson
2. Kenny Wooten
3. Ayinde Sprewell
4. Torren Jones
5. Desonta Bradford
6. Joshua Smith

**<u>Current Pipeline</u>**
1. Trae Young
2. Nassir Little
3. Coby White
4. Obi Toppin
5. Tyrese Haliburton
6. Melvin Frazier
7. Dennis Smith Jr.
8. Udoka Azubuike



1

# EXHIBIT B-17

| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>Filing Fee: $300 | <br>**Certificate of Formation<br>Limited Liability Company** | **Filed in the Office of the<br>Secretary of State of Texas<br>Filing #: 802747419 06/16/2017<br>Document #: 744927150002<br>Image Generated Electronically<br>for Web Filing** |

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

## Fundamental Sports Management, LLC

### Article 2 – Registered Agent and Registered Office

☑A. The initial registered agent is an organization (cannot be company named above) by the name of:

## Patel Gaines, PLLC

**OR**

☐B. The initial registered agent is an individual resident of the state whose name is set forth below:

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**14414 Blanco Road**
**Ste 320  San Antonio  TX  78216**

### Consent of Registered Agent

☐A. A copy of the consent of registered agent is attached.

**OR**

☑B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☐A. The limited liability company is to be managed by managers.

**OR**

☑B. The limited liability company will not have managers. Management of the company is reserved to the members. The names and addresses of the governing persons are set forth below:

| Managing Member 1: **Rahul  B  Patel** | Title: **Managing Member** |
|---|---|
| Address: **14414 Blanco Road  Ste. 320  San Antonio  TX, USA  78216** | |
| Managing Member 2: **Nicolas    LaHood** | Title: **Managing Member** |
| Address: **14414 Blanco Road  Ste. 320  San Antonio  TX, USA  78216** | |
| Managing Member 3: **Grant  M  Gaines** | Title: **Managing Member** |
| Address: **14414 Blanco Road  Ste. 320  San Antonio  TX, USA  78216** | |

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

Zokaei
Exhibit
**17**
3 August 2021

**Supplemental Provisions / Information**

[The attached addendum, if any, is incorporated herein by reference.]

### Organizer

The name and address of the organizer are set forth below.

**Rahul B. Patel**          **14414 Blanco Road, Ste 320, San Antonio, Texas 78216**

### Effectiveness of Filing

☑A. This document becomes effective when the document is filed by the secretary of state.

### OR

☐B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Rahul B. Patel**

Signature of Organizer

**FILING OFFICE COPY**

# EXHIBIT B-19

# Registered Envelope Service

 

## OUTGOING WIRE NOTICE [send secure]

SB    **SECURITY BANK <DoNotReply@MYSBANK.COM>**
      06/24/2020 02:00:29 PM CDT
      To: TGAINES@PATELGAINES.COM, GGAINES@PATELGAINES.COM

DEAR SECURITY BANK CUSTOMER

      SECURITY BANK 6/24/20
MIDLAND, TX 79701
NOTICE OF WIRE TRANSFER

Funds in the amount of $ 5,000.04 have been wired to
Sona Shafiee
from account 4197542

Transfer fee.......$10.00
20200624 000006


FUNDAMENTAL SPORTS MANAGEMENT LLC
2030 N LOOP 1604 W STE 200
SAN ANTONIO TX 78248



E-BANKING DEPARTMENT

**\*\*\*This is an automated email. Please do not respond to this email\*\*\***

Zokaei
Exhibit
**19**
3 August 2021

file:///private/var/folders/jz/hhjmr5d15ml11_5r01t9bn2h0000gr/T/com.microsoft.Outlook/Outlook%20Temp/securedoc_20200624T190029.html          Page 1 of 1

Page 128

# EXHIBIT B-20

# Fundamental Sports Management

## TRANSACTION REPORT

### January - December 2020

| DATE | TRANSACTION TYPE | NUM | ADJ | NAME | MEMO/DESCRIPTION | ACCOUNT | SPLIT | AMOUNT | BALANCE |
|------|------------------|-----|-----|------|------------------|---------|-------|--------|---------|
| **Contractors and Employment** | | | | | | | | | |
| 01/21/2020 | Expense | | No | Mayar Zokaei | Wire Transfer Debit Mayar Zokaei | Contractors and Employment | FSM Operating | 6,250.00 | 6,250.00 |
| 01/31/2020 | Expense | | No | Mayar Zokaei | Wire Transfer Debit Sona Shafiee | Contractors and Employment | FSM Operating | 6,250.00 | 12,500.00 |
| 02/04/2020 | Expense | | No | Mayar Zokaei | Wire Transfer Debit Sona Shafiee | Contractors and Employment | FSM Operating | 40,000.00 | 52,500.00 |
| 02/14/2020 | Expense | | No | Mayar Zokaei | Wire Transfer Debit Sona Shafiee | Contractors and Employment | FSM Operating | 6,250.00 | 58,750.00 |
| 02/28/2020 | Expense | | No | Mayar Zokaei | Wire Transfer Debit Sona Shafiee | Contractors and Employment | FSM Operating | 6,250.00 | 65,000.00 |
| 03/16/2020 | Expense | | No | Mayar Zokaei | Wire Transfer Debit Sona Shafiee | Contractors and Employment | FSM Operating | 6,750.00 | 71,750.00 |
| 04/01/2020 | Expense | | No | Mayar Zokaei | Wire Transfer Debit Sona Shafiee | Contractors and Employment | FSM Operating | 6,250.00 | 78,000.00 |
| 04/14/2020 | Expense | | No | Mayar Zokaei | Wire Transfer Debit Sona Shafiee | Contractors and Employment | FSM Operating | 6,250.00 | 84,250.00 |
| 06/24/2020 | Expense | | No | Mayar Zokaei | Wire Transfer Debit Sona Shafiee | Contractors and Employment | FSM Operating | 5,000.00 | 89,250.04 |
| **Total for Contractors and Employment** | | | | | | | | **$89,250.04** | |
| **TOTAL** | | | | | | | | **$89,250.04** | |

Zokaei
Exhibit
**20**   Page
3 August 2021
30