IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| FUNDAMENTAL SPORTS MANAGEMENT, LLC, RAHUL PATEL, ROE-BRG INVESTMENTS, LLC, | § § § § | |
| *Plaintiffs,* | § § | 5-20-CV-00774-RBF |
| vs. | § § | (Consolidated with 5-20-CV-00775) |
| MAYAR ZOKAEI, | § § § | |
| *Defendant.* | § § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Before the Court is the above-captioned cause of action, in which the parties consented to the jurisdiction of a United States Magistrate Judge. *See* Dkt. Nos. 46, 47. On November 14, 2022, the parties and counsel appeared before the Court for a bench trial on all live claims.[1] Pursuant to Federal Rule of Civil Procedure 52(a) and 28 U.S.C. § 636(c)(1), and upon consideration of the evidence presented at trial, the arguments of counsel, and the parties' proposed findings of fact and conclusions of law, *see* Dkt. Nos. 84, 85, the Court issues the following findings of fact and conclusions of law.

**Findings of Fact**

After applying the applicable burden of proof, whether preponderance of the evidence or by clear and convincing evidence, the Court finds that the following facts have been established:

1. Plaintiff Fundamental Sports Management, LLC ("FSM"), was formed on June 16, 2017, with a registered business address in San Antonio. The original managing members of FSM consisted of Plaintiff Rahul Patel, Grant Gaines, and Nicolas LaHood. In November

---

[1] Pursuant to a stipulation filed April 11, 2022, the parties waived their rights to a jury trial and agreed to proceed with a trial to the bench. *See* Dkt. No. 56.

of 2018, LaHood was removed as a managing member and Gaines's interest in FSM was transferred to Plaintiff ROE-BRG Investments, LLC, of which Gaines is the sole member. At all relevant times, Patel, Gaines, and LaHood were citizens of Texas.[2] FSM realized no profits from when it was founded through the end of 2019.

2. Defendant Mayar Zokaei was at all relevant times a citizen of Oregon. Zokaei was a player agent or representative certified by the National Basketball Players Association ("NBPA") since at least December 2019 and at all relevant times through trial. Prior to the events that formed the basis of this dispute, Zokaei had active agent agreements for several professional basketball players, including Mitchell Robinson of the New York Knicks.

3. In early December 2019, Zokaei reached out to FSM to express interest in joining FSM as an agent. Zokaei assisted one of FSM's clients by getting their Twitter account verified. Throughout December, Zokaei and Patel, on behalf of FSM, engaged in negotiations for the purposes of hiring Zokaei as an independent contractor. In addition to his current client list, Zokaei indicated aspirations to sign an agent agreement with Trae Young of the Atlanta Hawks.

4. On December 17, 2019, FSM loaned Zokaei $10,000.00 pursuant to a promissory note, intended to cover expenses associated with servicing his existing clients and engaging new clients.

5. On January 31, 2020, Patel on behalf of FSM sent Zokaei a draft independent contractor agreement for his input, as well as a draft purchase agreement and a draft confidentiality and non-disclosure agreement. Patel stated at the time that the drafts were "basically final

---

[2] FSM identifies multiple additional members in the Second Amended Joint Pretrial Order, dated April 12, 2022, but none are citizens of Oregon. *See* Dkt. No. 59 at 1 & n.1.

other than the bonus structure," and that FSM had agreed to a $150,000 salary and "already paid January prior to this agreement." Dkt. No. 79, Ex. 7. FSM's records indicate that Zokaei was paid $6,250.00 on January 21 and that same sum again on January 31. Dkt. No. 79, Ex. 11.

6. The draft independent contractor agreement contained a large "DRAFT" watermark and several terms remained blank, including the agreement's effective date, annual salary, and bonus structure. The agreement was never signed. But the draft did contain completed sections titled "Hiring" and "Term," stating that Zokaei "has been hired by [FSM] effective February 1, 2020 to serve as the Vice-President of Basketball Operations," and would be employed as a contractor from that date "for a period of one-year, renewable annually at the sole discretion of FSM." Dkt. No. 79, Ex. 6 at 1.

7. As early as February 1, and at least before March of 2020, Zokaei was issued an FSM email account and used a signature block on his emails identifying himself as "VP of Basketball Operations" at FSM. Dkt. No. 79, Ex. 5. Zokaei also began receiving bimonthly payments of $6,250.00. Patel and FSM did not object to these developments.

8. On February 4, FSM loaned Zokaei $40,000.00 pursuant to a second promissory note. The purpose of this loan was again to service Zokaei's existing clients and to engage new clients, particularly Trae Young.

9. On or around February 7, basketball player Mitchell Robinson terminated Zokaei as his agent. Zokaei contacted Patel upon learning of his termination and explained that he had no idea why it happened.

10. On February 10, Zokaei traveled to San Antonio and personally met with Patel and others at FSM for the first and only time while working with FSM. At all other relevant times, Zokaei worked remotely and without direct supervision.

11. Zokaei and others from FSM attended the NBA All-Star weekend in Chicago, Illinois, between February 14 and 16. Over that weekend, Zokaei attended lunch with the father of Trae Young, who according to Zokaei was also acting as his handler. Although Zokaei made efforts over the weekend to sign Trae Young as a client, those efforts were ultimately unsuccessful.

12. On March 11, Zokaei emailed FSM and Patel indicating a desire to finalize the draft agreements while requesting a change to the draft language for one item. Zokaei's question did not pertain to the draft independent contractor agreement.

13. Throughout this time, Zokaei continued to seek out new clients for FSM and succeeded in signing several agent agreements. FSM continued to pay Zokaei $6,250.00 bimonthly.

14. Around April 18, Patel received information that FSM had been erroneously listed on the website RealGM.com as the agent for Keldon Johnson of the San Antonio Spurs. Patel also received a message alleging that Zokaei was linked to several bogus social media accounts.

15. On April 20, Patel called Zokaei to inform him that he would be terminated. Patel did not supply a reason for the decision, other than that there was no "chemistry," but he indicated an openness to working together in the future.

16. In July of 2020, after Zokaei's termination, FSM signed an agent agreement with Keldon Johnson. FSM's professional relationship with Keldon Johnson continued until around November of 2021. FSM dissolved at some point after then.

17. Zokaei continues to be a licensed NBPA agent with several clients. Zokaei has never been investigated for any alleged violations of NBPA rules.

## Conclusions of Law

Based on the parties' briefing and arguments raised at trial, the Court makes the following conclusions of law:

*Pretrial Matters*

1. The Court previously granted partial summary judgment on FSM's two promissory notes to Zokaei. *See* Dkt. No. 28. The Court does not disturb that ruling based on new arguments raised at trial, and Zokaei remains liable for the amount stated in the Court's Order.

2. The parties stipulated to dismissal of certain claims both at the Final Pretrial Conference and at trial. Accordingly, the Court dismisses pursuant to the parties' representations, the following causes of action asserted by FSM[3]: tortious interference with contract; Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code § 134A; Computer Fraud and Abuse Act, 18. U.S.C. § 1030; Defense Trade Secret Act, 18 U.S.C. § 1832 *et seq.*; and harmful access by computer, Tex. Civ. Prac. & Rem. Code § 143.001. *See* FSM Compl. ¶¶ 35-36, 39-48; Dkt. No. 1. The Court also dismisses Zokaei's claims under the Fair Labor Standards Act, 29 C.F.R. § 790.21, and all claims against individual plaintiffs

---

[3] Plaintiff ROE-BRG does not independently assert any claims against Zokaei aside from the collective request for declaratory judgment on Zokaei's contract claims. *See* FSM Compl. ¶¶ 50-52. Plaintiff Patel joins FSM in asserting claims against Zokaei for fraud and breach of contract, in addition to the request for declaratory judgment. *See* FSM Compl. ¶¶ 28-31, 50-52. FSM and Patel also seek exemplary damages. *See* FSM Compl. ¶ 53. For convenience, and because Plaintiffs Patel and ROE-BRG have not asserted any independent bases to obtain relief aside from their status as members of FSM, the Court refers to Plaintiffs collectively as "FSM" below.

other than FSM. *See* Zokaei Compl. ¶¶ 26-33; Dkt. No. 1, Ex. B (5-20-CV-00775). The remaining claims are discussed below.

*Applicable Law*

3. The Court has jurisdiction over this case by virtue of complete diversity between the parties and an amount in controversy that is over the required threshold to support exercise of diversity jurisdiction. *See* Dkt. No. 1; 28 U.S.C. § 1332.

4. "A federal court sitting in diversity applies the substantive law of the forum state." *Learmonth v. Sears, Roebuck & Co.*, 710 F.3d 249, 258 (5th Cir. 2013). The parties agree that Texas law applies to all claims asserted here.

*Contract Claims*

FSM Compl. ¶¶ 30-31, 50-52 (breach of contract and declaratory judgment)

Zokaei Compl. ¶¶ 18-25 (wrongful termination and breach of contract)

5. The elements of a valid contract under Texas law are: "(1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *DeClaire v. G & B Mcintosh Fam. Ltd. P'ship*, 260 S.W.3d 34, 44 (Tex. App. 2008). "The elements of a contract, express or implied, are identical" under Texas law, and the primary distinction between the two "is in the character and manner of proof required to establish them," which means that for implied contracts the elements are "inferred from the circumstances." *Plotkin v. Joekel*, 304 S.W.3d 455, 476-77 (Tex. App. 2009) (quotations omitted). A party's signature on a contract may be "'strong evidence' that the party unconditionally assented to its terms," but a signature is not essential, and unconditional

assent can be shown through subsequent conduct. *In re Citgo Petroleum Corp.*, 248 S.W.3d 769, 774 (Tex. App. 2008).

6. The elements for breach of contract are: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex. App. 2001) (emphasis removed); *accord Electrostim Med. Servs., Inc. v. Health Care Serv. Corp.*, 614 F. App'x 731, 744 (5th Cir. 2015). Employment contracts are presumptively "at will" and thus "terminable at any time by either party, with or without cause, absent an express agreement to the contrary." *Ronnie Loper Chevrolet-Geo, Inc. v. Hagey*, 999 S.W.2d 81, 83 (Tex. App. 1999). This presumption "may only be rebutted by an agreement that directly limits, in a 'meaningful and special way,' the employer's right to terminate at will." *Id.*

7. The Court does not find that the draft independent contractor agreement is binding on the parties. As evidenced by the "DRAFT" watermark that was never removed, the numerous blanks remaining in the draft, and the fact that the parties never signed the agreement, the Court is unconvinced that there was any meeting of the minds as to every clause in the written draft agreement. Moreover, Zokaei asked for alterations in one of the three draft agreements as late as March 11, 2020. This is evidence that the parties' negotiations were ongoing, as FSM sent the three draft agreements to Zokaei as a set, and the testimony at trial established that the three draft agreements were interrelated.

8. Nonetheless, the Court does find that an implied contract between Zokaei and FSM did exist. The parties, as evidenced by their statements and conduct from January through

April of 2020, at the very least agreed to the following essential terms: that Zokaei would serve as the Vice President of Basketball Operations for FSM, that Zokaei would attempt to sign new professional basketball players as FSM's clients, that Zokaei would work remotely without direct supervision or set hours, and that Zokaei would receive a bimonthly salary of $6,250.00. In all other respects, the parties appear to have only agreed to continue to negotiate in good faith toward a final contract. And because the parties never expressly agreed to a full term, as is further evidenced by Zokaei's request for payment on services rendered in December of 2019, the implied contract was presumptively "at will." Zokaei has met his burden of proving the existence of an implied contract, but not as to all terms contained in the written draft.

9. Zokaei argues that FSM breached the contract by wrongfully terminating him without good cause prior to expiration of the alleged one-year term. But because the parties at most agreed to an implied at-will employment contract, FSM was free to terminate employment for no cause. Indeed, even the written draft agreement contained no clause explicitly addressing termination. Accordingly, FSM did not breach the parties' implied contract by terminating Zokaei on April 20, 2020.

10. FSM argues that even if the Court were to find that a binding contract existed, Zokaei breached that contract for various reasons, such as his failure to recruit high-level NBA players. But as noted above, the parties at most agreed that Zokaei would *attempt* to sign Trae Young and other basketball players. Zokaei fulfilled those expectations by, for example, meeting with Trae Young's alleged handler in Chicago. And Zokaei even signed several agent agreements for new clients while at FSM. FSM has not met its

burden of proving the existence of any terms to the implied contract that Zokaei breached.

### *Fraud Claims*

FSM Compl. ¶¶ 28-29 (misrepresentation and fraudulent inducement)

11. The elements of fraud under Texas law are: "(1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury." *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001).

12. Fraudulent inducement, which permits parties to avoid a contract, consists of the same elements as fraud but with the added requirement of "the existence of a contract." *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001). Barring special circumstances, statements of opinion or "mere puffery" are immaterial and not actionable in fraud. *GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 889 (Tex. App. 2008). Statements pertaining to future events can only support fraud if "the speaker purports to have special knowledge of facts that will occur or exist in the future." *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983).

13. FSM argues that Zokaei fraudulently misrepresented the likelihood of signing an agent agreement with Trae Young, and that those representations, among others, caused FSM to engage Zokaei as an independent contractor. But FSM identifies no material statements or representations by Zokaei that qualify as something other than opinions on future events or "mere puffery." None of Patel's testimony at trial establishes with the requisite specificity that Zokaei ever *materially* misrepresented his connections or

abilities. Indeed, Zokaei had lunch with Trae Young's alleged handler in Chicago, and he managed to sign several basketball players on FSM's behalf. Merely because the best-case scenario for FSM did not come to pass does not turn optimism or puffery into material misrepresentation. FSM has not bet its burden on the elements of fraud.

*Texas Deceptive Trade Practices Act ("DTPA")*

FSM Compl. ¶¶ 32-34

14. The elements of a DTPA claim are: "(1) the plaintiff is a consumer; (2) the defendant engaged in false, misleading, or deceptive acts; and (3) these acts constituted a producing cause of the consumer's damages." *Hugh Symons Grp., plc v. Motorola, Inc.*, 292 F.3d 466, 468 (5th Cir. 2002); *accord* Tex. Bus. & Com. Code § 17.50(a). The term "consumer" is defined as "an individual, partnership, [or] corporation, . . . who seeks or acquires by purchase or lease, any goods or services." Tex. Bus. & Com. Code § 17.45(4); *see also Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 815 (Tex. 1997).

15. Because FSM has not met its burden on fraud, it cannot seek recovery under the DTPA on a fraud predicate. FSM has not asserted any other violations of the DTPA other than those grounded in its fraud allegations. Nor has FSM sufficiently established any actual damages suffered due to Zokaei's alleged violations. Moreover, FSM has offered no real argument to show it is a "consumer," as that term is defined in the DTPA, as opposed to mere conclusory assertions. FSM has not met its burden.

*Breach of Fiduciary Duty*

FSM Compl. ¶¶ 37-38

16. The elements of a claim for breach of fiduciary duty are: "(1) a fiduciary relationship between plaintiff and defendant, (2) breach of the fiduciary duty, and (3) damages arising from the breach." *Davis-Lynch, Inc. v. Asgard Techs., LLC*, 472 S.W.3d 50, 60 (Tex. App. 2015). Texas courts are generally reluctant to impose a fiduciary duty on independent contractors barring the existence of some special relationship. *See id.* at 61.

17. FSM made no argument at trial relating to the asserted breach of fiduciary duty—this claim is therefore waived. Moreover, because FSM asserts throughout its briefing that Zokaei was an independent contractor,[4] it was FSM's burden to show the existence of some special relationship that created a fiduciary duty above and beyond Zokaei's status as an independent contractor. FSM has offered no such evidence and has not met its burden to show the existence of a fiduciary duty, much less any breach thereof or resulting damages.

*Defamation/Business Disparagement*

FSM Compl. ¶ 49

18. The elements of defamation are: "(1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages." *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015). Specific damages are not necessary if the statement is defamatory per se and thus "so obviously harmful that general damages may be presumed." *Id.*

---

[4] The Court does not purport to determine whether Zokaei was in fact an employee or an independent contractor at the time. Zokaei has waived his FLSA claims, and FSM has presented no argument on the issue.

19. The elements for business disparagement are: "(1) the defendant published false and disparaging information about [the plaintiff], (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff." *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003).

20. FSM alleges that Zokaei is behind a number of social media accounts. FSM bases this allegation on hearsay and rumor. Zokaei denies that he owns any of the accounts. Patel conceded at trial that he could have easily confirmed whether in fact Zokaei owned any of the social media accounts that posted the allegedly defamatory statements, but he never did so. Accordingly, FSM has not met its burden to establish that *any* of the allegedly defamatory statements are attributable to Zokaei. Moreover, FSM has not shown any specific damages stemming from the alleged statements, and FSM does not argue that any of the statements are defamatory per se. FSM has not met its burden.

## Conclusion

For the reasons stated above, the Court finds that an implied, at-will employment contract existed between the parties. But as to all remaining claims before the Court, the parties have not met their respective burdens to show they are entitled to any affirmative relief. The Court therefore **DENIES** all relief requested in the parties' respective complaints as to the remaining claims before the Court.

The Court additionally carried into trial two pending dispositive motions filed by FSM. *See* Dkt. Nos. 67, 68. FSM did not renew those motions at trial and has not moved for judgment as a matter of law. Accordingly, those motions, Dkt. Nos. 67, 68, are **DENIED**.

FSM is directed to file within 45 days from the date of these Findings of Fact and Conclusions of Law a motion for final judgment to include the issues above and payment of the

promissory notes, with adjustments for interest. The Court previously indicated that it may entertain a future motion for attorney's fees when it granted partial summary judgment on FSM's two promissory notes. *See* Dkt. No. 28 at 8. FSM is advised that any award of attorney's fees will be limited solely to fees connected to obtaining relief on the two notes. *See* Dkt. No. 26. Any such request for attorney's fees should be made in conformity with the Court's local rules. A fees request that doesn't conform to the local rules will be denied. The Court in its discretion declines to award costs or attorney's fees in all other respects. If FSM wishes the final judgment to include any attorney's fees award, rather than to have attorney's fees decided by a separate order, FSM should so indicate to the Court, and it should provide the appropriate fees motion and motion for entry of final judgment to the Court on a timeline that permits the Court to address both in a final judgment.

**IT IS SO ORDERED**.

SIGNED this 21st day of December, 2022.

_____
RICHARD B. FARRER
UNITED STATES MAGISTRATE JUDGE